# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  05-10057-RCL |
| | ) | |
| ABDUL RAZZAQUE AHMED, | ) | |
| | ) | |
| Defendant | ) | |

### UNITED STATES' REPLY BRIEF TO DEFENDANT'S OPPOSITION TO MOTION *IN LIMINE* TO ADMIT A STIPULATION INTO EVIDENCE

In the Defendant's Opposition To Government's Motion In Limine To Admit Into Evidence A Stipulation Entered Into By The Parties ("Opposition"), Ahmed argues, inter alia, that the now-executed Stipulation[1/] is irrelevant or, at most, conditionally relevant to the pending charges.  He further contends that certain statements within the Stipulation are protected by the attorney-client privilege.  He is wrong on both points. As discussed in both in the United States' Memorandum of Law in Support of Motion In Limine For Ruling Admitting Into Evidence A Stipulation Entered Into By The Parties ("Opening Brief") and below, the Stipulation sets forth facts that are directly relevant to one or more counts in the Indictment.  Moreover, as discussed below, none of the Stipulation's facts are protected by the attorney-client privilege for two reasons:  first, they pertain to matters that Ahmed and his counsel never intended to be kept confidential; and second, Ahmed and Attorney Egbert revealed the facts to third parties (i.e., representatives of the United States), thereby waiving any privilege that might otherwise have existed.

---

[1/]  The executed Stipulation and an Agreement concerning the execution of the Stipulation are attached hereto as Exhibits A and B, respectively.

# I. **BACKGROUND**

## A.     **The Indictment**

As the Opening Brief described, the Indictment charges Ahmed with a variety of crimes, including mail fraud, health care fraud, money laundering and obstruction of justice.  These charges arise out of two different, yet interconnected schemes:  (1) Ahmed's scheme to defraud the Medicare program; and (2) Ahmed's scheme to obstruct the Government's investigation into his Medicare billings.

The fraudulent Medicare scheme relates to Ahmed's practice of providing false information to Medicare in connection with his use of an extremely expensive drug, intravenous immunoglobulin ("IVIG").  This scheme involved Ahmed's submission of false diagnoses for patients who were suffering solely from a non-Medicare reimbursable disease (e.g., pemphigoid) to make it appear that the patients were also suffering from a different disease (e.g., pemphigus vulgaris) for which Medicare allowed reimbursement for IVIG treatments.

The obstruction scheme involved Ahmed's continued submission of false information to the United States after commencement of the investigation into Ahmed's billing practices.  As described in Count Twenty-One, Ahmed, after receiving an administrative subpoena requiring production of medical records pertaining to his IVIG treatments, caused the creation of false documents relating to patients who received those treatments and then caused those documents to be produced to federal criminal investigators.  Later, as discussed in Count Twenty-Two, Ahmed caused other false documents to be presented to the United States through Attorney Egbert, his retained counsel.  These false documents consisted of blood test results that were obtained through the surreptitious mixing of blood sera samples from various patients, thereby

resulting in test results that falsely indicated that certain patients were suffering from both pemphigoid and pemphigus.

### B. Negotiations Pertaining to the Stipulation

As detailed in the earlier Memorandum in Support of the United States' Motion to Disqualify Richard M. Egbert, Esq., as Trial Counsel, filed on September 1, 2005, Attorney Egbert's presentation of false documents on behalf of Ahmed is at the heart of the obstruction counts. Counsel for the United States discussed the fact that the United States intended to call Attorney Egbert as a witness on the obstruction counts at Ahmed's initial appearance. See Declaration of Assistant U.S. Attorney James Arnold, filed on September 1, 2005, at Ex. D, p. 9. In an effort to forestall the need to file a disqualification motion and in reliance upon Attorney Egbert's assertion that the disqualification issue could be resolved by a Stipulation, the United States forwarded draft Stipulations to Attorney Egbert. After receiving no initial response to the draft Stipulations, the United States filed a Motion to Disqualify Attorney Egbert, which was set for hearing at 2:00 p.m. on September 26, 2005.

At approximately noon on September 26, counsel for the United States and Attorney Egbert met at the courthouse and discussed, edited and arrived at tentative agreement on the Stipulation. Later that afternoon, counsel for the parties reported this to the Court, which suspended consideration of the disqualification motion. Shortly thereafter, counsel for the United States sent Attorney Egbert a typewritten redraft and Attorney Egbert's handwritten mark-up of the Stipulation. See Ex. C attached hereto.

At a subsequent hearing held on November 15, 2005, relating to the United States' renewed motion to disqualify counsel, Attorney Egbert relied upon this negotiated Stipulation as

grounds not to be disqualified as counsel.  Attorney Egbert, with Ahmed present at counsel table, acknowledged in open court that the facts in the Stipulation were truthful.  At the same time, however, Attorney Egbert suggested that he wanted to reserve the right to object to the admissibility of the Stipulation.  Hearing Transcript (attached hereto as Ex. D) at p. 8 ("I agreed that I would stipulate, for example, Dr. Ahmed knew such and such or gave me such and such as a true fact, but not it's [sic] admissibility"); p. 31 ("I'm stipulating as to what facts occurred.  I agree with that, without waiving the privilege as to those facts or any of the facts in the stipulation.").

Thereafter, the parties entered into an Agreement relating to execution of the Stipulation. See Exhibit B.  In that Agreement, the United States agreed not to argue that Ahmed's act of signing the Stipulation (which act constituted an acknowledgment of the accuracy of the facts set forth in the Stipulation) represented a waiver by Ahmed of any otherwise applicable privileges or protections that he may possess with respect to any factual representations contained within the Stipulation.  In return, Ahmed understood and agreed that the United States reserved all of its arguments in support of the Stipulation's admission at trial and/or in connection with a motion in limine pertaining to the Stipulation.

## II. ARGUMENT

This Court should not countenance Ahmed's attempt to use the Stipulation both as a sword and a shield.  Initially, Ahmed used the Stipulation to fend off the United States' motion for disqualification.  Ahmed pointed to the Stipulation and his willingness to enter into the Stipulation as grounds why Attorney Egbert should not be disqualified.  Now, after successfully

defeating the United States' disqualification motion using the Stipulation, Ahmed argues that the same Stipulation is not admissible at trial.

This gambit, however, is without substance.  The Stipulation at issue was the product of open negotiation and agreement between the parties.  Attorney Egbert openly acknowledged the accuracy of the Stipulation, both during the negotiations and later in Court.  The facts set forth in the Stipulation are directly relevant to the conduct set forth in the obstruction counts and are not privileged.  Accordingly, the Stipulation should be admitted in its entirety.

A.      **The Stipulation is Relevant to the Obstruction Counts**

Contrary to Ahmed's assertions, the facts established by the Stipulation are relevant to the factual allegations contained within the Indictment.  Indeed, as discussed in the United States' Opening Brief, many of the facts set forth in the Stipulation go directly to the conduct that forms the bases of various counts of the Indictment.

1.      **There is a direct nexus between the Stipulation and the conduct underlying Counts Twenty-One and Twenty-Two**

In arguing against the relevance of the facts set forth in the Stipulation, Ahmed focuses entirely upon issues pertaining to his intent.  In so doing, Ahmed ignores the fact that the vast majority of the Stipulation goes directly to establishing **the conduct** alleged in the two obstruction counts.  Due to his misdirected focus, Ahmed fails to address the evidentiary nexus between the Stipulation and the conduct underlying Counts Twenty-One and Twenty-Two.

a.      **Count Twenty-One**

A simple comparison of the charges set forth in Count Twenty-one and Paragraphs 1 through 4 of the Stipulation reveals a direct and immediate connection between the Indictment's allegations and the Stipulation's facts.  Count Twenty-One charges that, on June 15, 2000,

5

Ahmed was served with a subpoena in a federal health care fraud investigation.  Indictment, ¶ 37.  Count Twenty-One further charges that Ahmed sought to prevent, obstruct, mislead, and delay the investigation through the creation of false documents that were then produced to federal agents involved in the health care fraud investigation.  Id., ¶ 38.

Paragraphs 1 through 4 of the Stipulation concern these allegations and establish several of the alleged facts.  For example, in Paragraph 1, Ahmed stipulates that June 15, 2000, was, in fact, the date on which he was served with a health care fraud subpoena.  Similarly, in paragraph 4, Ahmed stipulates that he was aware of an ongoing criminal investigation involving whether he was engaged in proper Medicare billing practices with respect to patients who were diagnosed with pemphigus and/or pemphigoid.

Paragraphs 2 and 3 of the Stipulation provide further evidentiary detail directly related to the allegations contained in Count Twenty-One.  Paragraph 2 describes the types of documents sought by the subpoena served on Ahmed on June 15, 2000.  Paragraph 3 establishes that the subpoenaed documents were sought in connection with an investigation of a Federal health care offense.  Paragraph 3 of the Stipulation also establishes certain of the conduct alleged in Count Twenty-One -- namely that Ahmed caused various documents to be produced through his retained counsel (Attorney Egbert) in response to the subpoena:

> Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

Stipulation, ¶ 3.

b.    **Count Twenty-Two**

Similarly, there is a direct relationship between the conduct alleged in Count Twenty-Two and the facts set forth in the Stipulation.  Count Twenty-Two charges that, on or about October 25, 2001, Ahmed attempted to obstruct an ongoing health care fraud investigation by causing false documents to be prepared and produced through his retained counsel to federal officials conducting a health care fraud investigation.  Indictment, ¶ 40.

As with Count Twenty-One, there is a direct evidentiary nexus between the conduct charged in Count Twenty-Two and the facts set forth in the Stipulation.  Paragraphs 5 and 6 of the Stipulation explain that on or before the date alleged in Count Twenty-Two, Ahmed provided a chart to his counsel (Attorney Egbert) and authorized counsel to present this chart to, and discuss this chart with, federal prosecutors and agents who were investigating his Medicare billing practices.  Paragraph 7 details the facts pertaining to the October 25, 2001, meeting that forms the basis of Count Twenty-Two.  Paragraph 7 further discusses the actual production of the records by counsel (Attorney Egbert) that are alleged in Count Twenty-Two to be false and fraudulent.  Additionally, paragraph 7 sets forth statements made by counsel (Attorney Egbert) with Ahmed's authorization in connection with the production of those records:

> 7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and two federal agents.  One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service.  The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed.  During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with the binders attached hereto as Exhibit __.  Included in these binders was the chart.  With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis" of

pemphigus and pemphigoid.  Defendant Ahmed's attorney further stated on
behalf of defendant Ahmed that reimbursement from Medicare for intravenous
immunoglobulin treatments was permitted as a result of these "dual diagnoses"
and that defendant Ahmed had not defrauded Medicare.

Stipulation, ¶ 7.

### 2.    <u>The United States need not make any conditional relevance showing in order to introduce the Stipulation.</u>

Admission of the facts set forth in the Stipulation is not, as Ahmed suggests, contingent

upon the admission of other facts.  Proof to establish criminal liability takes many forms -- some

evidence may be introduced to establish the actual conduct that has been charged, whereas other

evidence may be admitted to establish a defendant's intent.  Simply put, there is no "order of

proof" requirement requiring that evidence of intent be introduced before evidence of conduct is

admissible.  Defendant's argument is akin to suggesting that in a murder case, the Government

must establish a defendant's *mens rea* before the Government may introduce evidence of the

defendant's actual involvement in the shooting of the victim.  There is, of course, no such

requirement under the law.[2]

Regardless of what evidence the United States introduces at trial concerning Ahmed's

criminal intent with respect to Counts Twenty-One and Twenty-Two, there can be no real

dispute as to whether the Stipulation establishes facts directly and intimately related to the

conduct charged in the obstruction counts.  It is this direct nexus between the Stipulation and the

---

[2] Defendant's effort to force an evidentiary hearing by means of a "conditional
relevance" argument is unavailing.  The United States also notes that Defendant's Opposition
argues at some length that the crime fraud exception to the attorney-client privilege does not
apply here.  In that argument, he also appears to press for an evidentiary hearing.  As part of this
Motion <u>In Limine</u>, the United States has elected not to press a crime-fraud argument, thereby
obviating the need for an evidentiary hearing.

conduct charged in the Indictment that renders inapposite Ahmed's reliance upon United States v. Wilson, 798 F.2d 509, 515-16 (1st Cir. 1986),[3] and Tate v. Robbins & Myers, Inc., 790 F.2d 10, 11-12 (1st Cir. 1996).

Indeed, if anything, Tate supports a finding of admissibility.  Tate concerned a party's claim that an equipment manual published in 1980 was admissible in a products liability case involving a piece of equipment manufactured in 1943.  Plaintiff sought to introduce the manual, arguing that it was relevant to his claim that the manufacturer had violated its continuing duty to warn.  The court upheld the district court's refusal to introduce the manual, noting that there was no evidence that the manufacturer knew that plaintiff's employer owned the equipment.  Id., at 12.  Significantly, however, the First Circuit specifically noted that had there been evidence that the manufacturer knew about the employer's purchase of the equipment, then "the question of the relevancy of the 1980 Manual would have been for the jury."  Id., at 12 n.1.

Here, there is no doubt as to Ahmed's knowledge of the ongoing investigation at the time of the acts in question.  By virtue of Ahmed being served with a subpoena requiring production of various medical records, see Stipulation ¶¶1-3, it was evident that:

> By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

See id., ¶ 4.  Thus, even under Tate, the Stipulation is relevant and admissible.

---

[3] In Wilson, the First Circuit upheld the district court's refusal to allow a defendant to introduce evidence pertaining to actions taken years after the charged conduct when there was no evidence to tie those subsequent acts to his intent at the time of the offense.

**B.**     **The Second Circuit's Decision in United States v. Valencia Is Neither Binding Nor Applicable in This Case.**

Nowhere in his Opposition does Ahmed dispute the United States' position in its Opening Brief that counsel's statements and production of documents as set forth in the Stipulation meet the requirements under Fed. R. Evid. 801(d)(2)(C) and 801(d)(2)(D), and are thus admissible. Instead, relying solely upon United States v. Valencia, 826 F.2d 169 (2d Cir. 1987), Ahmed argues that this Court should exercise its discretion and exclude that evidence which forms the basis of Count Twenty-Two -- namely, Attorney Egbert's statements on his behalf made during the October 25, 2001, meeting (and the production of false documents) -- unless and until the Government puts forward evidence pertaining to his intent. See generally Opposition at 6-10.

Valencia, however, cannot and does not offer Ahmed the refuge he seeks. The law does not allow a defendant to knowingly and willfully communicate to the Government false information either directly or through an authorized agent in an attempt to obstruct an ongoing investigation. Yet, were Ahmed's argument and reliance upon Valencia to be upheld, that would, in fact, be the outcome. Ahmed's efforts to create such a loophole should be rejected.

**1.**     **Ahmed's reliance upon United States v. Valencia is unavailing.**

United States v. Valencia was decided by a split panel in the Second Circuit and has never been adopted by the First Circuit. Moreover, adoption of the rule proposed by Ahmed would allow for a total circumvention of the First Circuit's holdings in United States v. Diozzi, 807 F.2d 10, 11-15 (1st Cir. 1986) and United States v. O'Connor, 433 F.2d 752, 755-56 (1st Cir. 1970). Finally, the procedures Ahmed suggests that Valencia requires are not even representative of the current law in the Second Circuit.

Valencia involved informal statements made by defense counsel to a prosecutor in which defense counsel sought to obtain his client's release on bail. During those conversations, defense counsel asserted that his client had just met his female co-defendant and was innocent of drug trafficking charges. The Government subsequently determined that this story was false and that the defendant and the female co-conspirator had a longstanding relationship. The Government then moved to admit the statements made by defense counsel pursuant to Fed. R. Evid. 801(d)(2)(C), (D), both as substantive evidence to show the defendant's guilt on the drug trafficking charges and as impeachment evidence were the defendant to testify.

Relying upon United States v. McKeon, 738 F.2d 26 (2d Cir. 1984), a split panel of the Second Circuit upheld the district court's refusal to admit at trial the earlier statements by defense counsel. See Valencia, 826 F.2d at 172-74. In so doing, the panel majority emphasized that the statements in question were only ancillary to the crime and did not directly pertain to an element of the offense charged. Id., at 173. The panel then balanced the Government's need for the statements against various perceived interests of the defendant (e.g., the defendant's interests in retaining counsel, assuring uninhibited discussions between defense counsel and the prosecutor, and avoiding the risk of impairing the privilege against self-incrimination) and concluded that the district court did not abuse its discretion in refusing to admit the evidence. Id., at 173-74. Judge Meskill dissented, arguing that the panel's reliance on United States v. McKeon was inappropriate and that the statements by counsel were admissible, both under Fed.R.Evid. 801(d)(2)(C) (statements made with authorization) and 801(d)(2)(D) (statements made by an agent). See id., at 174-77.

11

With deference to the Valencia panel in the Second Circuit, the United States submits that Judge Meskill's dissent is considerably more consistent with the law in the First Circuit and that statements such as those made by Attorney Egbert to federal prosecutors and others during the October 25th meeting (which were both authorized by Ahmed and made during the course of counsel's representation of Ahmed) are admissible at trial. For example, in United States v. O'Connor, 433 F.2d 752, 755-56 (1st Cir. 1970), the First Circuit upheld the introduction of statements by counsel to the IRS that contradicted statements previously made by the defendant. Even though counsel's statements directly contradicted the defendant's earlier statements and consisted of admissions of wrongdoing by the defendant, the First Circuit emphasized that counsel made the statements while acting within the scope of his representation of the defendant. Because counsel's statements were made during and within the scope of representation, the First Circuit concluded that the statements were admissible:

> It was clearly within the power and duty of the attorney to do what he could, in his own best judgment, to dispel the suspicions of the Internal Revenue Service and avoid indictment.

Id., at 756 (footnote omitted).[4/]

United States v. Diozzi, 807 F.2d 10 (1st Cir. 1986) similarly supports admission of out-of-court statements made by Attorney Egbert to representatives of the United States such as those contained within the Stipulation. Nowhere in Diozzi did the First Circuit suggest that out-of- court statements made by defense counsel were not admissible; instead the Court held that

---

[4/] See also United States v. Pappas, 806 F.Supp. 1, 3-6 (D. N.H. 1992) (holding that inculpatory statements made to IRS officials by counsel pursuant to power of attorney were admissible).

12

disqualification was not appropriate when the evidence the Government sought to be admitted could have been obtained via a stipulation that the defendant was willing to offer.

In Diozzi, counsel met with and submitted documents to the IRS and to the Justice Department in which counsel described his client's business practices and argued that his client had a "total lack of criminal intent." Id., at 11. The Government successfully sought and obtained counsel's disqualification after determining that there were numerous false or misleading statements contained in counsel's submissions. Significantly, although the First Circuit found that disqualification of counsel was inappropriate, it did not premise its rationale upon the inadmissibility of counsel's statements. Instead, it concluded that the stipulation of facts offered by the defendants provided for all of the facts sought to be admitted by the Government during trial. Id., at 13-15.

Neither O'Connor nor Diozzi support creation in the First Circuit of the special rule of admissibility sought by Ahmed in reliance upon Valencia. This is not surprising for even in the Second Circuit, the holdings in Valencia and United States v. McKeon, 738 F.2d 26, (2d Cir. 1984), the case upon which the Valencia majority relied, have been narrowed considerably by two later decisions. First, in United States v. Arrington, 867 F.2d 122 (2d Cir. 1989), the Second Circuit emphasized that neither McKeon nor Valencia stood for the proposition that a trial court was to enact or conduct special procedures or evidentiary hearings before admitting statements or submissions made by counsel pursuant to Rule 801(d)(2):

> We find no support for [defendant's] contention that there are special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements."

13

<u>Id.</u>, at 128.[5]  Thereafter, in <u>United States v. Amato</u>, 356 F.3d 216 (2d Cir. 2004), the Second

Circuit upheld the admission at trial of a letter written by defense counsel challenging a bail

revocation decision, explaining that counsel's letter was more akin to an out-of-court statement

governed by a straightforward application of Fed.R.Evid. 801(d)(2)(D) and that <u>McKeon</u>'s

special balancing test was not applicable.  <u>Id.</u>, at 220 ("It is abundantly clear that the

admissibility of [counsel's] letter is not governed by <u>McKeon</u> but rather the Federal Rules of

Evidence."); <u>see</u> <u>also</u> <u>id.</u>, at 220 n.3.

In sum, neither First Circuit law nor subsequent decisions in the Second Circuit support

Ahmed's interpretation of <u>Valencia</u> to create a special rule of admissibility of relevant evidence.

## 2.    **The Stipulation is admissible even under Valencia**

Even were this Court inclined to consider the various factors identified in <u>Valencia</u>, the

Stipulation remains admissible.  First, unlike <u>Valencia</u>, 826 F.2d at 173, there is no dispute

concerning the substance of the Stipulation.  The parties have agreed to the language in the

Stipulation and the document has been executed.

Second, admission of the Stipulation will neither chill defense counsel's advocacy on

behalf of his client, nor impede legitimate plea negotiations.  <u>See id</u>.  The October 25 meeting

between the Government and Attorney Egbert was not a plea negotiation; thus, that concern is

_____

[5]  The <u>Arrington</u> court limited the scope of <u>McKeon</u>'s holding to only those instances in
which the Government sought to introduce defense counsel's prior jury argument at trial and
held that <u>McKeon</u> has no applicability to any other statements made by defense counsel:

> Contrary to defendant's assertion that these procedures apply to the use of all
> statements by defense counsel, we clearly stated in <u>McKeon</u> that we were
> 'circumscrib[ing] the evidentiary use of **prior jury argument.**'

867 F.2d at 127 (quoting <u>McKeon</u>, 738 F.2d at 33) (emphasis in <u>Arrington</u>).

not relevant here.  Accord In re Grand Jury Proceedings, 2001 WL 237377, *15 n.14 (S.D.N.Y. 2001).  Had Attorney Egbert, Ahmed's experienced counsel, sought to invoke the protections of either Fed. R. Evid. 410 and/or Fed. R. Crim. P. 11(f), he could have done so.  See United States v. Vito, 1988 WL 78031, *2 (E.D. Pa. 1988) ("Where the protections of Fed.R.Crim.P. 11 may not be invoked, putative agents can nonetheless make clear the nature and extent of their authority to speak for defendants prior to informational meetings or negotiation sessions with government agents").  Ahmed should not now be allowed to invoke protections that were neither mentioned nor negotiated prior to the meeting in question.[6]  Cf. In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corporation), 348 F.3d 16, 26-28 (1st Cir. 2003).

Third, the evidence sought to be admitted here is considerably "more substantial" than the evidence at issue in Valencia.  See Valencia, 826 F.2d at 173.  As characterized by the panel majority in Valencia, the statements in that case were "not offered to show admission of an element of the offense, a use that would directly prove the Government's case and expedite the trial."  Id.  In contrast, the evidence contained in the Stipulation pertaining to the October 25 meeting goes directly toward establishing an element of the offense charged:  namely, that the defendant knew and authorized the production to the Government by counsel of those materials that form the basis of Count Twenty-Two.

In short, even were Valencia to apply, none of the concerns identified in Valencia are at issue here and the Stipulation should be admitted.  Accord United States v. Pappas, 806 F. Supp.

---

[6]  In any event, any policy consideration involving plea negotiations is only furthered when defendants engage in open, frank, and truthful discussions; it is not furthered through the presentation of false or misleading information.  See, e.g., United States v. Harris, 914 F.2d 927, 932 (7th Cir. 1990).

1, 6 (D. N.H. 1992).  This Court should reject Ahmed's attempt to create a safe harbor that would allow a defendant, hoping to derail an investigation, to submit false information to the United States through counsel.

### C.     Information Intended To Be Disclosed to Third Parties Is Not Privileged

Ahmed has not met his burden of showing that any attorney-client privilege exists with respect to the Stipulation.  The communications giving rise to the October 25 meeting were never intended to be kept confidential.  Attorney Egbert freely and voluntarily disclosed the facts to representatives of the United States, and he did so with Ahmed's knowledge and authorization.

It is well-settled that the attorney-client privilege must be narrowly construed because it "stands as an obstacle of sorts to the search for truth."  In Re Keeper of the Records, 348 F.3d at 22.  To invoke the privilege, the party seeking the privilege's protection must show that it applies to the communications at issue and that it has not been waived.  See id.

The attorney-client privilege protects only communications that are confidential and made for purposes of seeking or receiving legal advice.  Id.  Thus, the "privilege does not apply . . . where it is the intention or understanding of the client that the communication is to be made known to others."  In Re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir. 1984).

In arguing against the Stipulation's admissibility, Ahmed points to two different factual statements within the Stipulation that he contends are privileged:  (1) his providing the chart to Attorney Egbert; and (2) his authorizing Attorney Egbert to present and discuss the chart with federal prosecutors and agents.   Neither of these statements contain privileged information.

First, there can be little dispute that it was Ahmed's intention that the chart be shared and discussed with third parties. See Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984) (client's intent – "whether [he] reasonably understood the conference to be confidential" – is paramount). As set forth in the Stipulation, Ahmed provided the chart to Attorney Egbert and authorized him to present it to representatives of the United States. Stipulation ¶¶ 5-6. This is consistent with the actual facts -- namely, that the purpose of the October 25 meeting was for Attorney Egbert to present, provide and discuss the chart in question in an attempt to convince federal prosecutors and agents that defendant Ahmed had not defrauded Medicare. Given these actions, it can hardly be said that Ahmed had a reasonable expectation of confidentiality with respect to the chart.

When a client knows that counsel is going to communicate facts to third parties (and, as here, authorizes such conduct), there can be no reasonable expectation of confidentiality and, hence, no attorney-client privilege. See In re Grand Jury Proceedings, 727 F.2d at 1356-58. In In re Grand Jury Proceedings, the issue pertained to discussions that an attorney had with his client during preparation of a prospectus to be used in the enlistment of investors. Even though the prospectus was never actually mailed to third parties, the Fourth Circuit had little problem rejecting the claim of attorney-client privilege:

> [I]t is irrelevant that no prospectus was ever actually issued in this case. The significant fact is that the information given the [attorney] was to assist in preparing such prospectus which was to be published to others and was not intended to be kept in confidence. That is the critical circumstance, to wit, the absence of any intent that the information was to be kept confidential. Remembering that the privilege itself is not "favored" and is to be "strictly confined within the narrowest possible limits," we have no difficulty in concluding under the admitted facts of this case that all information given the [attorney] by any of the joint venturers connected with the subject-matter of the

17

proposed issuance of participations is without the protection of the attorney-client privilege.

Id., at 1358.

Similarly, in United States v. Tellier, 255 F.2d 441 (2d Cir. 1958), the defendant, who was in the securities business, sought to exclude from evidence a conversation with his lawyer in which his lawyer urged him against being involved in certain securities transactions.  However, in relaying the advice, the lawyer told Tellier that he would also notify other individuals, who he was not representing, about his negative views on the transaction.  The Tellier court thus concluded that it "was clear that this advice was not understood by either [the lawyer] or Tellier to be confidential."  Id. at 447; see also Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962) (information provided to attorney for inclusion in a tax return is not privileged).[7/]

Ahmed's contention that his act of providing the chart to Attorney Egbert so that counsel could, with authorization, then present it to representatives of the United States in an effort to demonstrate that Ahmed had not defrauded Medicare is somehow privileged defies both the facts and the law.  Unlike the prospectus in In re Grand Jury Proceedings, the chart at issue in the Stipulation was in fact presented to federal representatives during the October 25, 2001 meeting. Given the facts, Ahmed has not articulated, let alone met his burden, of demonstrating the requisite intention to maintain confidentiality necessary to support the attorney-client privilege.

---

[7/] The Tellier court also made clear that the scope of the information that can be shared in such circumstance is quite broad.  "Moreover, where, as here, information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure."  Tellier, 255 F.2d at 448.

**D.      If Any Privilege Ever Applied to Any of the Statements in the Stipulation, Ahmed Waived That Privilege through Disclosure to the United States**

Even if Ahmed could meet his burden of establishing privilege with respect to any statement in the Stipulation, he subsequently waived that privilege by dint of disclosure to representatives of the United States.  "When otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised." In Re Record Keeper Subpoena, 348 F.3d at 22.  Certainly, when disclosure is to a government agency, either voluntarily or in response to a subpoena, the privilege is waived.  See United States v. Mass. Inst. of Tech., 129 F.3d 681, 685 (1st Cir. 1997); see also United States v. Pappas, 806 F.Supp. at 4 (clients "waive the privilege by authorizing their lawyers to represent them before the IRS").

When Attorney Egbert made a presentation to representatives of the United States on October 25, 2001, he was acting within the scope of his representation on Ahmed's behalf and was using the chart to try to convince the United States that Ahmed had not defrauded Medicare. Similarly, on September 26, 2005, when Attorney Egbert met in the courthouse cafeteria to negotiate the Stipulation, those negotiations pertaining to the Stipulation's content were made on Ahmed's behalf.  If there was any doubt, Attorney Egbert, in the presence of his client, referred to the Stipulation as "facts" in open court on November 15, 2005, and acknowledged the Stipulation's accuracy.[8]  Each of those acts independently, and all of them collectively, effected

---

[8] Although the Agreement (Ex. B, hereto) executed between the parties provides that Ahmed's act of signing the Stipulation was, in and of itself, not a waiver, the Agreement does not protect earlier waivers by Ahmed or Attorney Egbert.  By the time Ahmed executed the Agreement, he and counsel had already waived any purported privilege and the United States reserved the right to so argue.

19

a waiver of any purported privilege that might have otherwise existed.  See United States v. Hernandez-Hernandez, 431 F.3d 1212, 1219 (9th Cir. 2005) ("we have repeatedly held that criminal defendants are bound by the admissions of fact made by their counsel in their presence and with their authority").[9/]

## III.  CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the Court admit the Stipulation, in its entirety, as evidence in the trial (or for any other purpose) in this matter.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Jeremy M. Sternberg
James E. Arnold
Jeremy M. Sternberg
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

---

[9/]  An element of fairness goes into any privilege waiver analysis.  E.g., In Re Grand Jury Investigation of Ocean Transportation, 604 F.2d 672, 675 (D.C. Cir. 1979) ("There is always the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not.") (internal quotations and citations omitted).  Here, defendant Ahmed is engaging in impermissible selective privilege assertions to block the introduction of potentially harmful evidence in the Stipulation, while maintaining that he would "stipulate" to the facts in order to argue against the disqualification of his chosen counsel.  Disqualification of counsel in Diozzi was deemed inappropriate because the stipulation of facts offered by defendants provided for the introduction into evidence of all facts sought to be admitted by the United States during trial.  807 F.2d at 13-15.  A similar result should obtain here.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

      /s/ James E. Arnold
JAMES E. ARNOLD
Assistant United States Attorney

Date:  May 8, 2006

21

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) **CRIMINAL NO. 05-10057-RCL** |
| | ) |
| v. | ) |
| | ) |
| ABDUL RAZZAQUE AHMED | ) |
| | ) |
| Defendant | ) |

### FACTUAL STIPULATION

1.  On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. §3486).

2.  The Subpoena sought from defendant Ahmed, among other things, "medical and billing records for all patients who are being treated or were treated with IVIG and for whom any part or all of the services was billed to medicare and/or any third party payor."

3.  The documents sought by the Subpoena related to the investigation of a Federal health care offense. Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

4.  By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing

1

practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

5.    Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney. Defendant Ahmed stipulates that the copy of the chart attached hereto is authentic.

6.    Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing practices.

7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and two federal agents. One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with the binders attached hereto as Exhibit __. Included in these binders was the chart. With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin

2

treatments was permitted as a result of these "dual diagnoses" and that defendant Ahmed had not

defrauded Medicare.

So Stipulated:

_ABDUL RAZZAQUE AHMED_
ABDUL RAZZAQUE AHMED

RICHARD M. EGBERT
Counsel for Abdul Razzaque Ahmed

3

## AGREEMENT

This Agreement pertains to the stipulation negotiated by counsel in <u>United States v.</u>
<u>Abdul Razzaque Ahmed</u>, Criminal No. 05-10057-RCL:

The parties agree that, by signing the stipulation, defendant Abdul Razzaque Ahmed is
acknowledging the accuracy of the facts set forth in the stipulation. However, the parties further
agree that the defendant reserves the right to challenge the admissibility of any or all of the facts
contained in the stipulation. The United States agrees that it will not contend that the act of
signing the proposed stipulation (which act constitutes an acknowledgment of the accuracy of
the facts set forth in the stipulation) represents a waiver by defendant Ahmed of any otherwise
applicable privileges or protections that he may possess with respect to any factual
representations contained within the stipulation. Defendant understands and agrees that the
United States reserves all of its arguments in support of the stipulation's admission at trial and/or
in connection with a motion in limine pertaining to the stipulation.

_____
RICHARD EGBERT, ESQ.
Counsel for Abdul Razzaque Ahmed

_____
ABDUL RAZZAQUE AHMED

_____
JAMES E. ARNOLD
Assistant U.S. Attorney

_____2/23/06_____
Date

_____Feb 20, 2006_____
Date

_____3/16/2006_____
Date



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 3, 2005

<u>Via Messenger</u>

Richard M. Egbert
Law Offices of Richard M. Egbert
99 Summer Street, Suite 1800
Boston, MA 02110

   Re: <u>United States v. Abdul Razzaque Ahmed, Criminal No. 05-10057-RCL</u>

Dear Mr. Egbert:

   Enclosed is a redraft of the Stipulation we discussed on September 26, 2005. Also enclosed is your original handwritten mark-up from our meeting that date, which serves as the basis of the redraft. Please let us know at your earliest convenience if this is acceptable so that we can contact the Court to set up a hearing to accept the Stipulation. Finally, enclosed is a draft of an assented to motion to take the videotape deposition of RL, which we plan to file by the end of this week. You indicated your assent to this motion when we met on September 26, 2005, and requested that we conduct the deposition on a Friday. Please let us know if any of the following Fridays are available for you for this deposition in the Berwick, Maine area: November 4, November 18 or December 2.

       Very truly yours,

       MICHAEL J. SULLIVAN
       UNITED STATES ATTORNEY

By:              
       James E. Arnold
       Jeremy M. Sternberg
       Assistant U.S. Attorneys

**DRAFT**

Factual Stipulation

1.    On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued

under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996,

Public Law No. 104-91 (18 U.S.C. §3486).

2.    The Subpoena sought from defendant Ahmed, among other things, "medical and billing

records for all patients who are being treated or were treated with IVIG and for whom any part or all

of the services was billed to medicare and/or any third party payor."

3.    The documents sought by the Subpoena related to the investigation of a Federal health

care offense. Defendant Ahmed, through his ~~counsel~~ retained counsel, produced documents responsive to the

Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's

Office for the District of Massachusetts, who was duly authorized by the Department of Justice to

conduct or engage in investigations for prosecutions of health care offenses.

4.    By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal

investigation that was investigating whether he was engaged in proper Medicare billing practices

concerning certain patients who were diagnosed with pemphigus and/or pemphigoid.

~~5.~~    In connection with that investigation, defendant Ahmed retained an attorney.

6.    Sometime before October 25, 2001, defendant Ahmed provided the chart marked as

Exhibit __ to his attorney.

7.    Defendant Ahmed provided Exhibit __ to his attorney with the knowledge that it ~~so that his attorney could~~ present

~~that chart be presented~~ so that his authorized his atty to

that chart to the prosecutors and agents who were then investigating defendant Ahmed's Medicare

billing practices. ~~The purpose of having~~ did Defendant Ahmed's attorney make that presentation did was so

that he could convince the prosecutors and agents that the patients who appeared on Exhibit __ had a

**DRAFT**

"dual diagnosis" of pemphigoid and pemphigus vulgaris, that reimbursement from Medicare was permitted as a result of these "dual diagnoses," and that defendant Ahmed had **not defrauded** Medicare.

*delete*

8.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to **above in paragraph 3**) and two federal agents. One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with Exhibit ____. With the authorization of defendant Ahmed and in reliance upon information that had been provided to him by defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit ___ should convince them "beyond a reasonable doubt" that the patients appearing on Exhibit ___ had pemphigus that defendant Ahmed had not defrauded Medicare, ~~and that they should close their investigation of defendant Ahmed.~~

*dual diagnosis RVS/good.*

*and that result was proven, and Ah had no defrauded Medicare.*

### Factual Stipulation

1.   On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. §3486).

2.   The Subpoena sought from defendant Ahmed, among other things, "medical and billing records for all patients who are being treated or were treated with IVIG and for whom any part or all of the services was billed to medicare and/or any third party payor."

3.   The documents sought by the Subpoena related to the investigation of a Federal health care offense. Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

4.   By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

5.   Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney. Defendant Ahmed stipulates that the copy of the chart attached hereto is authentic.

6.   Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing practices.

1

7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant

Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and

two federal agents. One of the agents was from Department of Health and Human Services, Office of

the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two

agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that

meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney

presented them with the binders attached hereto as Exhibit __. Included in these binders was the chart.

With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the

two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on

Exhibit __ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further

stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous

immunoglobulin treatments was permitted as a result of these "dual diagnoses" and that defendant

Ahmed had not defrauded Medicare.

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**DRAFT**

|                                  |   |                                   |
|----------------------------------|---|-----------------------------------|
| UNITED STATES OF AMERICA         | ) | CRIMINAL NO. 05-10057-RCL         |
|                                  | ) |                                   |
| v.                               | ) |                                   |
|                                  | ) |                                   |
| ABDUL RAZZAQUE AHMED             | ) |                                   |
|                                  | ) |                                   |
| Defendant                        | ) |                                   |

## ASSENTED TO MOTION BY THE UNITED STATES
## TO TAKE VIDEOTAPE DEPOSITION OF RL

The United States, by its attorneys Michael J. Sullivan, United States Attorney for the

District of Massachusetts, and Assistant United States Attorneys James E. Arnold and Jeremy M.

Sternberg, hereby moves this Court, pursuant to Federal Rule of Criminal Procedure 15, to take

the videotape deposition of RL.[1] In support of its motion, the United States submits as follows:

1. On March 15, 2005, Defendant was indicted on a variety of charges, including mail

fraud, health care fraud, obstruction of justice and money laundering. At the heart of the

Indictment, is a scheme to defraud Medicare by falsifying diagnoses of a rare blistering skin

disease, pemphigus vulgaris ("pemphigus"), for patients who actually suffered from a different

and distinct skin disease, pemphigoid. The Indictment charges that Defendant falsified these

diagnoses, because during the relevant period, Medicare allowed reimbursement for expensive

intravenous immunoglobulin ("IVIG") treatments for pemphigus, but not for pemphigoid.

Defendant is charged with fraudulently billing Medicare, by falsifying a diagnosis of pemphigus,

for over $5 million for IVIG treatments for patients who did not have the pemphigus, but rather

---

[1]RL is one of Defendant's former patients. He is so identified in this motion in light of
the protective order entered in this case. Full identifying information for RL was provided to
Defendant by letter dated April 18, 2005.

had pemphigoid.

**DRAFT**

    2. The Indictment charges, among other things, fourteen counts of health care fraud in violation of 18 U.S.C. §1347. One of the counts relates solely to a Medicare claim that Defendant made on behalf of one of his patients at the time, RL.

    3. Like many of the patients identified (by initials) in the Indictment, RL is elderly and physically infirm and lives some distance from this Courthouse. The United States believes that RL knew he had pemphigoid, not pemphigus, and that he received IVIG treatments from the Defendant. The United States therefore seeks to preserve the testimony of this elderly and sick witness, RL, for use at trial. See United States v. Keithan, 751 F.2d 9 (1st Cir. 1984) (allowing, pursuant to Rule 15, taking of depositions of two elderly, infirm witnesses who live 60 miles from the Courthouse)

    4. In accordance with Local Rule 7.1(A)(2), counsel for the United States has, through letter dated July 21, 2005, sought to engage counsel for Defendant in an effort to narrow or resolve the issues raised by this motion. On September 26, 2005, counsel for the United States met with counsel for the Defendant, discussed this motion, obtained his assent, and agreed to schedule the deposition of RL in the Berwick, Maine area on a Friday that was mutually convenient for all counsel and the witness.

2

5. Accordingly, the United States respectfully requests that the Court allow it to take the

videotape deposition of RL in Maine at a time convenient for counsel for Defendant.

MICHAEL J. SULLIVAN
United States Attorney

By:    **DRAF**

James E. Arnold
Jeremy M. Sternberg
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

October __, 2005

### Certificate of Service

I hereby certify that I served a copy of the foregoing pleading on Richard M. Egbert, Law Offices of Richard M. Egbert, 99 Summer Street, Suite 1800, Boston, MA 02110, this day by mail.

**DRAFT**

Jeremy M. Sternberg
Assistant U.S. Attorney

3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,      )
                      Plaintiff, )
                             )
-v-                       )   CRIMINAL DOCKET NO.
                       )   05-10057-RCL
ABDUL RAZZAQUE AHMED,      )
                   Defendant. )


MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE


November 15, 2005

Boston, Massachusetts

<u>For the United States:</u>

    JEREMY STERNBERG, ESQ.
    JAMES E. ARNOLD, ESQ.
    Assistant U.S. Attorneys
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

<u>For the Defendant:</u>

    RICHARD M. EGBERT, ESQ.
    99 Summer Street
    Suite 1800
    Boston, MA  02110
    (617) 737-8222

Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.



1  attempting to do now is exactly what they're not permitted

2  to do.  Number one, yes, I agreed that I would stipulate,

3  for example, Dr. Ahmed knew such and such or gave me such

4  and such as a true fact, but not it's admissibility.

5        I don't think they can get to it, because of the

6  attorney/client privilege, for example, which is not waived.

7  I don't think they can get to it for other reasons of agency

8  and the like, which I've cited some cases to you in the

9  brief.

10        And so what the government is really attempting to

11  do here is to turn the whole issue on its head and basically

12  say, for you to stay in as counsel, for Dr. Ahmed to keep

13  the lawyer he's had for five years involved in this case, we

14  want him to waive the attorney/client privilege, no.  We

15  want him to stipulate that something is admissible in court,

16  without knowing the status of it, when we come to that time;

17  waiving arguments that's irrelevant; waiving arguments that

18  it's immaterial; waiving the argument that counsel's

19  statements to the government during the course of a

20  discussion about whether or not they should indict or

21  shouldn't indict are or are not relevant and material

22  evidence in a criminal case and the like.

23        Moreover, we believe that the government has

24  virtually no evidence that shows anything like manipulation

25  of these samples or that Dr. Ahmed was responsible for a

1   acknowledge the fact occurred, or you say we can't stipulate

2   to that, because we believe it's privileged.  We're caught

3   between the proverbial rock and a hard place on this one.

4        THE COURT:  Mr. Egbert?

5        MR. EGBERT:  I don't -- I don't understand it.  I

6   mean I'm not trying to be facetious, but I simply don't

7   understand the argument.  I'm stipulating as to what facts

8   occurred.  I agree with that, without waiving the privilege

9   as to those facts or any of the facts in the stipulation.

10       I'm also not waiving any objections to the

11  admissibility of those facts.  And you should know that I

12  did agree to with the government, and that that's why this

13  all comes up as kind of bizarre.  I told them at the outset,

14  I said I'll agree to the authenticity to the documents up

15  front, so you don't have an authenticity problem, you know,

16  at the end of the day and say, oh boy, we forgot to do that.

17       But as to objections, I don't waive them.  And as

18  to the privilege, I don't waive that.

19       THE COURT:  Okay.  I'm denying the motion.  I will

20  be issuing a decision, but not today.  So if you want to get

21  back to me tomorrow, you have the right to submit something

22  else.  And this will hopefully be written by the end of the

23  week.  Okay?

24       MR. ARNOLD:  Thank you.

25       THE CLERK:  The Court is in recess.