UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO.
05-10057-RCL

UNITED STATES OF AMERICA

v.

ABDUL RAZZAQUE AHMED

**MEMORANDUM OF DECISION AND ORDER ON GOVERNMENT'S
MOTION IN LIMINE REGARDING ADMISSIBILITY OF STIPULATION**

August 3, 2006

DEIN, M.J.

## I. INTRODUCTION

The defendant Abdul Razzaque Ahmed ("Dr. Ahmed") is charged in a multi-count indictment with mail fraud, health care fraud, money laundering, and obstruction of justice. The government previously moved to disqualify Dr. Ahmed's counsel, Richard Egbert. As detailed in a memorandum of decision and order dated November 22, 2005, this court denied the motion to disqualify on the grounds that a stipulation could be reached regarding Mr. Egbert's testimony. After extensive negotiations, the parties have reached a stipulation. While the defendant agrees that the facts asserted in the stipulation are true, he disputes the admissibility of the stipulation on various grounds.

This matter is presently before the court on the "Motion In Limine By The United States For Ruling Admitting Into Evidence A Stipulation Entered Into By The Parties." (Docket No. 69). For the reasons detailed herein, this court finds that the stipulation is

admissible, although ¶ 7 should be modified to more accurately reflect the parties' agreement. Therefore, as detailed below, the motion in limine is ALLOWED.

## II. STATEMENT OF FACTS

The principal claim against Dr. Ahmed is that he allegedly engaged in a scheme to defraud the Medicare program by falsely representing that certain patients who were suffering from a blistering skin disease known as pemphigoid were also suffering from a different rare blistering skin disease known as pemphigus vulgaris ("pemphigus"). At the time, Medicare allowed reimbursements for certain intravenous immunoglobulin ("IVIG") treatments for pemphigus but not for pemphigoid. Dr. Ahmed is charged with fraudulently billing Medicare over $5 million for IVIG treatments for patients who suffered from pemphigoid, but did not have pemphigus. The pre-indictment investigation of Dr. Ahmed lasted about five years — with a subpoena being issued to Dr. Ahmed on June 15, 2000 and the indictment being returned on March 15, 2005.

During the investigation, a meeting was held on October 25, 2001.[1] The Factual Stipulation at issue relates to this meeting. The meeting was attended by AUSA Sandra Bower, Postal Inspector Jean Zaniewski, Special Agent Nancy Scanlan, and two attorneys representing Dr. Ahmed, Richard Egbert and Patrick Sparks. These attorneys represented Dr. Ahmed throughout the pre-indictment investigation of the

---

[1] Facts about what took place at the meeting are taken from the Declaration of Assistant U.S. Attorney James E. Arnold ("Arnold Decl.") (Docket No. 46), the exhibits thereto, including a memorandum from Special Agent Nancy Scanlan (Ex. B) and the chart in question (Ex. C), the parties' memoranda, and statements made during oral argument.

case. However, only Mr. Egbert, and not Mr. Sparks, has entered an appearance as trial counsel in this matter.

In the course of this meeting, Mr. Egbert presented the government with a chart. The chart, which is referenced in the challenged stipulation, lists 42 of Dr. Ahmed's patients and purports to show the results of three lab tests conducted on the blood sera for each of the patients. See Arnold Decl. at ¶ 7. According to the Government, "[t]he three lab tests were conducted by defendant Ahmed, Beutner Labs and Mayo Clinic. The chart purported to represent that the lab test results for each of the 42 patients had indicated that each of the patients were suffering from both pemphigoid and pemphigus." Id.

During the course of the meeting, Mr. Egbert made various statements to the government that are reflected in the stipulation. He has characterized these statements as having been made "in a good faith attempt to convince the government not to pursue charges against his client." Defendant's Opposition to Government's Motion in Limine ("Opp.") (Docket No. 71) at 7. His efforts, however, were unsuccessful. As a result of the meeting and information provided at the time, Dr. Ahmed was indicted for obstruction of justice. Specifically, Counts 21 and 22 of the indictment charge Dr. Ahmed with obstruction of justice by allegedly providing false written documents to the government during the investigation to show that patients who had received IVIG treatments and suffered from pemphigoid also suffered from pemphigus. In addition, the indictment charges that Dr. Ahmed mixed the blood of patients who suffered from pemphigoid and pemphigus and then sent the mixed blood

-3-

to a laboratory for testing. The test results, which were included in the chart given to the government, then showed patients who were actually only suffering from pemphigoid to also be suffering from pemphigus. As alleged in Count 22 of the indictment, at the meeting of October 25, 2001, Dr. Ahmed caused false documents

> to be prepared and produced, <u>through his retained defense counsel</u>, to individuals duly authorized by a department and agency of the United States to conduct and engage in investigations for prosecutions for violations of health care offenses, including individuals employed by the United States Attorney's Office for the District of Massachusetts, which documents were false and fraudulent in that they were created using results obtained by: (1) causing blood sera samples for 42 of his pemphigoid patients (including at least 22 Medicare patients) to be mixed with the blood of other of his patients who suffered from pemphigus; and (2) causing the mixed blood sera to be sent to the Buffalo Lab for testing in order to obtain test results which would falsely show that each of these 42 patients suffered from pemphigus.

Indictment ¶ 40 (emphasis added). The "retained defense counsel" refers to Mr. Egbert. The government has made it clear, however, that it is not contending that Mr. Egbert knew that the documents and information provided at the meeting were false.

## The Motion in Limine

After extensive negotiations, the parties entered into a "factual stipulation." Dr. Ahmed has stipulated to the accuracy of the facts contained in the stipulation, but not to their admissibility. The government has filed its motion in limine seeking a ruling that the stipulation is admissible.

Dr. Ahmed raises three arguments. First, he contends that the government has failed to establish the necessary factual predicates for the admission of the chart and any related information, and that such evidence is, therefore, inadmissible because it is not relevant under Fed. R. Evid. 104(b) and related common law. Second, Dr. Ahmed, relying on the case of United States v. Valencia, 826 F.2d 169 (2d Cir. 1987), argues that the meeting should be treated as a pre-plea discussion, and that this court should exercise its discretion and preclude the admission of evidence and testimony relating to the meeting. Finally, Dr. Ahmed contends that certain statements in the stipulation are protected by the attorney-client privilege and are therefore inadmissible.[2] For the reasons detailed herein, this court finds these arguments unpersuasive.

### III.  ANALYSIS

#### A.    The Need for a Foundation

Dr. Ahmed contends that, before the chart is relevant to the issues in this litigation, the government must first establish that (1) the samples were intentionally manipulated, and (2) that Dr. Ahmed knew about that manipulation. Since the government has not yet established these facts, the defendant contends that the chart and related evidence should be precluded under Fed. R. Evid. 104(b). That Rule provides as follows:

> **(b) Relevancy conditioned on fact.** When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

---

[2] During oral argument, the defendant provided the court with a copy of the stipulation marked to show which portions he claimed were privileged.

(emphasis added).

This court finds Dr. Ahmed's objection to be premature. There is no question that the chart and related conversations are relevant to the charges of obstruction of justice. Dr. Ahmed's objection is that the government has not yet revealed the rest of its case, and established that there is sufficient evidence to pursue the charges. However, there is no basis for the contention that, at this stage of the proceedings, the government has to establish facts which may turn out to be critical to the claim for obstruction of justice, i.e., that the samples were manipulated and that Dr. Ahmed knew of the manipulation. Consequently, there is no reason to rule at this stage that the government cannot proceed with its case.

Absent instructions from the trial judge to the contrary, the government may introduce its evidence in the order it deems most appropriate. Rule 104(b) expressly recognizes that evidence may be introduced either after or subject to the introduction of other evidence which makes it relevant. The defendant may raise the issue of the order of evidence with the trial judge. There is no basis at this point, however, to preclude the admission of the chart and related communications.

### B. Pre-plea Negotiations

Dr. Ahmed next argues that this court should exercise its discretion, and treat the meeting as a plea discussion that is inadmissible either under Fed. R. Evid. 410[3] or the policy behind the Rule. In light of the law of the First Circuit and the circumstances

---

[3] In relevant part, Fed. R. Evid. 410(4) makes inadmissible "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."

surrounding the meeting and the production of the chart, this court finds this argument unpersuasive. There is no basis for excluding the evidence relating to the meeting or the chart on this ground.

Dr. Ahmed is relying on the case of United States v. Valencia, 826 F.2d 169 (2d Cir. 1987). The issue in that case was "whether statements made by defense counsel during informal conversations with a prosecutor may be admitted against a criminal defendant as admissions by an agent." Id. at 170. Recognizing the "considerable discretion" of the trial judge in determining whether to admit certain evidence, a majority of the Court upheld the decision not to admit such statements, over a strong dissent. See id. at 173. Valencia, however, addresses a significantly different situation than the one presented here.[4]

The Valencia court began its analysis by recognizing that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." Id. at 172 (quotation and citation omitted). Nevertheless, the court cautioned that "care must be exercised in the criminal context in determining under what circumstances attorney statements may be used against a client," "because the routine use of attorney statements against a criminal defendant risks impairment of the privilege against self-incrimination, the right to counsel of one's choice, and the

---

[4] At least one court has held that the Second Circuit has "narrowed" the reach of Valencia by holding, in United States v. Arrington, 867 F.2d 122, 128 (2d Cir 1989), "that despite the concerns raised about the use of attorney's out-of-court statements, no special procedures are required for the admission of such evidence." United States v. Harris, 914 F.2d 927, 932 (7th Cir. 1990). The instant case does not require this court to address the exact scope or continued viability of Valencia.

-7-

right to the effective assistance of counsel." Id. In Valencia, the government had sought to have the statements of counsel admitted as an admission of a party opponent under the agency exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(C), (D).[5] Id. The trial judge denied the government's motion, and that decision was found not to be an abuse of discretion.

In upholding the trial court's decision not to admit the testimony, the Second Circuit relied on various factors. Specifically, the Court found it significant that the statements at issue were made during the course of informal discussions, and thus not only were not transcribed, but also were unlikely to have been made with any precision. Id. at 173. In addition, the court concluded that the admission of the statements would have a chilling effect on the prospect of plea negotiations. Thus the court ruled that while "the statements were not made during the course of plea negotiations and therefore were not automatically excludable under Fed. R. Evid. 410, see Fed. R. Crim. P. 11(e)(6), a statement by defense counsel protesting a client's innocence may often be the prelude to plea negotiations." Id. Further, the court found that there was little justification for using the statements which were "not offered to show admission of an element of the offense, a use that would directly prove the government's case and expedite the trial" but rather to show, in an attenuated way, a consciousness of guilt, or to impeach the defendant if he testified. Id. Finally, the court recognized that the

---

[5] Fed. R. Evid. 801(d)(2) provides in relevant part that the following statements are not hearsay: "(2) Admission by party opponent. The statement is offered against a party and is ... (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...."

government, when presented with counsel's statements, could have requested that counsel provide an affidavit of his client's version of the facts. Id. at 174.

None of these factors exist in the present case. Thus, the chart and conversations at issue were not part of "informal discussions." Rather, there was a specific meeting set up where the defendant, through his counsel, elected to make a formal presentation of facts which had been gathered specifically by the defense for the purpose of presenting evidence to the government. In light of the formality of the meeting, the admission of statements made at the meeting about the chart would not be inconsistent with the goal of this court "to honor scrupulously defendants' rights against self-incrimination, their right to counsel of their choice, and their right to effective assistance of counsel." United States v. Pappas, 806 F. Supp. 1, 6 (D. N.H. 1992) (while recognizing concerns addressed by Valencia, court finds that where attorney's statements were made pursuant to a power of attorney and not in an informal setting, the defendants' rights would not be violated by the admission of their representatives' statements).

Nor would the admission of the statements in this court's view have a chilling affect on plea negotiations. In United States v. Penta, 898 F.2d 815 (1st Cir. 1990), the First Circuit made it abundantly clear that the prohibition against admitting statements made during plea discussions "means plea discussions, and not simply anything that might ultimately lead to such." Id. at 817. The court expressly rejected the argument that a "preliminary discussion must be considered as part of the overall plea bargaining process." Id. at 818 (internal citation omitted). Therefore, statements made to the

government while the government "was openly trying to build a case against defendant's associates" were found to be admissible in Penta. See id. at 816. In light of this clear ruling, there is no legitimate claim that an attorney who engages in a formal meeting with the government in the First Circuit for the purpose of convincing the government not to pursue charges would expect that such discussions would be privileged in the absence of an express representation or agreement to that effect. See In re Keeper of the Records, XYZ Corp., 348 F.3d 16, 28 (1st Cir. 2003) (where party repeatedly informed the government during pre-indictment discussions that it was not waiving the attorney-client privilege by providing certain information, there was no waiver even absent an express written agreement). "Effective advocacy requires strategic and tactical decisions at all levels of the criminal process. The fact that a lawyer's unsuccessful maneuver might be used against his client will not unduly chill legitimate advocacy." United States v. Harris, 914 F.2d 927, 932 (7th Cir. 1990). Thus, the Valencia court's concern that the admission of an attorney's statement might chill the possibility of negotiations has no application to the facts presented here.

Furthermore, unlike Valencia, the statements being sought to be admitted are not of tangential value, but do, in fact, relate directly to the elements of the claims made against the defendant. Finally, unlike Valencia, the government is seeking to introduce the testimony in the form of an agreed statement of fact, thereby eliminating the need for any examination as to what precisely was said at the meeting. Thus, none of the bases for the Valencia court's decision to preclude the admission of the attorney's statements exist in the instant case.

In the instant case, given the formality of the meeting and the fact that the defense affirmatively introduced evidence to the government that it wanted the government to study and accept, this court sees no reason to exclude the evidence of the meeting either as a matter of law or as a matter of policy. While this court shares the Valencia court's concerns about not using defense counsel's statement's lightly, this court finds no benefit in creating a rule where the defense can affirmatively and voluntarily lead the government astray with impunity (if that is what, in fact, happened in the instant case). The meeting in question was not a plea negotiation, and is not entitled to the protections afforded such negotiations.

### C. Attorney-Client Communications

Dr. Ahmed's final, and in this court's view, most difficult objection is to specific stipulated facts which he claims are protected by the attorney-client privilege. Thus,"Dr. Ahmed does not claim that the chart reflecting the test results, or anything else said or given to the government at the October 25th meeting is privileged," but nonetheless disputes the admissibility of specific facts as seeking privileged information beyond the statements made at the meeting. See Defendant's Sur-Reply (Docket No. 73) at 6. "The burden of proving the existence of the privilege is on the party asserting the privilege." United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989). This means that as the party claiming the privilege, Dr. Ahmed must "present the underlying facts demonstrating the existence of the privilege." Fed. Trade Comm. v. Shaffner, 626 F.2d 32, 37 (7th Cir. 1980).

The rules governing the admissibility of attorney-client communications are easy to state, yet hard to apply.  Thus, the party asserting the privilege must establish that "(1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived."  In re the Reorganization of Electric Mutual Liability Ins. Co., Ltd., 425 Mass. 419, 421, 681 N.E.2d 838, 840 (1997).  See also United States v. Wilson, 798 F.2d 509, 512 (1st Cir. 1986) (the privilege protects "facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding[.]").  "It is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential."  United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958).  "Thus, it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others."  Id.  "In addressing whether a given communication was meant to be confidential, what the client *reasonably* understood is the key question."  United States v. Bay State Ambulance, 874 F.2d at 28 (internal punctuation and citation omitted).

It is also well established "that the privilege is narrowly confined because it hinders the courts in the search for truth."  United States v. Mass. Institute of Technology, 129 F.3d 681, 684-85 (1st Cir. 1997).  See also In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984) ( "since the privilege impedes the full

-12-

and free discovery of the truth" it is to be narrowly construed and can only apply where a communication was intended to be kept confidential) (internal citation omitted). Nevertheless, "[w]here an attorney knows facts only because they were confidentially communicated by the client, the government cannot circumvent the privilege by asking the attorney about 'the facts.'" United States v. Rakes, 136 F.3d 1, 4 n.4 (1st Cir. 1998)

Finally, there may be either express or implied waivers of the attorney-client privilege. In re Keeper of the Records, XYZ Corp., 348 F.3d at 22. Since the attorney-client privilege is "highly valued," "courts should be cautious about finding implied waivers." Id. at 23. Nevertheless, where fairness dictates that it do so, "waivers by implication can sometimes extend beyond the matter actually revealed." Id. at 23-24. However, "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter." Id. at 24.

In determining the scope of the attorney-client privilege in the instant case, this court must also consider the fact that the stipulation arises in the context of seeking to admit statements of counsel against his client. As detailed above, admissions made by counsel in the course of his or her representation may be admitted into evidence against the defendant. See United States v. O'Connor, 433 F.2d 752, 755-756 (1st Cir. 1970) (attorney's statements to IRS officials admitted against the defendant as having been made within the scope of attorney's authority where there was no evidence that the defendant had told his attorney not to make the statements or otherwise limited the

position counsel was to take); Fed. R. Evid. 801(d)(2)(C), (D), quoted at note 4, <u>supra</u>.

It is undisputed that Mr. Egbert was authorized to represent Dr. Ahmed at the meeting, and that he was acting within the scope of his authority when he presented the chart and engaged in discussions with the government.  <u>See</u> Stipulation at ¶¶ 6, 7.  It is appropriate for agents to "make clear the nature and extent of their authority to speak for defendants prior to informational meetings or negotiation sessions with government agents" and, by so doing, define which of their statements may be binding on their clients.  <u>See</u> <u>United States v. Vito</u>, 1988 WL 78031, *2 (Crim. No. 88-137)(E.D. Pa. July 22, 1998) (where defendant authorized his attorneys to meet with the IRS for the purpose of explaining his position during an investigation, attorneys' statements are admissible under Rule 801(d)(2)(D); scope of authority is not limited to written powers of attorney where the conduct of the defendant authorizing the meeting establishes an implied agency with counsel).

Applying these principles to the Factual Stipulations which Dr. Ahmed challenges as being privileged, this court rules as follows:

¶ 4. By not later that June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

The court finds this Stipulation to be admissible.  There is no evidence that Dr. Ahmed learned of the investigation only through confidential communications.  In fact, Stipulation ¶ 1 states that he was served with a subpoena on June 15, 2000.  Moreover, the facts included in this paragraph are relevant to defining the scope of Mr. Egbert's authority when he met with the government as counsel for Dr. Ahmed.

Therefore, it would have been appropriate for the government to seek this information from Mr. Egbert if he testified at trial. See United States v. Diozzi, 807 F.2d 10, 13 (1st Cir. 1986) (when stipulation used in lieu of disqualification of counsel, government limited to facts which could have been ascertained at trial).

¶ 5. Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney.

The court finds that this Stipulation is also admissible. Admittedly, there are situations were the identity of a client or the source of information is intended to be kept confidential, and, as such, is protected by the attorney-client privilege. See, e.g., United States v. Sanders, 979 F.2d 87, 91 (7th Cir. 1992) (where disclosure of a client's identity would convey the substance of the confidential communication, disclosure precluded by the attorney-client privilege); Anderson v. State, 297 So.2d 871, 873 (Fla. App. 1974) (attorney does not have to disclose from whom he received stolen property). However, no such "special circumstances" exist in the present case. See Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962).

As an initial matter, there is no evidence in the record to support the conclusion that there was any intent on the part of the defendant to keep the source of the chart confidential. While no one can remember what was said about the subject at the meeting, so as to be able to include the precise language in the stipulation, it is clear that the chart was put together for the purpose of convincing the government of Dr. Ahmed's innocence, and that the defendant intended that the government rely on the chart. See generally Arnold Decl. at Ex. B. Moreover, it is clear that the chart, itself, was explained to the government, including the source of the information contained in

the chart. It was apparently expected that the government would attempt to recreate the data on the chart. Under such circumstances, it would not have been reasonable for Dr. Ahmed to believe that the fact he provided the chart to his attorney would be kept confidential. Since the defendant has failed to establish that the fact that Dr. Ahmed provided the chart to his attorney was intended to be kept confidential, the claim of attorney-client privilege must fail.

"Moreover, where, as here, information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure." United States v. Tellier, 255 F.2d at 448. In such a situation, the circumstances are "too closely connected with the information which was intended to be communicated" to remain privileged. Id. For this reason as well, the fact that the defendant provided the chart to Attorney Egbert is not privileged.

¶ 6. Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents.

This court finds this statement admissible as well. Again, the government should be permitted to inquire into the scope of Mr. Egbert's authority to represent Dr. Ahmed at the meeting. Moreover, there is no evidence that the fact that Mr. Egbert was authorized to present and discuss the chart was intended to be privileged. Finally, this fact is too closely related to the facts that Mr. Egbert was clearly authorized to discuss to be considered privileged.

¶ 7. On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors. . . . With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and

the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit ___ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin treatments was permitted as a result of these "dual diagnoses" and that defendant Ahmed had not defrauded Medicare.

(Emphasis added).

For the reasons detailed above, this court concludes that these statements are admissible. The fact that the meeting took place with Dr. Ahmed's "knowledge and consent" is relevant to the scope of Mr. Egbert's authority at the meeting, and there is no evidence that any communications between counsel and Dr. Ahmed addressing the fact of the meeting was intended to be kept confidential. Similarly, the fact that statements were made by Mr. Egbert and that the statements were made "on behalf of" Dr. Ahmed, i.e. within the scope of Mr. Egbert's authority, is not privileged.

This court is, however, concerned about the underlined language simply because it does not appear to be accurate. At oral argument Mr. Egbert stated that Dr. Ahmed had not specifically approved the quoted language, which is the import of the Stipulation. While the court is hesitant to rewrite a negotiated stipulation, the court would accept a modification of the paragraph to more accurately reflect that the statements were made by Mr. Egbert at the meeting, and that they were made while Mr. Egbert was acting within the scope of his authority as counsel for Dr. Ahmed.

## IV.   CONCLUSION

For all the reasons detailed herein the government's motion in limine (Docket No. 69) is ALLOWED. The court, however, suggests that the parties clarify the

language of paragraph 7.  If the parties are unable to reach an agreement as to modified language, the court will consider the issue if presented with an appropriate motion.

                                                  / s / Judith Gail Dein
                                                  JUDITH GAIL DEIN
                                                  UNITED STATES MAGISTRATE JUDGE