# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA      )
                                                    )          Case No. 05-10057-RCL
                    v.                             )
                                                    )
ABDUL RAZZAQUE AHMED,        )
                                                    )
            Defendant                        )
_____)

### DEFENDANT'S OBJECTIONS TO MEMORANDUM OF DECISION AND ORDER ON GOVERNMENT'S MOTION *IN LIMINE* REGARDING ADMISSIBILITY OF STIPULATION

Pursuant to Rule 2(b) of the Local Magistrates Rules, Defendant Dr. Abdul Razzaque Ahmed ("Dr. Ahmed") objects to the Memorandum of Decision and Order on Government's Motion in Limine Regarding Admissibility of Stipulation, dated August 3, 2006 (Docket No. 82).

The Court erred in granting the government's motion for an order admitting into evidence a proposed stipulation relating to a meeting that took place between defense counsel and the government in October 25, 2001. First, the evidence reflected by the stipulation is only conditionally relevant to the case, and that the government had failed to lay the necessary evidentiary foundation. Second, even if the government had demonstrated relevance, the evidence should still be excluded as a matter of the court's discretion because it represents an improper attempt to use a criminal defense attorney's advocacy against his client, thereby raising significant constitutional concerns. Finally, even if the evidence is admissible, the stipulation as drafted impermissibly intrudes upon attorney-client privileged communications and must be redacted.

## PROCEDURAL AND FACTUAL HISTORY

On or around June 15, 2000, the grand jury issued a subpoena to Dr. Ahmed regarding suspected fraudulent billing practices.  See Indictment ¶ 19.[1]  On October 25, 2001, Richard M. Egbert ("Mr. Egbert" or "defense counsel") and another attorney who was representing Dr. Ahmed at the time met with several government representatives, including an Assistant U.S. Attorney for the District of Massachusetts and two federal agents (the "October 25th meeting").[2]  See Declaration of Assistant U.S. Attorney James E. Arnold ("Arnold Decl.") at ¶ 7, filed on September 1, 2005. During the meeting, Mr. Egbert provided two binders to the government containing laboratory reports (among other things), explained the reports' contents, and told the government that the reports demonstrated the lack of any fraud on the government.  Id.  Following the October 25th meeting, the government subpoenaed from the third-party labs the actual samples reported in the lab reports contained in the two binders and conducted a type of DNA analysis that allegedly suggests that the samples were previously contaminated with the DNA of other individuals.  Id. at ¶ 10.  Dr. Ahmed was indicted on March 15, 2005; Count 22 of the Indictment (obstruction) is purportedly based on this DNA analysis.  Id. at ¶¶ 10, 12.

The government wishes to introduce into evidence at trial both the statements made and the documents provided by defense counsel during the October 25th meeting against Dr .Ahmed, despite the undisputed fact that Dr. Ahmed did not attend the meeting.  In response to the government's threat to move disqualify him from representation, defense counsel agreed to stipulate to non-privileged facts regarding the October 25th meeting, but would not agree that "facts" invading the attorney-client privilege were admissible or to waive any other admissibility

---

[1] All citations to "Indictment ¶ __" refer to the corresponding paragraph in the Indictment that was returned against Dr. Ahmed on March 15, 2005.

[2] Dr. Ahmed was not present at the meeting and did not otherwise hear any of the discussions that took place at the meeting.

challenges.  After an unsuccessful attempt to have defense counsel disqualified for refusing to

stipulate to admissibility, on March 16, 2006 the government filed a Motion *in Limine*,[3] in which it

seeks an early ruling on the admissibility of a so-called Factual Stipulation ("Proposed

Stipulation").[4]

Dr. Ahmed opposed the motion to admit the stipulation because (1) such a ruling is

premature where, as here, the government has not provided the necessary factual foundation for this

Court to determine whether or not evidence of the October 25th meeting is in fact relevant to the

charges against Dr. Ahmed; (2) the government has not demonstrated that evidence of *defense*

*counsel's conduct* ought to be admitted *against the defendant*; and (3) the government's Proposed

Stipulation contains inadmissible privileged communications.[5]  On August 3, 2006, the Court

granted the Government's Motion *in Limine,* finding that "the stipulation is admissible, although ¶ 7

should be modified to more accurately reflect the parties' agreement."  (Ct. Order at 2).

## MAGISTRATE JUDGE DEIN'S MEMORANDUM OF DECISION AND ORDER

With respect to Dr. Ahmed's argument that certain evidence contained in the stipulation is

conditionally relevant and must not be admitted because the government has not laid the necessary

foundation, the Court found that Dr. Ahmed's objection was "premature" and concluded that

---

[3] See Motion *in Limine* by the United States for Ruling Admitting Into Evidence A Stipulation Entered Into by the Parties and United States' Memorandum of Law in Support of Motion *In Limine* for Ruling Admitting Into Evidence A Stipulation Entered Into by the Parties, attached hereto at Tabs B and C, respectively.

[4] See Factual Stipulation, Tab A to Government's Motion *in Limine*.  The Proposed Stipulation addresses not only what was said and done at the October 25th meeting, but also purports to cover what Dr. Ahmed *knew* and *intended* at various times in the sixteen months between the subpoena's issuance and the October 25th meeting.  It also encompasses, both directly and indirectly, *communications between Dr. Ahmed and defense counsel* throughout that sixteen-month period.  See id. at ¶¶ 4-7.

[5] See Defendant's Opposition to Government's Motion *in Limine* to Admit Into Evidence A Stipulation Entered Into by the Parties, attached hereto at Tab D.   See also United States' Reply Brief to Defendant's Opposition to Motion In Limine to Admit a Stipulation Into Evidence and Defendant's Sur-Reply to Government's Reply to Defendant's Opposition to Motion *In Limine* to Admit Stipulation Into Evidence, attached hereto at Tabs E and F, respectively.

"absent instructions from the trial judge to the contrary, the government many introduce its evidence in the order it deems most appropriate."  (Ct. Order at 6).

The Court similarly rejected Dr. Ahmed's argument that Mr. Egbert's statements during his meeting with the government were akin to "pre-plea negotiations" and protected by Federal Rule of Evidence 410 or the policy behind the rule.  The Court found that the instant case is different from United States v. Valencia, 826 F.2d 169 (2d Cir. 1987) in that:  (1) the October 25th meeting was formal enough that it would not be inconsistent with the Court's goal of honoring defendant's rights to admit counsel's statements (Ct. Order at 9-10);  (2) the statements do not fall under the purview of plea negotiations and thus there is no danger that their admission would have a chilling effect on plea negotiations (Ct. Order at 10); (3) the statements in this case are not of tangential value, but relate directly to the claims made against the defendant (Id.); and (4) the government is seeking to introduce testimony in the form of an agreed statement of fact, thus eliminating the need for any examination as to what precisely was said at the meeting (Id.).

Finally, the Court examined each challenged paragraph in the Stipulation in light of Dr. Ahmed's "most difficult objection" regarding "privileged information beyond the statements made at the meeting."  (Ct. Order at 11, 14-17).  Although it found that none of the objected-to paragraphs in the stipulation were privileged, however, the Court had concerns that some of the language "did not appear to be accurate" and so noted that it "would accept a modification of the paragraph."  (Id. at 17).

## **ARGUMENT**

When a party objects to a magistrate judge's recommendation on a matter, the district court reviews the ruling *de novo* and "may accept, reject, or modify in whole or in part, the . . . recommendation [] made by the magistrate judge."  28 U.S.C. § 636 (b)(1).  See also U.S. v.

Lawlor, 406 F.3d 37, 40 (1st Cir. 2005)(district court conducts a de novo review of a magistrate

judge's ruling on a motion to suppress).

A.    **The Court Erred by Admitting the Stipulation Without Any Indication by the Government That There Exists Evidence of the Conditional Facts Necessary for the October 25th Meeting to Be Relevant.**

The Court erred when it held that Dr. Ahmed's objection to the stipulation's admission was

"premature." (Ct. Order at 6). It is the government's motion for an order admitting the stipulation –

and not Dr. Ahmed's objection to that motion – that is premature.

As the party moving to admit the Proposed Stipulation, the government must demonstrate its

relevance under Federal Rule of Evidence 104(b). When the relevancy of evidence is conditioned

on the establishment of a conditional fact or facts – in this case, that the samples were intentionally

manipulated *and* that Dr. Ahmed was aware of or involved in the manipulation – the offering party

needs "to introduce sufficient evidence to permit a reasonable jury to find the conditional fact by a

preponderance of the evidence to establish that the evidence is relevant." U.S. v. Balthazard, 360

F.3d 309, 313 -314 (1st Cir. 2004)(citing Huddleston v. United States, 485 U.S. 681, 689-90

(1988)). See also U.S. v. Trenkler, 61 F.3d 45, 53 (1st 1995)("[i]n determining whether the

Government has introduced sufficient evidence to meet Rule 104(b), the trial court neither weighs

credibility nor makes a finding that the Government has proved the conditional fact by a

preponderance of the evidence [but] simply examines all the evidence in the case and decides

whether the jury could reasonably find the conditional fact by a preponderance of the evidence").

"Even relevant evidence should be excluded, however, if its probative value is substantially

outweighed by the danger of unfair prejudice." Id. (citing Fed. R. Evid. 403).

In this case, the government makes – and would have the Court and the jury make – the

unsupported and illogical inference that because later DNA tests performed by government agents

purport to show that the lab results were obtained with contaminated samples, Dr. Ahmed must

have had a corrupt intent in permitting his attorney to discuss the results with the government on

October 25th.  Without evidence of the conditional facts, however, any evidence of the October 25th

meeting is not relevant to prove either a wrongful act or a corrupt state of mind.  See, e.g., Ostler v.

Codman Research Group, Inc., 241 F.3d 91, 96 (1st Cir. 2001)(where a party tried to introduce

expert testimony and argued for a jury instruction but did not make a proffer regarding the

conditional fact, the district court permissibly concluded that there was no foundation for the expert

evidence or instruction and, as such, it would have been misleading to admit the evidence or allow

the instructions)(citing Fed. R. Evid. 104(b) and 403).

     If the evidence of intentional manipulation with Dr. Ahmed's knowledge or awareness was

such that a jury reasonably could find by a preponderance of the evidence that the samples were in

fact manipulated and Dr. Ahmed was aware of the manipulation, see Huddleston v. United States,

485 U.S. 681, 690 (1988), then the evidence of the October 25th meeting would be relevant to the

obstruction count.  In this case, however, the government has not only failed to show evidence of

the causal connection, but has made no offer of proof to the Court or to Dr. Ahmed that it has *any*

*evidence* tending to show that the samples were (1) intentionally manipulated (2) by Dr. Ahmed

(either with his knowledge or at his direction).  Unless and until the government can point to some

evidence in this regard, its motion *in limine* is premature and the Court erred in ruling otherwise.

See, e.g., United States v. Wilson, 798 F.2d 509, 515-16 (1st Cir. 1986)(affirming exclusion of

evidence relating to defendant's conduct in 1982 where indictment alleged fraudulent tax returns

were filed in 1978-1980 and defense failed to introduce foundational evidence to show defendant

planned to engage in later conduct at time he filed fraudulent returns); Tate v. Robbins & Myers,

Inc., 790 F.2d 10, 11-12 (1st Cir. 1986)(affirming exclusion of an instruction manual for lack of

foundation where the defendant manufacturer admittedly did not give to plaintiff's employer but plaintiff failed to show that defendant was aware plaintiff's employer had purchased product).

Admission of the stipulation without such foundational evidence would also unfairly prejudice Dr. Ahmed and mislead the jury and is thus prohibited by Rule 403. See, e.g., Ostler v. Codman Research Group, Inc., 241 F.3d 91, 96 (1st Cir. 2001)(where there is no prospect that the jury could find the conditional facts, the court excluded the conditionally relevant evidence because it would mislead the jury). The government has not offered any evidence that the samples were intentionally manipulated or that Dr. Ahmed had any knowledge of or involvement in such manipulation; this is likely because, to defense counsel's knowledge, none exists. For instance, Kailish Bhol, the person in charge of Dr. Ahmed's lab during the relevant timeframe, testified that he – and not Dr. Ahmed – collected the samples that were ultimately sent out to the third-party labs for testing, that he was confident that nothing he or anyone else in the lab did caused the samples to be manipulated, and that he was the person who received the results when they were returned to the lab.

Significantly, the stipulation as drafted misled the Court itself. Specifically, the stipulation apparently led the Court to the erroneous assumption that the chart at issue was specially prepared to give to the government.[6] As the government is well aware, grand jury testimony regarding the source of the chart is contrary to the Court's assumption. Bhol testified that he – and not Dr. Ahmed – prepared the chart at issue here, and that he did so sometime after he received the lab results, which was in July 2000. The meeting between defense counsel and the government occurred more than a year later, on October 25, 2001. Thus, although it is clear that the chart was

---

[6]   Based on the Proposed Stipulation and the government's argument, Magistrate Judge Dein erroneously concluded, "it is clear that the chart was put together for the purpose of convincing the government of Dr. Ahmed's innocence, and that the defendant intended that the government rely on the chart," (Ct. Order at 15), and "it is clear that the chart itself was explained to the government, including the source of the information contained in the chart." (Ct. Order at 15-16).

not created specifically to give to the government, the stipulation misled the Court into believing it was.  A jury is likely to make the same – if not broader – inferential (and incorrect) leaps.  Where, as here, there is no evidence that the samples were intentionally manipulated with Dr. Ahmed's knowledge or involvement, to allow evidence of the October 25th meeting would be to unfairly prejudice Dr. Ahmed at trial.  See, e.g.,  Ostler v. Codman Research Group, Inc., 241 F.3d 91, 96 (1st Cir. 2001)(where there was no evidence before the jury that plaintiff could exercise his rights as a dissenting shareholder, it would have been misleading to allow expert testimony and jury instructions on the appraisal rights under Delaware law).

        If the government wishes to wait until trial to present it foundational evidence, it is surely entitled to do so.  But it cannot simultaneously ask the Court to admit the stipulation *now* without also carrying its threshold burden of establishing admissibility by a preponderance of the evidence as required by Rule 104(b). The government must wait to seek admission of the Proposed Stipulation until it is willing or able to lay the foundation.  Only then can the Court can balance the evidence and, if appropriate, grant the government's motion.

**B.      The Court Erred In its Analysis Distinguishing this case from *Valencia***

        In a criminal trial, an attorney's statements should not lightly be admitted against his client. See, e.g., United States v. Valencia, 826 F.2d 169, 172 (2d Cir. 1987)(courts must employ a more exacting standard when considering admission of statements by attorneys under Rule 801(d)(2)(D)). Although statements made by an attorney concerning a matter within his or her employment "*may* be admissible against the party retaining the attorney . . . care must be exercised in the criminal context in determining under what circumstances attorney statements may be used against a client. . . ." Valencia, 826 F.2d at 172(emphasis added)(citations omitted).  Courts apply a more exacting standard for admission of counsel statements "in order to avoid trenching upon other important

8

policies," including the privilege against self-incrimination, the right to counsel of one's choice, and the right to the effective assistance of counsel.  Id.

Although the Court stated that it "shares the Valencia court's concerns about not using defense counsel's statements lightly," it erroneously found that this case differed from Valencia on four grounds:  (1) the October 25th meeting was formal enough that it would not be inconsistent with the Court's goal of honoring defendant's rights to admit counsel's statements (Ct. Order at 9-10);  (2) the statements do not fall under the purview of plea negotiations and thus there is no danger that their admission would have a chilling effect on plea negotiations (id. at 10); and (3) Mr. Egbert's statements are not of tangential value, but relate directly to the claims made against the defendant (id.); and (4) the government is seeking to introduce testimony in the form of an agreed statement of fact, thus eliminating the need for any examination as to what precisely was said at the meeting (id.).

First, much like Mr. Maloney's phone calls to the Assistant U. S. Attorney in Valencia, the statements by Dr. Ahmed's counsel were made "during the course of informal discussions between prosecutor and defense counsel."  Valencia, 826 F.2d at 173.  By "informal," the Valencia court could not have meant "made in a casual manner."  To the contrary, the conversations in Valencia occurred during a number of  telephone calls between counsel, during which time defense counsel made specific representations to the Assistant U.S. Attorney in order to advocate for his client's release from prison.  Such representations are not casually made to the government by competent counsel.  At the same time, however, they are not nearly as scripted as statements made in formal court proceedings.  It was this distinction between statements made during negotiations between counsel and statements made in the context of formal court proceedings that the Valencia court was concerned with.  See Valencia, 826 F.2d at 173 ("a pleading or an opening statement is more likely

to be worded with precision than informal remarks made during discussions with a prosecutor"). Clearly, defense counsel's statements at the October 25[th] meeting were not made in the context of a formal court proceeding and thus were "informal" within the meaning of <u>Valencia</u>.

Second, the <u>Valencia</u> court's concern about chilling the prospects for plea negotiations is equally at issue here. "A district court is entitled to consider whether trial use of informal attorney statements will lessen the prospects for plea negotiation or inhibit frank discussion between defense counsel and prosecutor on various topics that must be freely discussed in the interest of expediting trial preparation and the conduct of the trial." <u>Valencia</u>, 826 F.2d at 173. The government has appropriately never contended that pre-indictment meetings between counsel are anything less than a crucial part of the federal criminal process. Not only do such meetings tend to narrow the issues to be tried but often they do away with the need for trial altogether. <u>Id.</u> ("a statement made by defense counsel protesting a client's innocence may often be the prelude to plea negotiations"). For this reason, statements like those at issue in the instant case are properly excluded by the Federal Rules of Evidence and are protected unless and until Dr. Ahmed waives such protection via a proffer or plea agreement. <u>See</u> Fed. R. Evid. 410(4)(precluding the admission of evidence against the defendant, including "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which results in a plea of guilty later withdrawn"); <u>see also</u> <u>U.S. v. Stein</u>, 2005 WL 1377851 at * 10 (E.D. Pa. June 8, 2005)("the amended rules are intended to cover more than just discussions concerning the plea itself and extend to discussions concerning the preliminary steps to a negotiated plea") and at *13 ("Nothing in [Fed. R. Evid. 410] requires such 'magic words' and interpreting the rules to require them would render the rules arbitrary and unworkable").[7]

---

[7] Even if the statements made at the October 25th meeting were not automatically excluded under Federal Rule of Evidence 410, the same policy considerations underlying that Rule ought properly to inform

The fact that Dr. Ahmed was not even present at the October 25th meeting takes this case outside of the rule established by U.S. v. Penta, 898 F.2d 815 (1st Cir. 1990). Penta involved a *pro se* defendant's statements to a prosecutor made at the beginning of an investigation in order to curry favor with investigating government agents, a circumstance indistinguishable from any other in which a suspect makes inculpatory statements during an interview with an investigatory officer. Here, however, Dr. Ahmed did not personally appear at the October 25th meeting at the beginning of an investigation; he was not interviewed by the government as part of the investigatory process; and he personally did not provide any information at all. Even the Court does not believe that Dr. Ahmed cannot fairly be assumed to have "ratified" his counsel's statements in the same manner as if he had made the statements himself. (Ct. Order at 17)(noting that the portion of the stipulation asserting that Mr. Egbert made particular things "does not appear to be accurate").[8] The constitutional implications of nevertheless admitting the evidence of that meeting against him thus go far beyond that which the First Circuit was confronted with in Penta.[9]

Third, as explained in Part A, *supra.*, the evidence of the October 25th meeting can only "relate directly to the elements of the claims made against the defendant" (Ct. Order at 10) if the

---

this Court's discretion. See, e.g., U.S. v. Sanders, 979 F.2d 87, 92 (7th Cir. 1992); U.S. v. Valencia, 826 F. 2d 169 (2d Cir. 1987)(discussed in Defendant's Opposition at 6-9). Given the government's persistent attempts to gain a tactical advantage in this case by disrupting defense counsel's representation of Dr. Ahmed and attempting to force a waiver of the attorney client privilege, as well as its unwillingness to lay a proper foundation, the government's unprecedented request to admit evidence of defense counsel's meeting with the government ought to be denied.

[8] This finding also calls into question the Court's earlier statement that admitting the evidence in the form of the stipulation "eliminat[es] the need for any examination as to what precisely was said at the meeting" (Ct Order at 10).

[9] This distinction between information provided by a defendant during an investigation and statements made by counsel to advocate on the defendant's behalf also explains the otherwise odd fact that, to defense counsel's knowledge, every case in which counsel's statements have been admitted against the client have involved an attorney acting pursuant to a written power of attorney that explicitly authorized the lawyer to stand in the client's shows – or, in other words, to "be" the client – during an I.R.S investigation. U.S. v. Pappas, 806 F. Supp. 1, 4 (D. N. H. 1992); see also U.S. v. O'Connor, 433 F.2d 752, 755-56 (1st Cir. 1970); U.S. v. Martin, 773 F.2d 579, 583 (4th Cir. 1985); U.S. v. Vito, 1988 WL 78031 at *2 (E.D. Pa. July 22, 1988).

government can lay the proper foundation to show that the samples were manipulated with Dr. Ahmed's knowledge or involvement. Without that link, whether or not defense counsel met with the government on October 25th has absolutely no tendency to prove that Dr. Ahmed committed any crime.

**C.**    **The Court Erred on its Ruling with Respect to the Privileged Portions of the Stipulation.**

The applicable distinction with respect to Dr. Ahmed's privilege objection is between the communications and the facts communicated. See, e.g., United States v. Rakes, 136 F.3d 1, 4 n.4 (1st Cir. 1998)("Where an attorney knows facts only because they were confidentially communicated by the client, the government cannot circumvent the privilege by asking the attorney about 'the facts.'")(citing Upjohn Co. v. United States, 449 U.S. 383, 395 (1981)). For this Court's convenience, Dr. Ahmed will follow Magistrate Judge Dein's format and list and discuss each objected-to paragraph separately.

**¶ 4. By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.**

Through this paragraph, the government seeks to introduce evidence of Dr. Ahmed's awareness of the nature of investigation. The government may not elicit this evidence through defense counsel, however, because any "understanding" by Dr. Ahmed to which Mr. Egbert could testify comes directly from what he told Dr. Ahmed and what Dr. Ahmed told him and is clearly privileged. Furthermore, as the Court notes, paragraph 1 of the Proposed Stipulation states that Dr. Ahmed was "served with a subpoena on June 15, 2000." The government is free to introduce evidence of the subpoena and argue that the jury can infer Dr. Ahmed's knowledge from his receipt of it. What it cannot do, however, is intrude upon Dr. Ahmed's attorney-client privilege to reinforce the same.

¶ 5.  **Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney.**

The Court found "[w]hile no one can remember what was said about [the source of the chart] at the meeting, so as to be able to include the precise language in the stipulation, it is clear that the chart was put together for the purpose of convincing the government of Dr. Ahmed's innocence, and that the defendant intended that the government rely on the chart."  (Ct. Order at 15.)  The Court erred here because not only is it not "clear" that the chart was put together for this purpose, there is grand jury testimony directly to the contrary.  As explained in Part A, *infra*., Bhol testified that he – and not Dr. Ahmed – prepared the chart at issue here, and that he did so sometime after he received the lab results, which was in July 2000.  The meeting between defense counsel and the government occurred more than a year later, on October 25, 2001.[10]  The Declaration of Assistant U.S. Attorney James E. Arnold does not make any representation to the contrary.  And while "it is clear that the chart itself was explained to the government, including the source of the information contained in the chart"(Ct. Order at 15-16), that does not answer Dr. Ahmed's privilege challenge.

Dr. Ahmed agrees that the chart is not privileged.  He similarly agrees that what was said at the meeting about the source of the information contained in the chart (that is, that the samples came from Dr. Ahmed's lab) is not privileged.  What is privileged, however, is the fact that Mr. Egbert obtained the chart from his client.  Cf. In re Grand Jury Proceedings, 727 F. 2d 1352 (4th Cir. 1984)(attorney ordered to testify where discussions concerned a document that was always intended to be published, one privilege holder affirmatively waived the privilege, and the other two did not assert it); U.S. v. Colton, 306 F.2d 633, 639 (2d Cir. 1962)(distinguishing between information provided to an attorney for the explicit purpose of inclusion on a tax return from

---

[10] For this reason, the cited language ought properly to be excluded under Rule 403 as well because its tendency to mislead the jury is made manifest by the fact that it has already misled the Court.

"confidential communications," and noting that it is "self-evident" that any documents or testimony reflecting confidential communications between the client and attorney were "necessarily privileged"); U.S. v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958)(no intent to keep communication confidential where, at the time of the communication, the attorney advised the client that he would also disclose the contents of the communication to two other people). Again (assuming its relevance), the government can present testimony regarding the preparation of the chart through Dr. Bhol. There is no need for the government to invade the privilege to reinforce that testimony in a way that is likely to mislead the jury.

United States v. Tellier, 255 F.2d 441 (2d Cir. 1958), which was relied upon by the Court below, has no application to the facts of this case. In Tellier, a case decided by the Second Circuit in 1958, the Court admitted a letter – which was intended to be disclosed to other individuals – memorializing a phone conversation between Mr. Tellier and his attorney. Id. at 447. The Court found that because the client did not intend the contents of the letter to be kept confidential, the circumstances were "too closely connected with the information which was intended to be communicated" to remain privileged and admitted testimony regarding the phone conversation itself. Id. Thus the Court's reasoning was that because the letter memorialized an attorney-client communication and the letter was intended to be disclosed, the communication was not privileged. The instant situation is drastically different. Here, the chart – but *not* the attorney communication – was intended to be disclosed. Thus, although the chart – and the information contained therein – is not privileged, there has been no waiver of the privilege with respect to the communications.

**¶ 6. Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents.**

**¶ 7. On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors . . . With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents**

**that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis" of pemphigus and pemphigoid.  Defendant Ahmed's attorney further stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin treatments was permitted as a result of these "dual diagnosis" and that defendant Ahmed had not defrauded Medicare.**

The Court concluded that statements in paragraphs 6 and 7 are admissible except that the underlined language "does not appear to be accurate."  (Ct. Order at 17).  Through this finding, the Court implicitly recognized that clients rarely if ever tell their attorneys precisely what to say or do when advocating on the clients' behalf.  There is no dispute that Mr. Egbert was authorized to represent Dr. Ahmed in the investigation of this case and to advocate on Dr. Ahmed's behalf.  That Mr. Egbert decided to do so by meeting with the government and giving the government a chart containing lab results does not somehow vitiate his client's attorney client privilege with respect to conversations with his attorney.

## CONCLUSION

For the foregoing reasons and the reasons contained in Defendant's Opposition to Government's Motion *in Limine* to Admit Into Evidence A Stipulation Entered Into by the Parties and Defendant's Sur-Reply to Government's Reply to Defendant's Opposition to Motion *In Limine* to Admit Stipulation Into Evidence, Dr. Ahmed respectfully requests that the Court deny the Government's motion at this time.

Respectfully submitted,
**Dr. Abdul Ahmed,**
By his attorney,

__/s/ Richard M. Egbert _____
Richard M. Egbert
99 Summer Street
Boston, MA 02110
(617) 737-8222

Dated: August 17, 2006.

**<u>Certificate of Service</u>**

   I, Richard M. Egbert, hereby certify that I have, on this 17th day of August, 2006, caused the above document to be electronically served by hand upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

       <u> /s/ Richard M. Egbert  </u>
      Richard M. Egbert

16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO.
05-10057-RCL

UNITED STATES OF AMERICA

v.

ABDUL RAZZAQUE AHMED

**MEMORANDUM OF DECISION AND ORDER ON GOVERNMENT'S
MOTION IN LIMINE REGARDING ADMISSIBILITY OF STIPULATION**

August 3, 2006

DEIN, M.J.

## I.  INTRODUCTION

The defendant Abdul Razzaque Ahmed ("Dr. Ahmed") is charged in a multi-

count indictment with mail fraud, health care fraud, money laundering, and obstruction

of justice.  The government previously moved to disqualify Dr. Ahmed's counsel,

Richard Egbert.  As detailed in a memorandum of decision and order dated November

22, 2005, this court denied the motion to disqualify on the grounds that a stipulation

could be reached regarding Mr. Egbert's testimony.  After extensive negotiations, the

parties have reached a stipulation.  While the defendant agrees that the facts asserted

in the stipulation are true, he disputes the admissibility of the stipulation on various

grounds.

This matter is presently before the court on the "Motion In Limine By The United

States For Ruling Admitting Into Evidence A Stipulation Entered Into By The Parties."

(Docket No. 69).  For the reasons detailed herein, this court finds that the stipulation is

admissible, although ¶ 7 should be modified to more accurately reflect the parties'

agreement.  Therefore, as detailed below, the motion in limine is ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>

The principal claim against Dr. Ahmed is that he allegedly engaged in a scheme

to defraud the Medicare program by falsely representing that certain patients who were

suffering from a blistering skin disease known as pemphigoid were also suffering from a

different rare blistering skin disease known as pemphigus vulgaris ("pemphigus").  At

the time, Medicare allowed reimbursements for certain intravenous immunoglobulin

("IVIG") treatments for pemphigus but not for pemphigoid.  Dr. Ahmed is charged with

fraudulently billing Medicare over $5 million for IVIG treatments for patients who

suffered from pemphigoid, but did not have pemphigus.  The pre-indictment

investigation of Dr. Ahmed lasted about five years — with a subpoena being issued to

Dr. Ahmed on June 15, 2000 and the indictment being returned on March 15, 2005.

During the investigation, a meeting was held on October 25, 2001.[1]  The Factual

Stipulation at issue relates to this meeting. The meeting was attended by AUSA Sandra

Bower, Postal Inspector Jean Zaniewski, Special Agent Nancy Scanlan, and two

attorneys representing Dr. Ahmed, Richard Egbert and Patrick Sparks.  These

attorneys represented Dr. Ahmed throughout the pre-indictment investigation of the

---

[1]  Facts about what took place at the meeting are taken from the Declaration of
Assistant U.S. Attorney James E. Arnold ("Arnold Decl.") (Docket No. 46), the exhibits thereto,
including a memorandum from Special Agent Nancy Scanlan (Ex. B) and the chart in question
(Ex. C), the parties' memoranda, and statements made during oral argument.

case. However, only Mr. Egbert, and not Mr. Sparks, has entered an appearance as trial counsel in this matter.

In the course of this meeting, Mr. Egbert presented the government with a chart. The chart, which is referenced in the challenged stipulation, lists 42 of Dr. Ahmed's patients and purports to show the results of three lab tests conducted on the blood sera for each of the patients. See Arnold Decl. at ¶ 7. According to the Government, "[t]he three lab tests were conducted by defendant Ahmed, Beutner Labs and Mayo Clinic. The chart purported to represent that the lab test results for each of the 42 patients had indicated that each of the patients were suffering from both pemphigoid and pemphigus." Id.

During the course of the meeting, Mr. Egbert made various statements to the government that are reflected in the stipulation. He has characterized these statements as having been made "in a good faith attempt to convince the government not to pursue charges against his client." Defendant's Opposition to Government's Motion in Limine ("Opp.") (Docket No. 71) at 7. His efforts, however, were unsuccessful. As a result of the meeting and information provided at the time, Dr. Ahmed was indicted for obstruction of justice. Specifically, Counts 21 and 22 of the indictment charge Dr. Ahmed with obstruction of justice by allegedly providing false written documents to the government during the investigation to show that patients who had received IVIG treatments and suffered from pemphigoid also suffered from pemphigus. In addition, the indictment charges that Dr. Ahmed mixed the blood of patients who suffered from pemphigoid and pemphigus and then sent the mixed blood

-3-

to a laboratory for testing. The test results, which were included in the chart given to

the government, then showed patients who were actually only suffering from

pemphigoid to also be suffering from pemphigus. As alleged in Count 22 of the

indictment, at the meeting of October 25, 2001, Dr. Ahmed caused false documents

> to be prepared and produced, <u>through his retained defense</u>
> <u>counsel</u>, to individuals duly authorized by a department and
> agency of the United States to conduct and engage in
> investigations for prosecutions for violations of health care
> offenses, including individuals employed by the United States
> Attorney's Office for the District of Massachusetts, which
> documents were false and fraudulent in that they were created
> using results obtained by: (1) causing blood sera samples for 42 of
> his pemphigoid patients (including at least 22 Medicare patients) to
> be mixed with the blood of other of his patients who suffered from
> pemphigus; and (2) causing the mixed blood sera to be sent to the
> Buffalo Lab for testing in order to obtain test results which would
> falsely show that each of these 42 patients suffered from
> pemphigus.

Indictment ¶ 40 (emphasis added). The "retained defense counsel" refers to

Mr. Egbert. The government has made it clear, however, that it is not contending that

Mr. Egbert knew that the documents and information provided at the meeting were

false.

## The Motion in Limine

After extensive negotiations, the parties entered into a "factual stipulation."

Dr. Ahmed has stipulated to the accuracy of the facts contained in the stipulation, but

not to their admissibility. The government has filed its motion in limine seeking a ruling

that the stipulation is admissible.

Dr. Ahmed raises three arguments.  First, he contends that the government has

failed to establish the necessary factual predicates for the admission of the chart and

any related information, and that such evidence is, therefore, inadmissible because it is

not relevant under Fed. R. Evid. 104(b) and related common law.  Second, Dr. Ahmed,

relying on the case of United States v. Valencia, 826 F.2d 169 (2d Cir. 1987), argues

that the meeting should be treated as a pre-plea discussion, and that this court should

exercise its discretion and preclude the admission of evidence and testimony relating to

the meeting.  Finally, Dr. Ahmed contends that certain statements in the stipulation are

protected by the attorney-client privilege and are therefore inadmissible.[2]  For the

reasons detailed herein, this court finds these arguments unpersuasive.

### III.  ANALYSIS

#### A.    The Need for a Foundation

Dr. Ahmed contends that, before the chart is relevant to the issues in this

litigation, the government must first establish that (1) the samples were intentionally

manipulated, and (2) that Dr. Ahmed knew about that manipulation.  Since the

government has not yet established these facts, the defendant contends that the chart

and related evidence should be precluded under Fed. R. Evid. 104(b).  That Rule

provides as follows:

> **(b) Relevancy conditioned on fact.**  When the relevancy of
> evidence depends upon the fulfillment of a condition of fact, the
> court shall admit it upon, or subject to, the introduction of evidence
> sufficient to support a finding of the fulfillment of the condition.

---

[2]  During oral argument, the defendant provided the court with a copy of the stipulation
marked to show which portions he claimed were privileged.

(emphasis added).

This court finds Dr. Ahmed's objection to be premature. There is no question that the chart and related conversations are relevant to the charges of obstruction of justice. Dr. Ahmed's objection is that the government has not yet revealed the rest of its case, and established that there is sufficient evidence to pursue the charges. However, there is no basis for the contention that, at this stage of the proceedings, the government has to establish facts which may turn out to be critical to the claim for obstruction of justice, i.e., that the samples were manipulated and that Dr. Ahmed knew of the manipulation. Consequently, there is no reason to rule at this stage that the government cannot proceed with its case.

Absent instructions from the trial judge to the contrary, the government may introduce its evidence in the order it deems most appropriate. Rule 104(b) expressly recognizes that evidence may be introduced either after or subject to the introduction of other evidence which makes it relevant. The defendant may raise the issue of the order of evidence with the trial judge. There is no basis at this point, however, to preclude the admission of the chart and related communications.

## B.    Pre-plea Negotiations

Dr. Ahmed next argues that this court should exercise its discretion, and treat the meeting as a plea discussion that is inadmissible either under Fed. R. Evid. 410[3] or the policy behind the Rule. In light of the law of the First Circuit and the circumstances

---

[3] In relevant part, Fed. R. Evid. 410(4) makes inadmissible "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."

surrounding the meeting and the production of the chart, this court finds this argument unpersuasive. There is no basis for excluding the evidence relating to the meeting or the chart on this ground.

Dr. Ahmed is relying on the case of United States v. Valencia, 826 F.2d 169 (2d Cir. 1987). The issue in that case was "whether statements made by defense counsel during informal conversations with a prosecutor may be admitted against a criminal defendant as admissions by an agent." Id. at 170. Recognizing the "considerable discretion" of the trial judge in determining whether to admit certain evidence, a majority of the Court upheld the decision not to admit such statements, over a strong dissent. See id. at 173. Valencia, however, addresses a significantly different situation than the one presented here.[4]

The Valencia court began its analysis by recognizing that "statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." Id. at 172 (quotation and citation omitted). Nevertheless, the court cautioned that "care must be exercised in the criminal context in determining under what circumstances attorney statements may be used against a client," "because the routine use of attorney statements against a criminal defendant risks impairment of the privilege against self-incrimination, the right to counsel of one's choice, and the

---

[4] At least one court has held that the Second Circuit has "narrowed" the reach of Valencia by holding, in United States v. Arrington, 867 F.2d 122, 128 (2d Cir 1989), "that despite the concerns raised about the use of attorney's out-of-court statements, no special procedures are required for the admission of such evidence." United States v. Harris, 914 F.2d 927, 932 (7th Cir. 1990). The instant case does not require this court to address the exact scope or continued viability of Valencia.

right to the effective assistance of counsel." Id. In Valencia, the government had

sought to have the statements of counsel admitted as an admission of a party opponent

under the agency exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(C), (D).[5] Id.

The trial judge denied the government's motion, and that decision was found not to be

an abuse of discretion.

In upholding the trial court's decision not to admit the testimony, the Second

Circuit relied on various factors. Specifically, the Court found it significant that the

statements at issue were made during the course of informal discussions, and thus not

only were not transcribed, but also were unlikely to have been made with any precision.

Id. at 173. In addition, the court concluded that the admission of the statements would

have a chilling effect on the prospect of plea negotiations. Thus the court ruled that

while "the statements were not made during the course of plea negotiations and

therefore were not automatically excludable under Fed. R. Evid. 410, see Fed. R. Crim.

P. 11(e)(6), a statement by defense counsel protesting a client's innocence may often

be the prelude to plea negotiations." Id. Further, the court found that there was little

justification for using the statements which were "not offered to show admission of an

element of the offense, a use that would directly prove the government's case and

expedite the trial" but rather to show, in an attenuated way, a consciousness of guilt, or

to impeach the defendant if he testified. Id. Finally, the court recognized that the

---

[5] Fed. R. Evid. 801(d)(2) provides in relevant part that the following statements are not hearsay: "(2) Admission by party opponent. The statement is offered against a party and is ... (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship ...."

government, when presented with counsel's statements, could have requested that counsel provide an affidavit of his client's version of the facts. Id. at 174.

None of these factors exist in the present case. Thus, the chart and conversations at issue were not part of "informal discussions." Rather, there was a specific meeting set up where the defendant, through his counsel, elected to make a formal presentation of facts which had been gathered specifically by the defense for the purpose of presenting evidence to the government. In light of the formality of the meeting, the admission of statements made at the meeting about the chart would not be inconsistent with the goal of this court "to honor scrupulously defendants' rights against self-incrimination, their right to counsel of their choice, and their right to effective assistance of counsel." United States v. Pappas, 806 F. Supp. 1, 6 (D. N.H. 1992) (while recognizing concerns addressed by Valencia, court finds that where attorney's statements were made pursuant to a power of attorney and not in an informal setting, the defendants' rights would not be violated by the admission of their representatives' statements).

Nor would the admission of the statements in this court's view have a chilling affect on plea negotiations. In United States v. Penta, 898 F.2d 815 (1st Cir. 1990), the First Circuit made it abundantly clear that the prohibition against admitting statements made during plea discussions "means plea discussions, and not simply anything that might ultimately lead to such." Id. at 817. The court expressly rejected the argument that a "preliminary discussion must be considered as part of the overall plea bargaining process." Id. at 818 (internal citation omitted). Therefore, statements made to the

-9-

government while the government "was openly trying to build a case against defen-

dant's associates" were found to be admissible in Penta. See id. at 816. In light of this

clear ruling, there is no legitimate claim that an attorney who engages in a formal

meeting with the government in the First Circuit for the purpose of convincing the

government not to pursue charges would expect that such discussions would be

privileged in the absence of an express representation or agreement to that effect. See

In re Keeper of the Records, XYZ Corp., 348 F.3d 16, 28 (1st Cir. 2003) (where party

repeatedly informed the government during pre-indictment discussions that it was not

waiving the attorney-client privilege by providing certain information, there was no

waiver even absent an express written agreement). "Effective advocacy requires

strategic and tactical decisions at all levels of the criminal process. The fact that a

lawyer's unsuccessful maneuver might be used against his client will not unduly chill

legitimate advocacy." United States v. Harris, 914 F.2d 927, 932 (7th Cir. 1990). Thus,

the Valencia court's concern that the admission of an attorney's statement might chill

the possibility of negotiations has no application to the facts presented here.

Furthermore, unlike Valencia, the statements being sought to be admitted are

not of tangential value, but do, in fact, relate directly to the elements of the claims made

against the defendant. Finally, unlike Valencia, the government is seeking to introduce

the testimony in the form of an agreed statement of fact, thereby eliminating the need

for any examination as to what precisely was said at the meeting. Thus, none of the

bases for the Valencia court's decision to preclude the admission of the attorney's

statements exist in the instant case.

-10-

In the instant case, given the formality of the meeting and the fact that the defense affirmatively introduced evidence to the government that it wanted the government to study and accept, this court sees no reason to exclude the evidence of the meeting either as a matter of law or as a matter of policy. While this court shares the Valencia court's concerns about not using defense counsel's statement's lightly, this court finds no benefit in creating a rule where the defense can affirmatively and voluntarily lead the government astray with impunity (if that is what, in fact, happened in the instant case). The meeting in question was not a plea negotiation, and is not entitled to the protections afforded such negotiations.

### C.    Attorney-Client Communications

Dr. Ahmed's final, and in this court's view, most difficult objection is to specific stipulated facts which he claims are protected by the attorney-client privilege. Thus,"Dr. Ahmed does not claim that the chart reflecting the test results, or anything else said or given to the government at the October 25th meeting is privileged," but nonetheless disputes the admissibility of specific facts as seeking privileged information beyond the statements made at the meeting. See Defendant's Sur-Reply (Docket No. 73) at 6. "The burden of proving the existence of the privilege is on the party asserting the privilege." United States v. Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989). This means that as the party claiming the privilege, Dr. Ahmed must "present the underlying facts demonstrating the existence of the privilege." Fed. Trade Comm. v. Shaffner, 626 F.2d 32, 37 (7th Cir. 1980).

-11-

The rules governing the admissibility of attorney-client communications are easy to state, yet hard to apply. Thus, the party asserting the privilege must establish that "(1) the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; (2) the communications were made in confidence; and (3) the privilege as to these communications has not been waived." In re the Reorganization of Electric Mutual Liability Ins. Co., Ltd., 425 Mass. 419, 421, 681 N.E.2d 838, 840 (1997). See also United States v. Wilson, 798 F.2d 509, 512 (1st Cir. 1986) (the privilege protects "facts communicated for the purpose of securing a legal opinion, legal services or assistance in a legal proceeding[.]"). "It is of the essence of the attorney-client privilege that it is limited to those communications which are intended to be confidential." United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958). "Thus, it is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." Id. "In addressing whether a given communication was meant to be confidential, what the client *reasonably* understood is the key question." United States v. Bay State Ambulance, 874 F.2d at 28 (internal punctuation and citation omitted).

It is also well established "that the privilege is narrowly confined because it hinders the courts in the search for truth." United States v. Mass. Institute of Technology, 129 F.3d 681, 684-85 (1st Cir. 1997). See also In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984) ( "since the privilege impedes the full

-12-

and free discovery of the truth" it is to be narrowly construed and can only apply where

a communication was intended to be kept confidential) (internal citation omitted).

Nevertheless, "[w]here an attorney knows facts only because they were confidentially

communicated by the client, the government cannot circumvent the privilege by asking

the attorney about 'the facts.'" United States v. Rakes, 136 F.3d 1, 4 n.4 (1st Cir. 1998)

Finally, there may be either express or implied waivers of the attorney-client

privilege. In re Keeper of the Records, XYZ Corp., 348 F.3d at 22. Since the attorney-

client privilege is "highly valued," "courts should be cautious about finding implied

waivers." Id. at 23. Nevertheless, where fairness dictates that it do so, "waivers by

implication can sometimes extend beyond the matter actually revealed." Id. at 23-24.

However, "the extrajudicial disclosure of attorney-client communications, not thereafter

used by the client to gain adversarial advantage in judicial proceedings, cannot work an

implied waiver of all confidential communications on the same subject matter." Id. at

24.

In determining the scope of the attorney-client privilege in the instant case, this

court must also consider the fact that the stipulation arises in the context of seeking to

admit statements of counsel against his client. As detailed above, admissions made by

counsel in the course of his or her representation may be admitted into evidence

against the defendant. See United States v. O'Connor, 433 F.2d 752, 755-756 (1st Cir.

1970) (attorney's statements to IRS officials admitted against the defendant as having

been made within the scope of attorney's authority where there was no evidence that

the defendant had told his attorney not to make the statements or otherwise limited the

position counsel was to take); Fed. R. Evid. 801(d)(2)(C), (D), quoted at note 4, supra.

It is undisputed that Mr. Egbert was authorized to represent Dr. Ahmed at the meeting,

and that he was acting within the scope of his authority when he presented the chart

and engaged in discussions with the government. See Stipulation at ¶¶ 6, 7. It is

appropriate for agents to "make clear the nature and extent of their authority to speak

for defendants prior to informational meetings or negotiation sessions with government

agents" and, by so doing, define which of their statements may be binding on their

clients. See United States v. Vito, 1988 WL 78031, *2 (Crim. No. 88-137)(E.D. Pa. July

22, 1998) (where defendant authorized his attorneys to meet with the IRS for the

purpose of explaining his position during an investigation, attorneys' statements are

admissible under Rule 801(d)(2)(D); scope of authority is not limited to written powers

of attorney where the conduct of the defendant authorizing the meeting establishes an

implied agency with counsel).

     Applying these principles to the Factual Stipulations which Dr. Ahmed

challenges as being privileged, this court rules as follows:

     ¶ 4. By not later that June 15, 2000, defendant Ahmed was aware of an ongoing
criminal investigation that was investigating whether he was engaged in proper
Medicare billing practices concerning patients who were diagnosed with pemphigus
and/or pemphigoid.

     The court finds this Stipulation to be admissible. There is no evidence that Dr.

Ahmed learned of the investigation only through confidential communications. In fact,

Stipulation ¶ 1 states that he was served with a subpoena on June 15, 2000.

Moreover, the facts included in this paragraph are relevant to defining the scope of Mr.

Egbert's authority when he met with the government as counsel for Dr. Ahmed.

Therefore, it would have been appropriate for the government to seek this information

from Mr. Egbert if he testified at trial.  See United States v. Diozzi, 807 F.2d 10, 13 (1st

Cir. 1986) (when stipulation used in lieu of disqualification of counsel, government

limited to facts which could have been ascertained at trial).

¶ 5.  Sometime before October 25, 2001, defendant Ahmed provided the chart
marked as Exhibit __ to his attorney.

The court finds that this Stipulation is also admissible.  Admittedly, there are

situations were the identity of a client or the source of information is intended to be kept

confidential, and, as such, is protected by the attorney-client privilege.  See, e.g.,

United States v. Sanders, 979 F.2d 87, 91 (7th Cir. 1992) (where disclosure of a client's

identity would convey the substance of the confidential communication, disclosure

precluded by the attorney-client privilege); Anderson v. State, 297 So.2d 871, 873 (Fla.

App. 1974) (attorney does not have to disclose from whom he received stolen

property).  However, no such "special circumstances" exist in the present case.  See

Colton v. United States, 306 F.2d 633, 637 (2d Cir. 1962).

As an initial matter, there is no evidence in the record to support the conclusion

that there was any intent on the part of the defendant to keep the source of the chart

confidential.  While no one can remember what was said about the subject at the

meeting, so as to be able to include the precise language in the stipulation, it is clear

that the chart was put together for the purpose of convincing the government of Dr.

Ahmed's innocence, and that the defendant intended that the government rely on the

chart.  See generally Arnold Decl. at Ex. B.  Moreover, it is clear that the chart, itself,

was explained to the government, including the source of the information contained in

the chart. It was apparently expected that the government would attempt to recreate

the data on the chart. Under such circumstances, it would not have been reasonable

for Dr. Ahmed to believe that the fact he provided the chart to his attorney would be

kept confidential. Since the defendant has failed to establish that the fact that Dr.

Ahmed provided the chart to his attorney was intended to be kept confidential, the

claim of attorney-client privilege must fail.

"Moreover, where, as here, information is given and it is agreed that it is to be

transmitted to a third party, then not only the specific information, but the more detailed

circumstances relating to it are subject to disclosure." United States v. Tellier, 255 F.2d

at 448. In such a situation, the circumstances are "too closely connected with the

information which was intended to be communicated" to remain privileged. Id. For this

reason as well, the fact that the defendant provided the chart to Attorney Egbert is not

privileged.

¶ 6. Defendant Ahmed authorized his attorney to present that chart to and
discuss that chart with the prosecutors and agents.

This court finds this statement admissible as well. Again, the government should

be permitted to inquire into the scope of Mr. Egbert's authority to represent Dr. Ahmed

at the meeting. Moreover, there is no evidence that the fact that Mr. Egbert was

authorized to present and discuss the chart was intended to be privileged. Finally, this

fact is too closely related to the facts that Mr. Egbert was clearly authorized to discuss

to be considered privileged.

¶ 7. On October 25, 2001, with defendant Ahmed's knowledge and consent,
defendant Ahmed's attorney met with one of the prosecutors. . . . With the
authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and

-16-

the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit ___ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin treatments was permitted as a result of these "dual diagnoses" and that defendant Ahmed had not defrauded Medicare.

(Emphasis added).

For the reasons detailed above, this court concludes that these statements are admissible. The fact that the meeting took place with Dr. Ahmed's "knowledge and consent" is relevant to the scope of Mr. Egbert's authority at the meeting, and there is no evidence that any communications between counsel and Dr. Ahmed addressing the fact of the meeting was intended to be kept confidential. Similarly, the fact that statements were made by Mr. Egbert and that the statements were made "on behalf of" Dr. Ahmed, i.e. within the scope of Mr. Egbert's authority, is not privileged.

This court is, however, concerned about the underlined language simply because it does not appear to be accurate. At oral argument Mr. Egbert stated that Dr. Ahmed had not specifically approved the quoted language, which is the import of the Stipulation. While the court is hesitant to rewrite a negotiated stipulation, the court would accept a modification of the paragraph to more accurately reflect that the statements were made by Mr. Egbert at the meeting, and that they were made while Mr. Egbert was acting within the scope of his authority as counsel for Dr. Ahmed.

## IV.  CONCLUSION

For all the reasons detailed herein the government's motion in limine (Docket No. 69) is ALLOWED. The court, however, suggests that the parties clarify the

-17-

language of paragraph 7.  If the parties are unable to reach an agreement as to

modified language, the court will consider the issue if presented with an appropriate

motion.


        / s / Judith Gail Dein
JUDITH GAIL DEIN
UNITED STATES MAGISTRATE JUDGE

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 05-10057-RCL** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ABDUL RAZZAQUE AHMED** | ) | |
| | ) | |
| **Defendant** | ) | |

## MOTION IN LIMINE BY THE UNITED STATES FOR RULING ADMITTING INTO EVIDENCE A STIPULATION ENTERED INTO BY THE PARTIES

The United States hereby moves, in limine, pursuant to Federal Rule of Evidence 104, for a ruling that the Stipulation entered into between the parties, a copy of which is attached hereto as Exhibit A,[1] is admissible as evidence in the trial of this matter. The specific grounds in support of this motion are set forth in the accompanying Memorandum of Law.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ James E. Arnold
JAMES E. ARNOLD
JEREMY M. STERNBERG
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

March 13, 2006

---

[1] Counsel for the defendant has indicated his approval of the stipulation appearing at Exhibit A. Upon receipt of the executed stipulation, the United States will file that document with the Court.

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

_/s/ James E. Arnold_____
JAMES E. ARNOLD
Assistant United States Attorney

Date:  March 13, 2006

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.  05-10057-RCL |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ABDUL RAZZAQUE AHMED | ) |  |
|  | ) |  |
| Defendant | ) |  |

## FACTUAL STIPULATION

1.    On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. §3486).

2.    The Subpoena sought from defendant Ahmed, among other things, "medical and billing records for all patients who are being treated or were treated with IVIG and for whom any part or all of the services was billed to medicare and/or any third party payor."

3.    The documents sought by the Subpoena related to the investigation of a Federal health care offense.  Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

4.    By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing

1

practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

  5. Sometime before October 25, 2001, defendant Ahmed provided the chart marked as

Exhibit __ to his attorney.  Defendant Ahmed stipulates that the copy of the chart attached hereto

is authentic.

  6. Defendant Ahmed authorized his attorney to present that chart to and discuss that

chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare

billing practices.

  7. On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant

Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph

3) and two federal agents.  One of the agents was from Department of Health and Human

Services, Office of the Inspector General and one was from the Postal Inspection Service.  The

prosecutor and the two agents were all working on the Medicare billing investigation concerning

defendant Ahmed.  During that meeting, which took place at the United States Attorney's

Offices, defendant Ahmed's attorney presented them with the binders attached hereto as Exhibit

__.  Included in these binders was the chart.  With the authorization of defendant Ahmed,

defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit __ should

convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis"

of pemphigus and pemphigoid.  Defendant Ahmed's attorney further stated on behalf of

defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin

treatments was permitted as a result of these "dual diagnoses" and that defendant Ahmed had not

defrauded Medicare.

So Stipulated:


_____
ABDUL RAZZAQUE AHMED


_____
RICHARD M. EGBERT
Counsel for Abdul Razzaque Ahmed

.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-10057-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ABDUL RAZZAQUE AHMED | ) | |
| | ) | |
| Defendant | ) | |

## UNITED STATES' MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE FOR RULING ADMITTING INTO EVIDENCE A STIPULATION ENTERED INTO BY THE PARTIES

To stave off disqualification of defendant's retained trial counsel (Attorney Richard Egbert), whom the United States identified as a potential Government witness, defendant Abdul Razzaque Ahmed agreed to stipulate to certain facts that the United States sought to establish through the testimony of counsel.[1] Although defendant Ahmed agreed to stipulate to the *accuracy* of those facts, he has refused to stipulate to the *admissibility* of those same facts. Because the facts contained within the stipulation are clearly relevant to the allegations contained in the indictment -- particularly those allegations contained in Count 22 concerning the production of a chart to the United States by counsel on behalf of defendant Ahmed, which chart the United States subsequently determined was based upon false and altered evidence -- the United States at this time moves for a ruling that the stipulation entered into by defendant Ahmed is admissible in its entirety.

---

[1] An unsigned copy of the stipulation appears as Exhibit A to the Government's Motion in Limine. Counsel for the defendant has indicated his approval of the stipulation, and, upon receipt of the executed stipulation, the United States will file that document with the Court.

## I.  BACKGROUND

### A.    The Indictment's Allegations

The Indictment charges defendant Ahmed, a physician who established and operated a

medical practice under the name "Center For Blistering Diseases," with a variety of criminal

offenses, including, *inter alia,* mail fraud, health care fraud, money laundering, and obstruction

of justice.  These charges essentially relate to two different, yet interconnected, schemes:  (1)

defendant Ahmed's scheme to defraud the Medicare program, and (2) defendant Ahmed's

scheme to obstruct the Government's investigation into his Medicare billings.

### 1.    The scheme to defraud the Medicare program

The Indictment outlines defendant Ahmed's scheme to defraud the Medicare program

with respect to certain patients who were suffering from a blistering skin disease known as

pemphigoid.  The Indictment charges that defendant Ahmed concocted a scheme in which he

falsely represented to Medicare that certain of his pemphigoid patients were also suffering from

a different rare blistering skin disease known as pemphigus vulgaris ("pemphigus").[2]

The Indictment explains that Medicare allowed reimbursement for extremely expensive

intravenous immunoglobulin ("IVIG") treatments for patients suffering from pemphigus, but did

not allow for similar reimbursements for those patients suffering from pemphigoid.  *See*

Indictment, ¶ 14.  In order to obtain insurance payments for his administration of IVIG

---

[2]  Pemphigus and pemphigoid are two separate and distinct autoimmune blistering skin
diseases.  Indictment, ¶ 7.  Pemphigus attacks the body's immune system by sending antibodies
to attack inter-cellular cement, the mortar holding the cells of the skin place and can be fatal.  *Id.,*
¶ 8.  In contrast, pemphigoid is generally not a fatal disease, and attacks the foundation of the
skin known as the basement membrane zone.  *Id.,* ¶ 9.  Both diseases can generally be diagnosed
by biopsies of tissue or by laboratory analysis of blood sera.  *Id.,* ¶ 10.

treatments to his pemphigoid patients, defendant Ahmed made false "dual-diagnoses" in which

he misrepresented his patients' diagnoses. Over the course of the relevant time period (1997-

2001), defendant Ahmed submitted fraudulent bills to Medicare totaling over $5 million for

IVIG treatments for patients who suffered only from pemphigoid and did not have pemphigus.

*See generally* Indictment, ¶¶ 20-31.

The Indictment also explains the manner in which defendant Ahmed implemented his

fraudulent scheme. Defendant Ahmed created false documents, including bogus

Immunopathology Reports to create the impression that his pemphigoid patients were also

suffering from pemphigus. Defendant Ahmed used these documents both to cover up his

fraudulent billing scheme and to further his continued receipt of Medicare funds for these

patients. Indictment ¶ 28. Additionally, as part of his scheme and to further justify his false

Medicare billings with respect to his pemphigoid patients, defendant Ahmed caused the blood

sera of one or more of his patients suffering from pemphigus to be mixed with the blood sera of

certain patients suffering only from pemphigoid. Defendant Ahmed then caused those vials of

mixed blood to be sent to a testing laboratory, thereby causing that testing laboratory to issue test

results revealing the presence of pemphigus with respect to patients who were, in fact, suffering

only from pemphigoid. Indictment, ¶¶ 29-30.

## 2.     The attempts to obstruct and mislead the investigation

Counts 21 and 22 of the Indictment address defendant Ahmed's attempts to obstruct and

mislead the investigation into his Medicare billing activities. Count 21 charges that defendant

Ahmed was served with a subpoena on June 15, 2000, as part of an ongoing criminal

investigation by the United States into his Medicare billings. Thereafter, from June 2000

through at least October 2000, defendant Ahmed sought to obstruct justice by falsifying written documents pertaining to those pemphigoid patients who had received IVIG treatments so as to make it appear that they were also suffering from pemphigus. *See* Count Twenty-One, Indictment, ¶¶ 37-38. Defendant Ahmed then caused those false documents to be produced to federal criminal investigators who were investigating his Medicare billing practices. *Id.*, ¶ 38.

Count 22 of the Indictment charges that defendant Ahmed further sought to obstruct the ongoing investigation into his billing practices by causing other false documents to be prepared. These false documents incorporated fraudulent test results that had been previously obtained from the mixing of the blood sera samples of pemphigus patients with the blood sera of patients suffering only from pemphigoid. *Id.*, ¶ 40. According to the Indictment, on or about October 25, 2001, defendant Ahmed caused these false documents to be produced "through his retained counsel" to federal criminal investigators who were investigating health care offenses pertaining to defendant Ahmed's Medicare billing practices. *Id.*

## B.    The Stipulation

The Stipulation at issue sets forth facts that directly relate to the issues presented by the Indictment's allegations. Paragraphs 1 through 4 of the Stipulation address the fact that defendant Ahmed was aware that there was an ongoing criminal investigation into his Medicare billing practices with respect to certain patients who were diagnosed with pemphigus and/or pemphigoid by virtue of his receipt of an administrative subpoena issued pursuant to 18 U.S.C. § 3486 and his subsequent production of documents pursuant to that subpoena:

> 1.    On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. §3486).

2.      The Subpoena sought from defendant Ahmed, among other things, "medical and billing records for all patients who are being treated or were treated with IVIG and for whom any part or all of the services was billed to medicare and/or any third party payor."

3.      The documents sought by the Subpoena related to the investigation of a Federal health care offense.  Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

4.      By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

Paragraphs 5 and 6 of the Stipulation address steps taken by the defendant Ahmed in connection with the ongoing investigation:  namely, that he retained an attorney (Attorney Egbert), that he provided a chart to his attorney, and that he provided this chart to his attorney for the express purpose of having his attorney present the chart to the prosecutors and agents who were investigating his billing practices to convince them that he had not, in fact, defrauded the Medicare program:

5.      Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney.  Defendant Ahmed stipulates that the copy of the chart attached hereto is authentic.

6.      Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing practices.

Finally, paragraph 7 of the Stipulation discusses that, on October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney (1) met with various

5

federal officials who were working on the Medicare billing investigation, (2) presented those

federal officials with the chart previously provided by Ahmed, and (3) told those federal officials

that the information in this chart should convince them that defendant Ahmed had not defrauded

Medicare:

> 7.    On October 25, 2001, with defendant Ahmed's
> knowledge and consent, defendant Ahmed's attorney met with one
> of the prosecutors (the same one referred to above in paragraph 3)
> and two federal agents. One of the agents was from Department of
> Health and Human Services, Office of the Inspector General and
> one was from the Postal Inspection Service. The prosecutor and
> the two agents were all working on the Medicare billing
> investigation concerning defendant Ahmed. During that meeting,
> which took place at the United States Attorney's Offices,
> defendant Ahmed's attorney presented them with the binders
> attached hereto as Exhibit __. Included in these binders was the
> chart. With the authorization of defendant Ahmed, defendant
> Ahmed's attorney told the prosecutor and the two agents that
> Exhibit __ should convince them "beyond a doubt" that the
> patients appearing on Exhibit __ had a "dual diagnosis" of
> pemphigus and pemphigoid. Defendant Ahmed's attorney further
> stated on behalf of defendant Ahmed that reimbursement from
> Medicare for intravenous immunoglobulin treatments was
> permitted as a result of these "dual diagnoses" and that defendant
> Ahmed had not defrauded Medicare.

## II.  ARGUMENT

"[E]videntiary stipulations are a valuable and integral part of everyday trial practice."

*United States v. Mezzanato*, 513 U.S. 196, 203 (1995). Here, by stipulating to the facts set forth

in Exhibit A, defendant Ahmed succeeded in maintaining Attorney Egbert as his trial counsel.

However, regardless of the source of the evidence (whether directly from Attorney Egbert or via

Stipulation), there can be no question but that the facts set forth in the stipulation are relevant to

the allegations set forth in Counts 21 and 22 of the Indictment. Indeed, the facts set forth in the

Stipulation go to the heart of the events underlying aspects of both Counts 21 and 22. as well as

to the defendant's knowledge and intent at the time of those events.

Pursuant to Rule 401, Fed.R.Evid., evidence is relevant if has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." Counts 21 and 22 both allege that

defendant Ahmed willfully attempted to obstruct and mislead the investigation of a health care

fraud offense in violation of 18 U.S.C. § 1518. Title 18, United States Code, Section 1518

provides, in pertinent part, that:

> Whoever willfully prevents, obstructs, misleads, delays or attempts
> to prevent, obstruct, mislead, or delay the communication of
> information or records relating to a violation of a Federal health
> care offense to a criminal investigator shall be fined under this title
> or imprisoned not more than 5 years, or both.

Paragraphs 1 through 4 of the Stipulation set forth facts pertaining to the defendant's

knowledge of the ongoing investigation. These are necessary facts going toward establishing the

defendant's awareness of the ongoing investigation and provide context and background in

understanding the defendant's subsequent acts. As such, they are relevant and admissible under

Fed.R.Evid. 401. *See, e.g., United States v. Flemmi*, 402 F.3d 79, 87 (1st Cir. 2005) (citing

*United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("To be relevant, evidence need

only tend to prove the government's case, and evidence that adds context and dimension to the

government's proof of the charges can have that tendency. Relevant evidence is not confined to

that which directly establishes an element of the crime.")). Additionally, the statement in

paragraph 3 of the Stipulation that

> Defendant Ahmed, through his retained attorney, produced
> documents responsive to the Subpoena to a criminal investigator,

> namely an Assistant U.S. Attorney for the United States Attorney's
> Office for the District of Massachusetts, who was duly authorized
> by the Department of Justice to conduct or engage in investigations
> for prosecutions of health care offenses

is part of the very conduct alleged to constitute the defendant's criminal behavior in Count 21

(alleging, *inter alia*, that defendant Ahmed caused false documents to be created and that

defendant Ahmed "further caus[ed] those false documents to be produced to individuals duly

authorized by a department and agency of the United States to conduct and engage in

investigations for prosecutions for violations of health care offenses.")  Finally, the facts set forth

in paragraphs 1 through 4 of the Stipulation help establish the *mens rea* element pertaining to the

willfulness of defendant Ahmed's subsequent actions in attempting to obstruct and mislead the

ongoing investigation.  *See United States v. Feldman,* 83 F.3d 9, 14 n.3 (1st Cir. 1996).

The remainder of the paragraphs in the Stipulation (¶¶ 5-7) pertain to actions taken

directly by defendant Ahmed (¶¶ 5-6), and/or actions taken and statements made by counsel

during the course of counsel's representation of defendant Ahmed while acting on behalf of, and

with authorization from, Ahmed (¶ 7).  These actions and statements are at the heart of the

charges contained in Count 22 and, in fact, constitute the *actus reus* of the charged offense.  As

such, they are directly relevant and admissible.  *See* Fed.R.Evid. 801(d)(2)(A), 801(d)(2)(C),

801(d)(2)(D); *see, e.g., United States v. O'Connor*, 433 F.2d 752, 755-56 (1st Cir. 1970)

(statements made by counsel to IRS properly admitted where counsel's statements were

authorized by defendant by virtue of power of attorney); *United States v. Martin*, 773 F.2d 579,

583-84 (4th Cir. 1985) (same); *see generally United States v. Pappas*, 806 F.Supp. 1, 3-4

(D.N.H. 1992) (statements made by counsel within scope of authorization provided by defendant

are admissible); *United States v. Vito*, 1988 WL 78031, *1-*2 (E.D. Pa. 1988) (false exculpatory

statements made by counsel representing defendant concerning matter within scope of representation properly admitted).  Moreover, the chart produced by counsel, as well as counsel's statements concerning the patients on the chart, are admissible in that the chart (and counsel's associated statements) are not being offered for the truth of the matters asserted. Rather, as will be proven at trial, the Government's evidence will establish the falsity of both the chart and counsel's representations that the patients listed on the chart "had a 'dual diagnosis' of pemphigus and pemphigoid." *See, e.g., United States v. Munson*, 819 F.2d 337, 339-40 (1st Cir. 1987) (false statements made by others not hearsay).

### III.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court rule that the entirety of the Stipulation appearing as Exhibit A to the Motion in Limine be admitted into evidence for purposes of the trial of this matter and any related pre-trial proceedings.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/  James E. Arnold
        James E. Arnold
        Jeremy M. Sternberg
        Assistant United States Attorneys
        One Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3100

March 13, 2006

9

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

/s/ James E. Arnold
JAMES E. ARNOLD
Assistant United States Attorney

Date: March 13, 2006

10

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 05-10057-RCL |
| v. ) | |
| ) | |
| ABDUL RAZZAQUE AHMED, ) | |
| ) | |
| Defendant ) | |

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT INTO EVIDENCE A STIPULATION ENTERED INTO BY THE PARTIES

The government has moved *in limine* for an order admitting into evidence a so-called factual stipulation through which it hopes to prove Count 22 of the Indictment currently pending against the defendant, Dr. Abdul Razzaque Ahmed ("Dr. Ahmed"). For the following reasons, this Court should deny the government's motion.

## FACTS

The facts relevant to this motion are largely undisputed. On or around June 15, 2000, the grand jury issued a subpoena to Dr. Ahmed. See Indictment ¶ 19.[1] On October 25, 2001, Richard M. Egbert ("Mr. Egbert" or "defense counsel") and another attorney who was representing Dr. Ahmed at the time met with several government representatives, including an Assistant U.S. Attorney for the District of Massachusetts and two federal agents. See Declaration of Assistant U.S. Attorney James E. Arnold ("Arnold Decl.") at ¶ 7, filed on September 1, 2005. Dr. Ahmed was not present at the meeting and did not hear any of the discussions that took place at the meeting.

---

[1] All citations to "Indictment ¶ __" refer to the corresponding paragraph in the Indictment that was returned against Dr. Ahmed on March 15, 2005.

During the meeting, Mr. Egbert provided two binders to the government containing laboratory reports (among other things), explained the reports' contents, and told the government that the reports demonstrated the lack of any fraud on the government. Id. Following the October 25th meeting, the government subpoenaed the samples that formed the basis of the lab reports contained in the two binders and, using its own lab, conducted a type of DNA analysis that purports to show that the samples were contaminated with the DNA of other individuals. Id. at ¶ 10. Count 22 of the Indictment is purportedly based on this DNA analysis. Id. at ¶¶ 10, 12.

The government seeks to introduce at trial both the statements made and the documents provided by defense counsel during the October 25th meeting against Dr. Ahmed, despite the undisputed fact that Dr. Ahmed did not attend the meeting. It initially sought to do so by announcing that defense counsel would likely be called as a witness (despite the presumably available testimony of all other meeting participants), and suggesting that defense counsel voluntarily disqualify himself from representing his client. Id. at ¶ 13. That same day, the government announced to this Court its intent to have defense counsel disqualified. Id. at ¶ 13 (citing Transcript of Initial Appearance, dated March 16, 2005, at 9). Over the next few months, the government sent draft "stipulations" that would ostensibly obviate the need for it to carry through on its threat to seek defense counsel's disqualification. Id. at ¶¶ 14-16. Defense counsel agreed to stipulate to non-privileged facts regarding the October 25th meeting, but would not agree that "facts" invading the attorney-client privilege were admissible or to waive any other admissibility challenges.

After an unsuccessful attempt to have defense counsel disqualified for taking this position, the government filed the instant motion, which seeks an early ruling on the admissibility of a so-called Factual Stipulation ("Proposed Stipulation") See Proposed

Stipulation, attached to Government's Motion at Tab A. The Proposed Stipulation addresses not only what was said and done at the October 25th meeting, but also purports to cover what Dr. Ahmed knew and intended at various times in the sixteen months between the subpoena's issuance and the October 25th meeting. It also encompasses, both directly and indirectly, communications between Dr. Ahmed and defense counsel throughout that sixteen-month period. See id. at ¶¶ 4-7. As the asserted basis for the Proposed Stipulation's admissibility, the government has argued only that it is relevant under Federal Rule of Evidence 401. See Government's Memorandum of Law, filed on March 13, 2006, at 6-9.

## ARGUMENT

The Court should deny the government's motion to admit evidence of the October 25th meeting for three reasons. First, the government has utterly failed to provide the necessary factual foundation for this Court to determine whether or not evidence of the October 25th meeting is in fact relevant to the charges against Dr. Ahmed. Second, even if the government had laid the necessary evidentiary foundation for relevance, it has not demonstrated that evidence of defense counsel's conduct ought to be admitted against this defendant. Third, even if evidence of the October 25th meeting was properly admissible in theory, the government's Proposed Stipulation contains inadmissible privileged communications.

## A.    The Government Has Not Demonstrated that Evidence of the October 25th Meeting Is Relevant.

The government contends that evidence of defense counsel's statements and actions at the October 25th meeting is relevant to show Dr. Ahmed's alleged intent to obstruct justice. Specifically, the government states that at the meeting, defense counsel presented test results of certain sera samples to the government and stated that those results demonstrated that the diagnoses of certain patients were not fraudulent. There is no dispute that Dr. Ahmed was not

3

present at the meeting, and did not personally make any representations to the government about

the samples, the test results, or what the results demonstrated. Nonetheless, the government

reasons that because later DNA tests performed by government agents purport to show that the

lab results were obtained with contaminated samples, Dr. Ahmed must have had a corrupt intent

in permitting his attorney to discuss the results with the government on October 25th. Therefore,

according to the government, the discussion at the October 25th meeting must be relevant to the

obstruction charge.

"Relevancy is not an inherent characteristic of any item of evidence but exists only as a

relation between an item of evidence and a matter properly provable in the case." Fed. R. Evid.

401, advisory committee note. Here, the government's relevance argument necessarily requires

some proof that: (1) the samples were intentionally manipulated; and (2) Dr. Ahmed knew about

that manipulation prior to the October 25th meeting. "When the relevancy of evidence depends

upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the

introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed.

R. Evid. 104(b).

In assessing whether the proponent of conditionally-relevant evidence has laid a proper

foundation under Rule 104(b), the court must determine by a preponderance of the evidence

whether a fact-finder could reasonably find that the conditional fact exists. See Huddleston v.

United States, 485 U.S. 681, 690 (1988). In any case where the conditional facts necessary to lay

a proper foundation are not provided, the evidence should be excluded. See, e.g., United States

v. Wilson, 798 F.2d 509, 515-16 (1st Cir. 1986)(affirming exclusion of evidence relating to

defendant's conduct in 1982 where indictment alleged that fraudulent tax returns were filed in

1978-1980 and defense failed to introduce foundational evidence to show defendant planned to

engage in later conduct at time he filed fraudulent returns); Tate v. Robbins & Myers, Inc., 790

F.2d 10, 11-12 (1st Cir. 1986)(affirming exclusion of an instruction manual for lack of

foundation where the defendant manufacturer admittedly did not give the manual to plaintiff's

employer but plaintiff failed to show that defendant was aware plaintiff's employer had

purchased product).

    Here, the government claims that the reports provided on October 25th were obstructive

because they were based on contaminated samples. It has not, however, pointed to a single piece

of evidence showing that the samples were intentionally manipulated as opposed to unwittingly

contaminated. Nor has the government pointed to any evidence to show that Dr. Ahmed had any

idea that the samples were contaminated prior to the October 25th meeting. On information and

belief, the government has not done so because there is no such evidence. The grand jury

materials produced by the government reflect that the samples that the government alleges were

purposefully manipulated were prepared not by Dr. Ahmed but rather by laboratory technicians –

none of whom are alleged to have done anything wrong. Specifically, according to the

testimony, one technician prepared the samples to be tested from larger vials, while a second

technician generally supervised the preparation process. Both technicians then packed and

shipped the prepared samples to third-party laboratories for testing, while a third technician

recorded the shipments on a computer. Defense counsel is unaware of any evidence before the

grand jury to show that Dr. Ahmed personally participated in either preparing the samples or

shipping them to the third-party labs, or that Dr. Ahmed, his employees, or anyone else had any

idea that the samples may have been contaminated, purposefully or otherwise, at any time.

    Because both the intentional manipulation of the samples and Dr. Ahmed's knowledge of

that manipulation are preliminary facts necessary to establish the relevance of the October 25th

meeting to the obstruction charge, this failure of proof is fatal to the government's motion.

Without the proper foundation, the evidence of the October 25th meeting is not relevant to prove

either a wrongful act or a corrupt state of mind[2] and unless the government sets forth sufficient

evidence to show otherwise, the evidence of the meeting ought to be excluded.

**B.**     **The Government Has Not Demonstrated that Evidence of the October 25th Meeting Is Otherwise Properly Admissible.**

Even if the government were able to demonstrate a link between the samples'

contamination and Dr. Ahmed – which it cannot – this Court still has the discretion not to admit

evidence of Mr. Egbert's statements at the October 25th meeting.  Although statements made by

an attorney concerning a matter within his or her employment "*may* be admissible against the

party retaining the attorney . . . care must be exercised in the criminal context in determining

under what circumstances attorney statements may be used against a client. . . ."  See United

States v. Valencia, 826 F.2d 169, 172 (2nd Cir. 1987)(emphasis in original)(citations omitted).

This is because "the routine use of attorney statements against a criminal defendant risks

impairment of the privilege against self-incrimination, the right to counsel of one's choice, and

the right to the effective assistance of counsel."  Id.  As a consequence, "the government . . .

should only offer this sort of evidence in rare cases and when absolutely necessary, in order to

avoid impairing the attorney/client relationship, chilling full disclosure by a defendant to his

lawyer, and deterring defense counsel from 'vigorous and legitimate advocacy.'"  United States

v. Sanders, 979 F.2d 87, 92 (7th Cir. 1992)(citation omitted).

---

[2] Initially, the government argued that evidence of the October 25th meeting was relevant only to Count 22.  See United States' Motion to Disqualify Richard M. Egbert, Esq., as Trial Counsel ("Disqualification Motion"); Memorandum in Support (Disqualification Memo"), and the Declaration of Assistant U.S. Attorney James Arnold ("Arnold Decl."), all filed on September 1, 2005.  In its latest motion, the government asserts that the meeting is relevant to Count 21 as well.  See Govt. Memo. at 6-7.  Because both counts allege violations of 18 U.S.C. § 1518, which criminalizes only "willfully" obstructive conduct, the government would need to show the same foundational facts – that the samples were intentionally manipulated and that Dr. Ahmed knew it – prior to being able to establish the relevance of the October 25[th] meeting to either count.

Here, there is no dispute that Mr. Egbert's statements at the October 25th meeting were made in a good faith attempt to convince the government not to pursue charges against his client.[3] Such pre-indictment meetings happen everyday; indeed, like pre-indictment disposition discussions, bail discussions, discussions designed to expedite phases of a criminal case, and numerous other informal discussions between defense counsel and the government, they are a necessary part of federal criminal practice. Despite their ubiquity, the government has only rarely been permitted to use statements made by defense counsel at such meetings as substantive evidence of a defendant's guilt. This is no doubt because using attorney statements against a defendant raises serious risks to both private and public interests, including potentially: (1) infringing upon a defendant's constitutional rights, such as the right against self-incrimination, the right to counsel of one's choice, and the right to the effective assistance of counsel; (2) intruding upon the attorney-client privilege; (3) inhibiting frank discussion between defense counsel and the government on numerous topics designed to expedite trial and pre-trial matters; and (4) discouraging pre-indictment negotiations themselves. See e.g., Valencia, 826 F.2d at 171-72.

In Valencia, for example, defense counsel sought to persuade the government to release the defendant on bail by explaining that the defendant was innocent. See id. at 171. In a series of telephone conversations with the case agent and the Assistant U.S. Attorney, defense counsel elaborated on this claim of innocence by making assertions about the defendant's relationship (or lack thereof) with his alleged co-conspirator, assertions that the government later learned were demonstrably false. Id. Just like in this case, the government in Valencia filed an in limine

---

[3] The government has made clear that it does not believe Mr. Egbert himself had any knowledge that the samples were contaminated at the time of the October 25th meeting. See Govt's Disqualification Memo, at 11, n. 3 ("the Government would note that it has no evidence of, and is not suggesting that, Attorney Egbert had knowledge of the documents' falsity at the time that he presented and discussed the documents with Government representatives").

motion well before trial seeking to admit defense counsel's statements both as substantive

evidence to show the defendant's guilt and as impeaching evidence if the defendant testified.  Id.

The trial court denied the government's motion because using the statements "would be

'contrary to the attorney/client privilege.'"  Id.  As the court stated, "To rule as the government

asks . . . would set a dangerous precedent for the admission of all informal, out-of-court

statements by attorneys against their clients."  Id.  That denial was affirmed by the Second

Circuit, in part, because:

> [T]he admission of [defense counsel's] statements would pose some threat to chilling the
> prospects for plea negotiations.  Though the statements themselves were not made during
> the course of plea negotiations and therefore were not automatically excludable under
> Fed. R. Evid. 410, a statement made by defense counsel protesting a client's innocence
> may often be the prelude to plea negotiations.  A district court is entitled to consider
> whether trial use of informal attorney statements will lessen the prospects for plea
> negotiation or inhibit frank discussion between defense counsel and prosecutor on
> various topics that must be freely discussed in the interest of expediting trial preparation
> an the conduct of the trial.

Id. at 173.

Here, the government has gone even further than in Valencia.  It has freely admitted that

Count 22 itself is based solely on the statements and conduct of defense counsel at the October

25th meeting – a meeting that Dr. Ahmed did not attend.  See Arnold Decl. at ¶ 12 ("Count 22 of

the Indictment concerns the meeting that took place on October 25, 2001, between Attorney

Egbert and representatives of the United States.").  Moreover, while paying lip service to the

importance of constitutional protections, the government has repeatedly attempted to intrude on

Dr. Ahmed's Fifth and Sixth Amendment rights, including following through on its threats to

seek disqualification of his long-term counsel, in an attempt to bully Dr. Ahmed into waiving the

attorney-client privilege.  See, e.g., Transcript of Disqualification Hearing, dated November 15,

2005, at 4 (attached at Tab A) ("The stipulation has certain facts in it that only counsel would be

8

able to testify to."); 6 ("That information can come from no one, other than defense counsel"); 7 ("We believe that the crime fraud exception would apply . . . But the government, recognizing the defendant's Sixth Amendment concerns in this instance, are willing to live with this stipulation on the condition that it's admitted."); and 15 ("I think we would be able to obtain the discussions that counsel and his client had. Number one, under crime fraud . . . We were willing to forego that argument, in return for an admissible stipulation."). In other words, the government has repeatedly and intentionally used counsel's statements at the October 25[th] meeting to attempt to break the attorney-client privilege – not through litigation, but rather through coercion. This is precisely the type of governmental intrusion into the attorney-client privilege that led the <u>Valencia</u> court to exclude defense counsel's statements from the trial.

Nor is this a situation where the government has presented evidence that either the defendant or his counsel was acting in bad faith at the time of the meeting, such that a line could be drawn between this case and other pre-indictment negotiations. To the contrary, the government has already conceded that defense counsel was acting in good faith at the time of the meeting. As for the defendant, the government has yet to point to any evidence showing that he knew there was anything wrong with the information being imparted at the October 25th meeting, despite having briefed the details of the meeting in two memoranda of law, an affidavit by the lead Assistant U.S. Attorney, and at oral argument before this Court. Unless and until the government points to some evidence of wrongful intent on the part of the defendant, it ought not to be permitted to establish a new paradigm where criminal defense attorneys speak to the government in good faith at their client's automatic peril. Given the importance of encouraging pre-indictment discussions with the government generally, and the government's inability to point to a single piece of admissible evidence in this case to link Dr. Ahmed personally to the

allegedly obstructive conduct, this Court should decline the government's request to admit

evidence of Mr. Egbert's statements as substantive evidence of Dr. Ahmed's guilt.

**C.     Even if the Evidence of the October 25th Meeting Were Properly Admissible, the Proposed Stipulation Is Not.**

Finally, even if the government were able to present sufficient evidence to demonstrate

the relevance of the October 25th meeting, and even if this Court were inclined to exercise its

discretion to admit the evidence, the government cannot introduce that evidence through the

Proposed Stipulation.  Under United States v. Diozzi, 807 F.2d 10, 13-14 (1st Cir. 1986), where

the government announces an intent to call defense counsel as a witness, an appropriate factual

stipulation can provide an acceptable substitute for such testimony.  In drafting such a

stipulation, however, Diozzi does not permit the government to go beyond what it would

otherwise be able to show through defense counsel's testimony at trial.  See id. at 13 (defense

counsel did not need to stipulate to the fact that statements made to the government were false

and misleading where the government was unable to establish that fact through counsel's

testimony).  Rather, the Federal Rules of Evidence apply to stipulations just as they would to the

trial testimony itself.

As this Court is aware, the government moved to disqualify Mr. Egbert from representing

Dr. Ahmed at trial because it claimed it needed Mr. Egbert to testify about the October 25th

meeting.  Acting in accordance with Diozzi, Mr. Egbert agreed to stipulate to the facts of the

October 25th meeting in response to the government's claim, and he remains willing to do so

should this Court decide that evidence of the meeting is properly admissible.  But the Proposed

Stipulation drafted by the government and attached to its Motion is inadmissible because it

clearly implicates, both directly and indirectly, privileged communications between Dr. Ahmed

and his attorney that occurred over the sixteen months in between the subpoena's issuance (in

June 2000) and the pre-indictment meeting (in October 2001). Because the government has
made no argument justifying its proposed use of this privileged information against Dr. Ahmed
at trial, the stipulation that the government seeks to admit must be excluded.

      1.     The Proposed Stipulation contains inadmissible "facts" that intrude upon the
              attorney-client privilege.

     As an initial matter, the Proposed Stipulation is in lieu of Mr. Egbert's testimony, yet it
purports to stipulate to Dr. Ahmed's subjective frame of mind. For example, ¶ 4 states, "By no
later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that
was investigating whether he was engaged in proper Medicare billing practices concerning
patients who were diagnosed with pemphigus and/or pemphigoid." Similar problems are
apparent in ¶ 7, which states that Mr. Egbert attended the October 25th meeting "with defendant
Ahmed's knowledge and consent."

     "A witness may not testify to a matter unless evidence is introduced sufficient to support
a finding that the witness has personal knowledge of the matter." See Fed. R. Evid. 602. Any
factual basis upon which Mr. Egbert could assess Dr. Ahmed's knowledge would have arisen as
a result of their confidential discussions as attorney and client. As such, the government cannot
inquire into, and Mr. Egbert cannot provide, his assessment of Dr. Ahmed's state of mind
without violating the attorney-client privilege. See, e. g., United States v. Rakes, 136 F.3d 1, 4
n.4 (1st Cir. 1998) ("Where an attorney knows facts only because they were confidentially
communicated by the client, the government cannot circumvent the privilege by asking the
attorney about 'the facts.'")(citing Upjohn Co. v. United States, 449 U.S. 383, 395 (1981)).

     Through the Proposed Stipulation, the government also seeks privileged communications
directly. In ¶ 5, the Proposed Stipulation states that "defendant Ahmed provided the chart
marked as Exhibit __ to his attorney." Similarly, ¶ 6 asserts that "Defendant Ahmed authorized

his attorney to present that chart to and discuss that chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing practices." And ¶ 7 states that defense counsel made certain statements at the October 25[th] meeting "[w]ith the authorization of defendant Ahmed." Each of these assertions are nothing more than a bold attempt to re-characterize as "fact" information that is clearly based on prior attorney-client communications.

Information provided by a criminal defendant to his attorney is privileged unless some exception applies. See Rakes, 136 F.3d at 3. Here, Dr. Ahmed and Mr. Egbert engaged in numerous discussions throughout the sixteen months between the issuance of the first subpoena on June 15, 2000, and the October 25, 2001 meeting. During those discussions, Dr. Ahmed revealed numerous confidences for the purpose of seeking legal advice. That Mr. Egbert ultimately met with the government at the pre-indictment stage in an attempt to advocate for his client does not somehow operate to waive the privilege for the communications that occurred over that sixteen-month period. See, e.g., Rakes, 136 F.3d at 5 (noting the difference between disclosing the attorney-client communication itself, which can waive the privilege, and disclosing facts recounted within such a communication, which will not waive the privilege absent some additional showing). Here, the government has made no argument – let alone a sufficient evidentiary showing – upon which this Court could conclude that the privilege's protections for the entire sixteen-month period at issue were waived. Its failure to do so despite its clear acknowledgement at oral argument that its Proposed Stipulation "has certain facts in it that only counsel would be able to testify to," see Tr., Disqualification Hearing, at 4, should send a clear signal that there is no legitimate waiver argument to be made.

2.    The government has not demonstrated that the crime-fraud exception operates to withdraw the protections of the attorney-client privilege in this case.

At base, the government wants to use the Proposed Stipulation to vitiate the attorney-client privilege without having to actually go through the requisite steps to invoke the crime-fraud exception. Fortunately, the law does not permit the privilege's protections to be stripped away so casually.

In order to successfully invoke the crime-fraud exception, the government must make a prima facie showing that Dr. Ahmed sought Mr. Egbert's assistance in furtherance of a crime or fraud. See United States v. Reeder, 170 F.3d 93, 106 (1st Cir. 1999). Specifically, the government must "present evidence: '(1) that the client was engage[ed] in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; *and* (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity.'" In re Grand Jury Proceedings, 417 F.3d 18, 22 (1st Cir. 2005)(citing In re Grand Jury Proceedings (Violette), 183 F.3d 71, 75 (1st Cir. 1999))(brackets and emphasis in original). This requires the government to present as an initial matter sufficient evidence to show "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." United States v. Zolin, 491 U.S. 554, 572 (1989)(citation omitted). If the government makes that showing, the Court then has the discretion to perform an *in camera* review of the privileged materials themselves, which may or may not be appropriate depending upon the facts and circumstances of the particular case, in order to decide whether or not to pierce the privilege. Id.

"[N]either speculation nor evidence that shows only a distant likelihood of corruption is enough." In re Grand Jury Proceedings, 417 F.3d at 23. Nor is it enough "to find reasonable cause to believe that the client is guilty of crime or fraud. Forfeiture of the privilege requires the

13

client's *use or aim to use* the lawyer to foster the crime or the fraud." Id. (emphasis in original).

As explained by the First Circuit:

> The government's underlying notion may be that the privilege is lost for any communication that plays a functional role in a crime – regardless of whether the parties to the communication are entirely innocent and otherwise protected by the privilege. . . . In all events, it is not the law.  Under the crime-fraud exception, we think that it takes wrongful complicity by the privilege holder, not innocent or involuntary action, to forfeit the privilege.

Rakes, 136 F.3d at 5.  Here, the government cannot make the requisite showing under the crime-fraud exception for much the same reason that it has failed to demonstrate relevance: without evidence showing (1) that the samples were intentionally manipulated as opposed to inadvertently contaminated; and (2) that Dr. Ahmed knew about that manipulation, it is impossible for the government to show that Dr. Ahmed intended to use Mr. Egbert at the October 25th meeting to obstruct justice.  See also United States v. Jacobs, 117 F.3d 82, 88 (2nd Cir. 1997)("To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act*.")(citing United States v. White, 887 F.2d 267, 271 (D.C. Cir. 1989))(emphasis in original).

The government does not argue to the contrary; in fact, it does not argue the crime-fraud exception at all.  Given the government's repeated references to the exception at the hearing on its disqualification motion, see, e.g., Tab A at 7, 15, 16, 24, its failure to even invoke the exception in its motion to admit the Proposed Stipulation – which intentionally implicates privileged communications – can fairly be taken as a tacit acknowledgement that the exception is inapplicable to this case.  At the very least, until the government presents some evidence to show (1) that Dr. Ahmed knew at some time before October 25, 2001 that the samples had been manipulated, and (2) that he intended to use Mr. Egbert to provide the government with lab reports based on those samples with the intent to obstruct justice, the "facts" set forth in the

14

Proposed Stipulation cannot be deemed admissible, because they clearly implicate attorney-client communications, and because the government has not presented this Court with any argument as to why the privilege ought not be respected here.

## CONCLUSION

For all of the foregoing reasons, Dr. Ahmed respectfully requests that the government's motion to admit evidence of the October 25th meeting be denied until such time as the government demonstrates some link between its speculative theories and the actual evidence.

Respectfully submitted,
**Dr. Abdul Ahmed,**
By his attorney,


___/s/ Richard M. Egbert _____
Richard M. Egbert
99 Summer Street
Boston, MA 02110
(617) 737-8222

Dated: April 10, 2006

## Certificate of Service

I, Richard M. Egbert, hereby certify that I have, on this 10th day of April, 2006, caused the above document to be electronically served by hand upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

___/s/ Richard M. Egbert _____
Richard M. Egbert

15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10057-RCL |
| | ) | |
| ABDUL RAZZAQUE AHMED, | ) | |
| | ) | |
| Defendant | ) | |

### UNITED STATES' REPLY BRIEF TO DEFENDANT'S OPPOSITION TO MOTION *IN LIMINE* TO ADMIT A STIPULATION INTO EVIDENCE

In the Defendant's Opposition To Government's Motion In Limine To Admit Into

Evidence A Stipulation Entered Into By The Parties ("Opposition"), Ahmed argues, inter alia,

that the now-executed Stipulation[1] is irrelevant or, at most, conditionally relevant to the pending

charges. He further contends that certain statements within the Stipulation are protected by the

attorney-client privilege. He is wrong on both points. As discussed in both in the United States'

Memorandum of Law in Support of Motion In Limine For Ruling Admitting Into Evidence A

Stipulation Entered Into By The Parties ("Opening Brief") and below, the Stipulation sets forth

facts that are directly relevant to one or more counts in the Indictment. Moreover, as discussed

below, none of the Stipulation's facts are protected by the attorney-client privilege for two

reasons: first, they pertain to matters that Ahmed and his counsel never intended to be kept

confidential; and second, Ahmed and Attorney Egbert revealed the facts to third parties (i.e.,

representatives of the United States), thereby waiving any privilege that might otherwise have

existed.

---

[1] The executed Stipulation and an Agreement concerning the execution of the Stipulation are attached hereto as Exhibits A and B, respectively.

# I. BACKGROUND

## A.    The Indictment

As the Opening Brief described, the Indictment charges Ahmed with a variety of crimes, including mail fraud, health care fraud, money laundering and obstruction of justice. These charges arise out of two different, yet interconnected schemes: (1) Ahmed's scheme to defraud the Medicare program; and (2) Ahmed's scheme to obstruct the Government's investigation into his Medicare billings.

The fraudulent Medicare scheme relates to Ahmed's practice of providing false information to Medicare in connection with his use of an extremely expensive drug, intravenous immunoglobulin ("IVIG"). This scheme involved Ahmed's submission of false diagnoses for patients who were suffering solely from a non-Medicare reimbursable disease (e.g., pemphigoid) to make it appear that the patients were also suffering from a different disease (e.g., pemphigus vulgaris) for which Medicare allowed reimbursement for IVIG treatments.

The obstruction scheme involved Ahmed's continued submission of false information to the United States after commencement of the investigation into Ahmed's billing practices. As described in Count Twenty-One, Ahmed, after receiving an administrative subpoena requiring production of medical records pertaining to his IVIG treatments, caused the creation of false documents relating to patients who received those treatments and then caused those documents to be produced to federal criminal investigators. Later, as discussed in Count Twenty-Two, Ahmed caused other false documents to be presented to the United States through Attorney Egbert, his retained counsel. These false documents consisted of blood test results that were obtained through the surreptitious mixing of blood sera samples from various patients, thereby

2

resulting in test results that falsely indicated that certain patients were suffering from both
pemphigoid and pemphigus.

**B.    Negotiations Pertaining to the Stipulation**

As detailed in the earlier Memorandum in Support of the United States' Motion to
Disqualify Richard M. Egbert, Esq., as Trial Counsel, filed on September 1, 2005, Attorney
Egbert's presentation of false documents on behalf of Ahmed is at the heart of the obstruction
counts. Counsel for the United States discussed the fact that the United States intended to call
Attorney Egbert as a witness on the obstruction counts at Ahmed's initial appearance. See
Declaration of Assistant U.S. Attorney James Arnold, filed on September 1, 2005, at Ex. D, p. 9.
In an effort to forestall the need to file a disqualification motion and in reliance upon Attorney
Egbert's assertion that the disqualification issue could be resolved by a Stipulation, the United
States forwarded draft Stipulations to Attorney Egbert. After receiving no initial response to the
draft Stipulations, the United States filed a Motion to Disqualify Attorney Egbert, which was set
for hearing at 2:00 p.m. on September 26, 2005.

At approximately noon on September 26, counsel for the United States and Attorney
Egbert met at the courthouse and discussed, edited and arrived at tentative agreement on the
Stipulation. Later that afternoon, counsel for the parties reported this to the Court, which
suspended consideration of the disqualification motion. Shortly thereafter, counsel for the
United States sent Attorney Egbert a typewritten redraft and Attorney Egbert's handwritten
mark-up of the Stipulation. See Ex. C attached hereto.

At a subsequent hearing held on November 15, 2005, relating to the United States'
renewed motion to disqualify counsel, Attorney Egbert relied upon this negotiated Stipulation as

grounds not to be disqualified as counsel. Attorney Egbert, with Ahmed present at counsel table, acknowledged in open court that the facts in the Stipulation were truthful. At the same time, however, Attorney Egbert suggested that he wanted to reserve the right to object to the admissibility of the Stipulation. Hearing Transcript (attached hereto as Ex. D) at p. 8 ("I agreed that I would stipulate, for example, Dr. Ahmed knew such and such or gave me such and such as a true fact, but not it's [sic] admissibility"); p. 31 ("I'm stipulating as to what facts occurred. I agree with that, without waiving the privilege as to those facts or any of the facts in the stipulation.").

Thereafter, the parties entered into an Agreement relating to execution of the Stipulation. See Exhibit B. In that Agreement, the United States agreed not to argue that Ahmed's act of signing the Stipulation (which act constituted an acknowledgment of the accuracy of the facts set forth in the Stipulation) represented a waiver by Ahmed of any otherwise applicable privileges or protections that he may possess with respect to any factual representations contained within the Stipulation. In return, Ahmed understood and agreed that the United States reserved all of its arguments in support of the Stipulation's admission at trial and/or in connection with a motion in limine pertaining to the Stipulation.

## II. ARGUMENT

This Court should not countenance Ahmed's attempt to use the Stipulation both as a sword and a shield. Initially, Ahmed used the Stipulation to fend off the United States' motion for disqualification. Ahmed pointed to the Stipulation and his willingness to enter into the Stipulation as grounds why Attorney Egbert should not be disqualified. Now, after successfully

defeating the United States' disqualification motion using the Stipulation, Ahmed argues that the same Stipulation is not admissible at trial.

This gambit, however, is without substance. The Stipulation at issue was the product of open negotiation and agreement between the parties. Attorney Egbert openly acknowledged the accuracy of the Stipulation, both during the negotiations and later in Court. The facts set forth in the Stipulation are directly relevant to the conduct set forth in the obstruction counts and are not privileged. Accordingly, the Stipulation should be admitted in its entirety.

**A.**      **The Stipulation is Relevant to the Obstruction Counts**

Contrary to Ahmed's assertions, the facts established by the Stipulation are relevant to the factual allegations contained within the Indictment. Indeed, as discussed in the United States' Opening Brief, many of the facts set forth in the Stipulation go directly to the conduct that forms the bases of various counts of the Indictment.

**1.**      **There is a direct nexus between the Stipulation and the conduct underlying Counts Twenty-One and Twenty-Two**

In arguing against the relevance of the facts set forth in the Stipulation, Ahmed focuses entirely upon issues pertaining to his intent. In so doing, Ahmed ignores the fact that the vast majority of the Stipulation goes directly to establishing **the conduct** alleged in the two obstruction counts. Due to his misdirected focus, Ahmed fails to address the evidentiary nexus between the Stipulation and the conduct underlying Counts Twenty-One and Twenty-Two.

**a.**      **Count Twenty-One**

A simple comparison of the charges set forth in Count Twenty-one and Paragraphs 1 through 4 of the Stipulation reveals a direct and immediate connection between the Indictment's allegations and the Stipulation's facts. Count Twenty-One charges that, on June 15, 2000,

5

Ahmed was served with a subpoena in a federal health care fraud investigation. Indictment, ¶ 37. Count Twenty-One further charges that Ahmed sought to prevent, obstruct, mislead, and delay the investigation through the creation of false documents that were then produced to federal agents involved in the health care fraud investigation. Id., ¶ 38.

Paragraphs 1 through 4 of the Stipulation concern these allegations and establish several of the alleged facts. For example, in Paragraph 1, Ahmed stipulates that June 15, 2000, was, in fact, the date on which he was served with a health care fraud subpoena. Similarly, in paragraph 4, Ahmed stipulates that he was aware of an ongoing criminal investigation involving whether he was engaged in proper Medicare billing practices with respect to patients who were diagnosed with pemphigus and/or pemphigoid.

Paragraphs 2 and 3 of the Stipulation provide further evidentiary detail directly related to the allegations contained in Count Twenty-One. Paragraph 2 describes the types of documents sought by the subpoena served on Ahmed on June 15, 2000. Paragraph 3 establishes that the subpoenaed documents were sought in connection with an investigation of a Federal health care offense. Paragraph 3 of the Stipulation also establishes certain of the conduct alleged in Count Twenty-One -- namely that Ahmed caused various documents to be produced through his retained counsel (Attorney Egbert) in response to the subpoena:

> Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

Stipulation, ¶ 3.

6

        b.     **Count Twenty-Two**

        Similarly, there is a direct relationship between the conduct alleged in Count Twenty-Two and the facts set forth in the Stipulation. Count Twenty-Two charges that, on or about October 25, 2001, Ahmed attempted to obstruct an ongoing health care fraud investigation by causing false documents to be prepared and produced through his retained counsel to federal officials conducting a health care fraud investigation. Indictment, ¶ 40.

        As with Count Twenty-One, there is a direct evidentiary nexus between the conduct charged in Count Twenty-Two and the facts set forth in the Stipulation. Paragraphs 5 and 6 of the Stipulation explain that on or before the date alleged in Count Twenty-Two, Ahmed provided a chart to his counsel (Attorney Egbert) and authorized counsel to present this chart to, and discuss this chart with, federal prosecutors and agents who were investigating his Medicare billing practices. Paragraph 7 details the facts pertaining to the October 25, 2001, meeting that forms the basis of Count Twenty-Two. Paragraph 7 further discusses the actual production of the records by counsel (Attorney Egbert) that are alleged in Count Twenty-Two to be false and fraudulent. Additionally, paragraph 7 sets forth statements made by counsel (Attorney Egbert) with Ahmed's authorization in connection with the production of those records:

        7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and two federal agents. One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with the binders attached hereto as Exhibit __. Included in these binders was the chart. With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis" of

pemphigus and pemphigoid. Defendant Ahmed's attorney further stated on
behalf of defendant Ahmed that reimbursement from Medicare for intravenous
immunoglobulin treatments was permitted as a result of these "dual diagnoses"
and that defendant Ahmed had not defrauded Medicare.

Stipulation, ¶ 7.

### 2. The United States need not make any conditional relevance showing in order to introduce the Stipulation.

Admission of the facts set forth in the Stipulation is not, as Ahmed suggests, contingent

upon the admission of other facts. Proof to establish criminal liability takes many forms -- some

evidence may be introduced to establish the actual conduct that has been charged, whereas other

evidence may be admitted to establish a defendant's intent. Simply put, there is no "order of

proof" requirement requiring that evidence of intent be introduced before evidence of conduct is

admissible. Defendant's argument is akin to suggesting that in a murder case, the Government

must establish a defendant's *mens rea* before the Government may introduce evidence of the

defendant's actual involvement in the shooting of the victim. There is, of course, no such

requirement under the law.[2]

Regardless of what evidence the United States introduces at trial concerning Ahmed's

criminal intent with respect to Counts Twenty-One and Twenty-Two, there can be no real

dispute as to whether the Stipulation establishes facts directly and intimately related to the

conduct charged in the obstruction counts. It is this direct nexus between the Stipulation and the

---

[2] Defendant's effort to force an evidentiary hearing by means of a "conditional
relevance" argument is unavailing. The United States also notes that Defendant's Opposition
argues at some length that the crime fraud exception to the attorney-client privilege does not
apply here. In that argument, he also appears to press for an evidentiary hearing. As part of this
Motion In Limine, the United States has elected not to press a crime-fraud argument, thereby
obviating the need for an evidentiary hearing.

8

conduct charged in the Indictment that renders inapposite Ahmed's reliance upon <u>United States v. Wilson</u>, 798 F.2d 509, 515-16 (1st Cir. 1986),[3] and <u>Tate v. Robbins & Myers, Inc.</u>, 790 F.2d 10, 11-12 (1st Cir. 1996).

Indeed, if anything, <u>Tate</u> supports a finding of admissibility. <u>Tate</u> concerned a party's claim that an equipment manual published in 1980 was admissible in a products liability case involving a piece of equipment manufactured in 1943. Plaintiff sought to introduce the manual, arguing that it was relevant to his claim that the manufacturer had violated its continuing duty to warn. The court upheld the district court's refusal to introduce the manual, noting that there was no evidence that the manufacturer knew that plaintiff's employer owned the equipment. <u>Id.</u>, at 12. Significantly, however, the First Circuit specifically noted that had there been evidence that the manufacturer knew about the employer's purchase of the equipment, then "the question of the relevancy of the 1980 Manual would have been for the jury." <u>Id.</u>, at 12 n.1.

Here, there is no doubt as to Ahmed's knowledge of the ongoing investigation at the time of the acts in question. By virtue of Ahmed being served with a subpoena requiring production of various medical records, <u>see</u> Stipulation ¶¶1-3, it was evident that:

> By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

<u>See id.</u>, ¶ 4. Thus, even under <u>Tate</u>, the Stipulation is relevant and admissible.

---

[3] In <u>Wilson</u>, the First Circuit upheld the district court's refusal to allow a defendant to introduce evidence pertaining to actions taken years after the charged conduct when there was no evidence to tie those subsequent acts to his intent at the time of the offense.

B.    **The Second Circuit's Decision in United States v. Valencia Is Neither Binding Nor Applicable in This Case.**

Nowhere in his Opposition does Ahmed dispute the United States' position in its Opening Brief that counsel's statements and production of documents as set forth in the Stipulation meet the requirements under Fed. R. Evid. 801(d)(2)(C) and 801(d)(2)(D), and are thus admissible. Instead, relying solely upon United States v. Valencia, 826 F.2d 169 (2d Cir. 1987), Ahmed argues that this Court should exercise its discretion and exclude that evidence which forms the basis of Count Twenty-Two -- namely, Attorney Egbert's statements on his behalf made during the October 25, 2001, meeting (and the production of false documents) -- unless and until the Government puts forward evidence pertaining to his intent. See generally Opposition at 6-10.

Valencia, however, cannot and does not offer Ahmed the refuge he seeks. The law does not allow a defendant to knowingly and willfully communicate to the Government false information either directly or through an authorized agent in an attempt to obstruct an ongoing investigation. Yet, were Ahmed's argument and reliance upon Valencia to be upheld, that would, in fact, be the outcome. Ahmed's efforts to create such a loophole should be rejected.

1.    **Ahmed's reliance upon United States v. Valencia is unavailing.**

United States v. Valencia was decided by a split panel in the Second Circuit and has never been adopted by the First Circuit. Moreover, adoption of the rule proposed by Ahmed would allow for a total circumvention of the First Circuit's holdings in United States v. Diozzi, 807 F.2d 10, 11-15 (1st Cir. 1986) and United States v. O'Connor, 433 F.2d 752, 755-56 (1st Cir. 1970). Finally, the procedures Ahmed suggests that Valencia requires are not even representative of the current law in the Second Circuit.

Valencia involved informal statements made by defense counsel to a prosecutor in which defense counsel sought to obtain his client's release on bail. During those conversations, defense counsel asserted that his client had just met his female co-defendant and was innocent of drug trafficking charges. The Government subsequently determined that this story was false and that the defendant and the female co-conspirator had a longstanding relationship. The Government then moved to admit the statements made by defense counsel pursuant to Fed. R. Evid. 801(d)(2)(C), (D), both as substantive evidence to show the defendant's guilt on the drug trafficking charges and as impeachment evidence were the defendant to testify.

Relying upon United States v. McKeon, 738 F.2d 26 (2d Cir. 1984), a split panel of the Second Circuit upheld the district court's refusal to admit at trial the earlier statements by defense counsel. See Valencia, 826 F.2d at 172-74. In so doing, the panel majority emphasized that the statements in question were only ancillary to the crime and did not directly pertain to an element of the offense charged. Id., at 173. The panel then balanced the Government's need for the statements against various perceived interests of the defendant (e.g., the defendant's interests in retaining counsel, assuring uninhibited discussions between defense counsel and the prosecutor, and avoiding the risk of impairing the privilege against self-incrimination) and concluded that the district court did not abuse its discretion in refusing to admit the evidence. Id., at 173-74. Judge Meskill dissented, arguing that the panel's reliance on United States v. McKeon was inappropriate and that the statements by counsel were admissible, both under Fed.R.Evid. 801(d)(2)(C) (statements made with authorization) and 801(d)(2)(D) (statements made by an agent). See id., at 174-77.

11

With deference to the <u>Valencia</u> panel in the Second Circuit, the United States submits that Judge Meskill's dissent is considerably more consistent with the law in the First Circuit and that statements such as those made by Attorney Egbert to federal prosecutors and others during the October 25th meeting (which were both authorized by Ahmed and made during the course of counsel's representation of Ahmed) are admissible at trial. For example, in <u>United States v. O'Connor</u>, 433 F.2d 752, 755-56 (1st Cir. 1970), the First Circuit upheld the introduction of statements by counsel to the IRS that contradicted statements previously made by the defendant. Even though counsel's statements directly contradicted the defendant's earlier statements and consisted of admissions of wrongdoing by the defendant, the First Circuit emphasized that counsel made the statements while acting within the scope of his representation of the defendant. Because counsel's statements were made during and within the scope of representation, the First Circuit concluded that the statements were admissible:

> It was clearly within the power and duty of the attorney to do what he could, in his own best judgment, to dispel the suspicions of the Internal Revenue Service and avoid indictment.

<u>Id.</u>, at 756 (footnote omitted).[4/]

<u>United States v. Diozzi</u>, 807 F.2d 10 (1st Cir. 1986) similarly supports admission of out-of-court statements made by Attorney Egbert to representatives of the United States such as those contained within the Stipulation. Nowhere in <u>Diozzi</u> did the First Circuit suggest that out-of- court statements made by defense counsel were not admissible; instead the Court held that

---

[4/] <u>See also</u> <u>United States v. Pappas</u>, 806 F.Supp. 1, 3-6 (D. N.H. 1992) (holding that inculpatory statements made to IRS officials by counsel pursuant to power of attorney were admissible).

12

disqualification was not appropriate when the evidence the Government sought to be admitted could have been obtained via a stipulation that the defendant was willing to offer.

In Diozzi, counsel met with and submitted documents to the IRS and to the Justice Department in which counsel described his client's business practices and argued that his client had a "total lack of criminal intent." Id., at 11. The Government successfully sought and obtained counsel's disqualification after determining that there were numerous false or misleading statements contained in counsel's submissions. Significantly, although the First Circuit found that disqualification of counsel was inappropriate, it did not premise its rationale upon the inadmissibility of counsel's statements. Instead, it concluded that the stipulation of facts offered by the defendants provided for all of the facts sought to be admitted by the Government during trial. Id., at 13-15.

Neither O'Connor nor Diozzi support creation in the First Circuit of the special rule of admissibility sought by Ahmed in reliance upon Valencia. This is not surprising for even in the Second Circuit, the holdings in Valencia and United States v. McKeon, 738 F.2d 26, (2d Cir. 1984), the case upon which the Valencia majority relied, have been narrowed considerably by two later decisions. First, in United States v. Arrington, 867 F.2d 122 (2d Cir. 1989), the Second Circuit emphasized that neither McKeon nor Valencia stood for the proposition that a trial court was to enact or conduct special procedures or evidentiary hearings before admitting statements or submissions made by counsel pursuant to Rule 801(d)(2):

> We find no support for [defendant's] contention that there are special procedures to be followed, or balancings to be performed as a prerequisite to the evidentiary use of a defendant's counsel's out-of-court statements."

Id., at 128.[5]  Thereafter, in United States v. Amato, 356 F.3d 216 (2d Cir. 2004), the Second

Circuit upheld the admission at trial of a letter written by defense counsel challenging a bail

revocation decision, explaining that counsel's letter was more akin to an out-of-court statement

governed by a straightforward application of Fed.R.Evid. 801(d)(2)(D) and that McKeon's

special balancing test was not applicable.  Id., at 220 ("It is abundantly clear that the

admissibility of [counsel's] letter is not governed by McKeon but rather the Federal Rules of

Evidence."); see also id., at 220 n.3.

        In sum, neither First Circuit law nor subsequent decisions in the Second Circuit support

Ahmed's interpretation of Valencia to create a special rule of admissibility of relevant evidence.

        **2.        The Stipulation is admissible even under Valencia**

        Even were this Court inclined to consider the various factors identified in Valencia, the

Stipulation remains admissible.  First, unlike Valencia, 826 F.2d at 173, there is no dispute

concerning the substance of the Stipulation.  The parties have agreed to the language in the

Stipulation and the document has been executed.

        Second, admission of the Stipulation will neither chill defense counsel's advocacy on

behalf of his client, nor impede legitimate plea negotiations.  See id.  The October 25 meeting

between the Government and Attorney Egbert was not a plea negotiation; thus, that concern is

_____

        [5] The Arrington court limited the scope of McKeon's holding to only those instances in
which the Government sought to introduce defense counsel's prior jury argument at trial and
held that McKeon has no applicability to any other statements made by defense counsel:

        Contrary to defendant's assertion that these procedures apply to the use of all
        statements by defense counsel, we clearly stated in McKeon that we were
        'circumscrib[ing] the evidentiary use of **prior jury argument.**'

867 F.2d at 127 (quoting McKeon, 738 F.2d at 33) (emphasis in Arrington).

14

not relevant here. Accord In re Grand Jury Proceedings, 2001 WL 237377, *15 n.14 (S.D.N.Y.

2001). Had Attorney Egbert, Ahmed's experienced counsel, sought to invoke the protections of

either Fed. R. Evid. 410 and/or Fed. R. Crim. P. 11(f), he could have done so. See United States

v. Vito, 1988 WL 78031, *2 (E.D. Pa. 1988) ("Where the protections of Fed.R.Crim.P. 11 may

not be invoked, putative agents can nonetheless make clear the nature and extent of their

authority to speak for defendants prior to informational meetings or negotiation sessions with

government agents"). Ahmed should not now be allowed to invoke protections that were neither

mentioned nor negotiated prior to the meeting in question.[6] Cf. In re Keeper of the Records

(Grand Jury Subpoena Addressed to XYZ Corporation), 348 F.3d 16, 26-28 (1st Cir. 2003).

Third, the evidence sought to be admitted here is considerably "more substantial" than

the evidence at issue in Valencia. See Valencia, 826 F.2d at 173. As characterized by the panel

majority in Valencia, the statements in that case were "not offered to show admission of an

element of the offense, a use that would directly prove the Government's case and expedite the

trial." Id. In contrast, the evidence contained in the Stipulation pertaining to the October 25

meeting goes directly toward establishing an element of the offense charged:  namely, that the

defendant knew and authorized the production to the Government by counsel of those materials

that form the basis of Count Twenty-Two.

In short, even were Valencia to apply, none of the concerns identified in Valencia are at

issue here and the Stipulation should be admitted. Accord United States v. Pappas, 806 F. Supp.

_____

[6]  In any event, any policy consideration involving plea negotiations is only furthered
when defendants engage in open, frank, and truthful discussions; it is not furthered through the
presentation of false or misleading information. See, e.g., United States v. Harris, 914 F.2d 927,
932 (7th Cir. 1990).

1, 6 (D. N.H. 1992). This Court should reject Ahmed's attempt to create a safe harbor that would allow a defendant, hoping to derail an investigation, to submit false information to the United States through counsel.

### C.    Information Intended To Be Disclosed to Third Parties Is Not Privileged

Ahmed has not met his burden of showing that any attorney-client privilege exists with respect to the Stipulation. The communications giving rise to the October 25 meeting were never intended to be kept confidential. Attorney Egbert freely and voluntarily disclosed the facts to representatives of the United States, and he did so with Ahmed's knowledge and authorization.

It is well-settled that the attorney-client privilege must be narrowly construed because it "stands as an obstacle of sorts to the search for truth." In Re Keeper of the Records, 348 F.3d at 22. To invoke the privilege, the party seeking the privilege's protection must show that it applies to the communications at issue and that it has not been waived. See id.

The attorney-client privilege protects only communications that are confidential and made for purposes of seeking or receiving legal advice. Id. Thus, the "privilege does not apply . . . where it is the intention or understanding of the client that the communication is to be made known to others." In Re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir. 1984).

In arguing against the Stipulation's admissibility, Ahmed points to two different factual statements within the Stipulation that he contends are privileged: (1) his providing the chart to Attorney Egbert; and (2) his authorizing Attorney Egbert to present and discuss the chart with federal prosecutors and agents. Neither of these statements contain privileged information.

16

First, there can be little dispute that it was Ahmed's intention that the chart be shared and

discussed with third parties. See Kevlik v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984) (client's

intent – "whether [he] reasonably understood the conference to be confidential" – is paramount).

As set forth in the Stipulation, Ahmed provided the chart to Attorney Egbert and authorized him

to present it to representatives of the United States. Stipulation ¶¶ 5-6.  This is consistent with

the actual facts -- namely, that the purpose of the October 25 meeting was for Attorney Egbert to

present, provide and discuss the chart in question in an attempt to convince federal prosecutors

and agents that defendant Ahmed had not defrauded Medicare.  Given these actions, it can

hardly be said that Ahmed had a reasonable expectation of confidentiality with respect to the

chart.

When a client knows that counsel is going to communicate facts to third parties (and, as

here, authorizes such conduct), there can be no reasonable expectation of confidentiality and,

hence, no attorney-client privilege. See In re Grand Jury Proceedings, 727 F.2d at 1356-58.  In

In re Grand Jury Proceedings, the issue pertained to discussions that an attorney had with his

client during preparation of a prospectus to be used in the enlistment of investors.  Even though

the prospectus was never actually mailed to third parties, the Fourth Circuit had little problem

rejecting the claim of attorney-client privilege:

> [I]t is irrelevant that no prospectus was ever actually issued in this case. The
> significant fact is that the information given the [attorney] was to assist in
> preparing such prospectus which was to be published to others and was not
> intended to be kept in confidence.  That is the critical circumstance, to wit, the
> absence of any intent that the information was to be kept confidential.
> Remembering that the privilege itself is not "favored" and is to be "strictly
> confined within the narrowest possible limits," we have no difficulty in
> concluding under the admitted facts of this case that all information given the
> [attorney] by any of the joint venturers connected with the subject-matter of the

proposed issuance of participations is without the protection of the attorney-client privilege.

Id., at 1358.

Similarly, in United States v. Tellier, 255 F.2d 441 (2d Cir. 1958), the defendant, who was in the securities business, sought to exclude from evidence a conversation with his lawyer in which his lawyer urged him against being involved in certain securities transactions. However, in relaying the advice, the lawyer told Tellier that he would also notify other individuals, who he was not representing, about his negative views on the transaction. The Tellier court thus concluded that it "was clear that this advice was not understood by either [the lawyer] or Tellier to be confidential." Id. at 447; see also Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962) (information provided to attorney for inclusion in a tax return is not privileged).[2]

Ahmed's contention that his act of providing the chart to Attorney Egbert so that counsel could, with authorization, then present it to representatives of the United States in an effort to demonstrate that Ahmed had not defrauded Medicare is somehow privileged defies both the facts and the law. Unlike the prospectus in In re Grand Jury Proceedings, the chart at issue in the Stipulation was in fact presented to federal representatives during the October 25, 2001 meeting. Given the facts, Ahmed has not articulated, let alone met his burden, of demonstrating the requisite intention to maintain confidentiality necessary to support the attorney-client privilege.

---

[2] The Tellier court also made clear that the scope of the information that can be shared in such circumstance is quite broad. "Moreover, where, as here, information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure." Tellier, 255 F.2d at 448.

**D.**    **If Any Privilege Ever Applied to Any of the Statements in the Stipulation,**
**Ahmed Waived That Privilege through Disclosure to the United States**

Even if Ahmed could meet his burden of establishing privilege with respect to any

statement in the Stipulation, he subsequently waived that privilege by dint of disclosure to

representatives of the United States. "When otherwise privileged communications are disclosed

to a third party, the disclosure destroys the confidentiality upon which the privilege is premised."

In Re Record Keeper Subpoena, 348 F.3d at 22.  Certainly, when disclosure is to a government

agency, either voluntarily or in response to a subpoena, the privilege is waived.  See United

States v. Mass. Inst. of Tech., 129 F.3d 681, 685 (1st Cir. 1997); see also United States v.

Pappas, 806 F.Supp. at 4 (clients "waive the privilege by authorizing their lawyers to represent

them before the IRS").

When Attorney Egbert made a presentation to representatives of the United States on

October 25, 2001, he was acting within the scope of his representation on Ahmed's behalf and

was using the chart to try to convince the United States that Ahmed had not defrauded Medicare.

Similarly, on September 26, 2005, when Attorney Egbert met in the courthouse cafeteria to

negotiate the Stipulation, those negotiations pertaining to the Stipulation's content were made on

Ahmed's behalf.  If there was any doubt, Attorney Egbert, in the presence of his client, referred

to the Stipulation as "facts" in open court on November 15, 2005, and acknowledged the

Stipulation's accuracy.[8]  Each of those acts independently, and all of them collectively, effected

---

[8] Although the Agreement (Ex. B, hereto) executed between the parties provides that
Ahmed's act of signing the Stipulation was, in and of itself, not a waiver, the Agreement does
not protect earlier waivers by Ahmed or Attorney Egbert.  By the time Ahmed executed the
Agreement, he and counsel had already waived any purported privilege and the United States
reserved the right to so argue.

a waiver of any purported privilege that might have otherwise existed. See United States v.

Hernandez-Hernandez, 431 F.3d 1212, 1219 (9th Cir. 2005) ("we have repeatedly held that

criminal defendants are bound by the admissions of fact made by their counsel in their presence

and with their authority").[2/]

### III. CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the Court admit

the Stipulation, in its entirety, as evidence in the trial (or for any other purpose) in this matter.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Jeremy M. Sternberg
James E. Arnold
Jeremy M. Sternberg
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

---

[2/] An element of fairness goes into any privilege waiver analysis. E.g., In Re Grand Jury
Investigation of Ocean Transportation, 604 F.2d 672, 675 (D.C. Cir. 1979) ("There is always the
objective consideration that when his conduct touches a certain point of disclosure, fairness
requires that his privilege shall cease whether he intended that result or not.") (internal
quotations and citations omitted). Here, defendant Ahmed is engaging in impermissible
selective privilege assertions to block the introduction of potentially harmful evidence in the
Stipulation, while maintaining that he would "stipulate" to the facts in order to argue against the
disqualification of his chosen counsel. Disqualification of counsel in Diozzi was deemed
inappropriate because the stipulation of facts offered by defendants provided for the introduction
into evidence of all facts sought to be admitted by the United States during trial. 807 F.2d at 13-
15. A similar result should obtain here.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).

<u>/s/ James E. Arnold</u>
JAMES E. ARNOLD
Assistant United States Attorney

Date: May 8, 2006

21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-10057-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| ABDUL RAZZAQUE AHMED | ) | |
| | ) | |
| Defendant | ) | |

## FACTUAL STIPULATION

1.   On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. §3486).

2.   The Subpoena sought from defendant Ahmed, among other things, "medical and billing records for all patients who are being treated or were treated with IVIG and for whom any part or all of the services was billed to medicare and/or any third party payor."

3.   The documents sought by the Subpoena related to the investigation of a Federal health care offense.  Defendant Ahmed, through his retained attorney, produced documents responsive to the Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's Office for the District of Massachusetts, who was duly authorized by the Department of Justice to conduct or engage in investigations for prosecutions of health care offenses.

4.   By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal investigation that was investigating whether he was engaged in proper Medicare billing

1

practices concerning patients who were diagnosed with pemphigus and/or pemphigoid.

5.    Sometime before October 25, 2001, defendant Ahmed provided the chart marked as Exhibit __ to his attorney. Defendant Ahmed stipulates that the copy of the chart attached hereto is authentic.

6.    Defendant Ahmed authorized his attorney to present that chart to and discuss that chart with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing practices.

7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and two federal agents. One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with the binders attached hereto as Exhibit __. Included in these binders was the chart. With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on Exhibit __ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous immunoglobulin

2

treatments was permitted as a result of these "dual diagnoses" and that defendant Ahmed had not

defrauded Medicare.

So Stipulated:


_Abdul Razzaque Ahmed_
ABDUL RAZZAQUE AHMED


_Richard M. Egbert_
RICHARD M. EGBERT
Counsel for Abdul Razzaque Ahmed

3

## AGREEMENT

This Agreement pertains to the stipulation negotiated by counsel in <u>United States v.</u> <u>Abdul Razzaque Ahmed</u>, Criminal No. 05-10057-RCL:

The parties agree that, by signing the stipulation, defendant Abdul Razzaque Ahmed is acknowledging the accuracy of the facts set forth in the stipulation. However, the parties further agree that the defendant reserves the right to challenge the admissibility of any or all of the facts contained in the stipulation. The United States agrees that it will not contend that the act of signing the proposed stipulation (which act constitutes an acknowledgment of the accuracy of the facts set forth in the stipulation) represents a waiver by defendant Ahmed of any otherwise applicable privileges or protections that he may possess with respect to any factual representations contained within the stipulation. Defendant understands and agrees that the United States reserves all of its arguments in support of the stipulation's admission at trial and/or in connection with a motion in limine pertaining to the stipulation.

_____
RICHARD EGBERT, ESQ.
Counsel for Abdul Razzaque Ahmed

Date  2/23/06

_____
ABDUL RAZZAQUE AHMED

Date  Feb 20, 2006

_____
JAMES E. ARNOLD
Assistant U.S. Attorney

Date  3/6/2006



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 3, 2005

Via Messenger

Richard M. Egbert
Law Offices of Richard M. Egbert
99 Summer Street, Suite 1800
Boston, MA 02110

Re: United States v. Abdul Razzaque Ahmed, Criminal No. 05-10057-RCL

Dear Mr. Egbert:

Enclosed is a redraft of the Stipulation we discussed on September 26, 2005. Also enclosed is your original handwritten mark-up from our meeting that date, which serves as the basis of the redraft. Please let us know at your earliest convenience if this is acceptable so that we can contact the Court to set up a hearing to accept the Stipulation. Finally, enclosed is a draft of an assented to motion to take the videotape deposition of RL, which we plan to file by the end of this week. You indicated your assent to this motion when we met on September 26, 2005, and requested that we conduct the deposition on a Friday. Please let us know if any of the following Fridays are available for you for this deposition in the Berwick, Maine area: November 4, November 18 or December 2.

Very truly yours,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By: _____
James E. Arnold
Jeremy M. Sternberg
Assistant U.S. Attorneys

# DRAFT

Factual Stipulation

1.    On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued

under authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996,

Public Law No. 104-91 (18 U.S.C. §3486).

2.    The Subpoena sought from defendant Ahmed, among other things, "medical and billing

records for all patients who are being treated or were treated with IVIG and for whom any part or all

of the services was billed to medicare and/or any third party payor."

3.    The documents sought by the Subpoena related to the investigation of a Federal health

care offense. Defendant Ahmed, through his counsel, produced documents responsive to the

Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's

Office for the District of Massachusetts, who was duly authorized by the Department of Justice to

conduct or engage in investigations for prosecutions of health care offenses.

4.    By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal

investigation that was investigating whether he was engaged in proper Medicare billing practices

concerning certain patients who were diagnosed with pemphigus and/or pemphigoid.

5.    In connection with that investigation, defendant Ahmed retained an attorney.

6.    Sometime before October 25, 2001, defendant Ahmed provided the chart marked as

Exhibit __ to his attorney.

7.    Defendant Ahmed provided Exhibit __ to his attorney so that his attorney could present

that chart to the prosecutors and agents who were then investigating defendant Ahmed's Medicare

billing practices. The purpose of having Defendant Ahmed's attorney make that presentation was so

that he could convince the prosecutors and agents that the patients who appeared on Exhibit __ had a

**DRAFT**

"dual diagnosis" of pemphigoid and pemphigus vulgaris, that reimbursement from Medicare was permitted as a result of these "dual diagnoses," and that defendant Ahmed had not defrauded

*delete*

Medicare.

8.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and two federal agents. One of the agents was from Department of Health and Human Services, Office of the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney presented them with Exhibit ____. With the authorization of defendant Ahmed and in reliance upon information that had been provided to him by defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the two agents that Exhibit ___ should convince them "beyond a reasonable doubt" that the patients appearing on Exhibit ___ had pemphigus, that defendant Ahmed had not defrauded Medicare, ~~and that they should close their investigation of defendant Ahmed.~~

*and that result was proven, and Ah had no defrauded Medicare.*

## Factual Stipulation

1.    On June 15, 2000, defendant Ahmed was served with a Subpoena, Ex. __, issued under

authority of Section 248 of the Health Insurance Portability and Accountability Act of 1996, Public

Law No. 104-91 (18 U.S.C. §3486).

2.    The Subpoena sought from defendant Ahmed, among other things, "medical and billing

records for all patients who are being treated or were treated with IVIG and for whom any part or all

of the services was billed to medicare and/or any third party payor."

3.    The documents sought by the Subpoena related to the investigation of a Federal health

care offense. Defendant Ahmed, through his retained attorney, produced documents responsive to the

Subpoena to a criminal investigator, namely an Assistant U.S. Attorney for the United States Attorney's

Office for the District of Massachusetts, who was duly authorized by the Department of Justice to

conduct or engage in investigations for prosecutions of health care offenses.

4.    By not later than June 15, 2000, defendant Ahmed was aware of an ongoing criminal

investigation that was investigating whether he was engaged in proper Medicare billing practices

concerning patients who were diagnosed with pemphigus and/or pemphigoid.

5.    Sometime before October 25, 2001, defendant Ahmed provided the chart marked as

Exhibit __ to his attorney. Defendant Ahmed stipulates that the copy of the chart attached hereto is

authentic.

6.    Defendant Ahmed authorized his attorney to present that chart to and discuss that chart

with the prosecutors and agents who were then investigating defendant Ahmed's Medicare billing

practices.

1

7.    On October 25, 2001, with defendant Ahmed's knowledge and consent, defendant

Ahmed's attorney met with one of the prosecutors (the same one referred to above in paragraph 3) and

two federal agents. One of the agents was from Department of Health and Human Services, Office of

the Inspector General and one was from the Postal Inspection Service. The prosecutor and the two

agents were all working on the Medicare billing investigation concerning defendant Ahmed. During that

meeting, which took place at the United States Attorney's Offices, defendant Ahmed's attorney

presented them with the binders attached hereto as Exhibit __. Included in these binders was the chart.

With the authorization of defendant Ahmed, defendant Ahmed's attorney told the prosecutor and the

two agents that Exhibit __ should convince them "beyond a doubt" that the patients appearing on

Exhibit __ had a "dual diagnosis" of pemphigus and pemphigoid. Defendant Ahmed's attorney further

stated on behalf of defendant Ahmed that reimbursement from Medicare for intravenous

immunoglobulin treatments was permitted as a result of these "dual diagnoses" and that defendant

Ahmed had not defrauded Medicare.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-10057-RCL |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ABDUL RAZZAQUE AHMED | ) |  |
|  | ) |  |
| Defendant | ) |  |

### ASSENTED TO MOTION BY THE UNITED STATES
### TO TAKE VIDEOTAPE DEPOSITION OF RL

The United States, by its attorneys Michael J. Sullivan, United States Attorney for the

District of Massachusetts, and Assistant United States Attorneys James E. Arnold and Jeremy M.

Sternberg, hereby moves this Court, pursuant to Federal Rule of Criminal Procedure 15, to take

the videotape deposition of RL.[1] In support of its motion, the United States submits as follows:

1. On March 15, 2005, Defendant was indicted on a variety of charges, including mail

fraud, health care fraud, obstruction of justice and money laundering. At the heart of the

Indictment, is a scheme to defraud Medicare by falsifying diagnoses of a rare blistering skin

disease, pemphigus vulgaris ("pemphigus"), for patients who actually suffered from a different

and distinct skin disease, pemphigoid. The Indictment charges that Defendant falsified these

diagnoses, because during the relevant period, Medicare allowed reimbursement for expensive

intravenous immunoglobulin ("IVIG") treatments for pemphigus, but not for pemphigoid.

Defendant is charged with fraudulently billing Medicare, by falsifying a diagnosis of pemphigus,

for over $5 million for IVIG treatments for patients who did not have the pemphigus, but rather

---

[1]RL is one of Defendant's former patients. He is so identified in this motion in light of
the protective order entered in this case. Full identifying information for RL was provided to
Defendant by letter dated April 18, 2005.

**DRAFT**

had pemphigoid.

2. The Indictment charges, among other things, fourteen counts of health care fraud in violation of 18 U.S.C. §1347. One of the counts relates solely to a Medicare claim that Defendant made on behalf of one of his patients at the time, RL.

3. Like many of the patients identified (by initials) in the Indictment, RL is elderly and physically infirm and lives some distance from this Courthouse. The United States believes that RL knew he had pemphigoid, not pemphigus, and that he received IVIG treatments from the Defendant. The United States therefore seeks to preserve the testimony of this elderly and sick witness, RL, for use at trial. See United States v. Keithan, 751 F.2d 9 (1st Cir. 1984) (allowing, pursuant to Rule 15, taking of depositions of two elderly, infirm witnesses who live 60 miles from the Courthouse)

4. In accordance with Local Rule 7.1(A)(2), counsel for the United States has, through letter dated July 21, 2005, sought to engage counsel for Defendant in an effort to narrow or resolve the issues raised by this motion. On September 26, 2005, counsel for the United States met with counsel for the Defendant, discussed this motion, obtained his assent, and agreed to schedule the deposition of RL in the Berwick, Maine area on a Friday that was mutually convenient for all counsel and the witness.

2

5. Accordingly, the United States respectfully requests that the Court allow it to take the

videotape deposition of RL in Maine at a time convenient for counsel for Defendant.

MICHAEL J. SULLIVAN
United States Attorney

By: **DRAF** _____

James E. Arnold
Jeremy M. Sternberg
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

October __, 2005

## Certificate of Service

I hereby certify that I served a copy of the foregoing pleading on Richard M. Egbert, Law Offices of Richard M. Egbert, 99 Summer Street, Suite 1800, Boston, MA 02110, this day by mail.

**DRAFT**
_____
Jeremy M. Sternberg
Assistant U.S. Attorney

3

1

1 - 33

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,        )
                    Plaintiff,   )
                                 )
-V-                              )    CRIMINAL DOCKET NO.
                                 )    05-10057-RCL
ABDUL RAZZAQUE AHMED,            )
                    Defendant.   )

MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

November 15, 2005

Boston, Massachusetts

For the United States:

        JEREMY STERNBERG, ESQ.
        JAMES E. ARNOLD, ESQ.
        Assistant U.S. Attorneys
        Office of the United States Attorney
        1 Courthouse Way
        Boston, MA  02210
        (617) 748-3100

For the Defendant:

        RICHARD M. EGBERT, ESQ.
        99 Summer Street
        Suite 1800
        Boston, MA  02110
        (617) 737-8222

Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.

COPY

*APEX Reporting*
(617) 426-3077

8

1   attempting to do now is exactly what they're not permitted

2   to do.   Number one, yes, I agreed that I would stipulate,

3   for example, Dr. Ahmed knew such and such or gave me such

4   and such as a true fact, but not it's admissibility.

5          I don't think they can get to it, because of the

6   attorney/client privilege, for example, which is not waived.

7   I don't think they can get to it for other reasons of agency

8   and the like, which I've cited some cases to you in the

9   brief.

10          And so what the government is really attempting to

11  do here is to turn the whole issue on its head and basically

12  say, for you to stay in as counsel, for Dr. Ahmed to keep

13  the lawyer he's had for five years involved in this case, we

14  want him to waive the attorney/client privilege, no.   We

15  want him to stipulate that something is admissible in court,

16  without knowing the status of it, when we come to that time;

17  waiving arguments that's irrelevant; waiving arguments that

18  it's immaterial; waiving the argument that counsel's

19  statements to the government during the course of a

20  discussion about whether or not they should indict or

21  shouldn't indict are or are not relevant and material

22  evidence in a criminal case and the like.

23          Moreover, we believe that the government has

24  virtually no evidence that shows anything like manipulation

25  of these samples or that Dr. Ahmed was responsible for a

31

1  | acknowledge the fact occurred, or you say we can't stipulate
2  | to that, because we believe it's privileged.  We're caught
3  | between the proverbial rock and a hard place on this one.
4  |         THE COURT:  Mr. Egbert?
5  |         MR. EGBERT:  I don't -- I don't understand it.  I
6  | mean I'm not trying to be facetious, but I simply don't
7  | understand the argument.  I'm stipulating as to what facts
8  | occurred.  I agree with that, without waiving the privilege
9  | as to those facts or any of the facts in the stipulation.
10 |         I'm also not waiving any objections to the
11 | admissibility of those facts.  And you should know that I
12 | did agree to with the government, and that that's why this
13 | all comes up as kind of bizarre.  I told them at the outset,
14 | I said I'll agree to the authenticity to the documents up
15 | front, so you don't have an authenticity problem, you know,
16 | at the end of the day and say, oh boy, we forgot to do that.
17 |         But as to objections, I don't waive them.  And as
18 | to the privilege, I don't waive that.
19 |         THE COURT:  Okay.  I'm denying the motion.  I will
20 | be issuing a decision, but not today.  So if you want to get
21 | back to me tomorrow, you have the right to submit something
22 | else.  And this will hopefully be written by the end of the
23 | week.  Okay?
24 |         MR. ARNOLD:  Thank you.
25 |         THE CLERK:  The Court is in recess.

APEX Reporting
(617) 426-3077

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 05-10057-RCL |
| | ) | |
| ABDUL RAZZAQUE AHMED, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT'S SUR-REPLY TO GOVERNMENT'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION *IN LIMINE* TO ADMIT STIPULATION INTO EVIDENCE

**I.    The Government Has Failed to Lay the Necessary Foundation to Admit Evidence of the October 25, 2001 Meeting Between the Government and Defense Counsel**

To be relevant to the charge of obstruction, evidence that defense counsel discussed blood sera sample test results with the government at a meeting on October 25, 2001 ("October 25[th] meeting") must be coupled with evidence that the defendant "caused [those samples] to be mixed" prior to the October 25th meeting  See Indictment ¶ 29; see also id. ¶¶ 36, 39 (incorporating ¶ 29 into obstruction charges).  Yet in its Reply to Defendant's Opposition, the government argues that it is entitled to introduce evidence of the October 25th meeting without the need to proffer anything from which a fact-finder could reasonably conclude (1) that the samples at issue were intentionally manipulated and (2) that Dr. Ahmed knew about that manipulation prior to the October 25th meeting.  See Govt's Reply, pp. 8.[1]  This is because, according to the government, it need not present evidence of a defendant's *mens rea* before introducing "evidence of the defendant's actual involvement" in the crime at issue.  Id.

---

[1] References to "Govt's Reply, pp. __" refer to the corresponding pages in the government's Reply Brief to Defendant's Opposition to Motion *in Limine* to Admit a Stipulation into Evidence, filed on May 8, 2006.

Yet it is precisely this "actual involvement" on the part of the defendant that the government has not shown. Based on the discovery provided by the government, Dr. Ahmed did not personally prepare the samples, send them to the lab, perform the lab tests on them, interpret the test results, or prepare any charts or other records reflecting those results, all of which was done at least fifteen months before the October 25th meeting. Nor has the government identified one shred of evidence that the samples used were intentionally manipulated by *anyone* – much less Dr. Ahmed -- or that *anyone* suspected the samples had been contaminated at the time defense counsel provided the test results to the government. Perhaps most significantly, the very "conduct" that the government claims is "intimately related" to the charges is not Dr. Ahmed's conduct at all; he was not even present at the October 25th meeting – a fact on which the government conveniently does not linger.

In discussing Tate v. Robbins & Myers, Inc., 790 F.2d 10 (1st Cir. 1996),[2] the government correctly explains that the court upheld the refusal to admit an equipment manual that the defendant had admittedly not given to the plaintiff's employer because there was no evidence that the defendant knew that the plaintiff's employer owned the equipment. See Govt's Reply, pp 9. As the government points out, "had there been evidence that the manufacturer knew about the employer's purchase of the equipment then 'the question of the relevancy of the 1980 Manual would have been for the jury.'" Id. (citing Tate, 790 F.2d at 12, n.1). That is precisely Dr. Ahmed's point. If the government offered some evidence of relevant knowledge (in this case, that Dr. Ahmed knew about the supposed sample manipulation), then the statements made about those samples to the government would arguably be relevant to the obstruction charge. Without such knowledge, however, defense counsel's statements to the government at the October 25th meeting, like the

---

[2] The government does not even attempt to distinguish the other First Circuit case cited by Dr. Ahmed in his initial Opposition. See United States v. Wilson, 798 F.2d 509, 515-16 (1st Cir. 1986).

failure to give the equipment manual in <u>Tate</u>, do not have any tendency to make it more or less probable that the defendant engaged in wrongful conduct.

Rather than proffer such evidence, the government attempts to establish relevance by pointing to, of all things, the very portions of the Proposed Stipulation that implicate the attorney-client privilege. <u>See</u> Govt's Reply, pp. 9 (citing Proposed Stipulation ¶ 4, which purports to set forth Dr. Ahmed's understanding of the basis of the investigation); <u>cf.</u> Transcript of Motion Hearing (November 15, 2005)(attached at Tab A), pp. 4-5 ("The stipulation has certain facts in it that only counsel would be able to testify to, [for example] "that by not later than January 15th, 2000, defendant Ahmed was aware of an ongoing criminal investigation."). Of course, it is Dr. Ahmed's knowledge of the alleged sample manipulation, and not his knowledge of the investigation, that is the conditional fact necessary to establish relevance. In any event, the foundational standard established by Rule 104(b) requires *admissible* evidence, and the government has offered none. <u>See, e.g.</u>, <u>Huddleston v. United States</u>, 485 U.S. 681, 690 (1988).

## II.   Even if Relevant, the Evidence of Defense Counsel's Conduct and Statements Should Not Be Admitted Against the Defendant.

The government has also failed to identify a single case where a court has done what the government is asking this Court to do: exercise its discretion to admit statements made by a defense attorney during pre-indictment negotiations with prosecuting attorneys in a later criminal trial against the client. The best the government can muster is a series of tax fraud cases, each of which involved a client-executed written power of attorney filed with the IRS that explicitly authorized the attorney to stand in the taxpayer's shoes. <u>See</u> <u>U.S. v. O'Connor</u>, 433 F.2d 752, 755-56 (1st Cir. 1970); <u>U.S. v. Martin</u>, 773 F.2d 579, 583 (4th Cir. 1985); <u>U.S. v. Pappas</u>, 806 F. Supp. 1, 4 (D. N. H. 1992); <u>U.S. v. Vito</u>, 1988 WL 78031 at *2 (E.D. Pa. July 22, 1988); <u>see also</u> IRS Form 2848 (attached at Tab B); <u>cf.</u> <u>U.S. v. Amelia</u>, 637 F.Supp. 1205, 1206-07 (D. Mass. 1986)(refusing to

follow O'Connell where the power of attorney executed by the defendant was more limited because the court was "unwilling to imply [broader authority] from the language of this power of attorney, particularly in a criminal case").

Unlike the meetings at issue in the government's tax fraud cases, the October 25th meeting was not a meeting between a proxy for Dr. Ahmed and an investigating agent. See Tab B (IRS power of attorney authorizes representative to stand in shoes of taxpayer and sign any agreements, consents or other documents in taxpayer's stead). Defense counsel in this case met with the lead Assistant U.S. Attorney a year and a half after the investigation began in an attempt to reach an agreement and prevent an indictment of his client – the type of meeting that is an everyday part of federal criminal practice and that has never before been used, to defense counsel's knowledge, as substantive evidence of a defendant's guilt. In fact, as the government points out, Mr. Egbert's statements at the meeting are barred from admission by Federal Rule of Evidence 410. See Govt's Reply, pp. 15. Although not explicitly plea discussions, such pre-indictment meetings between counsel are understood by both sides to be a "preliminary step" toward plea agreements and, as such, cannot be used at trial. U.S. v. Stein, 2005 WL 1377851 at * 10 (E.D. Pa. June 8, 2005)("the amended rules are intended to cover more than just discussions concerning the plea itself and extend to discussions concerning the preliminary steps to a negotiated plea"); cf. U.S. v. Penta, 898 F.2d 815, 817-18 (1st Cir. 1990)(inculpatory statements made by an unrepresented defendant to investigators and prosecutors at very beginning of investigation are not "plea discussions" within the meaning of the Rules).

The government appears to acknowledge Rule 410's applicability to the October 25th meeting but mistakenly suggests that defense counsel needed to "invoke the protections" at the meeting to earn the shelter of the Rule. See Govt's Reply, pp. 15. Contrary to the government's

4

understanding, there are no "magic words" necessary for the statements made at the October 25th meeting to be inadmissible pursuant to Rule 410. See, e.g., Stein, 2005 WL 1377851 at *13 ("Nothing in [Fed. R. Ev. 410] requires such 'magic words' and interpreting the rules to require them would render the rules arbitrary and unworkable"). Statements made in plea discussions or in anticipation of plea discussions are protected unless and until the defendant waives such protection. See Fed. R. Ev. 410(4)(precluding the admission of evidence against the defendant, including "any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which results in a plea of guilty later withdrawn"); U.S. v. Mezzanatto, 514 U.S. 196, 205 (1995)(protections afforded by Rule 410 may be waived or varied at defendant's request). Defendant Ahmed signed no such waiver and thus his lawyer's statements cannot be used against him.

Even if the statements made at the October 25th meeting were not automatically excluded under Federal Rule of Evidence 410, the same policy considerations underlying that Rule would properly to inform this Court's discretion. See, e.g., U.S. v. Sanders, 979 F.2d 87, 92 (7th Cir. 1992); U.S. v. Valencia, 826 F. 2d 169 (2d Cir. 1987)(discussed in Defendant's Opposition at 6-9). Given the government's persistent attempts to gain a tactical advantage in this case by disrupting defense counsel's representation of Dr. Ahmed and attempting to force a waiver of the attorney client privilege, as well as its unwillingness to lay a proper foundation, the government's unprecedented request to admit evidence of defense counsel's meeting with the government ought to be denied.

III.    **Dr. Ahmed Has Not Waived the Privilege with Respect to his Confidential Attorney Client Communications.**

Finally, with respect to those portions of Proposed Stipulation ¶¶ 4-7 over which Dr. Ahmed has asserted his attorney-client privilege, Dr. Ahmed did not waive the privilege: (1) when defense

counsel attended the October 25th meeting; (2) when defense counsel agreed to the stipulation; or (3) when defense counsel made in-court statements relating to the "facts" included in the stipulation.[3]

The government cites U.S. v. Massachusetts Institute of Technology, 129 F.3d 681 (1st Cir. 1997), for the unremarkable proposition that when disclosure is made to a government agency, the privilege is waived. In that case, however, MIT claimed the privilege as to the very documents it had disclosed to another agency. Id. at 683. Dr. Ahmed does not claim that the chart reflecting the test results, or anything else said or given to the government at the October 25th meeting, is privileged. The attorney-client discussions prior to that meeting, however – including any words, documents, or items exchanged between Dr. Ahmed and his attorney over the course of their then-sixteen-month relationship – most certainly are.[4] Cf. U.S. v. Rakes, 136 F.3d 1, 5 (1st Cir. 1998)(noting the difference between disclosing the attorney-client communication itself, which can waive the privilege, and disclosing facts recounted within such a communication, which will not waive the privilege absent some additional showing).

For this reason, the government's argument that "it was Dr. Ahmed's intention that the chart be shared and discussed with third parties" is a red herring. It confuses the chart, which was given to the government and is thus clearly not privileged, with Dr. Ahmed's confidential attorney-client communications, which were not disclosed and were never intended to be disclosed. Here, an individual under investigation made numerous disclosures over an extended period of time to his criminal defense lawyer with the expectation that the lawyer would decide how best to use that

---

[3] Interestingly, after repeatedly threatening at the disqualification hearing to assert the crime-fraud exception should Dr. Ahmed invoke the privilege, the government has now "elected not to press a crime-fraud argument." See Govt's Reply, pp. 8, n.2. This is particularly surprising given the government's theory of culpability on the obstruction charge.

[4] To the extent the government has based its argument upon an imagined scenario in which Dr. Ahmed handed Mr. Egbert the chart while saying, "Please give this to the government for me," the undersigned can assure the Court that was not even remotely the case.

information throughout the course of representation. The cases cited by the government are simply

not applicable to this situation. Cf. In re Grand Jury Proceedings, 727 F. 2d 1352 (4th Cir.

1984)(attorney ordered to testify where discussions concerned a document that was always intended

to be published, one privilege holder affirmatively waived the privilege, and the other two did not

assert it); U.S. v. Colton, 306 F.2d 633, 639 (2d Cir. 1962)(distinguishing between information

provided to an attorney for the explicit purpose of inclusion on a tax return from "confidential

communications," and noting that it is "self-evident" that any documents or testimony reflecting

confidential communications between the client and attorney were "necessarily privileged"); U.S. v.

Tellier, 255 F.2d 441, 447 (2d Cir. 1958)(no intent to keep communication confidential where, at

the time of the communication, the attorney advised the client that he would also disclose the

contents of the communication to two other people).

This is not a case where the defendant personally met with the government and disclosed the

substance of actual conversations with his lawyer. Cf. U.S. v. Morrell-Corrada, 343 F.Supp.2d 80,

87 (D. P.R. 2004)(client waived the privilege when he attended a meeting with the government,

asserted that the attorney "never was [his] lawyer" and told the government in detail the contents of

his communications with the attorney). In fact, it is undisputed that Dr. Ahmed *never* met with the

government on October 25, 2001, or at any other time. And because the privilege belongs to Dr.

Ahmed, it is his to waive, which he clearly has not done. Data General Corp. v. Grumman Sys.

Support Corp., 139 F.R.D. 556, 559 (D. Mass. 1991)(citing Helman v Murray's Steaks, Inc., 728

F.Supp. 1099, 1104 (D. Del. 1990)("The holder of the privilege is the client. It would fly in the face

of the essential purpose of the attorney/client privilege to allow a truly inadvertent disclosure of a

privileged communication by counsel to waive the client's privilege."); see also See Kevlik v.

Goldstein, 724 F. 2d 844, 849 (1st Cir. 1984)(intent of the client controls).

7

Even if the privilege were Mr. Egbert's to waive, which it is not, the government does not claim that he did so by discussing any attorney-client conversations at the October 25th meeting. Instead, the government appears to believe that merely by meeting with the government, defense counsel waived Dr. Ahmed's attorney-client privilege. See Govt's Reply, pp. 19 (arguing that Mr. Egbert waived the privilege by making "a presentation to representatives of the United States on October 25, 2001, [while] acting within the scope of his representation on Ahmed's behalf and using the chart to try to convince the United States that Ahmed had not defrauded Medicare"). This expansive theory of the law of waiver is, quite frankly, absurd. Lawyers do not waive the attorney-client privilege by advocating for their clients, even when that advocacy involves discussing facts communicated by the client to the lawyer. See Rakes, 136 F.3d at 5. The government's apparent belief that individuals under investigation must choose between maintaining the privilege over communications with their attorneys and having those same attorneys use the information so communicated to zealously advocate on their behalf reflects a fundamental misunderstanding of both the attorney-client relationship and the law.

The government's two-sentence argument that defense counsel waived the privilege five years after the October 25th meeting in the context of defending against the government's disqualification motions is equally without merit. Defense counsel could not, consistent with Diozzi, refuse to stipulate to the facts that the government insisted it needed from him. However, he expressly reserved the right to challenge that stipulation on the ground that it was not admissible, in part because it violated the attorney-client privilege. It was precisely because defense counsel would not agree to waive this challenge that the government decided to press its disqualification motion. See Tab A, pp. 6-7. And, as the transcript reflects, at that hearing, defense counsel repeatedly reserved the privilege on the record. See, e.g., Tab A, pp. 8 ("I don't think they can get

8

to it, because of the attorney client privilege . . . which is not waived"), 9 ("They want the privilege

waived. And it's simply not going to happen."), 31 ("I'm stipulating as to what facts occurred. I

agree with that, without waiving the privilege as to those facts or any of the facts in the

stipulation.") Given defense counsel's repeated assertion of Dr. Ahmed's privilege throughout the

course of these proceedings, the government's claim that he somehow simultaneously waived it is

specious. See, e.g., In Re Keeper of Records, 348 F.3d 16, 27-28 (1st Cir. 2003)(where defense

counsel expressly reserves privilege, government cannot use subsequent disclosures to argue

waiver).

### CONCLUSION

For the foregoing reasons and the reasons contained in Defendant's initial Opposition, Dr.

Ahmed respectfully requests that the Court deny the Government's motion at this time.

Respectfully submitted,
**Dr. Abdul Ahmed,**
By his attorney,


    /s/ Richard M. Egbert
Richard M. Egbert
99 Summer Street
Boston, MA 02110
(617) 737-8222

Dated: May 22, 2006.

### Certificate of Service

I, Richard M. Egbert, hereby certify that I have, on this 22nd day of May, 2006, caused the above document to be electronically served by hand upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

    /s/ Richard M. Egbert
Richard M. Egbert

9

**EXHIBIT A**

1

1 - 33

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                    Plaintiff, )
                               )
-v-                            )    CRIMINAL DOCKET NO.
                               )    05-10057-RCL
ABDUL RAZZAQUE AHMED,          )
                    Defendant. )

MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

November 15, 2005

Boston, Massachusetts

For the United States:

    JEREMY STERNBERG, ESQ.
    JAMES E. ARNOLD, ESQ.
    Assistant U.S. Attorneys
    Office of the United States Attorney
    1 Courthouse Way
    Boston, MA  02210
    (617) 748-3100

For the Defendant:

    RICHARD M. EGBERT, ESQ.
    99 Summer Street
    Suite 1800
    Boston, MA  02110
    (617) 737-8222

Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.

4

1   witness on the stand to cure that evidentiary issue.  If

2   you're with a naked stipulation and there's an objection as

3   to some aspect of that, the government is without a witness

4   to cure the objection.

5          THE COURT:  I'm having a hard time following that.

6   I have to tell you.  It seems to me that you've got --

7   you've set up this situation where first of all, if I

8   understand it, there are other potential witnesses of people

9   who were there.

10         MR. STERNBERG:  That's not correct.

11         THE COURT:  Not correct?

12         MR. STERNBERG:  That isn't --

13         THE COURT:  There is not another lawyer who was

14  involved?

15         MR. ARNOLD:  Well, the problem, Your Honor, is

16  that the stipulation, as currently written -- and

17  Mr. Sternberg, do you have a copy that we can provide the

18  court?  May I approach?

19         THE COURT:  Yes.

20         MR. ARNOLD:  The stipulation has certain facts in

21  it that only counsel would be able to testify to.  And those

22  include, among others, that if you look at paragraph 4, that

23  by not later than January 15th, 2000, defendant Ahmed was

24  aware of an ongoing criminal investigation that was

25  investigating whether he was engaged in proper Medicare

5

1   billing practices, concerning patients who were diagnosed

2   with Pemphigus and/or Pemphigoid.

3        THE COURT:  Why would Mr. Egbert be the only one

4   that knew that.  I mean did you tell him he was being

5   investigated?

6        MR. ARNOLD:  He was well aware of it.  There was

7   --

8        THE COURT:  How was he aware of it?

9        MR. ARNOLD:  There were subpoenas that had been

10  served.  But that shows that counsel was aware.  But in

11  terms of the defendant's personal knowledge, the government

12  is entitled to its best evidence, not secondary evidence

13  that we submitted -- that a grand jury subpoena was served

14  on the defendant.  But we're entitled to our best evidence.

15  And the best evidence, in this instance, comes from counsel,

16  particularly, if we continued forward with the stipulation

17  No. 5, that defendant Ahmed provided the chart to his

18  attorney.

19       THE COURT:  I don't have that.  Oh, that's No. 6?

20       MR. ARNOLD:  If you look, not at the handwritten

21  mark, but if you go behind the handwritten marks, there's a

22  clean copy, which incorporates the changes as proposed by

23  defense counsel.

24       THE COURT:  I'm sorry.  I have a motion here.

25  Okay.

6

1          MR. ARNOLD:  No. 5.

2          THE COURT:  Okay.

3          MR. ARNOLD:  That sometime before October 25th,

4     2001, which is the date of the meeting with the government,

5     the defendant Ahmed provided the chart to his attorney.  And

6     paragraph 6, the defendant Ahmed authorized his attorney to

7     present that chart to and discuss that chart with the

8     prosecutors and agents who were then investigating defendant

9     Ahmed's Medicare billing practices.

10          That information can come from no one, other than

11     from defense counsel.

12          THE COURT:  Okay.  And he said that he's willing

13     to stipulate to it?

14          MR. ARNOLD:  But he's not willing to stipulate to

15     the admissibility.

16          THE COURT:  But doesn't the judge rule?  If you

17     put him on the stand and there's a question that says, did

18     Dr. Ahmed give you this chart, all right?  And there's an

19     objection as to admissibility, then the judge rules.

20          MR. ARNOLD:  And then it's resolved, and the

21     government can cure -- the government can cure any problem

22     with admissibility by creating a better foundation,

23     following up with the questions.  In contrast, in this

24     situation, Mr. Egbert would remain as trial counsel.  The

25     jury would have already seen Mr. Egbert.  Mr. Egbert would

7

1   have done opening statements.  And at the point in time when

2   the government's seeking --

3           THE COURT:  What kind of foundation problems are

4   you worried about?

5           MR. ARNOLD:  We're not aware of what the problem

6   with admissibility is.  We believe it's admissible.  What

7   we're trying to find out from counsel and counsel hasn't

8   articulated for us is why he believes that this might not be

9   admissible.

10          If it were admissible, then all the issues

11  surrounding our motion to disqualify are gone.  The only

12  reason that we're here today is we reached a factual

13  stipulation that the government deem sufficient.  Not all

14  that we could get from Mr. Egbert, were Mr. Egbert to

15  testify.

16          We believe that the crime fraud exception would

17  apply in this situation and that we could actually get more

18  testimony from Mr. Egbert were he to testify.  But the

19  government, recognizing the defendant's Sixth Amendment

20  concerns in this instance, are willing to live with this

21  stipulation on the condition that it's admitted.

22          THE COURT:  Okay.  Mr. Egbert?

23          MR. EGBERT:  Your Honor, I think our brief handles

24  the law in this, so let me just get right down to the issue

25  that you've addressed.  What the government had done and is

8

1    attempting to do now is exactly what they're not permitted

2    to do.   Number one, yes, I agreed that I would stipulate,

3    for example, Dr. Ahmed knew such and such or gave me such

4    and such as a true fact, but not it's admissibility.

5         I don't think they can get to it, because of the

6    attorney/client privilege, for example, which is not waived.

7    I don't think they can get to it for other reasons of agency

8    and the like, which I've cited some cases to you in the

9    brief.

10        And so what the government is really attempting to

11   do here is to turn the whole issue on its head and basically

12   say, for you to stay in as counsel, for Dr. Ahmed to keep

13   the lawyer he's had for five years involved in this case, we

14   want him to waive the attorney/client privilege, no.   We

15   want him to stipulate that something is admissible in court,

16   without knowing the status of it, when we come to that time;

17   waiving arguments that's irrelevant; waiving arguments that

18   it's immaterial; waiving the argument that counsel's

19   statements to the government during the course of a

20   discussion about whether or not they should indict or

21   shouldn't indict are or are not relevant and material

22   evidence in a criminal case and the like.

23        Moreover, we believe that the government has

24   virtually no evidence that shows anything like manipulation

25   of these samples or that Dr. Ahmed was responsible for a

9

1    nefarious manipulation of samples, versus DNA contamination

2    of samples, which would make the very foundation of this

3    whole chart, this whole piece of evidence, inadmissible

4    without that prior showing in that regard.

5            So all of those things seem to me be ones which

6    are out there live, whether I testify or not.  I offered to

7    the government the following, as to allay any fears that

8    they're being set up in some way, which seems to be the

9    problem here.

10           Well, it's basically, we don't know what he's

11   going to object to.  Well, that's what trials are for.  I

12   told him look, if there comes a time when there's a problem

13   of a foundation issue, for example, if they needed me to add

14   a statement that x or y, then we can either stipulate to it,

15   at the time of the -- with another stipulation, or handle it

16   out of the presence of the jury as a foundational matter or

17   do a motion in limine ahead of trial, as to the

18   admissibility of the evidence.  So that it not be even close

19   to an issue.

20           They've rejected all of those.  And the reason

21   they've rejected them is simple.  They don't want to risk

22   losing the -- they want it stipulated to be admissible and

23   they want the privilege waived.  And it's simply not going

24   to happen.  And so it seems to me that the government has

25   made a choice and they said well, we won't take the

31

1          MR. ARNOLD:  You either stipulate to the fact and

2    acknowledge the fact occurred, or you say we can't stipulate

3    to that, because we believe it's privileged.  We're caught

4    between the proverbial rock and a hard place on this one.

5          THE COURT:  Mr. Egbert?

6          MR. EGBERT:  I don't -- I don't understand it.  I

7    mean I'm not trying to be facetious, but I simply don't

8    understand the argument.  I'm stipulating as to what facts

9    occurred.  I agree with that, without waiving the privilege

10   as to those facts or any of the facts in the stipulation.

11         I'm also not waiving any objections to the

12   admissibility of those facts.  And you should know that I

13   did agree to with the government, and that that's why this

14   all comes up as kind of bizarre.  I told them at the outset,

15   I said I'll agree to the authenticity to the documents up

16   front, so you don't have an authenticity problem, you know,

17   at the end of the day and say, oh boy, we forgot to do that.

18         But as to objections, I don't waive them.  And as

19   to the privilege, I don't waive that.

20         THE COURT:  Okay.  I'm denying the motion.  I will

21   be issuing a decision, but not today.  So if you want to get

22   back to me tomorrow, you have the right to submit something

23   else.  And this will hopefully be written by the end of the

24   week.  Okay?

25         MR. ARNOLD:  Thank you.

*APEX Reporting*
(617) 426-3077

**EXHIBIT B**

Form **2848**
(Rev. March 2004)
Department of the Treasury
Internal Revenue Service

**Power of Attorney
and Declaration of Representative**

▶ Type or print. ▶ See the separate instructions.

OMB No. 1545-0150

**For IRS Use Only**
Received by:
Name _____
Telephone _____
Function _____
Date ___ / ___ / ___

**Part I**  **Power of Attorney**
Caution: *Form 2848 will not be honored for any purpose other than representation before the IRS.*

**1    Taxpayer information.** Taxpayer(s) must sign and date this form on page 2, line 9.

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| | Daytime telephone number ( ) | Plan number (if applicable) |

hereby appoint(s) the following representative(as) as attorney(s)-in-fact:

**2    Representative(s)** must sign and date this form on page 2, Part II.

| Name and address | CAF No. .......................................... |
|---|---|
| | Telephone No. ................................... |
| | Fax No. .......................................... |
| | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |
| Name and address | CAF No. .......................................... |
| | Telephone No. ................................... |
| | Fax No. .......................................... |
| | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |
| Name and address | CAF No. .......................................... |
| | Telephone No. ................................... |
| | Fax No. .......................................... |
| | Check if new: Address ☐  Telephone No. ☐  Fax No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3    Tax matters**

| Type of Tax (Income, Employment, Excise, etc.) or Civil Penalty (see the instructions for line 3) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) (see the instructions for line 3) |
|---|---|---|
| | | |
| | | |
| | | |

**4    Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. See the instructions for Line 4. Specific uses not recorded on CAF.    .    .    .    .    .    .    .    .    .    ▶ ☐

**5    Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative, the power to sign certain returns, or the power to execute a request for disclosure of tax returns or return information to a third party. See the line 5 instructions for more information.

**Exceptions.** An unenrolled return preparer cannot sign any document for a taxpayer and may only represent taxpayers in limited situations. See **Unenrolled Return Preparer** on page 2 of the instructions. An enrolled actuary may only represent taxpayers to the extent provided in section 10.3(d) of Circular 230. See the line 5 instructions for restrictions on tax matters partners.

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ...............................
..................................................................................................................................................
..................................................................................................................................................
..................................................................................................................................................

**6    Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH,** refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ▶

For Privacy Act and Paperwork Reduction Notice, see page 4 of the instructions.    Cat. No. 11980J    Form **2848** (Rev. 3-2004)

Form 2848 (Rev. 3-2004)                                                                                                Page **2**

**7    Notices and communications.** Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2.
**a**   If you also want the second representative listed to receive a copy of notices and communications, check this box   .  ▶ ☐
**b**   If you do not want any notices or communications sent to your representative(s), check this box   .   .   .   .   .  ▶ ☐

**8    Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do **not** want to revoke a prior power of attorney, check here.   .   .   .   .   .   .   .   .   .   .  ▶ ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**9    Signature of taxpayer(s).** If a tax matter concerns a joint return, **both** husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

▶ **IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.**

| Signature | Date | Title (if applicable) |
|---|---|---|

| Print Name | PIN Number | Print name of taxpayer from line 1 if other than individual |
|---|---|---|

| Signature | Date | Title (if applicable) |
|---|---|---|

| Print Name | PIN Number | |
|---|---|---|

**Part II**    **Declaration of Representative**

**Caution:** *Students with a special order to represent taxpayers in Qualified Low Income Taxpayer Clinics or the Student Tax Clinic Program, see the instructions for Part II.*
Under penalties of perjury, I declare that:
  • I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
  • I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
  • I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
  • I am one of the following:
    **a**   Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
    **b**   Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
    **c**   Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.
    **d**   Officer—a bona fide officer of the taxpayer's organization.
    **e**   Full-Time Employee—a full-time employee of the taxpayer.
    **f**   Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
    **g**   Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d) of Treasury Department Circular No. 230).
    **h**   Unenrolled Return Preparer—the authority to practice before the Internal Revenue Service is limited by Treasury Department Circular No. 230, section 10.7(c)(1)(viii). You must have prepared the return in question and the return must be under examination by the IRS. See **Unenrolled Return Preparer** on page 2 of the instructions.

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.** See the Part II instructions.

| Designation—Insert above letter (a–h) | Jurisdiction (state) or identification | Signature | Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Form **2848** (Rev. 3-2004)