# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|                              |   |                              |
|------------------------------|---|------------------------------|
|                              | ) | CRIMINAL NO. 05-10057-RCL    |
| **UNITED STATES OF AMERICA** | ) |                              |
|                              | ) |                              |
| **v.**                       | ) |                              |
|                              | ) |                              |
| **ABDUL RAZZAQUE AHMED,**    | ) |                              |
|                              | ) |                              |
| **Defendant.**               | ) |                              |

## GOVERNMENT'S SUPPLEMENTAL BRIEF ON ITS MOTION TO RECONSIDER AND/OR CLARIFY THE COURT'S ORDER FOR SEPARATE TRIAL ON COUNTS 21 AND 22

### I.  INTRODUCTION

At the initial pre-trial hearing held on January 16, 2007, the Court heard argument on the Government's Motion to Reconsider and/or Clarify the Court's Order For Separate Trial on Counts 21 and 22.  At the conclusion of that hearing, the Court requested supplemental briefing on the issue of the relationship between the DNA evidence and the fraud and money laundering charges.  As demonstrated below, the DNA evidence is not just critical to the obstruction counts, it is also central to the charged health care fraud, mail fraud, and money laundering counts.  For this reason, irrespective of this Court's proposed severance Order, the Government submits that the DNA evidence will be at the heart of any trial against the Defendant.

### II.  BACKGROUND

#### A.  The Relationship between the DNA Evidence and Indictment

On March 15, 2005, a Grand Jury returned an Indictment charging the Defendant with a variety of crimes, including mail fraud, health care fraud, money laundering and obstruction of justice.  The charges arise out of the Defendant's scheme to bilk Medicare out of millions of dollars.  The Indictment explained that, at times relevant to the charges, Medicare allowed for

payment for extremely expensive intravenous immunoglobulin ("IVIG") treatments for one very rare skin disease called pemphigus vulgaris ("pemphigus"). However, during this time period, Medicare did not allow for payments when IVIG treatments were given for a second, different rare skin disease called pemphigoid. The Indictment charged the Defendant with falsifying diagnoses for patients suffering from pemphigoid (the disease for which Medicare coverage for IVIG treatments was not available) by intentionally misrepresenting that these patients were suffering from both pemphigoid *and* pemphigus, thereby causing Medicare to pay for IVIG treatments that Medicare would not otherwise cover.

The Indictment charged the Defendant with fraudulently billing Medicare in excess of $5 million in connection with IVIG treatments that the Defendant provided to patients who suffered only from pemphigoid and did not have pemphigus. See generally Indictment ¶¶ 20-31. The Indictment explained that as part of the Defendant's fraudulent scheme, the Defendant created various false documents. The Indictment further charged the Defendant with trying to support his false "dual diagnoses" by causing blood samples from various patients to be mixed together and submitted to an independent laboratory in order to obtain fraudulent tests results indicating that his pemphigoid patients were suffering from both pemphigoid and pemphigus. As set forth in the Indictment, the Defendant accomplished this through various "manners and means":

- "in order to conceal his fraudulent activity and further his continued receipt of Medicare funds for IVIG treatments for pemphigoid patients, [defendant] caused the creation of false documents . . . that falsely indicated that a number of his Medicare patients had tested positive for pemphigus." Indictment ¶ 28.

- Defendant "caused to be mixed blood sera from one or more patients known by him to have the disease pemphigus, in the blood sera of at least 35 other patients, including certain Medicare patients, known by him to have only the disease pemphigoid." Indictment ¶ 29.

- Defendant "caused the vials of mixed blood to be sent to a testing laboratory . . . knowing that the tests would falsely reveal the presence of the disease pemphigus for a number of patients. . ." Indictment, ¶ 30.

- Defendant "paid the Buffalo Lab for testing the vials of mixed blood with checks drawn on an account that contained the proceeds of his fraudulent Medicare billings." Indictment, ¶ 31.

Each of these "manners and means" involves, and will be established at trial by the United States using, *inter alia*, DNA evidence. At trial, the Government will show that the Defendant directed that specific blood sera samples be sent to an independent laboratory to support his diagnoses that various patients had "dual diagnoses" of both pemphigoid and pemphigus. The DNA evidence will establish that many of these blood sera samples contained a mixture of blood sera from two or more of Defendant's patients, at least one of whom actually was suffering from pemphigus (the covered disease). This DNA evidence directly supports one of the Government's central theories of fraud alleged in the Indictment: *i.e.*, one of the ways in which the Defendant sought to perpetuate his criminal activities was by causing "to be mixed blood sera" in order to generate false positive pemphigus lab results for patients suffering from only pemphigoid. See Indictment ¶¶ 21, 29.

In addition to establishing one of the central "manner and means" of the Defendant's fraudulent scheme, the DNA evidence is also, as will be discussed below, central to various substantive counts in the Indictment.

## 1.    Health Care Fraud (Counts 7 through 20)

The Indictment charges fourteen counts of health care fraud. The counts are based upon Defendant's Medicare claims for IVIG treatments for fourteen different patients, each of whom the Defendant falsely asserted was suffering from both pemphigus and pemphigoid. See

Indictment ¶ 35.  With respect to each of these patients, Defendant submitted a bill to Medicare in which he set forth the false "dual diagnoses" indicating that the patient was suffering from both pemphigoid and pemphigus.  As to each of those patients, Defendant included with the bill a document purporting to be results of a lab test conducted by his lab.  These purported lab test results, which were signed by the Defendant, indicated that each of the fourteen pemphigoid patients also had pemphigus.  The evidence at trial will establish that these lab tests were, in fact, false and consisted, if they took place at all, of tests using mixed blood sera, *i.e.*, blood from multiple patients.  The DNA evidence will establish that many of these blood sera mixtures purporting to be blood sera samples of Defendant's pemphigoid patients at issue also included the DNA from Defendant's other patients who were known to be suffering from pemphigus.

### 2.  Mail Fraud (Counts 1 through 6)

Counts 1 through 6 each charges the Defendant with engaging in mail fraud in violation of 18 U.S.C. § 1341.  The mailing that forms the basis for one of these counts (Count Six) is a letter dated June 26, 2000.  This letter was the cover letter accompanying the vials of mixed blood sera that were submitted on the Defendant's behalf for testing in order to obtain test results supporting Defendant's false "dual diagnoses" for his pemphigoid patients.  Indictment ¶ 33.  The DNA evidence is central to establishing that the blood sera samples enclosed with this letter were mixed.[1]

---

[1]  The other five mail fraud counts (Counts 1 through 5) concern letters bearing various dates in 1996 through 1999.  Each of these letters was sent on or about September 11, 2000 -- after the Defendant received the test results of the mixed blood sera samples from the independent testing laboratory.  In each letter, the Defendant falsely advised a given patient's treating physician that the patient was suffering from both pemphigoid and pemphigus.

3.    **Money Laundering (Counts 23 and 24)**

The Indictment further charges two counts of "promotion" money laundering in violation of 18 U.S.C. § 1956(a)(1). These two counts allege that the Defendant conducted a financial transaction using the proceeds from his fraudulent activities to promote and further his fraudulent scheme. The basis for these two counts is once again directly related to the DNA evidence: the counts allege that the Defendant, on two separate dates, sent checks to the independent testing laboratory "to pay for the testing of blood sera marked with the names of defendant Abdul Razzaque Ahmed's patients (including at least 22 Medicare patients), including the vials of mixed blood." Indictment ¶ 43.

B.    **Chronology**

In order to put the DNA evidence into context and understand its central relevance to the fraud and money laundering counts, a brief chronology of salient events is important. The United States believes that the evidence at trial will establish the following:

| | |
|---|---|
| 1997-2000 | Defendant seeks Medicare guidance on billing for IVIG treatments for certain blistering skin diseases and learns that Medicare will provide payment for IVIG treatments only for pemphigus. Defendant advocates for Medicare payment for IVIG treatments for pemphigoid but is told that coverage does not exist for pemphigoid. Thereafter, Defendant submits claims for pemphigoid patients in which he falsely claims that the patients are suffering from both pemphigoid and pemphigus, and begins receiving Medicare payments. |
| June 15, 2000 | Defendant is served with a subpoena requiring production of records pertaining to patients being treated with IVIG. |
| June 2000 | Defendant directs and identifies certain specific patient blood sera samples (including the mixed blood samples) that are to be taken from the freezer in his lab and sent to an independent lab in Buffalo, New York (the Beutner Lab) for disease testing. |

| | |
|---|---|
| June 26, 2000 | The sera samples are sent to the Beutner Lab with accompanying letter (Count 6). |
| June 27, 2000 | Defendant signs and sends a check for $3,283 to pay for the testing of the blood sera at Beutner Lab(Count 23). |
| July 6, 2000 | Defendant signs and sends a second check for $6,418.60 also to pay for the testing of the blood sera at Beutner Lab (Count 24). |
| July 2000 | Defendant receives test results from Beutner Lab showing that a number of his patients, including 22 Medicare patients, have "dual diagnoses" of pemphigoid and pemphigus. |
| September 11, 2000 | Defendant causes "addendum" letters (bearing dates ranging from 1996 through 1999) to be sent to referring physicians of various patients.  In these letters, Defendant falsely advises the referring physicians that -- notwithstanding the Defendant's earlier written diagnosis of pemphigoid -- the patients were suffering from both pemphigoid and pemphigus (Counts 1 through 5). |
| October 2000 | Defendant causes to be produced various medical records pursuant to subpoena.  These records contain false documents, including immunopathology reports and letters to patients' referring physicians, and show that various pemphioid patients suffered from "dual diagnoses" of pemphigoid and pemphigus (Count 21). |
| later 2000 | Defendant assigns an employee in his lab to create a chart using Defendant's (phony) Immunopathology Report data, the (phony) Beutner Lab data and other data.  (A copy of this chart, with patient names redacted to initials, is attached hereto as Exhibit A.) |
| December 2000 | Defendant submits an article called "Simultaneous Presence of Mucous Membrane Pemphigoid and Pemphigus Vulgaris: Molecular Characterization of Both Autoantibodies," based on the data in the Chart, to the Clinical Immunology journal. |
| March 27, 2001 | Defendant submits to Medicare, *inter alia*, fourteen claims for IVIG treatments for different pemphigoid patients in which Defendant falsely asserts that each of the patients has pemphigoid and pemphigus, thereby causing Medicare to issue payments for IVIG treatments (Counts 7 through 20). |

| June 2001 | Defendant submits an article called "Diagnostic Features of Pemphigus vulgaris in Patients with Bullous Pemphigoid," to the Dermatology journal. |
| October 25, 2001 | Defendant's counsel meets with Government agents and prosecutors and presents the chart containing the false data based upon the blood mixtures that Defendant obtained in July 2000 which purports to show that 42 of Defendant's patients, including 22 Medicare patients, really have dual diagnoses of pemphigoid and pemphigus (Count 21). |

## C.    The DNA Evidence

At the meeting conducted on October 25, 2001, Defendant, through counsel, submitted to the Government a chart (the "Chart")(Exhibit A) purporting to show that 42 of his patients suffered from both pemphigoid and pemphigus. Included in this chart were a number of the Medicare patients whose bills form the basis for the health care fraud charges in the Indictment.

The Chart contained quite a bit of information, including *inter alia*: (1) patient name; (2) date of the blood draw from the patient; (3) test results from Dr. Ahmed's lab; (4) test results from the independent testing lab in Buffalo (the "Beutner Lab"); and (5) test results from the Mayo Clinic. Each lab conducted some of the same tests, and each conducted different tests as well.[2] In somewhat varying concentrations, the Chart shows that every patient purportedly tested positive for pemphigus based on a blood draw sample of the same date at Dr. Ahmed's lab, the Beutner Lab and the Mayo Clinic. Using the chart, Defendant's counsel stated to government agents that the data included in the Chart should convince them "beyond a doubt" that the patients in question had a dual diagnosis of pemphigoid and pemphigus and that Defendant had not defrauded Medicare.

---

[2] For these purposes, the focus is on the tests each lab performed that were the same – namely the ICS test, which tests for pemphigus, and the BMZ test, which tests for pemphigoid.

Thereafter, the United States subpoenaed the actual test records, among other things from the Beutner Lab and from the Mayo Clinic.  As part of that process, the United States learned that while the Mayo Clinic had disposed of the blood samples, the Beutner Lab had retained the samples.  The United States subpoenaed those samples, had them shipped to an independent DNA laboratory and undertook DNA tests on those samples.

The results obtained from this DNA testing revealed that these blood samples were mixed.  The test results demonstrated that many of the blood samples submitted to the Beutner Lab contained mixtures involving a combination of the blood sera from Defendant's pemphigoid patients with some of the blood sera from other patients who were known to be suffering from pemphigus.

### III.   ARGUMENT

### A.    The DNA Evidence Is Plainly Relevant to the Fraud and Laundering Counts

The touchstone of "relevance" is Federal Rule of Evidence 401: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  By that standard, the DNA evidence is relevant to both the substantive fraud counts and the money laundering counts.[3/]

---

[3/]  In the briefing before Magistrate-Judge Dein on the admissibility of the Stipulation, defendant Ahmed contended that there was some conditional relevance hurdle that the United States had to clear, pursuant to Federal Rule of Evidence 104(b), before the Chart became relevant to the obstruction counts.  Magistrate-Judge Dein rejected this argument, stating: "the government may introduce its evidence in the order it deems most appropriate."  August 3 Memorandum and Order at p. 6.  The United States urges that this Court take a similar view of this argument.

Both sets of fraud counts (mail fraud and health care fraud) relate to the Defendant's scheme to defraud Medicare of over $5 million by falsely claiming that certain pemphigoid patients were also suffering from pemphigus so that the Defendant could bill and receive payments for expensive IVIG treatments for those patients for whom Medicare coverage would otherwise not be available. Although the Defendant's fraudulent scheme started long before he received the federal subpoena in June 2000 and long before he caused mixed blood samples to be submitted to the Beutner Lab, the scheme continued into 2001, well after he received the blood test results from Beutner.

### 1.     The DNA evidence is directly linked to the mail fraud charges

One of the mail fraud counts (Count Six) concerns the mailing of the very letter to the Beutner Lab that accompanied the vials of mixed blood for testing. Indictment ¶ 33. This mailing is an important step in furtherance of the Defendant's scheme -- it was this mailing that caused the mixed blood sera to be sent for purportedly "independent" disease testing so that later, when Defendant billed Medicare for the bogus "dual diagnoses" of pemphigoid and pemphigus, he would have "independent" evidence of these diagnoses. Moreover, Defendant used the "independent" data to build a record in the scientific journals that falsely suggested that the prevalence of "dual diagnoses" being reflected in his billings really existed. Showing that the purportedly "independent" data was bogus -- as the DNA evidence establishes -- is central to this charge.

The other five mail fraud counts (Counts One through Five) concern letters that the Defendant caused to be sent on or about September 11, 2000 -- after Defendant received the test results of the mixed blood sera samples from Beutner Lab. Each of these letters purport to be an

"addendum" to an earlier letter sent by the Defendant to a patient's referring physician in which the Defendant truthfully advised the referring physician that the patient in question was suffering from pemphigoid. Although the Defendant caused each of these "addendum" letters to be mailed on or about September 11, 2000, they all bear different dates -- ranging from April 1996 through July 1999. (A cover letter accompanying the letters indicate that an employee in Defendant's office just discovered the letters: "I have come across letters in our office that I believe may not have been mailed out."). See Exhibit C.

In each of these "addendum" letters, Defendant amends his earlier diagnosis that the patient was suffering only from pemphigoid. Instead, in the "addendum" letters, the Defendant falsely asserts that the patient is suffering from dual diagnoses of both pemphigoid and pemphigus. For example, Count Two concerns patient BG. In a letter dated September 2, 1998, and mailed on or about that date, the Defendant first advised patient BG's referring physician that BG had bullous pemphigoid and proposed a regimen of IVIG to treat BG's condition: "IVIg has proven to be very effective as montherapy in the management of bullous pemphigoid." See Exhibit B. Thereafter, on or about September 11, 2000, the Defendant caused a second "addendum" letter to be mailed, which forms the basis of the mail fraud count. Although not mailed until on or about September 11, 2000, this letter bears the purported date of **September 9, 1998**. See Exhibit C. In contrast to the Defendant's earlier letter, this letter falsely states that BG was suffering from both pemphigoid and pemphigus.

The DNA evidence showing that the blood sera samples from the earlier testing were mixed will both support the government's theory that each of these so-called "addendum" letters

mailed on or about September 11, 2000 were false.   The DNA evidence also provides powerful

circumstantial evidence of the defendant's continued fraudulent intent.

> **2.     The DNA evidence provides compelling support of the health care fraud charges**

The health care fraud charges are each based upon different Medicare claims submitted

on Defendant's behalf on or about March 27, 2001 – approximately nine months after Defendant

procured the fraudulent "independent" test results from Beutner Labs using mixed blood sera

samples.  Each of the claims pertains to IVIG treatments for a different patient, each of whom

the Defendant claimed was suffering from both pemphigoid and pemphigus.  See Indictment ¶ 5.

As to each of those patients, Defendant included with that bill a lab test report (called an

Immunopathology Report) purporting to be results of a lab test signed by him stating that the

patient had the disease pemphigus.  Many of these lab reports further indicate that the blood sera

used was drawn from the same patient sera sample submitted to Beutner Lab.

Once again, the DNA evidence is directly relevant.  The DNA evidence affirmatively

establishes that the blood sera samples submitted on the Defendant's behalf were mixed.  The

DNA evidence also shows that the mixing sometimes involved the blood of the actual

(pemphigoid) patient and the blood of one of Defendant's actual pemphigus patients.  Because

these Immunopathology Reports purported to provide test results based on the same blood sera

samples that the DNA evidence proves is mixed, the DNA results directly undercut the

Defendant's purported claim that his "dual diagnoses" of pemphigoid and pemphigus were

supported by laboratory testing.

3.     **The factual underlying the money laundering counts is inextricably linked to the DNA evidence**

The DNA evidence is similarly relevant to the money laundering counts. Both money laundering counts charge the Defendant used the proceeds of unlawful activity (health care fraud) and engaged in two financial transactions in order to promote his health care fraud scheme. As previously discussed, these two counts concern the Defendant's issuing of two checks to the Beutner Lab to pay for the testing of blood sera, "including the vials of mixed blood." Indictment ¶ 43.

Evidence that the blood was indeed mixed – established by testimony regarding the DNA lab results demonstrating the mixtures -- is not just relevant but central to these counts. The money laundering charges are predicated upon the Defendant issuing payments for lab testing that promoted his fraudulent scheme. There can be no question that Defendant's objective in obtaining (through fraudulent means) false "independent" test results showing that certain patients had pemphigus (when in fact they did not) promoted the fraud scheme: (1) it falsely bolstered the false claims being sent to Medicare (and charged in the Indictment); (2) it aided in creating the false impression, through the publication of articles, that "dual diagnoses" were more prevalent than they actually were; and (3) it was actually used by the Defendant to attempt to deter a Government prosecution when the United States began to investigate the Defendant's "dual diagnoses" billing practices.

To prove that the Defendant sought to engage in independent lab testing to promote his fraudulent scheme, it is incumbent that the United States be allowed to introduce evidence showing that the blood sera samples submitted for that lab testing were mixed. The DNA test results establish this fact.

12

**4.      In addition to establishing crucial elements of the Government's case, the DNA evidence also provides powerful circumstantial evidence of defendant's intent**

Defendant's main objection to the evidence seems to be that he does not believe that the United States can prove that he was responsible for manipulating the blood sera samples in order to support his false "dual diagnoses" of pemphigoid and pemphigus to Medicare (and others). To be sure, the United States does not have a video tape demonstrating the Defendant personally engaged in the manipulation. However, the United States has adduced, and expects it will present at trial, evidence that will point the finger solely and squarely at the Defendant in terms of the intentional manipulation of the samples. The evidence will involve, but not be limited to:

    *      the patients' knowledge of their diseases as communicated by the
           Defendant,

    *      the Defendant's earlier description of the patient's conditions to their
           referring physicians and the manner in which the Defendant subsequently
           tried to modify that description;

    *      the disease testing of various patients by independent entities at or around
           the same time;

    *      the timing of the Beutner Lab testing;

    *      the Defendant's motive;

    *      the Defendant's opportunity;

    *      the Defendant's access to the lab freezer;

    *      the selection of the specific samples that were sent for testing; and

    *      the contents of the sera sample mixtures.

This type of circumstantial evidence is not only normal and acceptable in fraud cases,[4] it is the nature of DNA evidence. DNA evidence is often used to prove or disprove something entirely circumstantial. E.g., United States v. Bonds, 12 F.3d 540, 567 (6th Cir. 1994)("Here, the evidence and the testimony were clearly probative because they linked Bonds to the murder scene when no direct evidence existed to do so."). Defendant's quarrels with the DNA evidence go solely to weight -- not to admissibility. See United States v. Shea, 211 F.3d 658, 667-668 (1st Cir. 2000).

In sum, the DNA evidence is centrally relevant to the government's fraud and money laundering charges. Failing to admit that evidence would materially undermine the specific text of those charges, which explicitly refer to "vials of mixed blood," and render some of the charges inexplicable. The legal sufficiency of the Indictment (or any aspect of it) has not been challenged, and the deadline for dispositive motions (December 11, 2006) has passed. It is axiomatic that the United States should be able to prove the case it charged (and that will be extant when the case goes to trial).

---

[4] The First Circuit's Pattern Instructions (Section 3.05, Kinds of Evidence: Direct and Circumstantial) treat direct and circumstantial evidence as equals:

> There are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness that the witness saw something. Circumstantial evidence is indirect evidence, that is proof of a fact or facts from which you could draw the inference, by reason and common sense, that another fact exists, even though it has not been proven directly. You are entitled to consider both kinds of evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

**B.**     **No "Privilege" or "Immunity" Attached to the Statements Made at the October 25, 2001 Meeting, or Any Evidence Derived Therefrom**

At the January 16th pre-trial hearing, Defendant's counsel suggested that the October 25 meeting between Government representatives and Defendant's counsel was privileged and that any evidence derived by the Government from that meeting (including the DNA evidence) were somehow equally protected. Both as a factual matter and as a matter of law, however, there is no merit to this contention.

The October 25 meeting between defense counsel and Government representatives was not protected as part of a plea negotiation, nor was it protected by any other applicable privilege. There was no plea discussion at the meeting and no one, including Defendant's counsel, invoked any of the rules that denote a plea or settlement discussion.

Even engaging in the wholly unsupported assumption that the October 25 meeting somehow resembled a plea discussion, the law is clear that there is no prohibition on use of evidence from facts learned at such a discussion. Magistrate-Judge Dein's August 3, 2006 Memorandum and Order correctly dispensed with any such argument (at pp. 9-10):

> In United States v. Penta, 898 F.2d 815 (1ˢᵗ Cir. 1990), the First Circuit made it abundantly clear that the prohibition against admitting statements made during plea discussions "means plea discussions, and not simply anything that might ultimately lead to such." Id. at 817. The court expressly rejected the argument that a "preliminary discussion must be considered as part of the overall plea bargaining process." Id. at 818 (internal citation omitted). Therefore, statements made to the government while the government "was openly trying to build a case against defendant's associates" were found to be admissible in Penta. See id. at 816. In light of this clear ruling, there is no legitimate claim that an attorney who engages in a formal meeting with the government in the First Circuit for the purpose of convincing the government not to pursue charges would expect that such discussions would be privileged in the absence of an express representation or agreement to that effect.

Moreover, even under the discredited and impossible scenario that the October 25 meeting between defense counsel and Government representatives could be contorted into something resembling a plea discussion, and assuming that the protections of Federal Rule of Evidence 410 were invoked (they were not), there is nothing in the text of Rule 410 that prohibits the use of evidence derived from facts learned in a plea discussion. In fact, the federal courts to consider the issue have rejected any suppression of derivative evidence in this scenario. See, e.g., United States v. Rutkowski, 814 F.2d 594, 598-99 (11th Cir. 1987); United States v. Cusack, 827 F.2d 696, 697-98 (11th Cir. 1987); United State v. Millard, 235 F.3d 1119, 1120 (8th Cir. 2000); United States v. Fronk, 173 F.R.D. 59, 62 (W.D.N.Y. 1997).

Imposition of such a rule would be particularly inappropriate given the facts of this case. The Government either had (or had access to) substantially all of the data that made up the chart prior to the October 25, 2001 meeting in which defense counsel produced the chart to Government representatives:

- Defendant's Immunopathology Reports submitted with the bills on or about March 27, 2001; and

- Scientific articles referencing and discussing some of the data that were in the public domain as early as June 2001.[5]

Further, the United States had a legal right to, and did, discover that data derivatively. There is nothing privileged about the chart, and Defendant has conceded that point: "Dr. Ahmed does not

---

[5] Contrary to defense counsel's suggestion at the pre-trial hearing, the evidence establishes that the Defendant had the chart prepared for business, not litigation, purposes. The Defendant asked his lab employees to use the chart and the data reflected therein to assist in the preparation of articles for publication on patients who purportedly had "dual diagnoses" of pemphigoid and pemphigus. Drafts of these articles were received by various publications well before defense counsel met with Government representatives on October 25, 2001.

16

claim that the chart reflecting the test results, or anything else said or given to the government at the October 25, 2001 meeting, is privileged."  Defendant's Sur-Reply dated May 22, 2006 (Docket # 73) at p. 6.

## IV.   CONCLUSION

For all of these reasons, the United States respectfully requests that the Court reconsider its Order severing the obstruction counts and instead allow those counts to be tried together with fraud and money laundering counts.  See United States v. Stackpole, 811 F.2d 689, 694 (1st Cir. 1987)  ("[w]ere the counts severed, substantially the same evidence would have been admitted in both resulting trials").   In the alternative, the United States requests that the Court clarify its Order to make clear that the United States is permitted to present evidence relevant to the fraud scheme charged and the money laundering counts, including without limitation any and all DNA evidence that reflects blood sera mixing, false laboratory test results, and multiple DNA sources in the blood sera samples.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Jeremy M. Sternberg
JAMES E. ARNOLD
JEREMY M. STERNBERG
Assistant U.S. Attorneys
One Courthouse Way
Boston, MA 02210
(617) 748-3100

Date: February 6, 2007

17

Certificate of Service

     I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF).


                          /s/Jeremy M. Sternberg
                          Jeremy M. Sternberg
                          Assistant United States Attorney

EXHIBIT A

| NAME | DATE | Dr. Ahmed's Lab | | | Beutner's Lab | | ELISA DSG1/DSG3 | | Mayo Clinic | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ICS | BMZ | IB | ICS | BMZ | | | ICS | BMZ | SSS |
| DA | 6/13/96 | 40 | 1280 | 130 230,180 | 160 | 20 | 80.6 | 101.4 | 640 | 40 | Epidermal |
| RB | 10/03/93 | 640 | 160 | 130 230,180 | 640 | 10 | 71.8 | 172.3 | >80 | >80 | Epidermal |
| RB1 | 8/10/98 | 80 | 80 | 130 205 | 80 | 10 | 23.9 | 80.2 | 640 | 160 | Epidermal |
| RB2 | 9/20/99 | 640 | - | 130 205 | 160 | | 18.4 | 173.7 | 640 | - | - |
| RC | 11/5/98 | 40 | 160 | 130 205 | 80 | 640 | 71.0 | 102.6 | 20 | 5120 | Epidermal |
| MC | 8/16/96 | 20 | 80 | 130 205 | 10 | 320 | 6.3 | 69.1 | Trace | 2560 | Epidermal |
| VC | 4/9/98 | 40 | 320 | 130 205 | Trace 320 | 320 | 19.0 | 48.2 | Trace | >80 | Comb. |
| CD | 5/2/97 | 80 | 40 | 130 205 | 80 | - | 42.5 | 44.0 | 80 | 40 | Epidermal |
| EF | 9/08/97 | 320 | 1280 | 130 230,180 | 160 | 1280 | 29.0 | 159.2 | 320 | 10240 | Epidermal |
| JF | 9/03/94 | 320 | 1280 | 130 230,180 | 80 | 10 | 14.4 | 168.0 | 1280 | 40 | Epidermal |

| NAME | DATE | Dr. Ahmed's Lab | | | Beutner's Lab | | ELISA DSG1/DSG3 | | Mayo Clinic | | |
|------|------|-----|-----|-----|-----|-----|-------------|---|-----|-----|-----|
| | | ICS | BMZ | IB | ICS | BMZ | DSG1 | DSG3 | ICS | BMZ | SSS |
| JG | 5/28/98 | 40 | 40 | 130 205 | 160 | 10 | 29.2 | 164.0 | 320 | 80 | Epidermal |
| IG | 1/7/99 | 80 | 20 | 130 205 | 40 | | 11.8 | 53.5 | >80 | >80 | Epidermal |
| DG | 12/12/97 | 40 | 320 | 130 230,180 | 320 | 20 | 4.3 | 165.8 | 1280 | - | - |
| BG | 8/19/98 | 40 | 320 | 130 230,180 | 160 | 40 | 54.6 | 70.1 | 160 | 640 | Epidermal |
| FG | 4/4/97 | 40 | 40 | 130 205 | 20 | - | 20.6 | 29.6 | 20 | - | - |
| RH | 4/23/96 | 160 | 80 | 130 205 | 640 | 10 | 27.6 | 166.6 | 640 | 160 | Epidermal |
| CK | 7/3/1999 | 160 | 160 | 130 205 | 640 | - | 18.7 | 175.5 | 1280 | - | - |
| MK | 8/6/96 | 40 | 160 | 130 205 | 80 | - | 70.4 | 116.9 | 320 | 160 | Epidermal |
| RK | 4/13/99 | 40 | 40 | 130 205 | Trace 20 | 20 | 16.5 | 30.1 | Trace 1280 | 1280 | Epidermal |

| NAME | DATE | Dr. Ahmed's Lab | | | Beutner's Lab | | ELISA | | Mayo Clinic | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | ICS | BMZ | IB | ICS | BMZ | DSG1 | DSG3 | ICS | BMZ | SSS |
| RL | 5/22/97 | 160 | 20 | 130 205 | 160 | - | 65.4 | 180.8 | >80 | >80 | Epidermal |
| ML | 9/9/97 | 160 | 40 | 130 205 | 80 | - | 36.9 | 129.2 | >80 | - | - |
| SM | 10/2/97 | 40 | 160 | 130 230,180 | 80 | - | 23.0 | 86.6 | 20 | 640 | Epidermal |
| MM | 9/3/97 | 20 | 80 | 130 205 | 10 | 10 | 19.2 | 32.9 | 80 | - | Epidermal |
| EM | 3/26/96 | 320 | 640 | 130 230,180 | 1280 | - | 4.9 | 180.1 | 2560 | - | - |
| JN | 11/11/98 | 80 | 1280 | 130 230,180 | 40 | 160 | 27.1 | 36.3 | 80 | 1280 | Epidermal |
| JO | 1/19/98 | 160 | 160 | 130 205 | 40 | - | 38.6 | 59.2 | 160 | 40 | - |
| CP | 4/15/98 | 40 | 320 | 130 230,180 | 640 | - | 7.7 | 171.8 | 2560 | - | - |
| TP | 10/30/95 | 80 | 1280 | 130 230,180 | 80 | 20 | 56.7 | 143.1 | >80 | 640 | Epidermal |

| NAME | DATE | Dr. Ahmed's Lab | | | Beutner's Lab | | | Mayo Clinic | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ICS | BMZ | IB | ICS | BMZ | ELISA DSG1/DSG3 | ICS | BMZ | SSS |
| AP | 8/20/96 | 160 | 160 | 130 / 230,180 | 160 | 10 | 82.9 / 154.5 | >80 | 160 | Epidermal |
| JP | 3/15/98 | 160 | 160 | 130 / 230,180 | 640 | - | 70.4 / 171.8 | 1280 | - | - |
| AP1 | 6/30/97 | 80 | 160 | 130 / 205 | 320 | - | 4.6 / 175.3 | 2560 | - | - |
| EP | 1/23/97 | 80 | 160 | 130 / 205 | 40 | 80 | 15.9 / 141.4 | - | 2560 | Epidermal |
| NR | 11/12/98 | 40 | - | 130 / 205 | 40 | - | 16.3 / 102.7 | >640 | 320 | Epidermal |
| BR | 12/11/97 | 320 | 40 | 130 / 205 | 320 | - | 7.8 / 170.1 | 2560 | - | - |
| ES | 10/23/97 | 40 | 320 | 130 / 205 | 80 | - | 27.4 / 84.4 | 320 | - | - |
| RS | 4/24/97 | 80 | 160 | 130 / 205 | 80 | 20 | 25.5 / 83.3 | 160 | 40 | - |
| SS | 3/16/99 | 40 | 640 | 130 / 230,180 | 40 | 10 | 11.1 / 120.3 | >80 | 160 | Epidermal |

| NAME | DATE | Dr. Ahmed's Lab | | | Beutner's Lab | | | Mayo Clinic | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ICS | BMZ | IB | ICS | BMZ | ELISA DSG1/DSG3 | ICS | BMZ | SSS Tessier. |
| FS | 7/31/97 | 40 | 640 | 130 230,180 | 40 | - | 7.5 -96.2 | 160 | - | - |
| AS | 7/22/98 | 80 | 160 | 130 205 | 80 | - | 72.3 105.2 | 640 | - | - |
| NT | 7/29/19 | 160 | 160 | 130 205 | 160 | 20 | 28.9 158.2 | 320 | 640 | Epidermal |
| RW | 5/12/98 | 40 | 640 | 130 230,180 | 320 | - | 57.4 183.3 | 640 | - | - |
| JW | 10/10/95 | 160 | 1280 | 130 230,180 | 80 | 80 | 37.9 119.7 | 320 | 320 | Epidermal |

EXHIBIT B



**New England**
**Baptist**
**Hospital**

70 Parker Hill Avenue, Suite 203
Boston, Massachusetts 02120

A. Razzaque Ahmed, M.D.
Diseases of the Skin & Mucous Membranes

Tel: 617-738-1040
Fax: 617-754-6434

September 2, 1998

Dr. Steven Franks
Dermatology Associates of Worcester
110 Lincoln St.
Worcester, MA 01605

FAX: (508) 753-0151
TEL: (508) 754-3823
RE:    BG

Dear Steve,

Thank You very much for asking me to see this 79 year old gentleman. Thank you very much for sending me the accompanying records. Approximately 15 months ago the patient started to develop bullous pemphigoid. He had numerous erythematous plaques and some bullae on his lateral trunk, lower abdomen and thighs. This was perceived as being a drug reaction or erythema multiforme since he was on Dilantin Cardura and Aspirin. Initial treatment with oral Benadryl and 10mg QID of Prednisone did not bring much success. The disease continued and by mid June, 1998 he was doing slightly better and the dose of Prednisone was lowered. Once the dose was reduced to 20mg/day, he had a recurrence of the lesions. A punch biopsy on June 1998 revealed that he had bullous pemphigoid. He was started on Minacyclin 100mg BID. Since significant improvement was not noted the dose of Prednisone was increased to 50mg/ day. Hydroxyzine and Imuran 50mg BID was added. By August 1998 the improvement was not satisfactory and it appeared that the patient had lost 30lbs of weight.

The patient was seen by me on August 19, 1998. At this point he was on 50mg/ day of Prednisone and 100mg/day of Benadryl with Triamcinalone cream 0.1% being applied topically to the involved areas. He continued to use Cardura and Dilantin. The patient has a long-standing history of head trauma which has followed by several neurological problems notably surgery on his head as well as spinal chord. The patient is mostly in a wheelchair but is able to ambulate with assistance.

On examination there were numerous bullae of variable sizes present on the anterior and medial sides of both thighs with lesions extending to the buttock and lower abdominal area bilaterally. There was evidence of healing lesions on upper extremities as well.

Clearly the patient has bullous pemphigoid that is non-responsive to systemic antibiotic therapy. The dosages of Prednisone required are significantly higher and when lowered have resulted in the recurrence of the disease. The patient has not responded to the

FRA00011

reasonable doses of Imuran. Bringing the dosages of Prednisone any higher is associated with significant problems notably hypertension and infections in a patient who is predominantly living a sedentary life. Since Imuran is of little benefit, one would have to switch to an alternative agent. The one that would be of benefit at this time would be Cyclophosphamide. However, with his enlarged prostate and possible prostatitus it would not be advisable to use Cyclophosphamide because of the associated high incidence of hemorigic cystitis with it. Moreover, it is associated with cancer of the bladder.

Hence one is left with minimal choices with treating the patient. Ideally one would like to use an agent with which a quick remission can be produced with minimal side effects. One would also like a drug that will keep the patient in prolonged remission with minimal, side effects.

I have treated over 30 cases of bullous pemphigoid with very significant clinical results. I would consider that this would be the optimal therapy for this patient. Our protocol consists of 50-75Gms of IVIg daily for three consecutive days. A cycle of three day therapy is repeated every three weeks until the patient shows significant clinical improvement. At this point the frequency of the cycles is increased gradually. The entire therapy lasts less than a year. All other drugs used for the treatment, which in his case would be Prednisone and Imuran would be gradually lowered and eventually discontinued. IVIg has proven to be very effective as monotherapy in the management of bullous pemphigoid.

I will be publishing my series very shortly. In this series I have compared other treatment modalities for pemphigoid with IVIg and found that IVIg has a tremendous benefit in reducing the morbidity, in increasing the duration needed to achieve total and partial clinical remission. Most importantly, the side effects of IVIg are negligible or none. This is particularly important in light of his age, his cardiac condition as well as his blood pressure. The patient has agreed to the therapy and has a significant number of members in the family that will facilitate the driving back and forth. If this is agreeable with you, I will initiate the therapy as soon as possible so that one can achieve significant levels of IVIg in the serum and then begin to discontinue the other treatments and maintain this as monotherapy. I deeply appreciate your involving me in the care of this patient and for referring this very interesting patient to me. If I could be of further assistance please do not hesitate to contact me.

Sincerely yours,

A. Razzaque Ahmed, M.D.

CC: Dr. Frank Dufault

FRA00012

EXHIBIT C

September 11, 2000

I have come across some letters in our office that I believe may not have been mailed out. There have been some recent changes in personnel in our office and I apologize for the long delay in sending you this letter.

Please call me at Dr. A. Razzaque Ahmed's Office if you have any questions. Our office number is 617/738-1040.

Thank you for your understanding.

Sincerely,

Phyllis A. MacPherson, RN, MSN

FRA00013

**NE**
**B** Baptist
**D** Hospital

*New England*

70 Parker Hill Avenue, Suite 208
Boston, Massachusetts 02120

---

A. Razzaque Ahmed, M.D.
Diseases of the Skin & Mucous Membranes

Associate Professor of Oral Medicine
Harvard University School of Dental Medicine

Tel: 617-738-1040
Fax: 617-754-6434

---

September 9, 1998

Dr. Steven Franks
Dermatology Associates of Worcester
110 Lincoln Street
Worcester, MA 01605

                              **RE:**         BG

Dear Steve:

This brief note is an addendum to my recent letter to you.

The two skin biopsies you did provide evidence for the diagnosis of Pemphigoid. However, no serological studies were done. Hence I ordered indirect immunofluorescence to determine the target antigens in the skin. Interestingly serological analysis of Mr.    BG    sera reveals that there are demonstrable levels of two distinct antibodies. There are anti-BMZ antibodies which target BPAg1 and BPAg2 suggest Pemphigoid and antibodies to keratinocyte cell surface or intercellular cement substance (ICS), typically seen in pemphigus. This would indicate that we have dual diagnoses. The phenotypic presentation may be similar to typical pemphigoid, but the serological evidence is unequivocal for both disease processes. In most patients Pemphigoid is a self limiting easily controlled disease. In my opinion, it is this combination of two diseases that has made the clinical management difficult, prolonged clinical course and made it recalcitrant or non-responsive to conventional or usual therapy. In several pemphigus patients I have treated, a favorable response to IVIg has been observed. Such patients go into prolonged clinical remission. Hence, I am optimistically hopeful that Mr.   BG   will also respond likewise.

There are several reports in the literature that support the occurrence of this rare and interesting phenomenon. If you

FRA00014

Page 2

should like the bibliography, please let me know.  Hence, I am
optimistically hopeful that this patient will also respond.

Thank you again for providing me the opportunity to treat this
challenging patient.

Sincerely yours,

*Razzak*

A.Razzaque Ahmed, M.D.

FRA00015