UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | Case No. 05-10057-RCL |
| v. | ) ) |  |
| ABDUL RAZZAQUE AHMED, | ) ) |  |
| Defendant | ) ) |  |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL BRIEF
ON ITS MOTION TO RECONSIDER AND/OR CLARIFY
THE COURT'S ORDER FOR SEPARATE TRIAL ON COUNTS 21 AND 22**

Defendant Dr. Abdul Razzaque Ahmed ("Dr. Ahmed") responds to the Government's Supplemental Brief In Support of Its Motion to Reconsider and/or Clarify the Court's Order For Separate Trial on Counts 21 and 22. The Government has charged in an indictment, and argued in filings and appearances before the Court for the past two years, allegations against Dr. Ahmed that amount to two separate cases – (1) a fraud case, alleging that Dr. Ahmed billed Medicare as if certain patients had one disease when he knew they had another, and (2) an obstruction of justice case, alleging that when the U.S. Attorney's Office began investigating that conduct, Dr. Ahmed, <u>at that point</u>, created documents and manipulated blood sera test results in order to hinder the Government's investigation.

While the evidence in this case will reveal that Dr. Ahmed is innocent of all charges, it is clear even now that the Court was wise when it ruled that these two separate and distinct cases should be tried as such. The obstruction of justice trial raises significant Sixth Amendment issues, will require weeks of lengthy, complex testimony, and will be infected by an omnipresent possibility of a mistrial due to the Government's inability to provide any evidence linking Dr.

Ahmed to manipulation of blood sera. Upon consideration of the Government's new arguments, it is clear that in order to effectuate the Court's intent – of having the Medicare fraud case tried separately from the obstruction of justice case – further counts should be severed. The Medicare fraud counts (Counts 7-20) should be tried together, with the obstruction of justice counts (Counts 1-6, 21-24) tried together in a subsequent trial.

I.  **BACKGROUND**

   A.  **The Government's Fraud Case**

In order to understand the Government allegations against Dr. Ahmed, the Court must first understand who are the patients Dr. Ahmed treats and how he treats them. There is no dispute in this case that Dr. Ahmed's patients were very sick, and that all suffered from excruciatingly painful and potentially life-threatening diseases, referred to as "blistering diseases." There is similarly no dispute that these patients were in desperate need of treatment and that, in fact, they were referred to Dr. Ahmed because they were the sickest blistering skin disease patients who were the most difficult to diagnose and the most difficult to treat.[1]

---

[1] Dr. Ahmed is a world-renowned dermatologist who has been honored by virtually every international group of dermatology, has worked on blistering diseases for 25 years, and has authored more than 250 papers on the subject. Dr. Ahmed designed and created the first clinical facility exclusively devoted to the care, education, and total well being of patients with blistering diseases. He oversaw the construction of an accompanying laboratory that focuses on studying molecular mechanisms in blistering diseases, was a pioneer in identifying genes (haplotypes) that predispose to blistering diseases, and pioneered the use of IVIg in blistering diseases – a treatment now used worldwide, and responsible for saving the lives of hundreds of patients suffering from blistering diseases who do not respond to traditional therapies (cortisone & immunosuppressive agents).

As a result of Dr. Ahmed's expertise, doctors from around the country and the world refer to him their most difficult to diagnose and toughest to treat patients – the sickest patients in Dermatology, many of whom everyone else has given up on. Indeed, all patients seen by Dr. Ahmed were referred by other specialists – no patient with a blistering disease comes directly into the practice.

2

The two diseases at the center of this case are pemphigoid and pemphigus. Both are autoimmune blistering diseases in which the body's defenses mistake its own tissues as foreign, and attack the cells. Both are characterized by severe blistering of the skin – caused by antibodies attacking the inter-cellular cement (the mortar holding the cells of the skin in place) in the case of pemphigus, and the basement membrane zone (the foundation of the skin) in the case of pemphigoid.[2] Today, Medicare allows payments when IVIg treatments are given to treat either pemphigoid or pemphigus. Between 1997 and 2002, however, Medicare allowed payments only when IVIg treatments were given for pemphigus.

At the heart of the Government's indictment is the allegation that before Medicare began coverage for pemphigoid, Dr. Ahmed sought reimbursement from Medicare for patients he knew to only suffer from pemphigoid by claiming that they were also suffering from pemphigus, thereby causing Medicare to pay for IVIg treatments that Medicare would not otherwise cover.[3,4] There is nothing more to it than that.

---

[2] The difficulty in diagnosing these diseases is compounded by the fact that, as with so many diseases, they often appear comorbid with other diseases – including each other – meaning that some patients suffer from both pemphigoid and pemphigus simultaneously. <u>This reality has been noted in Medical Journals as early as 1974 – years before Dr. Ahmed was even practicing medicine.</u> Not surprisingly, patients suffering from multiple diseases simultaneously are inherently more difficult to diagnose and more difficult to treat. As a result, comorbid patients are regularly referred by their doctors to Dr. Ahmed.

[3] The patients in the indictment are only a tiny percentage of Dr. Ahmed's practice. Since 1997, Dr. Ahmed has seen thousands of patients with a variety of diseases. Of those, he diagnosed less than 500 with <u>either</u> pemphigus or pemphigoid. The 24 patients in the indictment make up 5% of the pemphigus and pemphigoid patients treated by Dr. Ahmed, and a much smaller percentage of his total practice.

[4] While the Government repeatedly refers in its papers to the allegation that Dr. Ahmed charged Medicare over $5 million relating to the treatment of these patients, that number refers to the alleged payments from Medicare, not profit to Dr. Ahmed. As the government is well aware, the lion's share of such payments went to pay for the cost of the medicine and other expenses, from which Dr. Ahmed profited not a penny.

This case is clearly defined and represented by 14 counts (Counts 7-20) – each one listing a claim for Medicare reimbursement for IVIg treatments which the Government alleges Dr. Ahmed knew were for pemphigoid patients.

### B.    The Government's Obstruction of Justice Case

Separately, the government alleges that after the Government served Dr. Ahmed with a subpoena on June 15, 2000 – <u>years after he began seeking and receiving Medicare reimbursement for the IVIg treatment of the specific patients referenced in the indictment</u> – Dr. Ahmed attempted to obstruct justice by falsifying documents (Counts 1-5, 21) and mixing blood sera to procure laboratory tests to present to the Government and convince them not to bring charges against him (Counts 6, 22-24).

Both obstruction of justice allegations are entirely distinct from the Government's Medicare fraud case – <u>there has never been any suggestion that the laboratory results or the allegedly back-dated documents were ever submitted to Medicare in support of reimbursement.</u>  To the contrary, Dr. Ahmed had already been seeking and receiving reimbursement for the IVIg treatment of the 24 patients referenced in the indictment for years before the Government alleges he sent the sera to any lab or back-dated the documents.[5]

The Government's obstruction of justice case involves two allegations.  The first is that <u>within days of receiving the Government's subpoena,</u> Dr. Ahmed had individuals working in his lab send dozens of blood sera samples to Beutner Lab in Buffalo, New York for independent testing of

---

[5] Of the 24 patients identified in the indictment, all were treated with IVIg by Dr. Ahmed before the end of 1999.  Although, for statute of limitations reasons, the Government chose claims from March 27, 2001, for Counts 7-20, each of those patients had been receiving IVIg treatment paid for by Medicare for a significant period of time before the subpoena issued June 15, 2000.  In fact, of those 14 patients, 7 received IVIg treatment from Dr. Ahmed beginning as early as 1997, and 6 did so as early as 1998.

4

his patients' diagnosis. Dr. Ahmed's counsel then presented the findings – that 42 of Dr. Ahmed's patients had both pemphigoid and pemphigus – to the U.S. Attorney's Office at a meeting aimed at convincing the Government not to indict. Although the Government has no evidence that Dr. Ahmed ever touched the blood sera samples sent to Beutner, the Government alleges that Dr. Ahmed somehow manipulated the blood sera samples before they were sent to the lab so tests would yield results that would be helpful to his counsel at that meeting,

    Second, the Government alleges that <u>after receiving the subpoena</u>, Dr. Ahmed created back-dated documents so that when they were produced to the Government pursuant to the subpoena, they would support his claim that the patients were initially diagnosed by him as suffering from both pemphigus and pemphigoid. The evidence will show that the five letters in question – each to a referring physician and noting that the referred patient suffered from pemphigus – were created when indicated on the documents, and were simply misplaced out of the thousands of letters sent and received by Dr. Ahmed's practice between 1997-2001. The letters were discovered during a review in response to the Government's subpoena, and were subsequently mailed, each one accompanied by a cover letter from Dr. Ahmed's office explaining what had happened (an example of the cover letter is attached as Exhibit 1 to this memorandum). The Government, however, will argue that in response to the subpoena, Dr. Ahmed forged back-dated letters to referring physicians, yet for some reason made no effort to cover-up the letters, instead sending each one with a cover letter indicating the post-subpoena date on which they were mailed.

    Both obstruction of justice allegations are easily severable from the Medicare fraud case because – Dr. Ahmed was treating the specific patients at issue with IVIg and was receiving Medicare reimbursement for that treatment long before the events forming the bases for the obstruction of justice allegations took place. As importantly, there has never been any suggestion

that the laboratory results or the allegedly back-dated documents were ever submitted to Medicare in support of reimbursement.

Faced with severance, the Government now argues these obstruction of justice allegations are somehow intertwined with the Medicare fraud allegations. The Government did not always take this position. In fact, it was not until the January 16, 2007, pre-trial hearing that the Government reversed course, and suggested for the first time that Dr. Ahmed procured the Beutner test results in order to someday publish articles in scientific journals supporting the prevalence of dual diagnoses. Despite this new argument from the Government in the last few weeks, and even putting aside for a moment that dual diagnoses of pemphigus/pemphigoid were no secret to the medical community in June 2000, it is difficult to imagine that the Government truly intends to argue at trial that within days of receiving a subpoena from the Government, Dr. Ahmed sent samples to Beutner not as a result of the Government's investigation, but instead in the hopes of having an article published years later.[6]

Neither of the allegations that make up the Government's obstruction of justice case have anything to do with whether Dr. Ahmed's patients had particular diseases or whether Medicare was defrauded. To connect the counts, the Government offers nothing more than what can be said about virtually any obstruction charge – that conduct allegedly took place to protect the defendant from being caught.

---

[6] As the Government is well aware, all Grand Jury testimony on the subject was that the samples were collected in a manner <u>inconsistent</u> with the idea that Dr. Ahmed expected them to lead to publication. (e.g. Patient names were kept on the samples, while they are removed when samples are being sent for research purposes.)

What is more, <u>while Beutner Lab conducted indirect immunoflourescence testing on the samples, such testing is used for clinical diagnosis – not for research purposes</u>. Another method of testing, immunoblotting, is used for research purposes.

6

Ten counts (Counts 1-6, 21-24) relate specifically and solely to these allegations.[7]

II.    **Severence Would Prevent the Fraud Case From Being Overwhelmed by the Substantial Constitutional And Evidentiary Issues**

As this Court has correctly recognized, there are important reasons for severance in this case even aside from allowing the two distinct cases to be tried separately.[8] The presentation of evidence relating to the Beutner tests will require weeks of complex testimony from several witnesses (including expert testimony regarding the science of DNA, and numerous witnesses regarding the custody of the sera samples at Dr. Ahmed's lab, Beutner Lab, and Bode Lab). None of these witnesses would otherwise be called to testify on the health care fraud counts. As a result, convenience and simplicity alone justify severance here.

What is more, as detailed in numerous pleadings before this Court, the Government has thus far failed to lay the necessary evidentiary foundation for its proposed evidence (in this case, that the samples were intentionally manipulated and that Dr. Ahmed was aware of or involved in that manipulation), and the Defendant expects that the Government will not be able to meet that burden at trial.[9] See, e.g., Ostler v. Codman Research Group, Inc., 241 F.3d 91, 96 (1st Cir. 2001) (where there was no evidence before the jury that plaintiff could exercise his rights as a dissenting

---

[7] Counts 1-6 charge Dr. Ahmed with mail fraud for the mailing of the allegedly back-dated letters (Counts 1-5) and the letter to Beutner accompanying the samples to be tested (Count 6). Counts 21-22 charge Dr. Ahmed with obstruction of justice based on the allegedly back-dated documents (Count 21) and the Beutner tests (Count 22). Counts 23-24 charge Dr. Ahmed with money laundering based on checks sent to Beutner for the cost of the tests.

[8] While the Court has already severed Counts 21-22 from the others, as discussed above it would make the most sense to try Counts 7-20 (the Medicare fraud counts) and Counts 1-6, 21-24 (the obstruction counts) separately.

[9] These arguments, and the underlying factual and procedural background, are described in further detail in a number of documents, most notably Defendant's Opposition To Government's Motion *In Limine* To Admit Into Evidence a Stipulation Entered Into By The Parties, filed April 10, 2006, and Defendant's Objections to Memorandum of Decision and Order On Government's Motion *In Limine* Regarding Admissibility of Stipulation, filed August 17, 2006.

7

shareholder, it would have been misleading to allow expert testimony and jury instructions on the appraisal rights under Delaware law). The Government has no evidence that Dr. Ahmed ever touched – never mind adulterated, manipulated, or otherwise altered – the blood sera samples sent to Beutner. All of the testimony to the Grand Jury was consistent that the blood sera samples were prepared by lab technicians while Dr. Ahmed was out of the country attending his mother's funeral.[10] In fact, the evidence presented to the jury will be more consistent with accidental contamination than with intentional manipulation.

Even more importantly, the Government's attempt – through the testimony of Defendant's counsel or through stipulation – to use a criminal defense attorney's advocacy against his client raises significant constitutional concerns. See, e.g., United States v. Valencia, 826 F.2d 169, 172 (2d Cir. 1987) (courts must employ a more exacting standard when considering admission of statements by attorneys under Rule 801(d)(2)(D)). These Sixth Amendment issues can be avoided entirely in a health care fraud trial from which the obstruction of justice counts have been severed.

At the January 16, 2007, pretrial hearing, the Government for the first time argued that even if Count 22 (the obstruction of justice count based on the Beutner tests) is severed from the health care fraud allegations at the heart of the charges against Dr. Ahmed, evidence of the Beutner tests should still somehow be admitted. Such a proposal asks the Court and counsel to ignore reality and

---

[10] At the January 16, 2007, pretrial hearing, the Government admitted that it has no evidence Dr. Ahmed ever touched the samples, and instead argued (contrary to all of the clear and consistent Grand Jury testimony on the subject) that Dr. Ahmed directed the lab technicians to specific vials:

> The evidence would be in June of 2000 Dr. Ahmed gave a list by very specific coordinate number, go to row 16, column K, pull this sample, pull these samples, pull a series of samples, and send them off to this reputed laboratory in Buffalo…

Transcript at 18-19. To the contrary, the Grand Jury testimony was entirely consistent that Dr. Ahmed gave the lab technicians only names and dates of patient samples (for some patients there were multiple samples on those dates), and it was the lab technicians who chose the specific vials from which to take samples.

8

force the jury to do the same. First of all, <u>the Government would not have had the Beutner tests or the blood sera samples if Dr. Ahmed's counsel had not given the results to the Government.</u> Second, it will be impossible for either the Government or the Defendant to address the Beutner tests or the allegedly back-dated documents without acknowledging their connection to the subpoena.

### III.    Conclusion

Despite the new theories offered by the Government in recent weeks for the sole purpose of contesting the Court's severance order, in reality the Government intends to try two clearly distinct and easily severable cases – (1) a Medicare fraud case (Counts 7-20) and, (2) an obstruction of justice case (Counts 1-6, 21-24). Making severance even more appropriate, it is the obstruction of fraud case which brings with it the troubling evidentiary and constitutional issues which do not otherwise infect the Medicare fraud case, and which would involve weeks of additional testimony – much of it scientific and incredibly complex, and none of it having any bearing on the sole issue in the Medicare fraud case: whether Dr. Ahmed billed Medicare as if patients had a disease he knew they did not have. To ensure that the Government's allegations can be tried efficiently and fairly, this Court is correct that severance is appropriate and necessary. To effectuate the Court's intent of holding a Medicare fraud trial and then a separate obstruction of justice trial, Counts 7-20 (the Medicare fraud counts) should be tried together, followed by Counts 1-6, 21-24 (the obstruction of justice counts).

        Respectfully submitted,
        **Dr. Abdul Ahmed,**
        By his attorney,

        __/s/ Richard M. Egbert_____
        Richard M. Egbert
        99 Summer Street
        Boston, MA 02110
        (617) 737-8222

Dated: March 7, 2007

## Certificate of Service

I, Richard M. Egbert, hereby certify that I have, on this 7th day of March, 2007, caused the above document to be electronically served by hand upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

        __/s/ Richard M. Egbert_____
        Richard M. Egbert



September 11, 2000

I have come across some letters in our office that I believe may not have been mailed out. There have been some recent changes in personnel in our office and I apologize for the long delay in sending you this letter.

Please call me at Dr. A. Razzaque Ahmed's Office if you have any questions. Our office number is 617/738-1040.

Thank you for your understanding.

Sincerely,

Phyllis A. MacPherson, RN, MSN