UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No: 05-10057-RCL |
| V.                        ) | |
| ) | |
| ABDUL RAZZAQUE AHMED      ) | |

EXPERT DISCLOSURES OF
MR. BRIAN WRAXALL AND DR. EDMOND YUNIS

1. Mr. Brian Wraxall

A. Qualifications

Mr. Wraxall is the Executive Director and Chief Forensic Serologist of Serological Research Institute ("SERI"), located in Richmond, California. SERI is a forensic laboratory accredited to conduct testing and analysis that includes but is not limited to serological testing and forensic deoxyribonucleic testing. Mr. Wraxall is a Diplomate in Criminalistics, received from the American Board of Criminalists, and received a Diplomate certification from the American Board of Forensic Examiners. Mr. Wraxall has conducted training in a variety of related areas, including bloodstain analysis, basic electrophoresis, advanced electrophoresis, semen identification and analysis, gm\km typing and DNA Typing. Mr. Wraxall has over 40 years experience in forensic serological testing and has publications in these areas of expertise. Mr. Wraxall has examined, analyzed and conducted thousands of forensic tests on biological samples using varying forensic DNA methodologies. He has instructed and published in the area of forensic DNA statistical analysis and databases. Mr. Wraxall's curriculum vitae, which more fully sets forth his educational background, training, professional experience and publications, has been previously furnished to the government.

B. Substance of Testimony, Opinions and Bases for Opinions

Mr. Wraxall is expected to testify about forensic DNA testing methodologies, the steps taken to conduct such testing, protocols used in such testing, and chain of custody and quality control issues, and proficiency testing, that are relevant to such testing. Mr. Wraxall will testify to the forensic DNA testing using the various manufactured kits used by the government's laboratory, The Bode Technology Group ("Bode") and SERI and other laboratories, and will testify to the specific testing methods used in this case. Mr. Wraxall will testify to testing methods conducted in this case including polymerase chain reaction ("PCR") , short tandem repeat ("STR") and Y-STR analysis.

Mr. Wraxall will also testify to methods and procedures in collecting, sorting and manipulating biological specimens, both in the context of traditional serological testing and forensic DNA testing. Mr. Wraxall will testify to the training and oversight necessary to ensure proper handling of biological specimens. Mr. Wraxall will testify to the methods for and problems in detecting the DNA molecule in nucleated cells, in various biological substances including serum, and in mixtures of biological samples where the sources of the sample are known or not known. Mr. Wraxall will testify to the issue of contamination and will describe the ways in which contamination can occur both outside and within a testing laboratory. In Mr. Wraxall's opinion, without sufficient training and quality control measures, contamination of a biological sample occurs to one or more factors, including but not limited to handling, manipulation, failure to follow forensic-DNA protocols, and the lack of understanding and training by a laboratory technician of the relatively small amounts of a biological substance that can result in detection of DNA. Mr. Wraxall may testify to instances of contamination in forensic laboratories, including forensic DNA laboratories as well as the protocols to be followed when contamination is suspected within a laboratory, and the protocols to be followed to try to determine the source of the contamination.

Mr. Wraxall is expected to testify to his review of the forensic DNA testing conducted by

Bode and the testing results, and his interpretation of the testing data received from the government. Similarly, Mr. Wraxall will provide testimony that explains the forensic DNA testing conducted in this case by SERI and will provide testimony explaining his interpretation of the testing results, and the raw electronic data, all of which have been provided to the government in both hard copies and electronic format.

In Mr. Wraxall's opinion, there is evidence of contamination in some samples tested by both Bode and SERI, contamination resulting from the handling and manipulation of the biological samples resulting in mixtures of biological specimens, in some instances mixtures of more than two possible sources. Mr. Wraxall will testify that in his opinion, contamination can occur when someone not trained in proper serological handling protocol or is not trained in proper forensic DNA protocols, and handles biological evidence, transfers such evidence from one container to another, manipulates the container of such biological evidence, and when there is a source of biological evidence that is used more than once over a period of time to extract or create a subset of any biological sample for DNA testing or for some other reason.

Mr. Wraxall will explain in his testimony the methods and standards used to analyze and interpret what appear to be mixtures of biological specimens. In Mr. Wraxall's opinion, mixture analysis and interpretation is complex and is further complicated in the case of suspected mixtures of more than two possible sources, in any suspected mixtures where the possible contributors are not known, and in suspected mixtures where there may be partial profiles of the possible contributors.

Mr. Wraxall is expected to testify to the analysis and interpretation of testing results where there is evidence of degradation of biological samples. In Mr. Wraxall's opinion, there is evidence of degradation in samples tested in this case. Additionally, Mr. Wraxall will testify to interpretation

and analysis of forensic DNA testing results where there is evidence of artifacts, including but not limited to stutter, spikes, and off-ladder alleles, and will give his opinion as to his interpretation of such artifacts in Bode's testing results and SERI's testing results.  Mr. Wraxall is expected to testify to the aforementioned artifacts and allelic drop-out, describing what it is, why it occurs, how it occurs and when it occurs, and how it impacts on interpretation of testing results.  Mr. Wraxall will give his opinion regarding detecting or observing such artifacts and allelic drop-out in the same sample or from the same source repeatedly tested. In Mr. Wraxall's opinion, there is evidence of degradation, artifacts, and allelic drop-out in various samples tested in this case.  Furthermore, in Mr. Wraxall's opinion, interpretation of testing results where one or more of these phenomenon are present and where there appears to be mixtures of biological samples, is complex, can be inconclusive, and result in error.

     Mr. Wraxall is expected to testify to the statistical calculations commonly used in forensic DNA testing.  Mr. Wraxall will testify regarding and give his opinion on the utility of statistical calculations where there is a suspicion of mixed biological samples, when there is a lack of a specific and known reference sample for any mixture component, when there is a some evidence of or a suspicion of degradation, allelic dropout, or when there is some other reason to believe a genetic profile is incomplete.

     The summary above is what Mr. Wraxall is expected to testify to at the trial of this matter. Mr. Wraxall's opinions are based upon his education, training, experience and knowledge, his knowledge of the relevant literature, his review of the Bode testing data, and the testing conducted at SERI in this case on samples.  Mr. Wraxall may reference during his testimony relevant and published literature in the field of forensic DNA testing.  Mr. Wraxall may use during his testimony computer-generated presentations related to the above.  At this time, since testing at

SERI has only recently been completed, no such computer-generated presentations have been produced to date.

2. Dr. Edmond J. Yunis

A. Qualifications

Dr. Yunis is a Professor of Pathology at Harvard Medical School. From 1976 to 1996 he was the Founder and Chief of the Division of Immunogenetics, at the Dana Farber Cancer Institute, and until 2000 the Director of its HLA laboratory. He is or has been on the Editorial Board of eight internationally renowned journals and eight international reference books in Immunology. He is an elected member of twenty-three medical professional societies, and has served on several National Institute of Health (NIH) Committees. He has received fifteen international awards for his distinguished contributions. Dr. Yunis has co-authored 395 original manuscripts, all in refereed, peer reviewed, respected journals, including New England Journal of Medicine, The Journal of Clinical Investigations, Proceeding of the National Academy of Sciences, Science, Nature, Cell, and Journal of Experimental Medicine.

Dr. Yunis is a qualified and trained pathologist and immunologist. He has significant knowledge and understanding of pemphigus and pemphigoid. He has published in this area on both diseases. At least some of Dr. Yunis' published work has been reproduced by at least twelve research scientists in different countries, and is the basis for ongoing research and studies recently published. Dr. Yunis has extensive experience in serology, and was one of the first serologists in the world to define HLA specificities using sera of multiparous women to identify HLA phenotypes. It is during this period that Dr. Yunis contributed to the immunobiology of antibodies and made many of the observations that define their biological properties. With the development of DNA technology, Dr. Yunis helped in developing probes and methodologies in identifying individuals by

both their DNA genetic profiles and the modes of DNA inheritance.

Some of Dr. Yunis' studies form the basis for the use of DNA in personal identification, including his recent work on chimerism. Dr. Yunis has made significant contributions in the area of the genetic, cellular and molecular basis of how and when autoantibodies are made.

Dr. Yunis' curriculum vitae has been previously produced to the government, and it contains an extensive list of publications and papers presented.

B. Substance of Testimony, Opinions and Bases for Opinions

Dr. Yunis will testify to his understanding of DNA testing and short tandem repeat analysis ("STR") and his knowledge of the variability of the STR's due to the different number of copies of the repeat element that can occur in a population of individuals. Dr. Yunis will testify that in recent years, STR analysis systems have gained importance in forensic investigation of biological specimens, as well as in paternity testing. Several STR loci can be typed in biological samples with small amounts of DNA in a single multiplex PCR reaction.

Dr. Yunis will testify to his extensive experience in serology, immunogenetics and immunodiagnostics. Dr. Yunis will testify to the specificities of autoantibodies. Dr. Yunis will testify to his knowledge, use and experience with observation of symptoms and the use of diagnostic tests used attempt to diagnose autoimmune diseases. Dr. Yunis will testify to titer levels, the use of evaluating titer level relevant to disease. Dr. Yunis will testify that in order to determine serological presence of an autoantibody, using indirect immunofluorescence (IIF), that certain titer levels must be properly determined. Dr. Yunis will testify that in his opinion, diagnostic test results may vary on a sample regarding the detection of autoantibodies due to many factors that include but are not limited to varying titer levels that are the result of the progress or the disease, the results of treatment, the age of a sample, the condition of a sample, the handling of a sample by personnel and

a laboratory.

Dr. Yunis will testify to his training of laboratory technicians, pre-medical, medical and graduate students, and post doctoral fellows during a career spanning forty-seven years in which he supervised a clinical service laboratory and a research laboratory.  Dr. Yunis will testify to his knowledge and experience in laboratory errors, especially by newer laboratory technicians, interns and trainees, and persons that have not been properly trained in serological protocol.  Dr. Yunis will emphasize the difference between collection of serological samples for purposes of serological studies and purposes of forensic studies.  Dr. Yunis will testify to the numerous limitations to obtaining DNA from white blood cells in sera, and the quantitative and qualitative differences in the amount of sera needed for antibody detection in an indirect immunofluorescence  ("IIF") assay and the amount needed to detect the DNA molecule.

More specifically, Dr. Yunis will testify that pemphigus vulgaris ("PV") is a rare autoimmune, intra epithelial, blistering disease. The main clinical characteristics are the affection of the skin and mucous membranes and are mediated by circulating autoantibodies directed against keratinocyte cell surfaces. Dr. Yunis will testify that PV is characterized by autoantibodies of the IgG isotype to the desmosomal glycoprotein desmoglein 3 ("Dsg3"), whereas pemphigus foliaceus targets desmosomal glycoprotein desmoglein 1 ("Dsg1"). Dr. Yunis will testify that the presence of autoantibodies in the sera of patients, to the intercellular substance ("ICS"), or keratinocyte cell surface is considered typical of PV.

Dr. Yunis will also testify to mucous membrane pemphigoid ("MMP"), and that it comprises a heterogeneous group of disorders characterized by subepithelial separation with a dense submucosal inflammatory cell infiltrate and the deposition of immunoglobulins and complement along the basement membrane zone ("BMZ"). Direct immunofluorescence ("DIF") studies on

perilesional biopsies demonstrate a smooth linear deposition of IgG and/or C3 along the BMZ. The target antigens in the epithelium and BMZ determine the nature of the condition, which are characteristic of MMP.  Dr. Yunis will testify that there are several reports in the literature describing the coexistence of features of PV and PG in the same patient and give his opinion that dual diagnosis is not a rare.

    Dr. Yunis will testify to the role of immunogenetics in the generation of autoantibodies to pemphigus and pemphigoid antigens in patients with dual diagnosis.  In summary here for purposes of disclosure, Dr. Yunis will testify that the human body contains a subset of lymphocytes called B-cells, that are the principle cells that make antibodies. Such antibodies may be beneficial such as those produced in response to vaccinations with tetanus toxoid, hepatitis B or mumps, measles and rubella. However these B-cells can also produce antibodies that can cause diseases. Dr. Yunis will testify that when such antibodies are targeted to antigens (molecules) present in normal human beings, such antibodies are called autoantibodies. Dr. Yunis will testify that the B-cells make these antibodies when stimulated by T-cells which are also a subset of lymphocytes. These T-cells in turn are activated by a group of cells called antigen presenting cells ("APC"). In order for the T cells to be activated the APC must present the antigen with the Major Histocompatibility Complex ("MHC") molecules. The antigen lies in a trough within the MHC, for its presentation to the T-cell receptor.  Dr. Yunis will testify that there are key end critical binding sites within the MHC to which the antigen must bind in order to be presented. The MHC molecules are produced by the genes that code for them.

    Dr. Yunis will testify that different MHC molecule or molecules have been associated with different diseases, referred to as antibody-mediated autoimmune diseases, that include PV and PG. Dr. Yunis will testify that PV and PG are considered paradigms of auto-antibody mediated

autoimmune diseases.

Dr. Yunis will testify more specifically regarding immunogenetics of PV in this context. PV is characterized by antibodies to Dsg3 which is a molecule that binds the cells in the epidermis and mucosa. Dr. Yunis will testify to his and other's work at the Center for Blood Research and Harvard Medical School where research identified two sets of MHC molecules in patients with PV. Dr. Yunis will testify that patients with Jewish ancestry carry DRB1*0402/DQB1*0302. Dr. Yunis will testify that patients with non-Jewish ancestry but European or Caucasian carry DRB1*1401/DQB1*0503. Dr. Yunis will testify that based on the research, literature and his experience, that these observations have been confirmed by several investigators worldwide.

Dr. Yunis will testify and give his opinion that in functional studies it has been shown that in the DRB1*0402/DQB1*0302 haplotype, the process of making the autoantibody is governed by the DRB1*0402 component of the MHC. Dr. Yunis will testify and give his opinion that in patients with the DRB1*1401/DQB1*0503 haplotype the ability to produce the pemphigus antibody is determined by the DQB1*0503. Dr. Yunis will testify that recent studies have shown that individuals who carry the DQB1*0301 allele, when presented with the Dsg3 antigen respond to it, and are thus capable of producing pemphigus antibodies. Dr. Yunis will testify that the research and literature demonstrates, and that in his opinion, since there is very significant homology between 0503 and 0501, it may also function in a similar manner.

Dr. Yunis will go on to testify that the research and literature and his opinion is that it appears that a negative charge amino acid at position B57 is critical for binding in the pocket of the 0503 molecule. In addition, the amino acids 71 through 77 also play a critical role in this binding. Dr. Yunis will testify that in his opinion, and based on the research and literature, that haplotypes that contain HLA-DQB1 molecules that share the homology between amino acid 71 through 77 are

also functionally capable of stimulating T cells and thus producing pemphigus antibody.

Dr. Yunis will also testify more specifically to immunogenetics of PG. PG is characterized by the presence of antibodies to different molecules in the basement membrane zone, referred to as anti-BMZ antibodies. Dr. Yunis will testify to studies in the early 1990's by Dr. Yunis and his collaborators at the Center for Blood Research at Harvard Medical School where it was demonstrated that patients with PG have a high association of linkage disequilibrium with HLA-DQB1*0301. Dr. Yunis will testify that this association is found in patients with bullous pemphigoid and all the subsets of patients with mucous membrane pemphigoid, MMP. Dr. Yunis will testify that these studies have been confirmed by investigators in France, the United Kingdom, and Italy.

Dr. Yunis will testify and give his opinion that functional studies have clearly demonstrated that the T cells of patients with PG can only be stimulated by APCs that carry the DQB1*0301 allele. Thus the ability to produce anti-BMZ antibody is controlled and restricted by the presence of DQB1*0301.

Dr. Yunis will testify to the relevance of immunogenetics to dual diagnosis. Dr. Yunis will testify to the fact that in patients where disease initially presents as PG may eventually also develop PV based on the genetic background and genetic capability to do so. Dr. Yunis will testify that studies have demonstrated that pemphigus patients with DQB1*0503 can process pemphigus antigen and produce pemphigus antibodies similar to DQB1*0301. Dr. Yunis will testify that it is his opinion and based on research that the presence of DQB1*0301 can result in PG patients producing PV antibodies. Dr. Yunis will testify that it is fair to presume that other genes and environmental factors may be involved. Dr. Yunis will give his opinion that the constant trauma to the skin and mucosal tissues in patients with PG may be one mechanism by which significant

amounts of desmoglein3 molecules become available to APCs. Dr. Yunis will give is opinion that the rarity of this observation may be entirely due to a number of factors that include the fact that the human body makes all efforts for self preservation, that investigators have simply not studied the patients in detail or there have been small numbers of patients at individual treatment centers to make these specific observations.

To further demonstrate the issues discussed above, Dr. Yunis will testify to his review and interpretation of preliminary data related to immunogenetics and immunodiagnostics and testing results involving patients with dual diagnosis and controls consisting of patients with a diagnosis of PV or PG. Data on the immunogenetics of the patients with the dual diagnosis of PV and PG is presented in Table 1, attached hereto. Dr. Yunis will testify that he reviewed the testing data that consists of six patients with dual diagnosis diagnosed after March 15, 2005, and that four patients who are among the patients designated in the indictments. Dr. Yunis will testify that the patients with dual diagnosis have antibodies to ICS and BMZ and on salt split skin bind to the epidermal side of the split. Dr. Yunis will testify that on immunoblot analysis they demonstrate binding to Dsg3 and BPAg1, BPAg2 and B4 integrin subunit. Dr. Yunis will testify that ELISA of serum specimens demonstrate presence of antibodies to Dsg1, Dsg3 and BPAg2. The immunogenetic analysis shows that the ten patients had DQB1*0301. In the control group of five PG patients, antibodies to ICS were detected. No BMZ antibodies were found on IIF. Immunoblots showed binding to Dsg3, but no binding to BPAgs or B4 integrin. Dr. Yunis will testify that ELISA of serum demonstrated high titers of antibodies to Dsg1 and Dsg3 but none to BPAg2. In the opinion of Dr. Yunis, the immunogenetics profile of these patients demonstrated the presence of the gene for DQB1*05031.

In the control group of five PG patients, antibodies to BMZ were detected on IIF. No

antibodies to ICS were found. Immunoblots demonstrated binding to BPAg1, BPAg2 and B4 integrin but not to dsg3.  Dr. Yunis will testify ELISA of serum specimens demonstrated high titers to BPAg2 but not to Dsg1 or Dsg3. In the opinion of Dr. Yunis, the immunogenetics profile of all five patients demonstrated that the gene for DQB1*0301 was present in all five patients.

Dr. Yunis will give his opinion that based on the testing data, the patients with dual diagnosis all carry DQB1*0301. Four of the ten are homozygous for this allele.  Dr. Yunis will testify and give his opinion that the literature supports the observation that the allele DQB1*0301 could be capable of providing enhanced susceptibility to producing anti-BMZ antibodies and thus developing pemphigoid.  Dr. Yunis will testify that since the DQB1*0301 molecule can function in the same capacity as DQB1*0503, when presented with the Dsg3 peptides, patients with DQB1*0301 can produce anti-ICS antibodies and have lesions that are seen in PV. Dr. Yunis will give his opinion that by using the appropriate controls, this preliminary data demonstrates that enhanced genetic predisposition may permit certain patients with PG, with DQB1*0301 to produce antibodies typical of patients with PV.   Dr. Yunis will give the opinion that the ability of a patient to produce PV and PG antibodies maybe genetically determined, and that the mechanisms that facilitate and activate this process are unknown. Dr. Yunis will testify that in his opinion, it is possible that other genes and environmental factors may also play a significant role.

Dr. Yunis will testify regarding chimerism.  Dr. Yunis will testify that recent interest in the study of chimerism has been increased due to the development of DNA technology that uses STR's or single nucleotide polymorphisms ("SNP") to resolve questions related to sports such as blood doping, cases of fusion of embryos, cases of vanishing fraternal twins occurring in-utero, and microchimerism in autoimmune diseases.  Dr Yunis will testify to the concept of microchimerism. Microchimerism is where some people carry smaller numbers of foreign blood cells that may have

passed from mother across the placenta, or transient from a blood transfusion. Dr. Yunis will testify that maternal-fetal chimerism has been described in autoimmune diseases. Dr. Yunis will also testify that there have been reports of the presence of fetal cells in maternal tissue following pregnancy which have generated conflicting reports. Since 1981 there have been reports of fetal-maternal transfusion or the presence of allogeneic fetal cells in maternal tissue during and long after pregnancy in mice and in humans. Dr. Yunis will give his opinion that chimerism can be the cause and help to explain the presence autoantibodies in a patient or sample where that patient does not appear to have the genetic markers associated with a specific autoantibody and autoimmune diseases.

The summary above is what Dr. Yunis is expected to testify to at the trial of this matter. Mr. Yunis' opinions are based upon his research, education, training, experience and knowledge, and his review of the relevant literature and the testing described above. Attached hereto is a table of 39 references to relevant scientific literature. Although some are co-authored by Dr. Yunis, the majority are not. This literature may be referenced in Dr. Yunis' testimony along with other literature in the relevant area. This citations below are not exclusive are not meant to be an exhaustive list of the relevant literature. Dr. Yunis may use during his testimony computer-generated presentations related to the above. At this time no such computer-generated presentations have been produced to date.

                                                                  Respectfully submitted,
Defendant, Abdul Razzaque Ahmed,
By his attorney,

/s/ Richard M. Egbert
Richard M. Egbert, BBO: 151800
Law Offices of Richard M. Egbert, PC
99 Summer Street, Suite 1800
Boston, MA 02110
Tel: (617) 737-8222

<u>Certificate of Service</u>

  I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF); and paper copies will be sent to those indicated as non-registered participants, on this 29th day of May, 2007.

            <u>/s/ Richard M. Egbert</u>
            Richard M. Egbert

**EXHIBITS SHALL BE FILED SEPARATELY WITH THE COURT**

**AND SENT TO ALL PARTIES ON RECORD VIA FIRST CLASS MAIL.**