**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 05-10057-RCL** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ABDUL RAZZAQUE AHMED,** | ) | |
| **Defendant.** | ) | |

**REPLY TO DEFENDANT'S OPPOSITION TO MOTION IN LIMINE TO EXCLUDE EVIDENCE OF PATIENT SATISFACTION OR PATIENT OUTCOMES**

The United States of America, by its attorneys Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Assistant United States Attorneys Jeremy M. Sternberg and James E. Arnold, hereby submits its Reply to Defendant's Opposition to its Motion In Limine to Exclude Evidence of Patient Satisfaction or Patient Outcomes:

**INTRODUCTION**

Defendant's fundamental misapprehension of the charges against him are revealed in the third sentence of his Opposition to the government's motion in limine: "At the heart of this case is the question whether Dr. Ahmed properly diagnosed and treated twenty-three specific patients." Opposition at p. 1. This is entirely wrong.

This is a case about billing fraud and obstruction of justice; the propriety of defendant's treatment program is wholly irrelevant. The Indictment does not say a word about the propriety of defendant's medical treatment provided to his patients. Contrary to the defendant's assertions, this is not a case in which the government is claiming that the defendant's patients "could have been cured through a different, cheaper treatment program." Id. Rather, the crux of this criminal prosecution is whether defendant -- knowing that Medicare provided reimbursement for expensive IVIG treatments for patients suffering from the disease pemphigus

and that Medicare would not provide reimbursement for such treatments for patients suffering from the disease pemphigoid -- lied about patients' pemphigus diagnoses in order to obtain Medicare reimbursement totaling in excess of $5 million.

**ARGUMENT**

Every reason given in Defendant's Opposition to support use of evidence of patient satisfaction or patient outcomes is specious. First, defendant claims that the fact that he can show that patients responded positively to the IVIG treatment somehow proves they really had pemphigus. This *post hoc* analysis, however, founders at its core. Even if the patients at issue in this case responded favorably to IVIG treatments (and not all patients did so respond), this result provides no evidence as to whether the patient was initially suffering from pemphigus or pemphigoid. Indeed, the defendant's *post hoc* suggestion that his patients' response to IVIG treatments is somehow relevant to determining the patients' initial medical condition is belied by the defendant's own assertions and research papers in which he argued that IVIG is an effective treatment not only for patients suffering from pemphigus, but also for those patients suffering only from pemphigoid as well. See, e.g., Exhibits A (letter from Dr. Ahmed to referring physician touting the effectiveness of IVIG treatment for pemphigoid)[1] and B (paper written by

[1] "Clearly the patient has bullous pemphigoid that is non-responsive to systemic antibiotic therapy." Exhibit A at p. 1. "I have treated over 30 cases of bullous pemphigoid with very significant clinical results. I would consider that this would be optimal therapy for this patient. Our protocol consists of 50-75Gms of IVIg daily for three consecutive days." Exhibit A at p. 2. "I will be publishing my series very shortly. In this series I have compared other treatment modalities for pemphigoid with IVIg and found that IVIg has a tremendous benefit in reducing morbidity, in increasing the duration needed to achieve total and partial clinical remission." Exhibit A at p. 2 (emphasis supplied).

Dr. Ahmed asserting the value of IVIG treatments for pemphigoid patients)[2].

Moreover, any such *post hoc* analysis is wholly inconsistent with both the practice of medicine and with defendant's obligations under the Medicare program. Defendant was required to diagnose a patient's condition prior to embarking upon a course of treatment for a patient and was required to communicate that diagnosis to Medicare at the time he sought reimbursement for such treatment. Defendant could not bill Medicare for a disease that he hoped a patient might have, collect on the treatment, and then figure out the diagnosis based on how the patient responded to the treatment.

Defendant's claim that there will be jury prejudice if he is not permitted to introduce evidence of patient outcomes or satisfaction is similarly flawed. In fact the opposite is true; the jury may be prejudiced from focusing on the billing fraud issues if the trial turns into an irrelevant referendum on the quality of the care provided by defendant to his patients. Moreover, any issues about jury speculation about the treatment or patient condition can be solved by simple jury instructions.

Finally, the law is clearly on the side of the government. Defendant dismisses the cases cited by the government as "financial fraud" cases. However, this is a financial fraud case -- it just happens to arise in the medical context. Therefore, those cases discussed in the Government's opening memorandum, particularly Ciccone and Elliot, are both instructive and controlling.

In contrast, Defendant puts all his eggs into the basket of the lone case that he cites as

---

[2]"Intravenous immunoglobulin immunomodulatory therapy can be a safe and effective therapy for otherwise treatment-resistant ocular cicatricial pemphigoid." Exhibit B at p. 1.

"analogous." United States v. Rutgard, 116 F.3d 1270 (9th Cir. 1997). However, while patient testimony was critical to the charges and diagnostic issues in Rutgard, a simple examination of those charges and issues reveal how the same evidence remains irrelevant in this case. The defendant ophthalmologist in Rutgard faced a host of charges including numerous counts of mail fraud on, and false claims to, Medicare. Rutgard, 116 F.3d at 1275. The Medicare fraud included billing for unnecessary cataract surgery, billing for unnecessary YAG laser surgery, billing for unnecessary eyelid surgery, billing for vitrectomy surgery, and billing for retrobulbar injections. The Rutgard opinion makes it clear that on a variety of these issues, though primarily the unnecessary cataract surgery and unnecessary eyelid surgery, patient testimony as to the need for this surgery was crucial evidence.

With respect to the cataract surgery counts, this issue was whether the defendant used a Brightness Acuity Test ("BAT") in a fraudulent manner such that the test yielded a need for cataract surgery when no need actually existed. Rutgard, 116 F.3d at 1280. Patients testified on the cataract issue in a number of ways that directly bore on whether the defendant had performed unnecessary cataract surgeries, including whether they experienced glare (Pearl Adams), their extent of vision (John Boyle), and whether the entries in their files regarding glare and vision problems were consistent with what they told the defendant (Bobbie McKelvey). Id. at 1281-1283. This testimony had everything to do with whether medical necessity existed at the time the surgery was performed and billed to Medicare. In other words the patient testimony as to their conditions that existed on the date of their surgery and in turn the date that surgery was billed was essential to prove whether or not the cataract diagnosis and need for surgery was false.

The issue here is different from, and more narrow than, the issues in Rutgard. It is not the government's contention that the patients were not suffering from a blistering skin disease -- it is agreed by all that they were. Nor is there any argument about whether the defendant could lawfully provide IVIG as a treatment to his patients suffering from pemphigoid -- he was so entitled. The only issue is whether defendant lied to Medicare about the reason why he provided IVIG treatment to his pemphigoid patients in order to obtain reimbursements that he was not otherwise entitled to receive.

As to this issue, the success or failure of the IVIG treatments to patients is irrelevant. Testimony from Defendant Ahmed's patients as to how they responded to IVIG treatments contributes nothing as to defendant's knowledge and intent when he caused pemphigus to be listed as a diagnosis in bills submitted to Medicare.

In his Opposition brief, Defendant Ahmed quotes from the portion of the Rutgard decision in which the Court found that with respect to a particular patient, Jean Elwood, the government had not proven that her cataract surgery was unnecessary. Opposition at p. 6. Elwood testified at trial that before surgery she could not see well in order to function in "every day life" and that the cataract surgery benefited her. Rutgard, 116 F.3d at p. 1282. However, her testimony as to the benefit of the surgery was directly linked to whether or not she was properly diagnosed with a need for cataract surgery. In contrast, Defendant Ahmed's patient outcomes have nothing to do with whether his diagnosis of permphigus was proper. This is particularly true in a case such as this in which the defendant has extolled IVIG treatment as being proper both to treat patients suffering from pemphigus or pemphigoid.

Defendant also argues that individual patients in Rutgard were allowed to testify about

their "patient satisfaction" in order "to determine whether the government had met is burden to show that the defendant had submitted fraudulent Medicare claims." A careful reading of the Rutgard decision reveals the error this assertion. In Rutgard, the government sought to prove that Rutgard's entire practice was "permeated by fraud" and therefore that "all its proceeds were the fruit of fraud" for purposes of the money laundering and forfeiture charges. The happy patients were offered to rebut the government's theory that the whole practice was "permeated by fraud." Rutgard, 116 F.3d at 1280, 1289-1290. In this case, there is no money laundering, forfeiture or other charge or allegation that requires or seeks to prove that Defendant Ahmed's whole practice was permeated by fraud.

Thus, Defendant Ahmed's attempt to use Rutgard as support for the introduction of happy patient evidence founders for two reasons: (1) the evidence of patient outcomes was a necessary part of proving the diagnosis/billing fraud in Rutgard, but is not in this case; (2) the general evidence of patient satisfaction in Rutgard was directed to an issue that existed in that case – whether the whole practice was permeated by fraud – but which does not exist in this case.

**CONCLUSION**

For the foregoing reasons, and for the reasons in the original motion in limine, the United States respectfully requests that the Court allow its motion in limine and exclude any evidence of patient satisfaction or patient outcomes.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: /s/ Jeremy M. Sternberg
James E. Arnold
Jeremy M. Sternberg
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142

August 15, 2007

Certificate of Service

I hereby certify that I served a copy of the foregoing pleading on Richard M. Egbert, Law Offices of Richard M. Egbert, 99 Summer Street, Suite 1800, Boston, MA 02110, this day by mail and by electronic filing.

/s/ Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney

# EXHIBIT A

NEB New England Baptist Hospital

70 Parker Hill Avenue, Suite 203
Boston, Massachusetts 02120

A. Razzaque Ahmed, M.D.
Diseases of the Skin & Mucous Membranes

Tel: 617-738-1040
Fax: 617-754-6434

9/10/98

September 2, 1998

Dr. Steven Franks
Dermatology Associates of Worcester
110 Lincoln St.
Worcester, MA 01605

FAX: (508) 753-0151
TEL: (508) 754-3823
RE: BG

Dear Steve,

Thank You very much for asking me to see this 79 year old gentleman. Thank you very much for sending me the accompanying records. Approximately 15 months ago the patient started to develop bullous pemphigoid. He had numerous erythematous plaques and some bullae on his lateral trunk, lower abdomen and thighs. This was perceived as being a drug reaction or erythema multiforme since he was on Dilantin Cardura and Aspirin. Initial treatment with oral Benadryl and 10mg QID of Prednisone did not bring much success. The disease continued and by mid June, 1998 he was doing slightly better and the dose of Prednisone was lowered. Once the dose was reduced to 20mg/day, he had a recurrence of the lesions. A punch biopsy on June 1998 revealed that he had bullous pemphigoid. He was started on Minacyclin 100mg BID. Since significant improvement was not noted the dose of Prednisone was increased to 50mg/ day. Hydroxyzine and Imuran 50mg BID was added. By August 1998 the improvement was not satisfactory and it appeared that the patient had lost 30lbs of weight.

The patient was seen by me on August 19, 1998. At this point he was on 50mg/ day of Prednisone and 100mg/day of Benadryl with Triamcinalone cream 0.1% being applied topically to the involved areas. He continued to use Cardura and Dilantin. The patient has a long-standing history of head trauma which has followed by several neurological problems notably surgery on his head as well as spinal chord. The patient is mostly in a wheelchair but is able to ambulate with assistance.

On examination there were numerous bullae of variable sizes present on the anterior and medial sides of both thighs with lesions extending to the buttock and lower abdominal area bilaterally. There was evidence of healing lesions on upper extremities as well.

Clearly the patient has bullous pemphigoid that is non-responsive to systemic antibiotic therapy. The dosages of Prednisone required are significantly higher and when lowered have resulted in the recurrence of the disease. The patient has not responded to the

reasonable doses of Imuran. Bringing the dosages of Prednisone any higher is associated with significant problems notably hypertension and infections in a patient who is predominantly living a sedentary life. Since Imuran is of little benefit, one would have to switch to an alternative agent. The one that would be of benefit at this time would be Cyclophosphamide. However, with his enlarged prostate and possible prostatitus it would not be advisable to use Cyclophosphamide because of the associated high incidence of hemorigic cystitis with it. Moreover, it is associated with cancer of the bladder.

Hence one is left with minimal choices with treating the patient. Ideally one would like to use an agent with which a quick remission can be produced with minimal side effects. One would also like a drug that will keep the patient in prolonged remission with minimal, side effects.

I have treated over 30 cases of bullous pemphigoid with very significant clinical results. I would consider that this would be the optimal therapy for this patient. Our protocol consists of 50-75Gms of IVIg daily for three consecutive days. A cycle of three day therapy is repeated every three weeks until the patient shows significant clinical improvement. At this point the frequency of the cycles is increased gradually. The entire therapy lasts less than a year. All other drugs used for the treatment, which in his case would be Prednisone and Imuran would be gradually lowered and eventually discontinued. IVIg has proven to be very effective as monotherapy in the management of bullous pemphigoid.

I will be publishing my series very shortly. In this series I have compared other treatment modalities for pemphigoid with IVIg and found that IVIg has a tremendous benefit in reducing the morbidity, in increasing the duration needed to achieve total and partial clinical remission. Most importantly, the side effects of IVIg are negligible or none. This is particularly important in light of his age, his cardiac condition as well as his blood pressure. The patient has agreed to the therapy and has a significant number of members in the family that will facilitate the driving back and forth. If this is agreeable with you, I will initiate the therapy as soon as possible so that one can achieve significant levels of IVIg in the serum and then begin to discontinue the other treatments and maintain this as monotherapy. I deeply appreciate your involving me in the care of this patient and for referring this very interesting patient to me. If I could be of further assistance please do not hesitate to contact me.

Sincerely yours,

A.R. Ahmed (FR)

A. Razzaque Ahmed, M.D.

CC: Dr. Frank Dufault

# EXHIBIT B

# Intravenous Immunoglobulin Therapy for Ocular Cicatricial Pemphigoid

## *A Preliminary Study*

C. *Stephen Foster*, MD, FACS,[1] A. *Razzzaque Ahmed*, MD[2]

***Objective:*** To report the effects of intravenous immunoglobulin treatment of ten patients with progressive ocular cicatricial pemphigoid who did not respond to conventional immunomodulatory regimens.

***Design:*** Noncomparative, interventional case series.

***Participants:*** Ten patients with biopsy-proven progressive cicatricial pemphigoid affecting the eyes who did not respond adequately to other local and systemic immunosuppressive treatment regimens.

***Intervention:*** Intravenous infusions of pooled human immunoglobulin, 2 to 3 g/kg body weight/cycle, divided over 3 days, and repeated every 2 to 6 weeks.

***Main Outcome Measures:*** Reduction in conjunctival inflammation, prevention of progression of subepithelial conjunctival fibrosis, improvement in ocular symptoms (discomfort, photophobia), improved visual acuity, reduction in extraocular mucosal lesions.

***Results:*** Clinical deterioration was arrested and resolution of chronic conjunctivitis was documented in all ten patients. Maximum therapeutic effect was observed and maintained after a minimum of 4 cycles of therapy; three patients required 12 cycles before disease control. The duration of therapy in these ten patients has been 16 to 23 months (mean, 19.3 months) with no treatment-induced side effects. Extraocular mucosal lesion resolution has occurred in all but one patient. Visual acuity has stabilized or improved in all ten patients, and subjective complaints of discomfort and photophobia have decreased in all patients.

***Conclusions:*** Intravenous immunoglobulin immunomodulatory therapy can be a safe and effective therapy for otherwise treatment-resistant ocular cicatricial pemphigoid. *Ophthalmology 1999;106:2136–2143*

Ocular cicatricial pemphigoid (OCP) is a systemic autoimmune disease occurring primarily in individuals older than 50 years of age and affecting other mucous membranes, such as the nose, mouth, and esophagus, in approximately 25% of affected individuals, and skin of thorax or scalp or both in 25%. Thus far, the gene phenotypes identified as predisposing to development of the disease are human leukocyte antigen (HLA)-DR2, HLA-DR4 (HLA-DR*0401), and particularly HLA-DQw7 (HLA-DQB*0301).[1] Environmental triggers associated with OCP development include systemic practolol therapy[2] and ocular exposure to idoxuridine,[3] phospholine iodide,[4] humorsol,[5] and epinephrine.[6] At least two target antigens have been described that supposedly play a role in the pathogenesis of the disease.[7,8] Based on the disparate immunoreactant deposition profile at the epithelial basement membrane zone and on the variable nature of response to treatment of OCP, we have hypothesized that, just as pemphigoid itself is a spectrum of diseases, so too is OCP probably a spectrum of several different related diseases. Each subset probably is associated with a different target antigen or antigens, different mechanisms that trigger the autoimmune response, and different therapeutic responsiveness. The specific role or purpose of the autoantibody in lesion production[9,10] and in disease development and progression is now being identified.[11]

All efforts at topical therapy for this disease have failed, and with the increasing recognition by the dermatologic community of the systemic nature of the disease, employment of systemic treatment for it was begun by dermatologists in the 1970s.[12] Systemic steroid treatment met with limited success and much toxicity, and so alternative immunmodulatory therapy was begun, first with azathioprine[13] and later with cyclophosphamide.[14] We noted the effectiveness of this approach in our patients with OCP, first in uncontrolled trials[15] and subsequently in controlled studies.[16] The results of these efforts prompted us to formulate recommendations for a treatment algorithm for OCP,[16] beginning with dapsone in patients with mild-to-moderate inflammation, provided the patient was not glucose-6-phosphate-dehydrogenase deficient nor had a history of sulfa allergy, and advancing to methotrexate, azathioprine, and cyclophosphamide as needed for control of the disease, defined as uninflamed conjuctiva showing no evidence of

Originally received: February 9, 1999.
Revision accepted: July 27, 1999. Manuscript no. 99080.

[1] Uveitis and Immunology Service, Massachusetts Eye and Ear Infirmary, Harvard Medical School, Boston, Massachusetts.

[2] Department of Oral Medicine, Harvard School of Dental Medicine, Boston, Massachusetts.

Reprint requests to C. Stephen Foster, MD, FACS, Uveitis and Immunology Service, Massachusetts Eye and Ear Infirmary, Harvard Medical School, 243 Charles Street, Boston, MA 02114. E-mail: fosters@helix.mgh.harvard.edu.

progression of subepithelial fibrosis. Analysis of the success rate using this approach subsequently disclosed that approximately 10% of our patients with OCP continued to experience progression[17] despite our best efforts to stop the progression. Mondino and Brown[18] reported similar results. Additional studies with cyclosporine and with tacrolimus have been disappointing (unpublished personal experience, 1988–present). Some of our patients who did not respond completely to the aforementioned medications did respond to cytosine arabinoside (Ara-C) therapy. Although inconvenient, requiring subcutaneous administration, and although potentially toxic to bone marrow, this therapy did allow us to salvage vision for patients in whom vision was being lost because of the consequences of OCP uncontrolled by the more conventional immunomodulators. In the series of patients described herein, Ara-C was also unable to provide acceptable control of disease or limit progression of cicatrization.

For the past 2 years, we have resorted to intravenous immunoglobulin (IvIg) treatment of patients who did not respond to any of these immunosuppressive drugs. Despite the inconvenience and cost of IvIg, the rationale for this approach stemmed from its effectiveness as an immunomodulatory agent in the care of patients with idiopathic thrombocytopenic purpura,[19] from the encouraging preliminary reports of its efficacy in treating other autoimmune diseases,[20–24] from its benign toxicity profile, and from the fact that some of our patients were clearly destined for blindness if the progression of the OCP could not be stopped. We report herein the results of this first observational, uncontrolled study of the safety and efficacy of IvIg therapy for progressive ocular cicatricial pemphigoid.

## Patients and Methods

Ten patients form the basis of this report. All suffered from chronic cicatrizing conjunctivitis. Immunohistochemical analysis of biopsied inflamed conjunctiva disclosed immunoglobulin and/or complement deposition at the epithelial basement membrane zone of each of the patients. All had circulatory autoantibodies that localized to the epithelial basement membrane zone of normal human conjunctiva in indirect immunofluorescent assay[10] and bound to a 205-kd protein in normal human conjunctival lysates in an immunoblot assay.[9] The sera of patients in this report bound to the epidermal side of a salt-split skin preparation in the indirect immunofluorescence assay.[11]

The following information was cataloged for each patient: age at onset of cicatrizing conjunctivitis, gender, race, duration of the disease before IvIg therapy, previous systemic treatment, involvement of other mucosae or skin, and clinical findings, such as conjunctival erythema, tearing, exudate, ocular pain and itch and photophobia, and visual acuity. Photographic documentation of the stage of conjunctival cicatrization was recorded. Each of these items was documented on every visit. Patients' subjective impressions of improvement in symptoms were also noted. Responses in extraocular mucosa were noted on each visit. The total number of cycles of IvIg therapy was recorded. The total duration of IvIg therapy is the same as the duration of follow-up, since all patients in this series continue with their treatment program.

From early November 1997 until late January 1998, there was an acute national shortage of Ig. None of the ten patients received their regular dose of IvIg during this period. All retrogressed during this shortage with recurrence of conjunctival inflammation. The retrogression in each patient's signs and symptoms was variable. The duration of resumed full dosage of IvIg therapy required to achieve the preshortage improvement was variable and noted. Each patient was carefully assessed for any possible side effects during the infusion (pulse, blood pressure, temperature, respirations), during the following 12, 24, 48, or 72 hours, and between the total interval between each cycle of treatment.

### Titer of Antibody to Human $\beta_4$ Integrin

In recent studies, we have shown that sera of patients with active OCP selectively binds to human $\beta_4$ integrin.[8] No binding is seen during remission or inactive stage of disease. Hence, in one patient, using normal human conjunctiva as a substrate in an immunoblot analysis, we measured the titers of the antibody to human $\beta_4$ integrin over a 12-month treatment period. The purpose was to determine, in a single patient, whether any correlation could be observed between the control of the disease by IvIg therapy and the titer of detectable anti-$\beta_4$ integrin antibody in the patient's serum.

### Intravenous Immunoglobulin Treatment Protocol

The levels of quantitative immunoglobulins were determined in each patient before therapy. If normal (especially immunoglobulin-A), therapy was started after informed consent was obtained. Our patients received 2 to 3 g/Ig/kg/cycle of treatment. Thus, the dosage varied between 140 and 250 g/cycle divided over 3 days. The patients were premedicated with 650 mg acetaminophen and 50 mg Benadryl (Parke-Davis, Morris Plains, NJ) orally 30 minutes before starting each infusion. The rate of infusion was determined by the general health of the patient, heart rate, and blood pressure. A slow, continuous infusion lasting 210 to 240 minutes in an ambulatory setting using a belt-worn infusion pump was usual.

The infusion cycle was repeated every 2 weeks until the clinical examination showed that conjunctival inflammation had subsided. The frequency of the infusion cycle was spaced to every 3 weeks for at least 6 cycles once a plateau of beneficial effect was reached. If the benefits were sustained, the frequency was reduced to every 4 weeks. In three patients, the interval between each cycle currently is 6 weeks.

During the national shortage of IvIg, patients received one fourth to one third of their earlier dosages. The amount each patient received was based on the availability of IvIg at the moment of treatment. Longitudinal follow-up assessment was conducted as described above with clinical and photographic assessment and an endpoint goal of uninflamed conjunctiva with no evidence of progressive conjunctival cicatrization on clinical evaluation or on sequential photograph analysis. Photograph analysis was performed by an independent observer who was unaware of the treatment received or the names of the patients associated with each picture; patients receiving IvIg represented half of the patients analyzed by the masked observer. The length of follow-up was 18 months. The endpoint assessment parameter was elimination of all evidence of conjunctival inflammation (i.e., production of a "white and quiet" eye) and absence of evidence of progressive subepithelial fibrosis on analysis of sequential photographs. The observer also made an assessment of the first photographically documented date of the complete disappearance of all conjunctival inflammation.

Table 1. Relevant Clinical Information on 10 Recalcitrant Patients with Ocular Cicatricial Pemphigoid Treated with IvIg

| Patient No. | Age (yrs) at Onset | Sex | Duration prior to IvIg (yrs) | Previous Systemic Rx | Other Mucosae Involved | Total No. of Cycles | Duration of IvIg Rx (mos) |
|---|---|---|---|---|---|---|---|
| 1 | 60 | F | 12.5 | Dapsone, Prednisone, Prograf, Ara-c, Imuran | None | 29 | 23 |
| 2 | 74 | M | 3.5 | Dapsone, CTX, Imuran, Ara-c, MTX, Prograf | None | 23 | 20 |
| 3 | 66 | F | 9 | Prednisone, Dapsone, CTX, Ara-c | Nose, mouth, vagina | 25 | 20 |
| 4 | 50 | F | 7 | Prednisone, Prograf, Dapsone, Cytx | Mouth, nose, pharynx, larynx, vagina, esophagus | 19 | 19 |
| 5 | 77 | F | 3 | Dapsone, MTX | Nose, mouth, esophagus | 15 | 17 |
| 6 | 75 | M | 3 | Prednisone, CTX, Ara-c, Dapsone | None | 16 | 17 |
| 7 | 74 | M | 6 | MTX, Prograf, Ara-c, Dapsone | None | 13 | 16 |
| 8 | 63 | F | 9 | Dapsone, MTX, Prednisone | None | 15 | 18 |
| 9 | 52 | M | 14 | Dapsone, Prednisone, Cytx | None | 11 | 14 |
| 10 | 62 | M | 10 | Dapsone, MTX, CTX, Ara-c | Mouth, esophagus, nose | 26 | 19 |

Ara-c = cytosine arabinoside; MTX = methotrexate.

# Results

## Patients

Ten patients were treated. Five were women. All patients were white. The mean age at onset was 74.6 years (range, 56–81 years). All previous treatment that failed to produce clinical improvement is listed in Table 1. Duration of systemic therapy before initiation of IvIg therapy varied from 3 to 14 years, with a mean of 8.3 years. Therefore, it was clear that the disease was present for at least this period, which coincides with the confirmation date of the diagnosis of immunopathologic techniques. It is equally clear that the disease was present in all patients for many months before the establishment of histologic diagnosis, since each was referred to us with the diagnosis of "chronic conjunctivitis." Therefore, the total duration of the disease process is longer than the documented duration of treatment before initiation of IvIg therapy. The duration of follow-up on IvIg therapy is 16 to 23 months (mean, 19.3 months). Extraocular manifestations of the disease existed in four patients (Table 1).

## Medications Used Before IvIg Therapy

Prednisone in doses greater than 60 to 80 mg daily was used in six of the ten patients. In most of the patients, it did produce a satisfactory clinical response, but the doses required resulted in side effects necessitating lowering of prednisone, which resulted in prompt recurrence of cicatrizing conjunctivitis requiring the addition of an immunosuppressive agent.

Dapsone had been used by all ten patients to the point that two patients developed clinically significant anemia, one developed neutropenia and one developed drug-induced hepatitis. Dapsone was ineffective in three patients and was partially effective in seven patients.

Azathioprine was used by two patients in an effort to lower prednisone dose requirement. Drug-induced hepatitis necessitated withdrawal of this drug from one patient, and the other patient developed unacceptable leukopenia as the azathioprine dose was raised in an effort to achieve disease control.

Cyclophosphamide was used for six patients. Four other patients refused this treatment. Leukopenia necessitated drug withdrawal in one patient. Cyclophosphamide did produce a significant reduction of conjunctival inflammation in five patients, but recurrence of cicatrizing conjunctivitis occurred with cyclophosphamide cessation after 1 year of therapy. The patient with recurrent inflammation did not respond to retreatment with cyclophosphamide.

Methotrexate was used in the care of five patients. No appreciable benefits were observed after 4 months of use in two patients. In three patients in whom methotrexate provided some initial therapeutic benefit, the pemphigoid recurred or worsened despite continued therapy and, hence, it was considered ineffective.

Tacrolimus was used because of its unique ability to selectively affect T-cells. It was given to five patients after they did not respond to other agents. Just as cyclosporin A had failed to provide any measurable therapeutic benefit to other patients with OCP not included in this report, so too did tacrolimus fail after 6 months of continuous use. Hyperglycemia and hypertension developed in one patient.

Cytosine arabinoside was used in the care of six patients. The disease process continued in all six patients with progressive cicatrizing conjunctivitis, albeit at a reduced degree of inflammation and rate of progressive cicatrization compared to pre-Ara-C therapy.

Subconjunctival injections of dexamethasone sodium phosphate (1 mg) and mitomycin C (0.1 mg) failed to produce more than a transient reduction in conjunctival inflammation in all ten patients (Table 1).

## Ocular Response to Intravenous Immunoglobulin Therapy

Clinical deterioration was arrested and resolution of chronic conjunctivitis was documented in all ten patients. The masked observer's documentation of total abolition of active conjunctivitis indicated that maximum therapeutic effect was not observed until a minimum of 4 cycles of therapy had been received, and three patients required 12 cycles before the disease was fully controlled.

Table 2. Sign and Symptom Scores before and during IvIg Therapy

| | | Initial | | | | Final | | | |
|---|---|---|---|---|---|---|---|---|---|
| Patient No. | Eye | VA | Conjunctival Inflammation | Discomfort | Photophobia | VA | Conjunctival Inflammation | Discomfort | Photophobia |
| | OD | 20/200 | 4+ | 4+ | | 20/100 | 0 | 1+ | |
| 1 | OS | 20/300 | 4+ | 4+ | 4+ | 20/200 | 0 | 1+ | 1+ |
| | OD | 20/60 | 4+ | 3+ | | 20/30 | 0 | 0 | |
| 2 | OS | 20/40 | 3+ | 2+ | 2+ | 20/25 | 0 | 0 | 0 |
| | OD | 20/400 | 4+ | 4+ | | 20/50 | 0 | 0 | |
| 3 | OS | 20/100 | 4+ | 4+ | 4+ | 20/40 | 0 | 0 | 0 |
| | OD | 20/30 | 2+ | 2+ | | 20/30 | 0 | 0 | |
| 4 | OS | 20/30 | 3+ | 2+ | 1+ | 20/30 | 0 | 0 | 0 |
| | OD | 20/50 | 3+ | 3+ | | 20/50 | 0 | 0 | |
| 5 | OS | 20/100 | 3+ | 3+ | 2+ | 20/40 | 0 | 0 | 0 |
| | OD | CF | 3+ | 3+ | | CF | 0 | 0 | |
| 6 | OS | 20/25 | 3+ | 3+ | 2+ | 20/25 | 0 | 0 | 0 |
| | OD | 20/50 | 4+ | 4+ | | 20/50 | 0 | 0 | |
| 7 | OS | 20/50 | 4+ | 4+ | 4+ | 20/50 | 0 | 0 | 0 |
| | OD | 20/80 | 3+ | 2+ | | 20/60 | 0 | 0 | |
| 8 | OS | 20/50 | 3+ | 2+ | 2+ | 20/50 | 0 | 0 | 0 |
| | OD | 20/30 | 3+ | 3+ | | 20/30 | 0 | 0 | |
| 9 | OS | 20/50 | 3+ | 2+ | 3+ | 20/30 | 0 | 1+ | 0 |
| | OD | 20/80 | 4+ | 4+ | | 20/30 | 0 | 1+ | |
| 10 | OS | CF | 4+ | 4+ | 4+ | CF | 0 | 1+ | 1+ |

VA = visual acuity; OD = right eye; OS = left eye; CF = counting fingers.

Patients gradually stopped all other systemic therapies and continued receiving IvIg as monotherapy. The improvement achieved has been sustained despite increased intervals between infusion cycles. All patients are still receiving therapy, and it is not known whether cessation of therapy will result in recurrence. No untoward side effects from IvIg therapy were observed in these ten patients, and in all it has been their subjective judgment (and ours) that they are enjoying a significantly higher quality of life with dramatically improved ocular comfort and visual acuity. The improved visual acuity and the diminution of conjunctival inflammation and cessation of progressive subepithelial fibrosis of the conjunctiva are listed in Table 2 and in Figures 1 through 5.

During periods of Ig shortage, each patient's Ig dose was reduced, such that each received one fourth to one third of his or her usual dose. Every one of the ten patients relapsed with dose reduction, typically within two treatment cycles. None regressed to his or her original degree of conjunctival inflammation, and all recovered full control within 4 cycles of IvIg infusion at full dose with increased availability of Ig in February 1998. However, at the time of submission of this article (December 1998), one patient, from New Jersey, was unable to obtain full dosage amounts of Ig, and his conjunctivitis had recurred, albeit to a lesser extent than originally observed; he currently is being considered for combination Ig and azathioprine or Ig and leflunomide immunosuppressive therapy.

## Extraocular Involvement and Response to Intravenous Immunoglobulin Therapy

Four patients had nasal mucosal involvement; three experienced resolution of these lesions, while in one patient no benefit was observed.

Oral mucosal involvement was documented in four patients, and all four experienced resolution of the oral lesions with IvIg therapy. In two of these patients, this part of the therapeutic response was especially impressive in that the oral lesions had produced more negative impact on quality of life for these patients than had the ocular involvement.

Esophageal involvement was documented in two patients, both with dysphagia. Both of these patients noted significant improve-




Figure 1. Correlation between titers of antibody to human $\beta_4$ integrin by an immunoblot assay using normal human conjunctiva as substrate (lower panel) and disease activity graded as 4+ when severe and 1+ when mild (upper panel). This correlation occurred over a 12-month period in one representative patient with ocular cicatricial pemphigoid who was treated with intravenous immunoglobulin.




**Figure 2.** A, right eye of patient 2 who was taking oral prednisone and cyclophosphamide before the introduction of intravenous immunoglobulin (IvIg) therapy. B, same patient, right eye, 3 months after institution of IvIg therapy every other week, with slow tapering and discontinuation of both prednisone and cyclophosphamide. Note the resolution of the chronic cicatrizing conjunctivitis.

**Figure 3.** A, same patient as in Fig 2A, left eye, taking combination prednisone and cyclophosphamide therapy before the initiation of intravenous immunoglobulin (IvIg) therapy. B, same patient, same eye, during a relapse (the eye had been white and quiet) during IvIg shortage and reduced dosage and frequency of IvIg therapy. C, same eye as in A and B 4 weeks after resumption of full doses of IvIg therapy. D, same eye as in preceding photographs (A–C) 3 months after resumption of full doses of IvIg therapy. Note in particular the complete resolution of the chronic cicatrizing conjunctivitis. The residual scarring, of course, is permanent.

**Figure 4.** A, right eye of patient 5 who was taking prednisone and methotrexate before the initiation of intravenous immunoglobulin (IvIg) therapy. B, same eye (right eye) 6 weeks after initiation of IvIg therapy. Note the marked reduction in inflammation. This eye went on to total resolution.

ment in the dysphagia. One was able to double the intervals between her esophageal dilation procedures.

Vaginal involvement was noted by one patient. She reported significant improvement and healing of the vaginal mucosal erosions. Sublesional corticosteroid injections twice at 1-month intervals, sitzbath soaks, and betamethasone cream application for 6 weeks were the initial adjunctive therapies for this target site. No recurrence has been observed in 12 months' follow-up.

## Titer of Antibody to Human $\beta_4$ Integrin

In one representative patient, the titer of the antibody to human $\beta_4$ integrin was measured by an immunoblot assay using normal conjunctiva as substrate. Serial dilutions of the sera were made. The titer was the highest dilution at which a 205-kd band was distinctly observed. The antibody titer was determined at least at monthly intervals and whenever change in clinical status or change




Figure 5. A, same patient as illustrated in Fig 4, left eye, before the initiation of intravenous immunoglobulin (IvIg) therapy. B, relapse of cicatrizing conjunctivitis during IvIg shortage. C, 6 weeks after the resumption of full doses of IvIg; note the reduction in inflammation. D, 8 weeks after resumption of full doses of IvIg. Note the resolution of the chronic cicatrizing conjunctivitis but the permanent adhesion, temporally, between lid and globe that developed during the drug shortage.

in IvIg therapy or both occurred. This was correlated with ocular disease. The disease severity was graded 1+ to 4+, where 4+ was the worst and 1+ was minimal disease. The results are presented in Figure 1. A distinct correlation between the titer of the antibody and the disease activity is observed.

## Discussion

We present herein our preliminary results in treating ten patients with cicatricial pemphigoid affecting the eye using intravenous immunoglobulin. We resorted to this high-cost, high-maintenance therapeutic strategy in each instance because the patients had failed all other published therapeutic interventions for this progressive blinding disease, and one eye of each of three patients had already been severely affected by the inflammatory process. Multiple mucosae were involved in four of the ten patients. The response to IvIg was similar in all the ways assessed, between those who did have extra ocular involvement compared to those who had only ocular involvement.

Cicatricial pemphigoid is a classic, systemic autoimmune disease with frequent extraocular manifestations, T-lymphocyte dysregulation,[16] and the presence of proinflammatory cytokines and immune system activation markers, serum immune system activation markers,[25] and autoantibodies in serum.[26] The autoantigen for our patients has been identified,[8] as have gene loci conferring enhanced susceptibility to OCP.[1] These and other features emphasize the systemic nature of OCP. Still, there exist today ophthalmologists who do not understand that ocular cicatricial pemphigoid is not simply an eye disease, amenable to topical or subconjunctival treatments. Dermatologists were the first to understand this and to turn to systemic prednisone in their care of patients with OCP in the 1970s. And while Hardy et al[12] found that more than half of his patients stabilized with high doses of systemic steroid, nearly 30% progressed, one patient died of steroid-induced pneumonia, one patient hemorrhaged in the brain secondary to steroid-induced hypertension, and one patient hemorrhaged from a steroid-induced peptic ulcer. Dermatologists quickly realized that the doses of systemic prednisone required for control of OCP were simply unacceptable. In 1974, Dave and Vicars[13] were the first to treat four patients with azathioprine with success. In 1977, Brody and Pirozzi[14] treated the first patient with cyclophosphamide when combination systemic prednisone and azathioprine had failed to halt the progression of the conjunctival cicatrization. We first explored systemic immunomodulatory therapy in patients with OCP in 1982[15] and by 1986[16] had performed two randomized, masked, clinical trials showing, unequivocally, both the safety and effectiveness of systemic immunomodulatory therapy for this progressive and blinding disease. Mondino and Brown[18] made similar observations. Still, 10% of our patients (or 6% of eyes involved) progressed despite all our best efforts.[17] Such was the case in our care of the ten patients reported herein.

We turned to intravenous immunoglobulin as a result of its proven efficacy[19] in the treatment of at least one other autoimmune disease (idiopathic thrombocytopenic purpura) and its apparent benefits in other autoimmune diseases, including rheumatoid arthritis, systemic lupus erythematosus, myasthenia gravis, vasculitis, and multiple sclerosis.[20–24] IvIg exhibits a number of immunomodulatory properties that are mediated by the fragment, crystallizable

(Fc) portion of immunoglobulin G (IgG) and by the spectrum of variable regions contained in the immunoglobulin preparations.[27] Although the major component of IvIg is IgG, other minor components such as solubilized lymphocyte surface molecules exhibit immunoregulatory effects on T- and B-cell immune responses as well. Several prominent and nonmutually exclusive mechanisms of action have been proposed to account for the immunomodulatory effects of IvIg in immune-mediated diseases, including:

- Functional blockade of Fc receptors on splenic macrophages.
- Inhibition of complement-mediated damage, an effect that is dependent on IgG to bind C3b and C4b and thus reduce the number of activated complement fragments that may deposit on target surfaces.
- Modulation of the synthesis and release of cytokines and cytokine antagonists.
- Neutralization of circulating pathogenic autoantibodies by reacting with idiotypes of natural or disease-related autoantibodies (IvIg has been shown to down-regulate or activate B-cell clones expressing surface IgG that is complementary [anti-idiotypic] to variable regions of antibodies present in IvIg, a mechanism that accounts for the rapid decrease in titer of circulating autoantibodies observed within hours after the infusion of IvIg).
- Selection of immune repertoires (a complex set of effects that may be observed in individuals receiving IvIg far beyond the half-life of the infused immunoglobulin and that is directly relevant to the ability of IvIg to suppress autoantibody producing clones in patients with antibody-mediated autoimmune disease for a short-term transient or longlasting suppression).
- Interaction with surface molecules of T-cells that are essential to immune regulation, such as the alpha/beta T-cell receptor, CD5 and CD4 molecules, and non-polymorphic determinants of major histocompatibility complex class-1 molecules and adhesion molecules of T- and B-cells.
- Alteration of the general "architecture" of the immunoregulatory network as assessed by the study of kinetic patterns of spontaneous fluctuations of natural antibodies in serum.[28]

The mechanism by which IvIg produces clinical remission in patients with OCP was not evaluated in this study. In one representative patient, the titer of the antibody to human $\beta_4$ integrin was measured; the titer of the antibody correlated with disease activity and the change in the antibody titer paralleled changes in disease activity and clinical profile without any lag period. This preliminary and limited observation would suggest that whatever mechanisms of action are involved, one of their direct consequences is lowering of detectable serum antibody titers. Hence, one could speculate that IvIg has a central effect on autoantibody production. Whether it simultaneously influences local phenomena within the conjunctiva remains to be seen. Clinical observations indicate the rapid diminution in erythema and photophobia; increased lacrimation and mucus production would suggest that it also does have local effects within the ocular environment.

The lack of significant side effects makes IvIg a rather valuable therapeutic agent. Because it acts as an anti-inflammatory and immunomodulatory agent, IvIg is a good choice for a progressive autoimmune disease. In the initial phase of treatment, it probably asserts its effects more as an anti-inflammatory agent. In the later stages when inflammation is reduced or subsides, it probably acts more as an immunoregulatory agent and decreases or eliminates pathogenic autoantibody production. These suggested mechanisms of action are hypothetical and not documented by laboratory data but provide one possible explanation for the mechanism of action of IvIg.

It could be argued that a longer follow-up period is required to determine whether IvIg is an effective agent in controlling OCP and in inducing a long-term or lifetime remission. Because OCP is a rare disease, a multicenter trial would be necessary to determine this. Because the clinical outcome in the most severe and recalcitrant patients has been so remarkable, we thought the need to publish this information after more than 1 year follow-up. Based on the results reported herein, we believe that in selected patients with progressive OCP in whom commonly used systemic anti-inflammatory agents or immunosuppressive agents or both are not effective, use of IvIg may be a useful, justifiable alternative.

**Acknowledgments.** The authors thank Phyllis MacPhearson, RN, MBA, for her assistance with and supervision of intravenous immunoglobulin therapy; Dr. Kailash Bhol for performing the autoantibody assay; and Cindy Vredeveld for her masked assessment of the clinical photographs.

## References

1. Yunis JJ, Mobini N, Yunis EJ, et al. Common major histocompatibility complex class II markers in clinical variants of cicatricial pemphigoid. Proc Natl Acad Sci U S A 1994;91:7747–51.
2. Rahi AH, Chapman CM, Garner A, Wright P. Pathology of practolol-induced ocular toxicity. Br J Ophthalmol 1976;60:312–23.
3. Lass JH, Thoft RA, Dohlman CH. Idoxuridine-induced conjunctival cicatrization. Arch Ophthalmol 1983;101:747–50.
4. Patten JT, Cavanaugh HD, Allansmith MR. Induced ocular pseudopemphigoid. Am J Ophthalmol 1976;82:272–6.
5. Hirst LW, Werblin T, Novak M, et al. Drug-induced cicatrizing conjunctivitis simulating ocular pemphigoid. Cornea 1982;1:121–8.
6. Norn MS. Pemphigoid related to epinephrine treatment [letter]. Am J Ophthalmol 1977;83:138.
7. Balding SD, Prost C, Diaz LA, et al. Cicatricial pemphigoid autoantibodies react with multiple sites on the BP 180 extracellular domain. J Invest Dermatol 1996;106:141–6.
8. Tyagi S, Bhol K, Natarajan K, et al. Ocular cicatricial pemphigoid antigen: partial sequence and characterization. Proc Natl Acad Sci U S A 1996;93:14714–9.
9. Bhol K, Mohimen A, Neumann R, et al. Differences in the anti-basement membrane zone antibodies in ocular and pseudo-ocular cicatricial pemphigoid. Curr Eye Res 1996;15:521–32.

10. Ahmed AR, Khan KN, Wells P, et al. Preliminary serological studies comparing immunofluorescence assay with radioimmunoassay. Curr Eye Res 1989;8:1011–9.
11. Chan RY, Bhol K, Tesavibul N, et al. The role of antibody to human β4 integrin in conjunctival basement membrane separation: possible in vitro model for ocular cicatricial pemphigoid. Invest Ophthalmol Vis Sci 1999 (in press).
12. Hardy KM, Perry HO, Pingree GC, Kirby TJ Jr. Benign mucous membrane pemphigoid. Arch Dermatol 1971;104:467–75.
13. Dave VK, Vicars CFH. Azathioprine in the treatment of muco-cutaneous pemphigoid. Br J Dermatol 1974;90:183–6.
14. Brody HJ, Pirozzi DJ. Benign mucous membrane pemphigoid. Response to therapy with cyclophosphamide. Arch Dermatol 1977;113:1598–9.
15. Foster CS, Wilson LA, Ekins MB. Immunosuppressive therapy for progressive ocular cicatricial pemphigoid. Ophthalmology 1982;89:340–53.
16. Foster CS. Cicatricial pemphigoid. Trans Am Ophthalmol Soc 1986;84:527–663.
17. Tauber J, Sainz de la Maza M, Foster CS. Systemic chemotherapy for ocular cicatricial pemphigoid. Cornea 1991;10:185–95.
18. Mondino BJ, Brown SI. Immunosuppressive therapy in ocular cicatricial pemphigoid. Am J Ophthalmol 1983;96:453–9.
19. Imbach P, Wagner HP, Berchtold W, et al. Intravenous immunoglobulin versus oral corticosteroids in acute immune thrombocytopenic purpura in childhood. Lancet 1985;2:464–8.
20. Cosi V, Lombardi M, Piccolo G, Erbetla A. Treatment of myasthenia gravis with high-dose intravenous immunoglobulin. Acta Neurol Scand 1991;84:81–4.
21. Francioni C, Galeazzi M, Fioravanti A, et al. Long-term i.v. Ig treatment in systemic lupus erythematosus. Clin Exp Rheumatol 1994;12:163–8.
22. Achiron A, Barek Y, Goren M, et al. Intravenous immune globulin in multiple sclerosis: clinical and neuroradiological results and implications for possible mechanisms of action. Clin Exp Immunol 1996;104 Suppl 1:67–70.
23. Tumiati B, Casoli P, Veneziani M, Rinaldi G. High-dose immunoglobulin therapy as an immunomodulatory treatment of rheumatoid arthritis. Arthritis Rheum 1992;35:1126–33.
24. Jordan SC, Toyoda M. Treatment of autoimmune diseases and systemic vasculitis with pooled human intravenous immune globulin. Clin Exp Immunol 1994;97 Suppl 1:31–8.
25. Lee SJ, Li Z, Sherman B, Foster CS. Serum levels of tumor necrosis factor-alpha and interleukin-6 in ocular cicatricial pemphigoid. Invest Ophthalmol Vis Sci 1993;34:3522–5.
26. Mohimen A, Neumann R, Foster CS, Ahmed AR. Detection and partial characterization of ocular cicatricial pemphigoid antigens on COLO and SCaBER tumor cell lines. Curr Eye Res 1993;12:741–52.
27. Strand V. Proposed mechanisms for the efficacy of intravenous immunoglobulin treatment. In: Lee ML, Strand V, eds. Intravenous Immunoglobulins in Clinical Practice. New York: Dekker, 1997;23–36.
28. Klaesson S, Ringden O, Markling L, et al. Immune modulatory effects of immunoglobulins on cell-mediated immune responses in vitro. Scand J Immunol 1993;38:477–84.