# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 05-10057-RCL |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ABDUL RAZZAQUE AHMED, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## GOVERNMENT'S TRIAL BRIEF

Pursuant to the Court's Pre-Trial Order, the United States hereby submits its trial brief.

## I.  BACKGROUND

The Superseding Indictment charges defendant Ahmed with a variety of crimes:  mail fraud in violation of 18 U.S.C. § 1341 (Counts 1-4); health care fraud in violation of 18 U.S.C. § 1347 (Counts 5-11); obstruction of an investigation of a health care offense in violation of 18 U.S.C. § 1518 (Counts 12-13); and money laundering in violation of 18 U.S.C. § 1956(a)(1) (Counts 14-15).  The crimes charged essentially relate to two different, yet interconnected schemes: (1) defendant Ahmed's scheme to defraud the Medicare program, and (2) defendant Ahmed's scheme to obstruct the Government's investigation into his Medicare billings.

The Superseding Indictment sets forth defendant Ahmed's scheme to defraud the Medicare program by falsely representing to Medicare that certain of his patients suffered from a rare blistering skin disease known as pemphigus vulgaris, when in fact they did not.  The Indictment explains that during the relevant period (1997-2001), Medicare allowed reimbursement for extremely expensive intravenous immunoglobulin treatments ("IVIG") for patients suffering from pemphigus, but did not allow IVIG reimbursement for patients who

suffered from a different skin disease called pemphigoid.[1]  Over the relevant period, defendant

Ahmed submitted a number of fraudulent bills to Medicare for IVIG treatments; the bills were

fraudulent because they included a pemphigus diagnosis for patients who did not suffer from

pemphigus.

Further, the Superseding Indictment charges that defendant Ahmed obstructed a health

care fraud investigation in two ways.  First, the Superseding Indictment charges that defendant

Ahmed created and produced to the government false documents, including Immunopathology

Reports and letters to referring physicians of certain of his Medicare patients, purporting to show

that they had a "dual diagnosis" of pemphigus and pemphigoid, when in fact they only had

pemphigoid.  See generally Count 12, Superseding Indictment.  As described in the Superseding

Indictment, defendant Ahmed later caused these false documents to be submitted to Medicare in

support of his claims seeking reimbursement.  See, e.g., id., ¶ 27, and Counts 1 through 4.

In addition, the Superseding Indictment charges defendant Ahmed with causing vials of

blood of pemphigus patients to be mixed with the blood of certain of his Medicare patients who

were not suffering from pemphigus.  The Superseding Indictment alleges that defendant Ahmed

caused this mixed blood to be sent to an independent testing laboratory in order to obtain

laboratory test results that falsely indicated that defendant Ahmed's pemphigoid patients

receiving Medicare reimbursement for IVIG treatments were suffering from pemphigus.

Defendant Ahmed then shared those test results with the government in an effort to demonstrate

to the government that his patients really did suffer from a "dual diagnosis."  See generally

---

[1]  Although both diseases are rare autoimmune blistering skin diseases, pemphigus can
be a potentially fatal disease as a result of various complications associated with the disease,
whereas pemphigoid is rarely fatal.

Count 13, Superseding Indictment.   As described in the Superseding Indictment, defendant

Ahmed also engaged in these acts to further his mail fraud and health care fraud schemes.  See,

e.g., id., ¶¶ 28-30, and Count 5.

## II.  SUMMARY OF EVIDENCE

The government's evidence consists of testimony and documents from many sources.

Without detailing the source of every piece of evidence, the government expects the evidence to

include the following categories of testimony and documents.

### A.    Evocare Witnesses

First, the government expects that witnesses formerly associated with a company known

as Evocare will testify about a business arrangement between Evocare and defendant Ahmed that

began in 1997.  They are expected to testify that pursuant to a written contract, Evocare provided

management and nursing services and a drug called intravenous immunoglobulin.  Pursuant to

the contract, defendant Ahmed treated patients by prescribing intravenous immunoglobulin

("intravenous immunoglobulin" or "IVIG"), which was purchased and prepared by Evocare.

Evocare, acting on defendant Ahmed's behalf, billed insurance companies, including Medicare

for those treatments.  Evocare and defendant Ahmed shared the profits from these treatments.

 The Evocare witnesses are expected to explain that the local Medicare policy at the time

was that Medicare would reimburse IVIG treatments for patients who had been diagnosed as

suffering from a blistering skin disease called pemphigus vulgaris ("pemphigus"); however, the

local Medicare policy did not provide for reimbursement for IVIG treatments for patients who

had been diagnosed with suffering from other blistering skin diseases, including any forms of

pemphigoid.

The Evocare witnesses will describe the manner in which the Medicare billings on behalf of defendant Ahmed were prepared and submitted with respect to patients who had been treated with IVIG.  The Evocare witnesses will explain that defendant Ahmed, at all times, was responsible for advising them as to his patients' diagnoses -- both for the purpose of administering IVIG treatments and for the purpose of seeking reimbursement from Medicare for those treatments.  These witnesses, and others, will explain that pemphigus and pemphigoid are separate and distinct diseases, and that pemphigus and pemphigoid have separate and distinct diagnosis codes for billing purposes.

The Government anticipates that the former Evocare employees and others will testify to some variations on the following theme:

(1)     that certain Medicare patients were referred to defendant Ahmed with a diagnosis of pemphigoid, and that this pemphigoid diagnosis had been established both through clinical examination and by independent biopsy;

(2)     Defendant Ahmed, upon referral, received independent biopsy reports and confirmed the patient's pemphigoid diagnosis, both orally to the patient and in writing to the patient's referring physician;

(3)     Defendant Ahmed started these patients on a treatment regimen of IVIG and originally caused a diagnosis of pemphigoid to be communicated to Evocare;

(4)     Evocare personnel informed defendant Ahmed that Medicare would not reimburse for IVIG treatments for patients diagnosed with pemphigoid and further advised defendant Ahmed that he would personally be responsible for the thousands of dollars in IVIG treatments he had already administered to his pemphigoid patients;

(5)     Defendant Ahmed then informed Evocare that each of the Medicare patients in question actually had a dual diagnosis consisting of both pemphigoid and pemphigus and that Medicare should be (and was) billed in this manner.

A number of communications between Evocare and defendant Ahmed's office in 1998 and thereafter will demonstrate that, for various Medicare patients, defendant Ahmed changed

4

the patients' diagnoses from pemphigoid only (a diagnosis for which Medicare reimbursement

for IVIG treatments was not available) to an exceptionally rare "dual diagnosis" of both

pemphigoid and pemphigus (a diagnosis for which Medicare reimbursement for IVIG treatments

*was* available).  Evidence establishing the falsity of this "dual diagnosis" will include numerous

documents authored by defendant Ahmed, including letters to the patients, their doctors, hospital

discharge summaries, defendant Ahmed's treatment notes and other treatment records.

       **B.**      **Patient/Physician Witnesses**

In addition, several of the Medicare patients in question, as well as their referring

physicians, are expected to testify that they believed that the patients' diagnoses was only

pemphigoid.  The government anticipates that the patients will testify that defendant Ahmed

never told them that they had pemphigus (despite the fact that pemphigus is potentially a fatal

disease, whereas pemphigoid is not).

       **C.**      **Documentary Evidence**

The documentary evidence will show that the Medicare patients in question had

independent biopsy-proven diagnoses of pemphigoid -- that is, that the patients underwent skin

biopsies that were then reviewed by independent testing laboratories, which confirmed that the

patients' conditions were consistent with pemphigoid.  Other documents will further establish

that defendant Ahmed regularly and consistently caused contemporaneous documents to be

issued in which he described the patients' diagnoses to be pemphigoid.  These documents

include paperwork submitted to Evocare, hospital discharge summaries dictated by defendant

Ahmed on behalf of the patients, and other letters written by defendant Ahmed on his patients'

behalf.  In these documents, defendant Ahmed never referred to the patients as suffering from

pemphigus.

      In marked contrast with the independent laboratory analyses confirming that these

Medicare patients were suffering from pemphigoid, the government will show that the only

documents that supported defendant Ahmed's claim that these patients were also suffering from

pemphigus was a one-page document purporting to be an analysis of the patients' blood.  These

one-page documents were entitled "Immunopathology Report" and were prepared and signed by

defendant Ahmed himself.  The government will show that defendant Ahmed caused certain of

these purported "Immunopathology Reports" to be submitted with patient claims seeking

reimbursement from Medicare for IVIG treatments.

      Testimony and documentary evidence will establish that these purported

"Immunopathology Reports" have numerous inconsistencies -- e.g., that the dates on the reports

do not match up correctly with other documents.  Other documentary evidence will establish that

defendant Ahmed wrote various communications that were dated *after* the date appearing on

these purported "Immunopathology Reports."  In these communications, defendant Ahmed

described various Medicare patients as suffering only from pemphigoid (notwithstanding the fact

that these purported "Immunopathology Reports" -- if real -- were suggesting that the patients

were also suffering from pemphigus).  Other documentation and testimony will further call into

question the veracity of these purported "Immunopathology Reports."  For example, in 1996,

defendant Ahmed and others published a case study describing a single rare and unusual patient

who had both pemphigoid and pemphigus despite the fact that, if the purported

"Immunopathology Reports" were to be believed, defendant Ahmed at the time was treating several patients suffering from both diseases.

### D.      Defendant Ahmed's Current/Former Employees

A number of defendant Ahmed's current and former employees are expected to testify. They are expected to testify as to what they observed and learned from him regarding the diagnoses of various patients. Some of them are also expected to testify about various projects given to them by defendant Ahmed after he had been served by the government, on June 15, 2000, with a subpoena seeking his IVIG treatment records.

One such project involved defendant Ahmed directing his lab personnel to send certain vials of blood serum, selected by defendant Ahmed, to an independent testing laboratory in Buffalo, New York called Beutner Laboratories. The purpose of this project was to obtain independent diagnostic tests showing the diseases that the patients had. The results showed that defendant Ahmed's Medicare patients had a "dual diagnosis." In an effort to prove the veracity of his Medicare billings and to support his continued Medicare billings for IVIG treatments, defendant Ahmed caused these test results to be shared with government investigators.

The government's DNA expert will establish that certain of these vials had been mixed. More specifically, the evidence will be that the mixtures often included the blood sera of some of defendant Ahmed's known pemphigus patients, thus demonstrating the purposeful and nefarious aspect of the mixing.

Defendant Ahmed employees will also testify about another project directed by defendant Ahmed, which took place in September 2000. This testimony will concern the fact that defendant Ahmed, after having been served with a subpoena for his records and knowing he was

7

under investigation, purported to have "found" some long-lost letters to the referring physicians of his Medicare pemphigoid patients.  The evidence will show that defendant Ahmed dictated a cover letter to his nurse, Phyllis MacPherson, and directed that she type the letter, sign it and mail the "found" letters to the appropriate persons.  The cover letter, dated September 11, 2000, signed by Phyllis MacPherson, stated as follows:

> I have come across some letters in our office that I believe may not have been mailed out.  There have been some recent changes in personnel in our office and I apologize for the long delay in sending you this letter.

> Please call me at Dr. A. Razzaque Ahmed's Office if you have any questions.  Our office number is 617/738-1040.

> Thank you for your understanding.

At trial, the government will show that defendant Ahmed had previously sent letters to his Medicare pemphigoid patients' referring physicians in which he had thanked the physicians for the referral, described the patients' medical condition and diagnoses (without any mention of pemphigus), and advised that he was going to start the patients on a treatment regimen of IVIG.  The government will contrast these original letters with the so-called "recently found" letters that defendant Ahmed directed his nurse to mail on September 11, 2000.  The evidence will show that the so-called "recently found" letters typically consisted of a so-called "addendum" signed by defendant Ahmed, which purported to update the referring doctors on the fact that the patients had a "dual diagnosis" of pemphigus and pemphigoid -- rather than just pemphigoid as defendant Ahmed had said in his original letters.  These so-called "recently found" letters (1) span a remarkable time frame, from 1996 to 1998, (2) are noteworthy in their similarity, and (3) are inconsistent with a variety of other documents written by the defendant both before and after the dates appearing on the so-called "recently found" letters.  The government will further establish

8

that defendant Ahmed later caused certain of these so-called "recently found" letters to be

submitted to Medicare in support of his claims for reimbursement for IVIG treatments.

      **E.**      <u>**Expert Witnesses**</u>

      The government expects to call two expert witnesses.  One, a dermatologist named Dr.

Russell Hall, is the J. Lamar Callaway Professor of Dermatology at Duke University Medical

School and is the Chief of the Division of Dermatology, Department of Medicine, at Duke

University Medical Center.  Dr. Hall is board-certified in dermatology with a special

certification in Dermatological Immunology and Diagnostic and Laboratory Immunology.  Dr.

Hall is expected to testify about dermatological issues.  Dr. Hall will explain that it is well-

established that pemphigus and pemphigoid are two distinct autoimmune blistering skin diseases.

Dr. Hall will discuss various differences between pemphigus and pemphigoid, including the fact

that pemphigus occurs at the intra-epidermal level of the skin whereas pemphigoid occurs at the

sub-epidermal level.  He will further explain that the established and accepted standard for

diagnosing pemphigus and pemphigoid in the 1990s was through (1) clinical examination, (2)

histological examination of the patient's lesion, and (3) a test called Direct Immunofluorescence,

which involved a different examination of a patient's skin taken near a lesion.

      The other government expert is a DNA expert named Todd Bille, who is expected to

testify about the DNA results of the testing that was done by his former firm, Bode Technology

Group, of various blood sera samples that originated in defendant Ahmed's lab.

### III. STATUTORY BASIS FOR THE OFFENSES CHARGED

#### A. Mail Fraud - 18 U.S.C. §1341

The elements of mail fraud are:

(1)     a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses or representations;

(2)     knowing and willful participation in this scheme with the intent to defraud or to obtain money or property by means of false or fraudulent pretenses or representations; and

(3)     the use of the US mail or private or commercial interstate carrier, on or about the date charged, in furtherance of the scheme.

United States v. Sawyer, 239 F.3d 31, 39-40 (1st Cir. 2001); United States v. Kenrick, 221 F.3d 19, 26-27 (1st Cir. 2000) (en banc). The fact that a defendant believed in good faith in a certain outcome does not provide license for that defendant to make false statements in an attempt to obtain the desired result. See United States v. Mueffelman, 470 F.3d 33, 37 (1st Cir. 2006). Materiality is a jury question. Neder v. United States, 527 U.S. 1, 4 (1999).

Mailings sent via United States Postal Service or via private or commercial interstate carrier all fall within the purview of the mail fraud statute. See 18 U.S.C. § 1341. With respect to the mailings, the government need not prove that the defendant personally used the mails; it is sufficient if the "defendant knew, or could have reasonably foreseen, that 'the use of the mails [would] follow in the ordinary course of business.'" United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (quoting Pereira v. United States, 347 U.S. 1, 9 (1954)). "[I]t is simply the 'use of the mails' in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied." Pimental, 380 F.3d at 589.

The mailing, while it must be in furtherance of the mail fraud scheme, need not itself be an essential element of the scheme so long it is "incident to an essential part of the scheme" or "a step in the plot." Id., at 586 (quoting Schmuck v. United States, 489 U.S. 705, 710-11 (1989)). For the mailings to be considered "in furtherance of the scheme, the scheme's completion or the prevention of its detection must have depended in some way on the mailings." United States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir. 1989) (internal quotations omitted). Letters sent in an attempt to conceal or cover up the fraud or decrease the likelihood of its detection are in furtherance of a scheme to defraud. See Pimental, 380 F.3d 587-88 (collecting cases).

**B.     Health Care Fraud - 18 U.S.C. §1347**

This provision was added to Title 18 by the Health Insurance Portability and Accountability Act of 1996. See United States v. Lauersen, 1999 WL 637237 at *4-*6 (S.D.N.Y. 1999) (upholding constitutionality of the statute).   It provides, pertinent part, that:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice-
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefit items, or services, shall be fined under this title or imprisoned not more than 10 years of both.

"Health care benefit program" is defined as:

> [A]ny public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. §24(b).  Medicare is a health care benefit program.  <u>E.g.</u>, <u>United States v. McGovern</u>,

329 F.3d 327, 328 (1st Cir. 2003).

Within the last few years, the Sixth Circuit recently set forth the elements of 18 U.S.C.

§1347(1) as follows:

> To convict a defendant of health care fraud under 18 U.S.C. §1347, the
> Government must demonstrate that the defendant:  (1) knowingly devised a
> scheme or artifice to defraud a health care benefit program in connection with the
> delivery of or payment for health care benefits, items or services; (2) executed or
> attempted to execute this scheme or artifice to defraud; and (3) acted with intent
> to defraud.  The defendant must have intended, through some deception, "to
> induce another to part with property or to surrender some legal right."

<u>United States v. Raithatha</u>, 368 F.3d 618, 624 (6th Cir. 2004).

A scheme or artifice to defraud is any plan, pattern or course of action including

materially false or fraudulent pretenses or misrepresentations intended to deceive others in order

to obtain something of value.  <u>See</u> <u>United States v. Benjamin</u>, 252 F.2d 1, 5-6 (1st Cir. 2001)

(interpreting 18 U.S.C. §1344(1), the bank fraud statute).

To prove a violation of §1347(2), the Government must prove:

(1)     that the defendant knowingly and willfully devised a scheme or artifice to obtain
        money or property owned by, or under the custody or control of, a health care
        benefit program in connection with the delivery of or payment for health care
        benefits, items or services;

(2)     that the defendant executed or attempted to execute this scheme or artifice by
        means of materially false or fraudulent pretenses, representations or promises; and

(3)     that the defendant acted with an intent to defraud.

<u>E.g.</u>, <u>United States v. Cooper</u>, 283 F.Supp.2d at 1232; <u>see</u> <u>Kenrick</u>, 221 F.3d at 27-29 (stating

comparable elements for violation of 18 U.S.C. §1344(2)).

Under either prong, the operative intent is to deceive a health care program in order to obtain from it money or property. "What is essential is proof of 'a scheme or artifice to defraud,' which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter." United States v. Colton, 231 F.3d 890, 901 (4th Cir. 2000).

Each execution or attempted execution of the charged scheme to defraud constitutes a separate, indictable offense. United States v. Hickman, 331 F.3d 439, 446 (5th Cir. 2003)("the health care fraud statute, § 1347, punishes executions or attempted executions of schemes to defraud, and not simply acts in furtherance of the scheme."). In the bank fraud context, the First Circuit in Brandon has held that "[e]ach time an identifiable sum of money is obtained by a specific fraudulent transaction, there is likely to be a separate execution of the scheme to defraud." United States v. Brandon, 17 F.3d 409, 422 (1st Cir. 1994). Similarly, in the health care fraud context, the Fifth Circuit has held that, where the fraudulent scheme concerns a misrepresentation of services, each fraudulent claim submitted and the receipt of monies resulting from that claim constitutes a new execution of the fraudulent scheme. Hickman, 331 F.3d at 446-47.

C.     **Obstruction of Criminal Investigations of Health Care Offenses -- 18 U.S.C. §1518**

Section 1518 is entitled "Obstruction of criminal investigations of health care offenses," and in pertinent part provides:

> Whoever willfully prevents, obstructs, misleads, delays or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator shall be fined under this title or imprisoned not more than five years, or both.

13

The elements of this offense are:

(1)    that the defendant willfully prevented, obstructed, misled or delayed, or attempted to prevent, obstruct, mislead or delay the communication of information or records;

(2)    that the information or records related to a violation of a Federal health care offense; and

(3)    that the defendant acted in this way to prevent, obstruct, mislead, delay, or attempt to prevent, obstruct, mislead, or delay the communication of such information or records to a criminal investigator.

With respect to the first element, there is limited case law interpreting §1518; however its language appears a bit more flexible than 18 U.S.C. §1505, as it only requires "willful" prevention, obstruction, misleading or delay, as opposed to "corrupt" obstruction or impeding. This statute also specifically refers to communication of information or records, as opposed to section 1505 which focuses on obstructing the "due and proper administration of the law." Finally, any obstruction need not be successful.  United States v. Vixie, 532 F.2d 1277 (9th Cir. 1976).

The second element refers to a "federal health care offense," which is defined in 18 U.S.C. § 24(a).  "Federal health care offenses" include health care fraud in violation of 18 U.S.C. § 1347 and obstruction of a criminal investigation of health care fraud offenses in violation of 18 U.S.C. § 1518.  See 18 U.S.C. § 24(a)(1).  "Federal health care offenses" also include mail fraud in violation of 18 U.S.C. § 1341, if the mail fraud scheme relates to a health care benefit program.[2/]  See 18 U.S.C. § 24(a)(2).

---

[2/]  A "health care benefit program" means any public of private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item or service for which payment may be made under the plan or contract.  18 U.S.C. § 24(b).

Finally, the third element refers to a "criminal investigator."  A "criminal investigator" is defined in 18 U.S.C. § 1518(b) as being "any individual duly authorized by a department, agency, armed force of the United States to conduct or engage in investigations for prosecutions for violations of health care offenses."

**D.    Money Laundering - 18 U.S.C. §1956(a)(1)(A)(i)**

Section 1956(a)(1)(A)(i) in pertinent part:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> with the intent to promote the carrying on of specified unlawful activity. . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

Mail fraud is a specified unlawful activity ("SUA") pursuant to 18 U.S.C. §1956(c)(7)(B).  See 18 U.S.C. § 1961(1).  Health care offenses (which are defined in 18 U.S.C. § 24(a)(1) to include both health care fraud in violation of 18 U.S.C. § 1347 and obstruction of an investigation of a health care offense in violation of 18 U.S.C. § 1518) are also specified unlawful activities.  See 18 U.S.C. §1956(c)(7)(F).

The money laundering charged is defendant Ahmed's use of proceeds of some form of unlawful activity (Medicare fraud) to pay for lab tests at Beutner Laboratories, so that an "independent lab" would opine that the serum samples of defendant Ahmed's Medicare patients did indeed have the "dual diagnosis."  The evidence will show that defendant Ahmed sought to

15

use these blood test results both to continue his receipts of Medicare payments for his

pemphigoid patients and to halt the government's ongoing health care fraud investigation.

Subsequent DNA analyses of these sera samples conducted as part of the ongoing

investigation will show that these sera samples had been mixed with sera from other patients

who were known to be suffering from pemphigus. The evidence will thus establish that, in each

instance, defendant Ahmed, by paying for lab tests involving mixed blood samples, was

promoting both a health care fraud and an obstruction of a health care investigation.

The elements of this money laundering offense are as follows:

- that defendant Ahmed entered into a financial transaction (or transactions), on or about the date alleged, with a financial institution engaged in interstate commerce, see United States v. Peay, 972 F.2d 71, 74 (4th Cir. 1992) (effect on interstate commerce element could be inferred from fact that bank was insured by FDIC);

- that the transaction involved the use of proceeds of unlawful activities, specifically proceeds of the health care fraud scheme;

- that defendant Ahmed knew that these were proceeds of some crime that amounted to a state or federal felony; and

- that defendant Ahmed entered into the transaction (or transactions) with the intent to promote the carrying on of specified unlawful activity.

Writing a check to a vendor is a financial transaction for purposes of the money

laundering statute. United States v. Jackson, 935 F.2d 832, 841 (7th Cir. 1991). "Promote" can

mean to further the prosperity of the criminal enterprise. United States v. Febus, 218 F.3d 784,

789-90 (7th Cir. 2000).

"[T]he defendant need not know exactly what crime generated the funds involved in a

transaction, only that the funds are the proceeds of some kind of crime that is a felony under

Federal or State law." United States v. Isabel, 945 F.2d 1193, 1201 n.13 (1st Cir. 1991) (quoting

S.Rep. No. 433, 99th Cong. 2d Sess. 12 (1986)); see United States v. Corchado-Peralta, 318 F.3d 255, 258 (1st Cir. 2003).  Moreover, the government is not required to specify the predicate offense in the indictment, United States v. McGauley, 279 F.3d 62, 77 n.15 (1st Cir. 2002), or to secure a conviction on the underlying unlawful activity.  United States v. Richard, 234 F.3d 763, 768 (1st Cir. 2000).

Defendants cannot avoid the sanction of money laundering by commingling funds. United States v. Jackson, 983 F.2d 757, 765 (7th Cir. 1993).  Due to fungibility of money, it is sufficient for government to prove that funds in question came from account in which tainted proceeds were commingled with other funds, and it is unnecessary to segregate tainted funds from commingled account.  United States v. English, 92 F.3d 909, 916 (9th Cir. 1996).

## IV.  ANTICIPATED LEGAL ISSUES

### A.     Pending Motions

There are a number of legal issues that have already been framed and briefed for the Court, including a government motion to exclude so-called "happy patient" evidence.  There are a number of other recent motion in limine filings, including motions by the government (1) to preclude reference of a change in Medicare policy in 2002 that extended Medicare coverage for IVIG treatments to patients suffering from pemphigoid and (2) to permit questioning of witnesses about the fact that defendant Ahmed encouraged the witnesses to exercise their Fifth Amendment right not to speak and not to cooperate with the government's investigation.

## B.    Admission of Rule 15 Depositions

The government also seeks to introduce video tapes of trial depositions of three of defendant Ahmed's former patients, Richard Layton, Regina Hartnett and Robert Weiss, and has provided its transcript designations to the Court and the Defendant.

## C.    Evidence Admissible under Fed. R. Evid. 803(4)

Much of the anticipated documentary evidence in this case is expected to be in the form of various medical records pertaining to certain patients.  Some of these medical records were kept and maintained by the Defendant's medical practice; other medical records were kept and maintained by other doctors/hospitals/labs.  While most, if not all, of those documents should be admitted as business records under Fed. R. Evid. 803(6), there is another applicable rule of evidence that will allow for the admission of the substance of the records, regardless of whether the author of those documents is present in court.

Rule 803(4) provides that statements made for purposes of medical diagnosis are not hearsay, even when the declarant is available to testify as a witness.  As set forth in the rule, the following statements (whether oral or in writing) are not hearsay:

> **(4) Statements for purposes of medical diagnosis or treatment.**
> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Fed. R. Evid. 803(4).  Under Rule 803(4), there are three requirements for the admission of out of court statements: "(1) the statements must be made for purposes of diagnosis or treatment (2) about (i) medical history (ii) or past or present symptoms, pain, or sensations or (iii) about the inception or general character of the cause or external source thereof (3) insofar as they are

reasonably pertinent to diagnosis or treatment." Danaipour v. McLarey, 386 F.3d 289, 297 (1st Cir. 2004) (footnote omitted). There is no requirement, either in the text of the Rule, or the case law, that the speaker be the patient himself. Bucci v. Essex Ins. Co., 393 F.3d 285, 298 (1st Cir. 2005).

### D. Documents Received from Third Parties that are Incorporated into Business or Medical Records and Subsequently Relied Upon are Admissible under Fed. R. Evid. 803(6)

The government anticipates introducing various documents (such as biopsy test results and other correspondence) that were (1) received by various treating physicians, including defendant Ahmed, (2) incorporated into patients' medical files, and (3) then relied upon by various physicians, including defendant Ahmed. As discussed above, many of these documents are admissible under Fed. R. Evid. 803(4). In addition, such evidence is admissible under Fed. R. Evid. 803(6).

Courts have generally recognized that documents prepared by a third party is properly admitted as part of a separate business entity's records if the business integrated the documents into its records and relied upon them. See generally Air Land Forwarders v. United States, 177 F.3d 1338, 1342-44 (Fed. Cir. 1999) (collecting cases). This is true even though the business receiving the documents in question was not the maker of the records and cannot testify about the circumstances surrounding the preparation of the documents in question. See, e.g., United States v. Childs, 5 F.3d 1328, 1333 (9th Cir. 1993) ("[s]everal circuits have held that exhibits can be admitted as business records of an entity, even when that entity was not the maker of those records, so long as the other requirements of Rule 803(6) are met and the circumstances indicate the records are trustworthy) (collecting cases).

19

In <u>United States v. Doe</u>, 960 F.2d 221, 223 (1st Cir. 1992), the First Circuit adopted this view. In <u>Doe</u>, the defendant challenged the admission of an invoice received by a Massachusetts sports shop owner from a South Carolina telemarketing firm. Upholding the document's admission, the First Circuit rejected the defendant's argument that the South Carolina invoice was inadmissible via the Massachusetts sports shop owner because the invoice had been prepared by a different business. Instead, the First Circuit held that the evidence, which established that the invoice had been (1) received by the Massachusetts sports shop owner, (2) relied upon by the Massachusetts sports shop owner, and (3) integrated into the Massachusetts sports shop owner's business records, was sufficient to warrant admission under Fed. R. Evid. 803(6). <u>Id.</u>, at 223; <u>accord</u> <u>United States v. Jakobetz</u>, 955 F.2d 786, 801 (2d Cir. 1992); <u>United States v. Parker</u>, 749 F.2d 628, 633 (11th Cir. 1984); <u>United States v. Sokolow</u>, 91 F.3d 396, 403 (3d Cir. 1996); <u>United States v. Ullrich</u>, 580 F.2d 765, 771-72 (5th Cir. 1978).

**E.    Fed. R. Evid. 803(7) and Absence of Record of Entry in Records of Regularly Conducted Activities**

The government anticipates introducing evidence pertaining to the fact that certain information was not found in the patients records of defendant Ahmed's Medicare patients whom defendant Ahmed asserted were suffering from both pemphigoid and pemphigus. The government may also seek to introduce evidence that certain testing information was not found in the laboratory notebooks kept and maintained in defendant Ahmed's laboratory.

Evidence that certain material not contained within normally maintained business records is admissible to establish the nonoccurrence or nonexistence of such material. <u>See</u>, <u>e.g.</u>, <u>United States v. Munoz-Franco</u>, 487 F.3d 25, 39 (1st Cir. 2007). Such evidence is likely not hearsay at all, <u>see</u> <u>id.</u>, at 39 n.11 (citing <u>United States v. Cervantes-Flores</u>, 421 F.3d 825, 832 n. 4 (9th Cir.

2005) ("evidence that a record does not exist arguably is not hearsay at all"); in any event, it is

admissible under Rule 803(7) of the Federal Rules of Evidence.  See Munoz-Franco, 487 F.3d at

39.  Federal Rule of Evidence 803(7) states that the rule against hearsay does not exclude

> [e]vidence that a matter is not included in the ... records ... kept in accordance
> with the provisions of [Fed.R.Evid. 803(6) ], to prove the nonoccurrence or
> nonexistence of the matter, if the matter was of a kind of which a ... record ... was
> regularly made and preserved, unless the sources of information or other
> circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(7).  The Advisory Committee Note to Rule 803(7) also states that the "[f]ailure

of a record to mention a matter which would ordinarily be mentioned is satisfactory evidence of

its nonexistence."  As Professor Wigmore has explained:

> When a book purports to contain all items transacted within the scope of the
> book's subject, the absence of an entry of transaction of a specific purport is in
> plain implication a statement by the maker of the book that no such transaction
> was had. The psychology of it is the same as that of testimony on the stand by a
> person who denies that a sound took place in his presence because he heard no
> such sound. The practical reliability of it is shown by every day's practice in every
> business house. All industry and commerce is daily conducted on the negative as
> well as on the affirmative showings of the regular books of entry.

5 J. Wigmore, Evidence § 1531 (Chadbourn ed. 1974).

The absence of certain tests or diagnoses from a regularly maintained medical record or

laboratory notebook is admissible under this rule.  See, e.g., Candelaria v. Coughlin, 1997 WL

796148, *2 (2nd Cir. 1997) ("Trustworthy records of regularly conducted activity, including

events or diagnoses, are admissible evidence in court, in any form, see Fed.R.Evid. 803(6);

United States v. Mendel, 746 F.2d 155, 166 (2d Cir.1984), as are records introduced to show the

absence of an event or diagnosis, see Fed. R. Evid. 803(7)").

**F.**    **Fed. R. Evid. 801(d)(2)(C), 801(d)(2)(D) and Statements Made by Nurses Working in Defendant Ahmed's Infusion Suite**

The government anticipates that one or more employees of Evocare will testify that one or more nurses working in defendant Ahmed's infusion suite regularly communicated patients' diagnoses to Evocare on defendant Ahmed's behalf. The evidence will establish that the Evocare employees needed to know from defendant Ahmed what diagnoses to list on his patients' Medicare reimbursement claims forms. The government anticipates that, with respect to certain Medicare patients whom defendant Ahmed previously diagnosed as having only pemphigoid, the Evocare employees will testify that, at subsequent times, the infusion suite nurses advised them that defendant Ahmed said that these patients also had a diagnosis of pemphigus.

This anticipated testimony will be admissible on several grounds. As an initial matter, the government expects to prove -- through other documents and witness testimony -- that the pemphigus diagnoses being communicated to Evocare were false and were being communicated to Evocare solely for the purpose of causing Evocare to submit claims for reimbursement for IVIg treatments that would not otherwise be allowed by Medicare. As such, the statements are not hearsay and are admissible. See, e.g., United States v. Munson, 819 F.2d 337, 339-40 (1st Cir. 1987) (false statements made by others not hearsay).

Moreover, the statements made by the nurses working in the infusion suite are admissible, both pursuant to Fed. R. Evid. 801(d)(1)(C) and pursuant to Fed. R. Evid. 801(d)(2)(D). Pursuant to Rule 801(d)(2)(C) of the Federal Rules of Evidence, a statement is not hearsay if it is offered against a party and is "a statement made by a person authorized by the party to make a statement concerning the subject." Similarly, Rule 801(d)(1)(D) provides that a

statement is not hearsay if offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Admissibility under these two provisions is governed not by the trustworthiness of the statement, but rather either by (1) evidence that the statements had been authorized by the principal, or (2) by the existence and scope of the principal-agent relationship as determined under the common law of agency. See Sabel v. Mead Johnson & Co., 737 F.Supp. 135, 138 (D. Mass. 1990) (Wolf, J.) (citing 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 801(d)(2)(C)[01], at 801-210, ¶ 801(d)(2)(D) [01], at 801-221 (1987)).

Here, the government anticipates that the evidence will support both inquiries. First, the evidence will show that the infusion suite nurses claimed to be speaking at the request of, and at the direction of, defendant Ahmed. The evidence will further establish that the infusion nurses advised the Evocare employees that the information that they were communicating came from defendant Ahmed. As such, this testimony will be admissible pursuant to Fed. R. Evid. 801(d)(1)(C). Second, the evidence will show that the infusion suite nurses were charged with the responsibility of administering IVIg treatments to the defendant's patients and that they acted strictly at the defendant's behest while working at the infusion suite. As such, their statements to Evocare employees concerning the patients' purported diagnoses concerning the administration of IVIg treatments were matters "within the scope of their agency relationship" and were "made during the existence of the relationship" as required by Rule 801(d)(1)(D). See, e.g., United States v. Agne, 214 F.3d 47, 54-55 (1st Cir. 2000); Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995); see also Beck v. Haik, 377 F.3d 624, 639-40 (6th Cir. 2004) (statements made by consultant to county dealing directly with subject matter of contractual

arrangement with county and expressed during the course of that relationship are admissible against county) (collecting cases).[3/]

###    G.    Self-Authenticating Public Records

The government anticipates introducing various public records pursuant to Rule 803(8)(A), including, *inter alia,* the articles of incorporation for the Center of Blistering Diseases (formerly known as Blistering Diseases Treatment Center, Inc.); defendant Ahmed's Medicare provider agreement; various documents submitted to Medicare, including reimbursement claims submitted on defendant's behalf; and copies of various Medicare reimbursement policies. The government anticipates that the articles of incorporation, defendant Ahmed's Medicare provider agreement, and the various documents submitted to Medicare will be self-authenticating pursuant to either Fed. R. Evid. 902(1) (domestic public documents under seal) or Fed. R. Evid. 902(2) (domestic public documents not under seal). The various Medicare reimbursement polices, which were communicated to health care providers via newsletter, will be self-authenticating pursuant to Fed. R. Evid. 902(5) (official publications).

---

[3/] The fact that the nurses were, at one time, employed by Evocare and assigned to work at the infusion suite under the defendant's direction and only later were employed directly by defendant Ahmed does not change the analysis. In evaluating the agency relationship, the primary inquiry is the issue of control -- i.e., is there adequate evidence that the principal exercised control over the speaker. See Sabel, 737 F. Supp. at 138. The issue of who paid for the individual's services "is relevant only to the extent that it bears on the issue of control." Id.; cf. Maynard v. Kenova Chemical Co., 626 F.2d 359, 361 (4th Cir. 1980) (citing to Restatement (Second) of Agency s 227 (1958) and observing that under certain circumstances "an employee directed or permitted to perform services for another 'special' employer may become that employer's employee while performing those services"); Alfonso v. City of Boston, 587 F. Supp. 1342, 1346-47 (D. Mass. 1984) (Keeton, J.) (recognizing that, under the "borrowed servant" doctrine, individuals may be viewed as employees of two different employers, and that the determining issue is control, not who employs or pays the employee). The evidence at trial will show that the infusion suite nurses worked entirely at the direction and control of defendant Ahmed with respect to matters involving patient care in the infusion suite.

H.     **Summary Witnesses/Summaries Under Rule 1006**

Certain witnesses, including possibly government agents, may testify about summaries of

Medicare claims, billing, payment and profit information, as well as about substantive aspects of

the investigation.  The United States will offer, pursuant to Rule 1006, one or more charts

summarizing voluminous Medicare claim records produced by Medicare and one or more charts

summarizing voluminous Medicare payment information produced both by Medicare and by

defendant Ahmed.

Rule 1006 of the Federal Rules of Evidence governs admission of summary exhibits:

> The contents of voluminous writings, recordings, or photographs
> which cannot conveniently be examined in court may be presented
> in the form of a chart, summary, or calculation. The originals, or
> duplicates, shall be made available for examination or copying, or
> both, by other parties at reasonable time and place. The court may
> order that they be produced in court.

Rule 1006, on its face, indicates that the summary of voluminous records is to be admitted in

place of such records.  See Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1,

7 (1st Cir. 1996) (". . . the evidence underlying Rule 1006 summaries need not be admitted into

evidence. . .").  However, as the First Circuit recently held, "summaries that are otherwise

admissible under Rule 1006 are not rendered inadmissible because the underlying documents

have been admitted, in whole or in part, into evidence."  United States v. Milkiewicz, 470 F.3d

390, 396 (1st Cir. 2006).  In Milkiewicz, the First Circuit observed that "while in most cases a

Rule 1006 chart will be the only evidence the fact finder will examine concerning a voluminous

set of documents, in other instances the summary may be admitted *in addition* to the underlying

documents to provide the jury with easier access to the relevant information." Id., at 396-97

(internal citations omitted; emphasis in original).

25

The United States has produced or made available all of the underlying voluminous documents upon which any summaries are based. The United States also will disclose any summary exhibits it intends to introduce at trial with counsel for defendant reasonably in advance of seeking admission of such exhibits.

### I.     Summary Charts as Pedagogical Aids

In Milkiewicz, the First Circuit also acknowledged that a second form of summary exhibit -- a pedagogical aid -- may be admissible at trial pursuant to Fed. R. Evid. 611(a) and/or Fed. R. Evid. 703. "A pedagogical aid that is allowed under Rule 611(a) to illustrate or clarify a party's position, or allowed under Rule 703 to assist expert testimony, may be less neutral in its presentation." Id., at 398. Although such aids may be "more akin to argument than evidence" and may, to some extent reflect "inferences and conclusions drawn from the underlying evidence," they may also be admitted in evidence provided that they are sufficiently accurate and reliable. See id.

### J.     Keepers of Records

The Keepers of Records fall into a number of categories: medical institutions/practices where defendant Ahmed's patients were treated; testing laboratories, banks, and other miscellaneous entities (such as the videographer hired by defendant Ahmed to videotape his annual patient support group meeting). As often as available, the United States will provide the defendant with affidavits of record keepers pursuant to Fed. R. Evid. 902(11). However, the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004) calls into doubt the viability of Rule 902(11). In an unreported decision, a district court in Kansas concluded that the procedures of Rule 902(11) do not survive Crawford. See United States v. Wittig, 2005 WL

1227790 *2 (D. Kan. 2005).  To the extent that the parties do not stipulate to the authenticity of certain of these records and their status as business records, the United States urges that such keeper of record testimony not serve as platform for digression.   Even the court in <u>Wittig</u> recognized as much:

> The Court cautions the defendants that although the government will be required to admit documents through live witnesses, rather than by use of the Rule 902(11) procedure, the Rules of Evidence shall be enforced in defendants' upcoming trial. Particularly, the Court reminds the defendants of Fed.R.Evid. 611(b), which states in relevant part: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."  . . .  This rule will be strictly enforced, and only cross examination on the matters testified will be allowed. Cross examination on "matters affecting the credibility of the witness," means matters affecting the credibility of the witness in their capacity as a custodian of records, not their credibility on other matters that they have not testified to on direct examination. Violations of this well-known edict will result in appropriate sanctions to deter such misconduct.

<u>United States v. Wittig</u>, 2005 WL 1227790, 3 (D.Kan. 2005) (footnote omitted).

Finally, with respect to the Keeper of Records' testimony, the government notes that the First Circuit has held that, for purposes of being a proper custodian of records, "it is well established that the witness need not be the person who actually prepared the record."  <u>Wallace Motor Sales, Inc. v. American Motors Sales Corp.</u>, 780 F.2d 1049, 1061 (1st Cir. 1985).

**K.**     **Rule 17(c) Subpoenas**

Lastly, the United States has served a number of witnesses with Rule 17(c) subpoenas, some of them seeking production of documents.  As these documents are produced to the United States, they have been produced to the Defendant.  The United States believes that the Defendant is also using Rule 17(c) subpoenas, and submits that as a matter of fairness, when either party invokes this court process, any documents produced in response be promptly shared.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:     /s/ James E. Arnold
JEREMY M. STERNBERG
JAMES E. ARNOLD
Assistant United States Attorneys
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3142/(617) 748-3603

October 19, 2007

<u>Certificate of Service</u>

I hereby certify that the foregoing document(s) filed through the ECF system will be sent electronically to counsel for defendant, who is a registered participant as identified on the Notice of Electronic Filing (NEF):

Richard M. Egbert
Law Offices of Richard M. Egbert
99 Summer Street
Suite 1800
Boston, MA 02110.


Dated: October 19, 2007

/s/ James E. Arnold
James E. Arnold
Assistant U.S. Attorney

29