# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 05-10057-RCL |
| v.  ) | |
| ) | |
| ABDUL RAZZAQUE AHMED, ) | |
| ) | |
| Defendant  ) | |

## DEFENDANT'S OPPOSITION TO GOVERNMENT'S
## PROPOSED OFFER OF 404(b) EVIDENCE

The government should not be permitted to offer evidence of the three alleged incidents of "misconduct" which it has attempted to disclose pursuant to Rule of Evidence 404(b). The alleged incidents are not admissible against the defendant, Dr. A. Razzaque Ahmed, for three distinct reasons. First, and most importantly, Dr. Ahmed did not engage in the misconduct alleged by the government in its disclosure. Second, the government's disclosure is too vague and does not meet the standard of admissibility set by Rule 404(b). Third, even if the government's offer were accurate and adequate, these alleged instances of misconduct would not be probative evidence, and would improperly prejudice, mislead, and confuse the jury. For all of these reasons, the government should be barred from presenting its alleged Rule 404(b) evidence.

**A.     The Government's Own Documents Establish That Dr. Ahmed Did Not Engage In the Acts of Misconduct It Seeks to Admit Into Evidence.**

Documents that the government has produced to the defense show that Dr. Ahmed did not engage in the conduct which the government claims he engaged in at UCLA and BU.

1.    **Dr. Ahmed's Alleged Misconduct at UCLA Medical Center in 1982/1983**

The government misleadingly claims that Dr. Ahmed engaged in three types of misconduct while he was an associate professor at UCLA. Specifically, the government's Rule 404(b) disclosure claims that Dr. Ahmed was subject to "an independent investigation" of the following allegations: (1) defrauding Medi-Cal; (2) fraudulently ordering laboratory tests on patients who did not require them; and (3) submitting articles to scholarly journals before completion of the experiments referenced in the articles, submitting the articles without informing the co-authors, and double submitting the same article to multiple journals. Government's Disclosure of Fed. R. Evid. 404(b) Evidence ("Gov't 404(b) Disclosure") at 1. It then erroneously claims that each of these allegations "was confirmed through independent investigation by Dr. Jordon of the University of Texas." *Id.*

The government's description of the investigation conducted by Dr. Jordon is completely inaccurate, and, most importantly, it grossly mischaracterizes his conclusions. Attached as Exhibit A to this memorandum is a copy of the letter that Dr. Robert Jordon wrote at the conclusion of his independent investigation into allegations that had been made against Dr. Ahmed. This letter was produced to the defense by the government, and is bates numbered JOR00041-43. Nowhere in the letter does Dr. Jordon conclude that Dr. Ahmed defrauded Medi-Cal. As to Dr. Ahmed's lab testing procedures, Dr. Jordon's major conclusion is that "Dr. Ahmed is competent" and is "capable of functioning effectively as the director" of the diagnostic immunfluoresence laboratory. Ex. A at 1. While Dr. Jordon acknowledges that Dr. Ahmed may have ordered certain tests when there was no clinical indication for them, Dr. Jordon concludes that the real problem is that UCLA's Division of Dermatology lacks guidelines regarding the proper performance and subsequent billing of those tests. He also notes that this lack of adequate guidelines "is not new and not confined to the UCLA Medical Center." Finally, Dr.

2

Jordon makes no definitive findings regarding the charges that Dr. Ahmed engaged in misconduct in the publication of articles. Dr. Jordon's letter notes that there "apparently have been double submissions of work to two journals simultaneously" and "submission of work before proper completion of experiments". Ex. A at 2. However, he again concludes that the real problem is that UCLA has provided Dr. Ahmed with insufficient guidance on the medical community's practices regarding research and publication. He therefore recommends that UCLA "establish a peer review mechanism for Dr. Ahmed's work. He definitely needs a mentor of some sort who will help give him direction and guidance." Ex. A at 2. At worst, Dr. Jordon's findings indicate that Dr. Ahmed was a young researcher who did not understand how to craft a properly focused research program. Nothing in Dr. Jordon's letter comes close to supporting the claim by the government that Dr. Ahmed had engaged in "fraudulent" research practices. Gov't 404(b) Disclosure at 1.

The conclusion that Dr. Jordan found no serious wrong-doing by Dr. Ahmed is further supported by two letters that Dr. Jordan wrote on Dr. Ahmed's behalf after he completed his investigation. First, in a letter to Dr. Harley A. Haynes at Brigham and Women's Hospital, Dr. Jordan summarizes the findings of his investigation as follows:

> Although I was somewhat surprised to learn that Dr Ahmed has had difficulties passing his American Board exam, I could find no deficiency in his handling of patients nor in his interpretation of immunofluoresence slides. Thus, the charges of incompetence were totally unfounded.

> The issues that I uncovered were extremely complicated. Most of the problems revolved around personal issues which have no bearing upon Dr. Ahmed's professional abilities. Although allegations regarding his research were made, these were investigated by an in-house team who found no irregularities. Dr. Ahmed has made contributions to our understanding of bullous skin diseases … . His expertise in the area of immunology should be an asset for your group.

Exhibit B. Dr. Jordon also wrote a letter to Dr. Edmond Yunis of the Dana Farber Cancer Institute regarding Dr. Ahmed in which he characterized his findings as follows:

3

... I found that Dr. Ahmed was competent to perform diagnostic immunofluoresence procedures. I also found that his techniques, appropriate controls, etc., were in order. I also found that he was competent to see and evaluate patients with bullous skin diseases and manage their care. I found that his research program was somewhat diffuse, unfocused, and many of his contributions had little impact on our understanding of mechanisms of bullous skin diseases. Some of the contributions, however, were important, such as the HLA studies in pemphigus. The problem is, Dr. Ahmed had little training to carry those studies any further. There were several double submissions of work to more than one journal, and at times, submission of work before proper completion of experiments. ... **In none of these situations did I find any evidence of fraud or fabrication of data, however.** In speaking with various investigators at the institution, all of the work was performed and results obtained and recorded were the same as those that were reported.

In essence, I left UCLA with the impression that somebody (a technician and a faculty member) were out to destroy Dr. Ahmed's credibility.

Ex. B (emphasis added). Both of these letters by Dr. Jordon demonstrate that his investigation did not lead him to harbor any serious concerns about Dr. Ahmed's conduct as a diagnostician or as a researcher. Again, the government has both of these letters, and its failure to reference or distinguish them in its 404(b) disclosure shows that the government's allegations lack probative value and that they are unfairly prejudicial.

In addition to the conclusions reached by Dr. Jordon, a separate investigation into Dr. Ahmed's conduct carried out by Dr. Kenneth Shine, the Executive Chairman of UCLA's Department of Medicine also exonerated Dr. Ahmed. After detailing his investigation into claims made against Dr. Ahmed, Dr. Shine concludes: "the charges of unethical research which have been brought by Mr. Caputo and Dr. Chalet [against Dr. Ahmed] strike me as so careless and vindictive as to question their motivation in this matter." Ex. C. This document was also provided to the defense by the government.

In sum, none of the available evidence supports the conclusion that Dr. Jordon's investigation uncovered any fraudulent acts by Dr. Ahmed. To the contrary, the evidence shows Dr, Jordon explicitly determined that Dr. Ahmed did <u>not</u> engage in fraud.

### 2.    Dr. Ahmed's Alleged Misconduct at Boston University

The government misleadingly states that in 1995, a Board of Investigation ("BOI") appointed by Boston University "found Dr. Ahmed (and his colleague Dr. Bohl) guilty of scientific misconduct... ." Gov't 404(b) Disclosure at 1.    The government's disclosure conveniently ignores the fact that in a subsequent review of the BOI's Investigation by the U.S. Department of Health and Human Services' Office of Research Integrity, the Office of Research Integrity found that the evidence did <u>not</u> support a finding of scientific misconduct under the U.S. Public Health Service's standards.  The investigation by the BOI, and subsequently the Office of Research Integrity, centered on whether Dr. Ahmed, Dr. Kailash Bohl, and Dr. Abeezar Sarela had submitted a mislabeled photograph as part of a grant application to the National Institutes of Health ("NIH").  After reviewing the evidence that had been presented to the BOI, the government's own Office of Research Integrity's Division of Research Investigations ("DRI") concluded that:

> ... In every case, the [BOI's] findings depend on the credibility of the testimony, which is often contradicted and unsubstantiated.

> Given the multiple persons involved in the admittedly last-minute preparation for the submission of supplementary material, DRI finds it plausible that errors and oversights in handling the materials may have occurred, which would constitute honest                                                                                           error.

> DRI agrees that the submission of falsified micrographs to NIH would be an act of scientific misconduct.  However, there is insufficient evidence for [the Office of Research Integrity] to go forward with a finding of scientific misconduct in this case.

Exhibit D.    Therefore, the government's claim that Dr. Ahmed was "guilty" of scientific misconduct is directly contradicted by the express written findings of the Department of Health and Human Services' Office of Research Integrity.  Again, these findings are contained in documents that the government itself provided to the defense.

**B.    Even If the Government's Allegations of Misconduct Were True, the
Government's 404(b) Disclosure Is Inadequate.**

The government's cursory and unsupported Rule 404(b) disclosure does not satisfy its

obligation to offer some proof of the alleged prior bad acts before seeking to admit them at trial.

The government is not permitted to "parade past the jury a litany of potentially prejudicial

similar acts that have been established or connected to the defendant only by unsubstantiated

innuendo." *Huddleston v. United States*, 485 U.S. 681, 689 (1988).  Instead, before prior bad

acts evidence may be admitted, there must be a showing that "the jury can reasonably conclude

that the act occurred and that the defendant was the actor." *Id.*; *see also United States v.

DeCicco*, 370 F.3d 206 (1st Cir. 2004) (affirming and applying the *Huddleston* standard).  The

government's disclosure is completely lacking any evidentiary support, and, as is discussed

above, the available evidence establishes that the government's allegations are actually false.

The government's "disclosure" that Dr. Ahmed allegedly instructed "one or more" grand

jury witnesses to assert the Fifth Amendment is even more inadequate.  Gov't 404(b) Disclosure

at 2.  The government's disclosure fails to specify who Dr. Ahmed allegedly instructed to assert

the Fifth Amendment, it provides no information about the circumstances under which Dr.

Ahmed allegedly gave such an instruction, and it even leaves ambiguous how many people Dr.

Ahmed allegedly spoke to about asserting the Fifth Amendment.  As a result, Dr. Ahmed is left

with no way to test or to challenge the government's assertion that he gave such an instruction.

Moreover, even if the government could establish that Dr. Ahmed advised a witness

regarding his Fifth Amendment rights, that, by itself, does not establish that Dr. Ahmed

committed a wrongful act.  The Supreme Court has made clear that the Fifth Amendment

"protects the innocent as well as the guilty," and therefore merely telling a witness that he or she

may assert the Fifth Amendment cannot be wrongful act.  *Ohio v. Reiner*, 532 U.S. 17, 18

(2001).  The law is clear that it is only when a person threatens, pressures, or coerces a witness

6

into asserting the Fifth Amendment with a "corrupt motive" that the behavior is wrongful. *See, e.g., United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir. 1987) (finding defendant participated in a scheme to envelop the witness "in pressure and intimidation so as to forestall any cooperation on his part with the grand jury").

The government's disclosure is devoid of any factual recitation that would allow the Court to determine whether the government can show that Dr. Ahmed acted with a "corrupt motive" or with some coercive power when he allegedly discussed the Fifth Amendment with grand jury witnesses. The government gives no indication of what relationship Dr. Ahmed had these with these individuals; it does not state whether these individuals had retained legal counsel when Dr. Ahmed allegedly spoke to them; it does not disclose whether these individuals were potential targets or just witnesses; and it does not explain anything about the tone or context of the alleged conversations. For example, it is possible that these witnesses asked Dr. Ahmed what advice he had received from his own attorney about how to respond to the government's investigation. Nothing in the government's disclosure supports the conclusion that Dr. Ahmed acted with the requisite corrupt motive and threatened, pressured, or otherwise sought to coerce a witness into asserting the Fifth Amendment.    Lacking any evidentiary foundation, the government's prior bad act allegations may not be admitted.

**C.     Even If the Government's Allegations of Misconduct Were True, They Are Not Probative, Admissible Evidence Under Rules 403 and 404(b).**

The three categories of alleged misconduct outlined by the government do not meet the requirements for relevance under the Rules of Evidence. "A district court may admit evidence of a defendant's other bad acts only if that evidence meets the requirements of both Rule 404(b) and Rule 403." *United States v. Tse*, 375 F.3d 148, 155 (1st Cir. 2004).  Evidence is admissible under Rule 404(b) only if it has "special relevance to an issue in the case" and it does "not include bad character or propensity as a necessary link in the inferential chain." *Id.* Rule 404(b)

7

only allows admission of prior bad acts evidence if it will help establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." At the same time, Rule 404(b) forbids evidence which will create an unacceptable risk that a jury will convict the defendant either based on wrongful conduct that was not included in the indictment or based on its impression that the defendant is a "bad person" and deserves punishment. *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982). To determine whether evidence is admissible under these principles, a court must examine "the remoteness in time of the other act and the degree of resemblance to the crime charged." *United States v. Varoudakis*, 233 F.3d 113, 119 (1st Cir. 2000) (citation and quotation omitted).

The government has not, nor can it, make any argument establishing that the wrongful conduct Dr. Ahmed allegedly carried out at BU and UCLA will help to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." None of the alleged prior misconduct involves providing a false diagnosis to Medicare in order to obtain improper reimbursement for medical treatment, and all of the conduct alleged occurred well before the fraud alleged in this case. Instead, the government's effort to introduce the alleged misconduct at UCLA and at BU appears to be an effort to smear Dr. Ahmed's character and to present him as a dishonest, "bad person." This tactic is strictly forbidden by Rule 404(b). *United States v. Arias-Montoya*, 967 F.2d 708, 709 (1st Cir. 1992) (Rule 404(b) imposes an "absolute bar" to admissibility of prior bad acts where only purpose it show bad character); *United States v. Burke*, 948 F.2d 23, 26 (1st Cir. 1991) (it was error to admit prior bad act evidence that had "no legitimate purpose" and merely served to show defendant had a bad character).

Moreover, all three categories of misconduct identified by the Government's 404(b) Disclosure threaten to mislead and confuse the jury as to what is at issue in this complex

Medicare fraud trial. In this case, the jury will be asked to resolve a host of complicated questions, including: whether certain patients treated by Dr. Ahmed were properly diagnosed as suffering from a skin blistering disease called pemphigus or whether they "merely" suffered from a skin blistering disease called pemphigoid; whether Dr. Ahmed improperly submitted a diagnosis of pemphigus for his patients to Medicare to obtain reimbursement for the patients' intravenous immunoglobulin treatments; whether Dr. Ahmed's records reflecting his diagnosis of pemphigus are bogus and constitute mail fraud; and whether Dr. Ahmed committed money laundering. All of these issues will be hotly contested. The government's attempt to bloat the trial by launching subsidiary mini-trials as to whether Dr. Ahmed committed completely unrelated misconduct at BU and UCLA or whether Dr. Ahmed corruptly pressured witnesses to assert the Fifth Amendment will only serve to confuse and mislead the jury as to the real issues to be decided. Such confusion of the trial issues with irrelevant matters is forbidden by Rule 403.

<div style="margin-left:40%">

Respectfully submitted,
**Dr. Abdul Razzaque Ahmed,**
By his attorney,

 /s/ Richard M. Egbert
Richard M. Egbert
99 Summer Street
Boston, MA 02110
(617) 737-8222

</div>

Dated: October 26, 2007

### Certificate of Service

I, Richard M. Egbert, hereby certify that I have, on this 26th day of October, 2007, caused the above document to be electronically served upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

<div style="margin-left:40%">

 /s/ Richard M. Egbert
Richard M. Egbert

</div>


Medical
School

Department of
Dermatology



The University
of Texas
Health Science Center
at Houston

(713) 792-5115

Robert E. Jordon, M.D.
Professor and Chairman
Department of Dermatology
6431 Fannin, MSMB 1.202
Houston, Texas 77030

May 31, 1983

Kenneth I. Shine, M.D.
Professor and Chairman
Department of Medicine
UCLA Medical Center
Los Angeles, California
90024

Dear Doctor Shine,

I am sorry that I did not have the opportunity to meet with you following
my assessment of the unfortunate situation within the Dermatology Division
at UCLA. The situation is much more complicated than I had first antici-
pated, as it seems that everyone within the Division of Dermatology has
taken sides upon the issue, including secretaries, technicians, residents
and faculty. Although I can offer no permanent solution, I hope that I
have been able to sort out some of the major issues involved. I have in-
formally discussed some of my findings with both Dr. Adams and Dr. Reisner.

I was somewhat surprised to find out that Dr. Ahmed is not a diplomate of
the American Board of Dermatology. Although such boards are not necessary
for the practice of dermatology, they are required for promotion in most
academic institutions. In addition, the American Board of Dermatology will
in the near future be offering certification of special competence in
cutaneous immunopathology. A requirement for certification of such compe-
tence will include passage of the American Board of Dermatology examination.
Thus, I believe it is imperative that Dr. Ahmed pass the American Board of
Dermatology examination. As it turns out, the absence of Dermatology Board
certification will have great bearing upon this whole unfortunate situation.

As far as diagnostic immunofluorescence is concerned, Dr. Ahmed is competent.
He fully appreciates the indications for such testing and the immunopathologic
findings associated with the various disease states. He fully understands
the techniques involved and utilizes the appropriate controls in the various
test procedures. He is then capable of functioning effectively as the director
of that laboratory. The major problem, however, is that he has lost the
confidence of his two technicians, Mrs. Forstall and Mr. Caputo. Both of these
individuals I view as very competent technicians, and to a certain extent
their allegations are not without foundation. For example, multiple tests

JOR00041

Kenneth I. Shine, M.D.
May 31, 1983
Page -2-

had been ordered on serologically negative patients, whereas one or two tests per year would suffice. Anti-SSA (Ro) antibodies were ordered upon bullous disease patients when 1) the tests were not available in Dr. Ahmed's lab, and 2) there was no clinical indication for such tests. An additional complication is that the patients were charged for the tests and some of them through "Medical". As far as I can tell, results of these tests were to be used for research purposes. In addition, the Dermatology residents have pointed out that bone marrows were performed upon bullous disease patients (I do not know if patients were charged for the procedure) in order to obtain lymphocytes for experimental purposes. If this is the case, such actions by Dr. Ahmed are inappropriate. I believe that the Division of Dermatology should establish some guidelines regarding the performance and subsequent charge for such testing. Certainly this problem is not new and not confined to the UCLA Medical Center. In addition to being competent in immunofluorescence, I find that Dr. Ahmed is also clinically competent, particularly in the care of patients with bullous skin diseases. I am afraid, however, that both residents and faculty have lost confidence in his clinical abilities, again because he has failed to pass the American Board of Dermatology examination.

Dr. Ahmed's research program also appears to be the subject of considerable controversy. Several of the faculty members question the validity of his work. There apparently have been double submissions of work to two journals simultaneously, submission of work before proper completion of experiments, etc. This has been pointed out to me by several individuals who have collaberated with Dr. Ahmed, many of whom will no longer work with him. My own view is that his research program is very diffuse, totally unfocused, and most of the contributions have little impact on our understanding of mechanisms in bullous skin diseases.

If I were to pinpoint the key problem underlying this whole situation, it would be that 1) Dr. Ahmed does not have American Board certification, and 2) he is trying desperately to be promoted to Associate Professor with tenure. This will explain the number of publications submitted, the duplicate submissions, and the fact that Dr. Ahmed sees this as his only chance for promotion. Obviously, he needs some help in establishing better goals. I have discussed this one facet with Dr. Reisner and he would concur with my interpretation.

Based upon what I learned, I would recommend the following: 1) If at all possible, the Department of Pathology should transfer the two technicians elsewhere. I believe both are competent, and as I stated earlier, some of their allegations are not without foundation. 2) Dr. Ahmed should be encouraged to discontinue paper writing for the time being and concentrate upon passing the American Board of Dermatology exam. This would reestablish his credibility with residents, faculty, etc. I would also hold his promotion until such time as he passes that examination. In addition, he will need such board certification for future certification in cutaneous immunopathology. 3) Either the Department of Medicine or the Division of Dermatology should establish a peer review mechanism for Dr. Ahmed's work. He definitely needs a mentor of some sort who will help give him direction and guidance. He also should be required to prepare research protocols for post doctorate fellows and should be required to focus his research on one or two key problems.

JOR00042

Kenneth I. Shine, M.D.
May 31, 1983
Page -3-

I do not believe Dr. Ahmed should be allowed to train post doctorate fellows until such time as such protocols are reviewed. In addition, some time sequence should be established for submission of an NIH grant if Dr. Ahmed is to continue his research program. Although he may not receive NIH funds, at least his research program would undergo the type of peer review it should receive. 4) Interrelationships with residents, faculty and former collaberators are at a low. If Dr. Ahmed is to continue at UCLA, he will need to work hard to reestablish good relations and confidence with faculty, nurses, housestaff, technicians, etc. Obviously, he should be encouraged to do so.

As I stated at the beginning, I wish that we had had the opportunity to discuss these things in person. I do not know if I have covered all of the facets of this problem. There are no quick solutions. Dr. Ahmed is still relatively young, however; there is plenty of time for him to change direction and to reestablish his credibility. The decision, however, will primarily be his.

I hope that this has been helpful to you. If you have any questions, please feel free to contact me. I have enclosed the list of my expenses. Best regards.

Sincerely yours,

Robert E. Jordan, M.D.
REJ:fm
Enclosure



**The University of Texas**
**Health Science Center at Houston**

MEDICAL SCHOOL

Department of Dermatology

Robert E. Jordon, M.D.
*Jack S. Josey Professor and Chairman*
*Director of Cutaneous Immunofluorescence*

6431 Fannin, MSMB 1.202
Houston, Texas 77030
(713) 792-5115

May 24, 1984

Harley A. Haynes, M.D.
Brigham and Women's Hospital
Department of Dermatology
75 Francis Street
Boston, Massachusetts
02215

Dear Doctor Haynes,

Dr. A. Razzaque Ahmed asked me to write you concerning the unfortunate situation within the Department of Dermatology at UCLA. As you are probably aware, several inflammatory letters have sent around the country concerning Dr. Ahmed's activities. As allegations as to his competency were made, I was asked by the Chairman of the Department of Medicine (Dr. Ken Shine) to site visit the Dermatology group to determine if Dr. Ahmed was competent in immunofluorescence interpretation and clinical activities. Although I was somewhat surprised to learn that Dr. Ahmed has had difficulties passing his American Board exam, I could find no deficiency in his handling of patients nor in his interpretation of immunofluorescence slides. Thus, the charges of incompetence were totally unfounded.

The issues that I uncovered were extremely complicated. Most of the problems revolved around personal issues which have no bearing upon Dr. Ahmed's professional abilities. Although allegations regarding his research were made, these were investigated by an in-house team who found no irregularities. Dr. Ahmed has made contributions to our understanding of bullous skin diseases and now has an excellent opportunity to receive post doctoral research training and develop into an independent investigator. His expertise in the area of immunology should be an asset for your group. I hope that this information is useful to you. Best regards.

Sincerely yours,

Robert E. Jordon, M.D.
REJ:fm

JOR00076

October 1, 1986

Dr. Edmond J. Yunis
Chief, Division of Immunogenetics
Dana Farber Cancer Institute
44 Binney Street
Boston, Massachusetts
02115

Re:  A. Razzaque Ahmed, M.D.

Dear Doctor Yunis,

I am writing you at the request of the above named individual.  Several years ago, certain allegations were made concerning Dr. Ahmed by an anonymous person who sent letters to laboratory directors and department chairmen in dermatology across the United States.  I received such a letter which had several nasty allegations concerning Dr. Ahmed, including accusations of fraudulent work, charging patients for research procedures, clinical incompetence, and not providing proper care for patients with serious skin diseases.  I must admit that when I received this letter, I thought it totally a hoax.  Several months later at one of the national meetings, I began to hear of dissension between faculty members within the Division of Dermatology at UCLA.  Shortly thereafter, the Chairman of the Department of Medicine at UCLA (Kenneth I. Shine, M.D.) contacted me.  Because of the allegations made, Dr. Shine asked me to serve as an advisor to the Department of Medicine and to the ad hoc committee appointed by the Department of Medicine to look into Dr. Ahmed's competence in the field of immunopathology.  Upon my arrival at UCLA, I found a very complicated situation which involved much more than just the issues listed above.  In essence, it involved a triangle which I will not detail here.

As to the charge I was given, I found that Dr. Ahmed was competent to perform diagnostic immunofluorescence procedures.  I found that his techniques, appropriate controls, etc., were in order.  I also found that he was competent to see and evaluate patients with bullous skin diseases and manage their care.  I found that his research program was somewhat diffuse, unfocused, and many of his contributions had little impact on our understanding of mechanisms of bullous skin diseases.  Some of the contributions, however, were important, such as the HLA studies in pemphigus.  The problem is, Dr. Ahmed had little training to carry those studies any further.  There were several double submissions of work to more than one journal, and at times, submission of work before proper completion of

JOR00215

Dr. Edmond T. Yunis
October 1, 1986
Page -2-

experiments.  This was really due to a problem Dr. Ahmed was having concerning his promotion to Associate Professor.  In none of these situations did I find any evidence of fraud or fabrication of data, however. In speaking with various investigators at the institution, all of the work was performed and results obtained and recorded were the same as those that were reported.

In essence, I left UCLA with the impression that somebody (a technician and a faculty member) were out to destroy Dr. Ahmed's credibility.  As this had already occurred within the Division of Dermatology at UCLA, I at a later date advised Dr. Ahmed it would be in his own best interest to leave.  I hope that this information is useful to you.  If you wish to discuss this matter further, I would be most pleased to do so but by telephone.

Sincerely yours,


Robert E. Jordon, M.D.
REJ:fm

cc: Chester A. Alper, M.D.

PERSONAL AND CONFIDENTIAL

To: Kenneth I. Shine, M.D.
Executive Chairman,
Department of Medicine

From: Morton Lee Pearce, M.D.
Professor of Medicine
Chairman, Ethics in Research Committee

Subject: Charges of Unethical Research Made Against Razzaque Ahmed, M.D.,
Division of Dermatology, Department of Medicine

The first set of charges were made by Mr. Gerard Caputo who
is a technician currently working in the Division of Dermatology.
Mr. Caputo has made three sets of charges:

1.  A case report titled, "Carpet Beetle Dermatitis," was submitted
    without approval from the Human Subjects Protection Committee.

    I checked with Dr. G.M. Beall at UCLA Harbor Hospital in regard
    to this matter. He states that the technique employed is a
    standard clinical practice and does not need approval of the
    Human Subjects Protection Committee.

2.  Mr. Caputo charges that there are irregularities in ordering
    and billing immunoflourescence studies.

    This is a serious charge, but falls outside the domain of the
    Ethics in Research Committee and should be referred to the
    appropriate authorities.

3.  Mr. Caputo obtained and submitted a memo addressed to Dr. Ahmed
    from Robert W. Schroff, Ph.D., dated November 20, 1981. Dr. Schroff
    was working at that time with Dr. Fahey in the Medical Immunology
    Laboratory and is presently at the National Cancer Institute in
    Frederick, Maryland. The memo, which is enclosed, accused Dr. Ahmed
    of incorporating data which apparently was to be the subject of
    another paper on which Dr. Schroff would be the senior author.

    I phoned Dr. Schroff concerning this matter (301-695-1235). He
    stated that he did not wish to make a complaint at this time
    and would send a letter confirming this. I have not yet received
    it. However, appended to this memo is a pre-print of a paper
    which will appear shortly in the Journal of Clinical Immunology,
    Volume 3, No. 3, for 1983, entitled "Production of Pemphigus
    Antibody in Vitro and Analysis of T-cell Subsets." The authors
    are A. Razzaque Ahmed, Richard I. Murahata, Robert W. Schroff,
    Ronald M. Stevens, and Andrew S. Saxon. This would confirm the
    impression that Dr. Schroff indeed does not want to pursue this
    matter and was willing to have his name acknowledged as one of
    the co-authors of this study.

I interviewed Mr. Caputo regarding the above charges. He stated that he is not personally aware of any research irregularities and is unwilling to make any charges in this area. However, he did repeat that he thought there were finanical and administrative irregularities.

The second complaint was submitted by Marc D. Chalet, Assistant Chief, Dermatology Service, of VA Wadsworth Medical Center. It is in the form of a memorandum from Dr. Chalet to Dr. Ahmed, titled, Pending Publication Entitled "Clinical and Histological Correlates in Bullous Pemphigoid," Co-authored by A. Razzaque Ahmed, Daniel C. Dwyer, Jerome Wollman, and Marc D. Chalet. In this memo, Dr. Chalet requests that his name be removed as co-author and further accuses Dr. Ahmed of falsification of data, of professional incompetence, improper acknowledgement of funding sources, and plagiarism.

I interviewed Dr. Chalet regarding these charges and he admitted, as Dr. Ahmed stated to you, that there is no such manuscript. Apparently, Dr. Daniel Dwyer is a research fellow in Dermato-Pathology under the supervision of Dr. Jerome Wollman at Wadsworth VA Hospital and is doing research in this area but has not produced any manuscript. I asked Dr. Chalet if he was willing to make charges of unethical research against Dr. Ahmed and he said specifically that he would not do so. He made several accusations regarding Dr. Ahmed's lack of professional competence and hearsay about professional charges but was not specific.

I reviewed the above material with Drs. Mayer Davidson, and Sydney Finegold who are the other members of the committee. They both stated and I agreed that there is not enough solid information to bring charges of unethical research against Dr. Ahmed at this time. Of course, we will reconvene if more meaningful evidence surfaces. Clearly the charges of professional incompetence and financial irregularities will have to be reviewed by the appropriate authorities. However, the charges of unethical research which have been brought by Mr. Caputo and Dr. Chalet strike me as so careless and vindictive as to question their motivation in this matter.


cc:  Dr. Mayer Davidson
     Dr. Sydney Finegold

JOR00057

**CONFIDENTIAL/SENSITIVE**

# ORI Oversight Report

# Boston University

# ORI 95-12

**Office of Research Integrity**

ORI00241

**CONFIDENTIAL/SENSITIVE**          ORI 95-12                    Page 1

## ORI Overview and Summary of Findings

### Overview

The Office of Research Integrity (ORI) reviewed a report of an investigation conducted by Boston University (BU) into possible scientific misconduct on the part of A. Razzaque Ahmed, M.D., Kailash Bhol, Ph.D., and Abeezar Sarela, M.D., for alleged misrepresentation of photographic data that they prepared and submitted as supplementary material for grant application 2 R01 DE09978-04 to the National Institutes of Health (NIH). Boston University conducted an inquiry in 1994, followed by an investigation in 1995, into this matter.

### Summary of Findings

*Issue 1:*          that Drs. A. Razzaque Ahmed, Kailash Bhol, and Abeezar Sarela falsified photographic data that they prepared and submitted as supplemental material for a grant application to NIH.

PHS Funding:        The allegations involved NIH grant application 2 R01 DE09978-04, "Oral vesiculo-bullous diseases: Mechanism of pathogenesis."

ORI Finding:        Boston University found scientific misconduct on the part of Drs. Ahmed and Bhol for their actions and negligence in submitting false information to NIH. They did not make a finding against Dr. Sarela. Given the plausible claims that honest errors had occurred in the last-minute preparation and submission of these materials by several scientists, ORI finds that no further PHS action is warranted, and ORI does not make findings of scientific misconduct in this case under the PHS regulations.

## PHS Relevance

### PHS Definition of Scientific Misconduct

The U.S. Public Health Service (PHS) definition of scientific misconduct at 42 C.F.R. §50.102 is: "fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting

ORI00242

or reporting research. It does not include honest error or honest differences in interpretations or judgments of data."

**PHS Related Funding or Applications**

Application 2 R01 DE09978-04 was submitted by Dr. Razzaque A. Ahmed to NIH on October 15, 1993. Dr. Kailash Bhol sent the photographs in question to Dr. Matthew Kinnard, Program Officer, National Institute of Dental Research (NIDR) on May 17, 1994.

# Background

Dr. Ahmed received his M.D. degree in 1972 from All-India Institute of Medical Sciences, New Delhi, India, and was appointed as Professor of Oral Biology in the Graduate School of Dentistry at Boston University (BU) in July 1993. Dr. Bhol received his Ph.D. in 1990 from Utkal University, Orissa, India, and was appointed as a post-doctoral research fellow at BU in July 1993. Dr. Bhawan received his M.D. degree in 1968 from Maulana Azad Medical College, University of Delhi, India, and was appointed as a post-doctoral fellow at BU in 1993. Dr. Sarela received his M.D. degree in 1990 from Seth Gordhandas Sunderdas Medical College & King Edward VII Memorial Hospital, Bombay, India, and was appointed as a post-doctoral research fellow at BU in July 1993.

In July 1993, Dr. Ahmed began his position in the Department of Dermatology of the School of Medicine at BU after leaving a similar position at the Center for Blood Research (CBR), an institute affiliated with Harvard Medical School. Dr. Bhol, his postdoctoral fellow, who held a similar position at CBR, transferred to BU with Dr. Ahmed. Dr. Ahmed transferred his research funding under NIH grants from Harvard to BU.

The research in question dealt with an evaluation of *Pemphigus vulgaris* (PV), which is an inflammatory disease of unknown cause that affects primarily an epithelial lining, such as the mucosa of the mouth and the epidermis. This disease is believed to be genetically determined, in part, which is evidenced by the increased susceptibility among the Ashkenazi Jewish population. The grant application in question is based upon the premise that PV is an autoimmune disease that is characterized by high levels of antibodies generated against a specific peptide believed to be an integral component of an E-cadherin. This substance (E-cadherin) belongs to a family of adhesive proteins that link epithelial cells together. The autoimmune reaction precipitated by the antibody-antigen (cadherin) complex results in a separation of the epithelial cells, which leads to a sloughing of the skin or a loss of the mucous membrane, creating a clinical condition called acantholysis.

In October 1993, Dr. Ahmed submitted a competitive renewal grant application entitled "Oral vesiculo-bullous diseases: Mechanism of pathogenesis" to NIDR at NIH. The NIH study section reviewed Dr. Ahmed's grant application and suggested that it would be helpful to have additional micrographs showing immunofluorescent and Hematoxylin-Eosin (H&E) stained sections (Attachment 3, p. 6).

On May 9, 1994, in response to the study section review, Dr. Ahmed met with Dr. Sarela (the complainant) and Dr. Bhol and discussed with them a handwritten draft that he had prepared of a format and legends labeled "Figure 1" for photographs, which were to be sent to NIH no later than May 18, 1994. In a memorandum dated May 10, 1994, to Dr. Jag Bhawan, Professor of Dermatology and Director of the Dermatopathology Laboratory in the Department of Dermatology, Dr. Ahmed stated, "Essentially we need three different pictures of positive acantholysis and five different pictures of negative acantholysis" (Attachment 3, p. 5). Dr. Ahmed also indicated that Dr. Sarela would provide the specimen slides for the photographs and Dr. Bhol would provide the appropriate related codes (Attachment 3, p. 5).

In a response to the study section review, which was submitted to NIH on May 10, 1994, Dr. Ahmed stated:

> At the time of the submission of the grant application [October, 1993], the experiments regarding the *in vitro* and *in vivo* pathogenicity were done. The immunofluorescence and H & E micrographs were available. The principle (sic) reason for not providing them was that at the time the P.I. considered them to be very preliminary and wanted to repeat them and confirm the results. This data, the H & E, and the immunofluorescence photographs are now being provided to the Council (Figures I and II) (Attachment 1).

Dr. Bhol provided Dr. Bhawan a copy of Figure 1 and its legends sometime after May 10, 1994. Dr. Bhawan then compared the typed legends to a list of codes, which he had obtained from Dr. Sarela, and determined that some of the legends did not match with any specimen on Dr. Sarela's list of codes. Dr. Bhawan wrote "does not exist" adjacent to legends designated B, E, F, & G and specimen slide numbers adjacent to the other four legends. Dr. Bhawan discussed the discrepancy with Drs. Sarela and Bhol, who stated that the problem would have to be discussed with Dr. Ahmed. However, Dr. Ahmed had left for a trip to Dubai, India, on May 11, 1994, and he was not available to review and approve the final figure for submission to NIH.

On May 17, 1994, Dr. Bhol picked up the developed photographs from Mr. Alfie Tsay, Dr. Bhawan's technician. In accordance with Dr. Ahmed's May 10th request (for three pictures of positive acantholysis and five pictures of negative acantholysis) to Dr. Bhawan, Dr. Bhol ". . . pasted the first three showing acantholysis and rest as controls, assuming that

they were in proper order" (Attachment 3, p. 6). On the same day, Dr. Ahmed's secretary signed Dr. Ahmed's name on a cover letter, and Dr. Bhol included Figures I and II to be sent to NIH via express mail.

It was later learned that Dr. Matthew Kinnard, the Program Officer at NIDR, NIH, had received this material but had not retained it when he assumed a new position and moved his office to a new location within NIH. Thus, the material was never provided to the NIDR Council (Attachment 5d).

On May 27, 1994, Dr. Sarela informed Mr. Bill Macone, Administrative Director of the Dermatology Department, that he believed Dr. Ahmed had submitted photographs to NIH that had been labeled incorrectly. Mr. Macone then informed Dr. Barbara A. Gilchrest, Chairman of the Department of Dermatology, of Dr. Sarela's allegation of possible scientific misconduct against Dr. Ahmed (Attachment 3, p. 8).

On May 31, 1994, Dr. Gilchrest and Mr. Macone met with Dr. Ahmed to discuss the concerns. During the meeting Dr. Gilchrest informed Dr. Ahmed of Dr. Sarela's allegations, which included that (1) Dr. Sarela was dissatisfied with how Dr. Ahmed had managed his (Sarela's) fellowship funds and (2) photographs submitted to NIH had been mislabeled. Dr. Gilchrest then requested Dr. Ahmed to respond in writing to the allegations by June 3, 1994. Dr. Gilchrest also indicated to Dr. Ahmed that he might consider withdrawing the grant application as well as withdrawing from the Department of Dermatology at BU (Attachment 3, p. 8).

On June 3, 1994, Dr. Ahmed provided a response to Dr. Gilchrest as she had requested. The details of the response were not discussed in the BU report (Attachment 3, p. 8).

On July 21, 1994, Dr. Jon Westling, Provost, appointed a Committee of Inquiry to explore the allegations further.

## Institutional Inquiry

On July 21, 1994, Dr. Jon Westling, Provost, appointed an inquiry committee consisting of:

- Alan Cohen, M.D., Professor of Medicine in Rheumatology (chairman);
- Herbert Kagan, Ph.D., Professor of Biochemistry;
- Alan Peters, Ph.D., Professor and Chairman of Anatomy and Neurobiology;
- David Shepro, Ph.D., Professor of Biology, College of Liberal Arts; and
- David Small, M.D., Professor and Chairman of Biophysics.

**CONFIDENTIAL/SENSITIVE**          ORI 95-12                    Page 5

The inquiry committee's report, dated October 11, 1994, recommended further investigation, and Provost Westling so notified ORI on November 21, 1994.

Dr. Ahmed made a counter-allegation against Dr. Sarela alleging that he had altered data in his laboratory notebook. In addition to being the complainant, Dr. Sarela also was named a respondent in the case.

## Institutional Investigation: Process

Provost Westling appointed a Board of Investigation consisting of:

- Professor Benjamin Kaminer, Department of Physiology (chairman);
- Professor Peter Brecher, Department of Biochemistry; and
- Associate Dean Jack Beerman, School of Law.

The Board of Investigation held formal hearings for six days between June 12 and June 19, 1995. The Board interviewed the following people (Attachment 3, p. 1):

- Dr. A. Razzaque Ahme, respondent;
- Dr. Jag Bhawan, Director, Dermatopathology Laboratory;
- Dr. Kailash Bhol, respondent;
- Dr. Aram Chobanian, Dean of the Medical School;
- Dr. Barbara Gilchrest, Chairman, Department of Dermatology;
- Mr. William Macone, Administrative Director, Department of Dermatology;
- Ms. Heather McKinley, former Secretary, Department of Dermatology;
- Dr. Narciss Mobini, former Postdoctoral Fellow in Dr. Ahmed's laboratory (by telephone from Iran);
- Dr. Abeezar Sarela, complainant and respondent (by telephone, from India); and
- Mr. Alfie Tsay, Technician in Dr. Bhawan's laboratory.

The testimony was taken under oath and transcribed by court reporters. On July 28, 1995, Provost Westling transmitted the investigation committee's report, dated July 13, 1995, to ORI (Attachment 2).

**CONFIDENTIAL/SENSITIVE**            ORI 95-12                Page 6

## Institutional Investigation:  Findings

The Board of Investigations Report found:

> It was unequivocally established that photographs submitted to NIH by
> Dr. Ahmed as part of Figure 1 of his May 17 [1994] submission did not
> correspond with the figure legend.  Dr. Bhawan, the pathologist, testified that
> he arbitrarily selected at least 3 slides showing normal skin, out of 8 for
> photography because the particular slides called for in the figure legend were
> not available.  Furthermore, Dr. Bhol testified that he pasted the photographs
> arbitrarily in the order in which he received them.  He further testified that he
> assumed the order was correct because the first 3 photographs received from
> Dr. Bhawan's technician showed acantholysis as required by the legend, but he
> did not check the labeling or any listing to determine if each photograph
> corresponded with the experiments described in the legends.  Ultimately,
> through the combination of random pasting and substitution of slides for those
> that Dr. Bhawan could not locate, only 2 out of 8 photographs sent to NIH
> matched the legends.  See Appendix # 1.  This was determined by Dr. Bhawan
> at the hearing by inspection of the labeled kodachromes and a second set of
> photographs.  The first set, submitted to NIH could not be retrieved because
> they were lost by the NIH (Attachment 3, p. 2, lines 2-18).

The Board of Investigation drew the following conclusions regarding the principals.  First,
with regard to Dr. Ahmed:

> The Board finds that Dr. Ahmed committed scientific misconduct by causing the
> submission of false material to the NIH, particularly the incorrectly labeled
> photographs in his May 17 submission (Attachment 3, p. 8, lines 35-37).

> . . . the Board believes that Dr. Ahmed knew, when he instructed Drs. Sarela
> and Bhol to prepare the submission, that legends and the photographs would be
> inconsistent, and that this did not matter to Dr. Ahmed as long as positives and
> negatives corresponded to the legend.  Dr. Ahmed's misrepresentation to the
> NIH regarding the timing of the experiments and the existence of the
> photographs as of October 1993 supports the view that Dr. Ahmed intended to
> mislead the NIH.  Dr. Ahmed's attempt to explain to the Board what he meant
> when he stated to the NIH in May that the photographs were available at the
> time of the [sic] October 1993 was unconvincing (Attachment 3, p. 9,
> lines 10-19).

Regarding the separate charge against Dr. Ahmed of failing to withdraw the mislabeled photographs in a timely fashion, the Board believes that in light of its finding on the charge regarding submission, this charge is somewhat beside the point and no conclusion need be reached on its separately . . . The Board did feel, however, that Dr. Ahmed's immediate repeat of the experiments and forwarding of corrected data to the NIH were appropriate responses to the situation (Attachment 3, p. 9, lines 20-24 and 30-33).

Second, with regard to Dr. Bhol:

The Board finds that, although it is a difficult judgment to make, that [sic] Dr. Bhol knew, when he sent the photographs to the NIH, that several of the photographs did not correspond to the accompanying legend. The Board thus concludes that Dr. Bhol committed scientific misconduct.

The Board is not sure that Dr. Bhol clearly recognized the implications of that act. Dr. Bhol did understand the scientific importance of Figure 1 . . . [but] probably had little insight into the meaning of Figure 1 relative to the original grant proposal or to the letter sent by Dr. Ahmed to NIH on May 10 . . .

Even if Dr. Bhol did not know for sure that the photographs and legends did not correspond, Dr. Bhol's negligence in not ascertaining which photograph was which before pasting them in (even where the correct photograph existed, Dr. Bhol sometimes did not paste it into its proper place) violates University standards by seriously deviating from standards of scientific conduct.

Dr. Bhol is mature enough and trained sufficiently to recognize this negligence and should be admonished formally for his actions. While Dr. Bhol was probably under intense pressure from Dr. Ahmed to see that everything went to NIH as planned and did not have a devious intent, that does not excuse Dr. Bhol's actions, but, in the Board's opinion, it mitigates it and it is the Board's view that Dr. Bhol should not be treated harshly by the University or the NIH (Attachment 3, p. 9, line 35, to p 10, line 18).

Third, in reference to Dr. Sarela:

With regard to Dr. Sarela, the Board finds that Dr. Sarela did not commit scientific misconduct . . . did not fabricate data and alter his notebook to trap Dr. Ahmed in a charge of scientific misconduct. However, it is clear that Dr. Sarela knew all along that Dr. Ahmed planned to submit inaccurate data in his May 17 submission . . . that at least some of the photographs would not be

CONFIDENTIAL/SENSITIVE                ORI 95-12                    Page 8

of what the legend stated. This is indisputable, since Dr. Sarela ultimately
"blew the whistle". . . Since the Committee of Inquiry did not recommend an
investigation of this particular conduct, the Board cannot find Dr. Sarela guilty
of it . . . (Attachment 3, p. 10, lines 19-34).

Fourth, in reference to Dr. Bhawan:

With regard to Dr. Bhawan's role in the false submission, Dr. Bhawan's own
testimony before the Board reveals that when he could not find slides that
corresponded to the legends in Figure 1, he carefully set out, allegedly with
Dr. Ahmed's indirect prompting through Dr. Bhol to find slides that would at least
correspond to the positive or negative findings that Dr. Ahmed stated each legend
should represent. The Board has little doubt that Dr. Bhawan knew, when he
photographed the slides, that they would be pasted into the Figure with the legends as
they were shown to him, especially since it does not appear that he tried to identify, for
Dr. Bhol, what experiment each photograph actually represented. Even if Dr. Bhawan
was not aware of exactly what was going to be done with the photographs, the Board
felt that Dr. Bhawan should have demonstrated a more active and responsible role and
prevented the submission of data that was not labeled accurately. Dr. Bhawan is a
senior investigator, he did know what the pictures were for, and he was aware of what
the last minute problems were regarding the validity of the photographs relative to the
legend for Figure 1. Dr. Bhawan apparently preferred to neither hear nor see any
possible problems, and represented himself as having a very passive role in the
incident. Dr. Bhawan's participation in the misconduct was probably as great as
Drs. Bhol and Sarela. While an investigation of Dr. Bhawan's conduct may not be
warranted, the Board does recommend that the matter be raised with Dr. Bhawan and
his immediate supervisors and that Dr. Bhawan be reprimanded in no uncertain terms
(Attachment 3, p. 11, lines 2-25).

## DRI Review

The Division of Research Investigations (DRI), ORI, found that the allegation in this case
involves several individuals attempting to assemble photographs depicting certain conditions to
match predetermined legends in a figure. The communication and coordination among the
individuals necessary to achieve this goal appear to have broken down, and it is not clear to
DRI from the evidence and the report who was actually responsible for the mislabeling of the

CONFIDENTIAL/SENSITIVE                  ORI 95-12                  Page 9

photographs in the figure. Dr. Ahmed (the P.I.) was out of the country during the time when the questioned material was assembled and submitted to NIH. DRI finds it difficult to assign responsibility to one (or two) of the individuals involved or to find that all those involved had committed scientific misconduct.

DRI notes the apparently misleading statement Dr. Ahmed made to NIH regarding the photographs' availability at the time he submitted the original renewal application. However, Dr. Ahmed's language is ambiguous, since it was purportedly written to address the criticism of the mouse experiments described in the original application. Although the human experiments reported in the supplementary material had not been completed, the mouse experiments for which the reviewers stated photographs would be useful, had been completed. DRI further notes a similar statement Dr. Bhol made to the investigation committee regarding Dr. Sarela's review and approval of the final assembled questioned figure; the evidence shows that Dr. Sarela was in another city at that time. In every case, the findings depend on the credibility of the testimony, which is often contradictory and unsubstantiated.

Given the multiple persons involved in the admittedly last-minute preparation for the submission of supplementary material, DRI finds it plausible that errors and oversights in handling the materials may have occurred, which would constitute honest error.

DRI agrees that the submission of falsified micrographs to NIH would be an act of scientific misconduct. However, there is insufficient evidence for ORI to go forward with a finding of scientific misconduct in this case.


## On BU's Conclusions

In reaching these conclusions, ORI has only addressed the interests of PHS. While mislabeled materials were submitted to the NIH Program Officer, which could have constituted falsification in the reporting of research, ORI decided not to make a finding of scientific misconduct under the PHS regulation. Nonetheless, Boston University has independent authority to set its own standards and to make its own determinations of when its faculty have failed to meet the expected norms of behavior, as the University did in this case.

CONFIDENTIAL/SENSITIVE
ORI 95-12

## Attachments

1.  Letter from Boston University to ORI, dated November 21, 1994, following the preliminary inquiry, with:
    a.  Letter from Dr. Ahmed to NIH (no photographs with inquiry), May 10, 1994
    b.  Letter in follow-up from Dr. Ahmed to NIH, August 31, 1994
    c.  Letter in further follow-up from Provost Westling to NIH, November 21, 1994

2.  Transmittal letter from Boston University to ORI, dated July 28, 1995, with
    a.  memorandum on security of evidence, July 28, 1995.

3.  Report of Boston University's Board of Investigation, dated July 13, 1995, with appendices:
    a.  # 1 -- Summary of the photographs sent to NIH
    b.  # 2 -- Bhawan's Selection of Slides from Sarela's list, and Summary of Findings

4.  Dr. Bhol's response to the University investigation report, July 28, 1995

5.  a.  Dr. Ahmed's response to the University investigation report, July 28, 1995
    b.  Dr. Ahmed's rebuttal to OGC/ORI, dated February 6, 1996
    c.  Dr. Ahmed's rebuttal to DPE/ORI, dated February 6, 1996
    d.  Dr. Ahmed's rebuttal to DRI/ORI, dated February 16, 1996

6.  Publication: Bhol, Kailash, Natarajan, Kannan, Nagarwalla, Neville, Mohimen, Aloke, Aoki, Valeria, and Ahmed, A. Razzaque. (1995, May). "Correlation of peptide specificity and IgG subclass with pathogenic and nonpathogenic autoantibodies in pemphigus vulgaris: A model for autoimmunity." *Proceedings National Academy Science* (USA) 92:5239-5243.

ORI00251

**CONFIDENTIAL**
ORI 95-12
Attachment 1

Letter from Boston University to ORI, dated November 21, 1994, following the preliminary inquiry, with:

a.    Letter from Dr. Ahmed to NIH (no photographs with inquiry), May 10, 1994

b.    Letter in follow-up from Dr. Ahmed to NIH, August 31, 1994

c.    Letter in further follow-up from Provost Westling to NIH, November 21, 1994