**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 05-10057-RCL |
| v. ) | |
| ABDUL RAZZAQUE AHMED, ) | |
| Defendant ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Dr. Abdul Razzaque Ahmed respectfully asks this Court to sentence him to six months home confinement and four hundred hours of medical community service, and to impose a $20,000 fine. This case arises out of the fact that Dr. Ahmed administered a cutting edge drug treatment to patients who needed and benefited from the treatment. Dr. Ahmed has admitted to improperly obstructing the government's investigation into the propriety of his billing of the drug treatment to Medicare. But even the government agrees that many of the Medicare patients who received this drug treatment from Dr. Ahmed had failed on other available treatments and their disease was arrested or halted after being treated by Dr. Ahmed.

The sentence is also appropriate in light of Dr. Ahmed's unique role in treating individuals suffering from debilitating skin blistering diseases. Dr. Ahmed is one of the only experts available to patients suffering from these diseases, and patients generally only come to him after other doctors have been unable to treat their conditions. As is reflected by the outpouring of letters of support attached to this memorandum, Dr. Ahmed's patients have made incredible recoveries under Dr. Ahmed's care. They have achieved these improvements because of his expertise in handling these diseases, the unusual amount of time he spends with each patient individually, and the supportive environment of his Center for Blistering Diseases.

Removing Dr. Ahmed from the community would put the lives of Dr. Ahmed's patients at risk. Moreover, in light of the $2.9 million that Dr. Ahmed has agreed to forfeit to the government as well as Dr. Ahmed's deep remorse for his criminal acts, a sentence of six months home confinement and four hundred hours of medical community service complies with the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2).

## I.    PERSONAL BACKGROUND

### A.    Dr. Ahmed's Origins Impel Him Towards a Career in Medicine.

Dr. Ahmed was born on October 27, 1948 in Hyderabad, India.  *See* Presentence Report ("PSR") ¶ 66.  He grew up in a large, happy family with his four sisters, Akhtar Jahan Begum, Naiyar Jahan Begum, Anwar Jahan Begum, and Rana Noor, as well as his brother, Abdul Mateen Ahmed.  *See* PSR ¶¶ 69-72.  Because Dr. Ahmed's family is part of India's nobility, Dr. Ahmed was raised with a strong sense of obligation toward his community and towards people less fortunate than himself.  *See* PSR ¶¶ 66, 76.

Following the family tradition of becoming a physician, Dr. Ahmed enrolled in the All-India Institute of Medical Sciences, the most prestigious medical school in India.  *See* PSR ¶ 86. Dr. Ahmed excelled at his studies and ranked first in his medical school class.  He also ranked first in his examinations in physiology & biochemistry, forensic medicine, and preventative & social medicine.  Dr. Ahmed received his medical degree from the All-India Institute of Medical Sciences in 1970 and received the Gold Medal for Best Medical Graduate of the Year from the President of India.  *See* PSR ¶ 96.

### B.    Dr. Ahmed Continues His Medical Studies in the United States.

In 1972, Dr. Ahmed decided to come to the United States to continue his medical studies and to provide a new home for his sister, Naiyar Jahan Begum, and her three children.  *See* PSR

¶ 74.  Dr. Ahmed's sister had lost her husband in the violent conflict between India and Pakistan, and Dr. Ahmed believed that she and her daughters would find a better opportunity to rebuild their lives after their loss and trauma if they came and lived with him in the United States.  *See id.*  Accordingly, Dr. Ahmed obtained a one-year medical internship at Montefiore Hospital, which is affiliated with the University of Pittsburgh.

After a successful year at the Montefiore Hospital, Dr. Ahmed continued his work in the United States at a series of prestigious institutions.  *See* PSR ¶ 87.  In 1973, Dr. Ahmed obtained a residency in Dermatology at the State University of New York at Buffalo.  In 1976, he obtained a Fellowship in Clinical Immunology and Allergy at the UCLA School of Medicine.  In 1985, he obtained a Fellowship at the Center for Blood Research, which is affiliated with Harvard Medical School and the Harvard School of Dental Medicine.  In 1989, he was awarded a Doctor of Medical Sciences degree by Harvard University.  *See* PSR ¶ 88.  He also obtained a Masters Degree in Public Administration from the Kennedy School of Government at Harvard University in 1995.  *Id.*

As Dr. Ahmed's medical career progressed, he decided to make his move to the United States permanent, and in 1982, Dr. Ahmed became a citizen of the United States.  *See* PSR ¶ 74.  His sister and nieces also continue to live in the United States.  Dr. Ahmed supported them financially for several years.

**C.    The Origins of Dr. Ahmed's Commitment to the Treatment of Patients
With Blistering Diseases.**

During his dermatology residency at SUNY Buffalo, Dr. Ahmed began his work with patients suffering from autoimmune blistering diseases.  A patient develops an autoimmune blistering disease when his body begins to make antibodies that, instead of protecting him from disease, erroneously attack his healthy tissues.  Of particular relevance to this case are two

groups of blistering diseases called pemphigus and pemphigoid. The pemphigus group includes

pemphigus vulgaris, pemphigus foliacious, and paraneoplastic pemphigus. The pemphigoid

group includes bullous pemphigoid and cicatricial pemphigoid (sometimes called mucuos

membrane pemphigoid). *See* Ex.A (T. Fleming & N. Korman, *Cicatricial Pemphigoid*, J. Am.

Acad. Dermatology; 2000: 43 (4): 571-91). The individual diseases within the pemphigus and

pemphigoid groups are distinguished by the type of tissue that the antibodies affect and the

precise location within these tissues where the antibodies bind. For example, in the pemphigus

diseases and in cicatricial pemphigoid, the antibodies frequently damage the mucosal tissue

found in the eyes and mouth. In pemphigoid the antibodies damage the basement membrane of

the skin or mucosal tissue while in pemphigus the antibodies target the intracellular cement (the

"glue" that holds cells together). Both the pemphigus and the pemphigoid diseases lead to

painful blisters which easily can rupture and cause portions of the skin and mucosa to detach and

fall off. *See* Exhibit B (pictures of patients with pemphigoid and pemphigus). The cardinal

feature of cicatricial pemphigoid is that as the blisters heal, they frequently cause irreversible

scarring. *Id.* at 2-3. All of these diseases threaten to cause metabolic changes, infections, and

possibly death.

Over time, Dr. Ahmed became increasingly involved in the diagnosis and treatment of

patients with blistering diseases, particularly patients afflicted with pemphigus and pemphigoid.

These patients are often in severe pain. Their conditions make simple activities like eating,

speaking, showering, urinating, defecating, wearing clothes, or even just lying in a bed extremely

difficult and painful. Because pemphigus and pemphigoid are rare, the patients Dr. Ahmed saw

often had great difficulty finding doctors who could provide them with proper care. Dr. Ahmed

decided to focus his practice on helping these patients because he wanted to take on the twin

challenges of battling a group of diseases about which very little is known, and which is so devastating and even deadly to its victims.

**D.    Dr. Ahmed Opens the Center for Blistering Diseases.**

Ultimately, Dr. Ahmed's dedication to his patients led him to found and operate the Center for Blistering Diseases in Boston. *See* PSR ¶ 93. Dr. Ahmed's center is the only center in the United States dedicated exclusively to the treatment of blistering diseases. *See* Ex. C12, (Letter of Dr. Sergei Grando). The Center for Blistering Diseases provides patients with the best, most advanced care available, and provides them with a unique setting of support and comfort. Since there are relatively few patients with blistering diseases, the Center for Blistering Disease has become an important hub where patients can exchange information and can talk to others suffering from similar conditions. Dr. Ahmed's patients are also all encouraged to participate in the Blistering Disease Support Group, an organization Dr. Ahmed created in 1990 for his current and former patients which meets at least once a year. *See* Exhibit D (DVD, Excerpts from Blistering Support Group Meetings 1999-2007).

As Dr. Ahmed began treating more and more patients afflicted with blistering diseases, he came to realize that recovery depended not only on the use of proper drug therapies, but also on patients making significant lifestyle changes. Patients must alter such fundamental aspects of their lives as what they eat, how they bathe, how they brush their teeth, and what materials they allow to come into contact with their skin. When patients come to the Center for Blistering Disease they receive individual education directly from Dr. Ahmed about their condition and about steps they can take towards improvement. He formulates individual treatment plans and assigns a specific nurse to the patient to ensure follow-through on the plan. Dr. Ahmed also takes care to assess and to address the personal and psychological needs of each patient. Overall,

the patients who see Dr. Ahmed receive focused, personalized care that is almost unheard of in today's busy, overtaxed health care system.

Dr. Ahmed and the Center for Blistering Diseases have developed an international reputation for treating patients with blistering diseases, particularly the diseases in the pemphigus and pemphigoid groups. Patients have traveled from 31 U.S. states and 18 different countries to be treated by Dr. Ahmed. Dr. Ahmed currently treats 153 patients with some form of pemphigus, 60 with bullous pemphigoid, and 67 with cicatricial pemphigoid. In an average month, he sees at least three new cases of pemphigus, four to six new cases of bullous pemphigoid, and two new cases of mucous membrane pemphigoid. In contrast, an ordinary dermatologist may see two to three cases of pemphigoid a year and may never see a case of pemphigus during the course of his career. Due to his expertise, Dr. Ahmed is one of the few dermatologists nationwide to whom pemphigoid and pemphigus patients routinely are referred. As a result, the patients who come to Dr. Ahmed often have the most recalcitrant and the most complicated forms of these diseases.

Even though Dr. Ahmed sees some of the sickest patients, he has had remarkable success in alleviating and even curing their conditions. Dr. Ahmed's achievements are reflected in the letters of support that have been submitted to this Court by Dr. Ahmed's patients. *See* Exhibit E (Patient Support Letters). Here are just a few representative excerpts:

- The innovative and inimitable work of Dr. Ahmed is truly a miracle and has saved my life. *Susan J. Belisle*, Ex. E4

- I have suffered from Pemphigoid for 4 years and today, I am in remission, thanks to the efforts of this man. He has given me back a life that I thought I had lost. The medical profession needs more doctors that care as deeply for the suffering of their patients as does Dr. Ahmed. *Alfred Granato*, Ex. E29

- To put it simply, Dr. Ahmed saved my life. I have pemphigus vulgaris, an autoimmune condition in which you lose your skin and mucosa. Simply taking a shower took the skin

off my back. … Those of us who are treated by Dr. Ahmed agree we are blessed.  Dr. Ahmed and his staff listen to our concerns.  They always take the time to explain what is happening to you and why.  Because of their extensive experience with blistering disease patients, they can give you very practical advice.  *Linda A. Hill*, Ex. E34

- [After being Dr. Ahmed's patient myself,] I have integrated his style into my own practice and have used my experience with him to teach medical students how to be a better physician.  Dr. Ahmed embodies the qualities and dedication that all physicians should strive to be.  *Dr. Paul M. Konowitz*, Instructor at Harvard Medical School, Ex. E40

- When I was originally diagnosed with Pemphigus, an extremely rare and sometimes fatal autoimmune disorder that causes blistering and raw sores on skin and mucous membranes, my life suddenly stopped. … Then I ended up at Dr. Ahmed's office and all of my fears and trepidations were allayed. … I am now in remission, just 8 months after my initial diagnosis.  *Kurt Kroeber*, Ex. E42

- From my initial visit, I knew *The Center for Blistering Diseases* was much different than any other office I had ever been to.  Dr. Ahmed met with me for over an hour during that first visit.  He thoroughly explained my disease to me, which no other doctor had ever bothered to do.  He took the time to learn about me, my goals and even my family.  *Laura Lambiase*, Ex. E43

- I live in Utica NY and had to travel over 500 miles for treatments.  Dr. Ahmed on his own initiative took the time and made the effort to work with Dr. Goodman, my doctor in Utica, making it possible for me to get treatments in Utica, NY.  *Dominick Marino*, Ex. E55

- He treated me with great skill and a great degree of personal attention. … My quality of life returned.  Today, twenty-five years later, I am still active, still doing research, and still teaching.  *Professor and Nobel Laureate George A. Olah*, Ex. E59

- Dr. Ahmed has a treatment method and a doctoring style that treats the whole patient: diet and nutrition, oral care, personal care, stress reduction, and psychological health.  At this moment I believe my future health and quality of life depends on the next few weeks and months of Dr. Ahmed's treatment.  *Peter Reich*, Ex. E66

- I became a patient of Dr. Ahmed's in 1996.  During my first visit I knew that he was someone very special.  He took the time to thoroughly explain [pemphigus vulgaris] to me and discussed my treatment options. … After several treatment types, Dr. Ahmed finally found the one that was right for me.  This treatment is known as IV/IG.  Throughout each new treatment, he was always there to explain and comfort my family and me.  *Rozella Wilson*, Ex. E79

The letters of support from fellow physicians, many of whom refer patients to Dr. Ahmed, echo

the patient's statements regarding Dr. Ahmed's dedication to the treatment of blistering diseases.

*See* Exhibit C (Physician Support Letters).  Here are some representative excerpts:

- I frequently have used Dr. Ahmed as a consultant, or transfer patients to his care.  These patients are often extremely ill, need hospitalization and sophisticated in-patient care as well as ongoing supervision of care.  Dr. Ahmed has always been available by phone to colleagues or to see patients with these difficult disorders.  *Dr. Kenneth A. Arndt*, Clinical Prof., Yale University School of Medicine, Ex. C1

- For those of us who practice in New England, he is a tremendous asset – we would be lost without him, and many patients would suffer.  *Dr. Philip S. Ellerin*, Asst. Clinical Prof., Tufts University School of Medicine, Ex. C9

- It is difficult to imagine the extent of the loss to patients and physicians, should Dr. Ahmed stop practicing medicine.  There are a large number of patients who depend on him, and there is literally no physician in the New England area who can step in quickly and care for these sick patients.  There would be a significant vacuum in the community of physicians for referral of patients with complex blistering diseases.  *Dr. David S. Feingold*, Dermatologist-in-Chief, Emeritus, Tufts-New England Medical Center, Ex. C10

- Dr. Ahmed is the founder and current director of the only blistering diseases treating center in the U.S.  This unique facility proved to be a "safe harbor" for a large number of patients with bullous diseases like pemphigus and pemphigoid, who badly need efficient treatment for their devastating diseases and whose local doctors have already exhausted their treatment resources without success.  *Dr. Sergei M. Grando*, Prof. Dermatology, UC Irvine, Ex. C12

- There are few physicians who have saved as many lives as Dr. Ahmed and few who have worked as tirelessly as he has on behalf of patients with life-threatening blistering diseases.  *Dr. Mark Lebwohl*, Chairman of the Department of Dermatology, Mt. Sinai School of Medicine, Ex. C20

- He takes care of patients who no one else can either treat, or wants to treat, and are often near death.  Somehow, he saves their lives. Since he was confronted with these difficult, severe, recalcitrant patients, he developed newer and better ways to save lives.  *Dr. Robert A. Schwartz*, Head of the Department of Dermatology, New Jersey Medical School, Ex. C33

- Because of his vast experience and research interest in treating these rare but serious dermatologic problems, he has provided an invaluable resource for me, as well as for the entire New England community.  *Dr. Paul E. Snyder*, Dartmouth Dermatology Associates, Ex. C35

These letters from patients and physicians consistently reflect the thoughtful approach that Dr. Ahmed takes to patient care and show the tremendous loss that the medical community would suffer if Dr. Ahmed was unable to continue his work.

Dr. Jean-Claude Bystryn, who is the Director of the Bullous Disease Clinic at the New York University School of Medicine, and who chairs the Medical Advisory Board of the International Pemphigus Foundation, attests to Dr. Ahmed's critical role when he writes to the Court: "one of the major concerns of patients with pemphigus and of the International Pemphigus Foundation … is the dearth of physicians able and willing to take care of this disease. The inability of Dr. Ahmed to provide his skills to these patients would create a vacuum that would be difficult to fill and would leave patients with few resources to deal with diseases which are often devastating."  Exhibit C6, Letter of Dr. Jean-Claude Bystryn.

**E.    Dr. Ahmed Discovers That Patients Who Are Failing With Conventional Pemphigus and Pemphigoid Treatment Can Be Helped By IVIg Treatment.**

At the heart of this case is Dr. Ahmed's insight that many of his sickest patients could benefit from a novel treatment called intravenous immunoglobulin ("IVIg").  "Immunoglobulin" refers to the portion of blood serum that contains antibodies.  IVIg treatment is prepared from pools of plasma collected from several thousand healthy blood donors to ensure that the IVIg treatment contains the entire repertoire of antibodies that would be found in normal, healthy blood.  This pooled immunoglobulin is then administered intravenously to patients whose immune systems are not working properly.  While the success of IVIg treatment is not fully understood, it is believed that the infusion of normal, healthy antibodies operates to reset the patient's malfunctioning immune system.

As Dr. Ahmed began to see an increasing number of patients suffering from blistering diseases, he became frustrated by the number of patients whose condition did not improve when they received conventional corticosteroid and immunosuppressive treatment.  He also saw that steroid treatment often created more problems for these already ailing patients, such as obesity, diabetes, osteoporosis, psychosis, and potentially fatal opportunistic infections.

In the late 1980s, Dr. Ahmed learned that IVIg treatment was having a positive effect on patients suffering from other autoimmune disorders.  Since pemphigoid and pemphigus are caused by a malfunction of the immune system, Dr. Ahmed decided to try IVIg treatment with some of his patients who were in advanced stages of their diseases and not benefiting from any conventional treatment.  This was a novel and creative approach to treating pemphigus and pemphigoid.  While steroid and immunosuppressive treatments repress the body's output of antibodies, IVIg instead infuses a patient with healthy antibodies.  Around 1990, Dr. Ahmed began administering IVIg to patients suffering from pemphigus and pemphigoid, and it quickly became apparent that IVIg was able to help a significant number of these very sick patients.  *See also*, Ex. B at 5 (pictures of recoveries made through IVIg treatment).

Between 1990 and 1997, Dr. Ahmed admitted over 100 patients to New England Baptist Hospital to receive IVIg treatment.  In 1997, New England Baptist Hospital converted the area where Dr. Ahmed's patients were receiving IVIg treatment in to a rehabilitation center.  Rather than try to relocate to another hospital facility, Dr. Ahmed decided to open the Center for Blistering Disease so that his patients could receive treatment on an out-patient basis.  By going to the Center for Blistering Disease for treatment, Dr. Ahmed's patients – whose immune systems were already compromised – did not have to face the common hospital risk of contracting dangerous infections.

Dr. Ahmed has taken a leading role in investigating the efficacy, proper administration, and dosing of IVIg for patients suffering from autoimmune blistering diseases. He has been an author on numerous articles documenting the effects and efficacy of IVIg.[1] In May 2000, Dr. Ahmed spoke on the use of IVIg in the treatment of cicatricial pemphigoid at a special symposium on the use of IVIg by the International Congress of Dermatology. Since 2000, Dr. Ahmed has helped publish two studies which compared IVIg to conventional immunosuppressive therapy and found that IVIg had a higher success rate that conventional therapies.[2] In 2003, Dr. Ahmed led a group of over thirty dermatologists who came together to develop the "Consensus Statement on the Use of Intravenous Immunoglobulin Treatment of Autoimmune Mucocutaneous Blistering Disease" which was published by the American Medical Association in the August 2003 edition of the Archives of Dermatology.

In no small part due to Dr. Ahmed's efforts, today most health care insurers consider IVIg a "covered service" for pemphigus and pemphigoid, and since 2002 Medicare provides coverage for IVIg for pemphigus and pemphigoid sufferers. Even the United States Attorney's Office has concluded that many of Dr. Ahmed's patients "who received IVIG treatments from him had not previously responded to other therapies and suffered serious side-effects from those

---

[1]    *See e.g.*, Foster & Ahmed, *Intravenous Immunoglobulin Therapy for Ocular Cicatricial Pemphigoid: A Preliminary Study*, Opthamology, Nov. 1999, 106(11):2136-43; Letko et al., *Influence of intravenous immunoglobulin therapy on serum levels of anti-β4 antibodies in ocular cicatricial pemphigoid*, Current Eye Research, 2000, 21(2):646-54; Letko et al., Engineer et al., *Analysis of current data on the use of intravenous immunoglobulins in management of pemphigus vulgaris*, J. Am. Acad. of Dermatology, Dec. 2000, 43(6):1049-57; Engineer & Ahmed, *Role of intravenous immunoglobulin in the treatment of bullous pemphigoid: analysis of current data*, J. Am. Acad. of Dermatology, Jan. 2001, 44(1):83-88; Kumari et al., *Interleukin 1 components in cicatricial pemphigoid. Role in intravenous immunoglobulin therapy*, Cytokine, May 2001; 14(4):218-24; Bhol et al., *Pemphigus Vulgaris: The Role of IL-1 and IL-1 Receptor Antagonist in Pathogenesis and Effects of Intravenous Immunoglobulin on Their Production*, Clinical Immunology, Aug. 2001, 100(2):172-80.

[2]    *See* Letko et al., *A nonrandomized comparison of the clinical outcome of ocular involvement in patients with mucous membrane (cicatricial) pemphigoid between conventional immunosuppressive and intravenous immunoglobulin therapies*, Clinical Immunology, Volume 111, Issue 3, 303-310 (2004); Ahmed & Sami, *Intravenous immunoglobulin therapy for patients with pemphigus foliaceus unresponsive to conventional therapy*, Journal of the American Academy of Dermatology, Vol. 46, Issue 1 at 42-49 (2002).

therapies, but benefited from these IVIG treatments, including some whose pemphigoid symptoms were arrested or halted." Plea Agreement at 3.

## II.  OFFENSE CONDUCT

### A.     Medicare Cuts Coverage of IVIg Treatments for Most Blistering Disease Patients.

In 1997, the New England Region Medicare agency decided that it would only pay for IVIg to treat patients who had a diagnosis of pemphigus, and that it would not pay for IVIg administered to patients suffering from other autoimmune blistering diseases.  Because IVIg is very expensive, Medicare's denial of insurance coverage effectively barred pemphigoid patients from receiving IVIg treatment.  Prior to 1997, Medicare had paid for IVIg treatment for several of Dr. Ahmed's pemphigoid patients.

After this new policy was announced, Dr. Ahmed was tireless in his efforts to get IVIg treatments for all of his Medicare patients, including those diagnosed with pemphigoid.  Between 1997 and 2002, Dr. Ahmed made repeated submissions to Medicare to try to make IVIg treatments available to all patients diagnosed with skin blistering diseases.  *See e.g.*, Exhibit F, (Cover letter and index to 2001 submission).  Dr. Ahmed believed his battle with Medicare was about nothing less than the lives of his patients.

By way of example, Dr. Ahmed's efforts to obtain IVIg for Ms. LW[3] demonstrate both the devastating impact of Medicare's coverage decision, and the extraordinary efforts Dr. Ahmed made on behalf of his patients.  *See* Ex. G (LW Materials).  In the late 1990s, Ms. LW was diagnosed by Dr. Michael Lichter with a skin blistering disease called epidermolysis bullous aquisita ("EBA") which, like cicatricial pemphigoid, is an autoimmune disease that causes the mucous membranes and skin to blister and causes permanent scarring.  *See* Ex. G at 1-3.  *See also* Ex. A at 581.  By the time Ms. LW came to see Dr. Ahmed, she had blisters in her mouth,

---

[3]   The patient's initials are being used to protect her privacy.

nose, and esophagus, and the nail on one of her fingers had fallen off. She had difficulty

swallowing and had frequent nosebleeds. She had been treated with steroids, but had

experienced side-effects such as wide mood swings, insomnia, and exacerbation of her diabetes.

Conventional therapies also had not succeeded in controlling her disease, and Dr. Ahmed

concluded that IVIg was the only available alternative. Since Ms. LW's medical care was being

paid for by Medicare, Dr. Ahmed sent a lengthy letter describing Ms. LW's condition and her

urgent need for IVIg treatment to the Medical Director for Medicare's New England Region and

asked that Medicare pay for the treatments. *See* Ex. G at 4-11. Ms. LW, her brother, U.S.

Congressman Charles Bass, and U.S. Senator Bob Smith, also all wrote letters to Medicare

seeking coverage for IVIg treatment for Ms. LW. *Id.* at 12-15. Medicare rejected all of these

requests. *Id.* at 16-19. However, Medicare's rejection did not put an end to Dr. Ahmed's efforts.

Instead, in February 2000, he contacted philanthropist A. Raymond Tye and explained Ms. LW's

plight. *Id.* at 20. Mr. Tye agreed to pay for Ms. LW's IVIg treatment. Thanks to Dr. Ahmed's

efforts and Mr. Tye's generosity, Ms. LW received her last IVIg infusion in September of 2002,

and in January of 2003, Dr. Ahmed reported to Dr. Lichter that Ms. LW's EBA was in sustained

remission. *Id.* at 24.

      Although Dr. Ahmed was able to find an alternative solution for Ms. LW, he was not

always so successful in procuring IVIg for his Medicare patients. For example, another one of

Dr. Ahmed's patients, Richard Layton, was diagnosed with pemphigoid in the 1980s. *See* Ex. H

at 21 (Layton Dep.). Before seeing Dr. Ahmed, Mr. Layton had been treated with a variety of

drugs, but they did not prevent the disease from diminishing his eyesight in both eyes, and he

became legally blind in his left eye. *Id.* at 23. Finally, Mr. Layton's physician referred him to

Dr. Ahmed so that he could receive IVIg therapy. *Id.* at 24-25. After Mr. Layton came under

Dr. Ahmed's care, his vision improved significantly. *Id.* at 28. Mr. Layton has testified that he measured the improvement in his vision by how well he could read the eye chart at Dr. Ahmed's office. *Id.* Initially, just being able to read any portion of the chart Mr. Layton felt was "good," but over the course of receiving IVIg, Mr. Layton was able to read smaller and smaller numbers on the chart. *Id.* at 29. Over time, Mr. Layton even regained some vision in his left eye. *Id.* at 30-31.

Mr. Layton's IVIg treatments were initially paid for by Medicare. However, consistent with New England Medicare's 1997 policy, around 1999, Medicare stopped paying for the treatments and Mr. Layton had to quit the treatment regimen. *Id.* at 32. Dr. Ahmed sent multiple letters to Healthsource, Mr. Layton's secondary insurer, asking for coverage for IVIg treatments. *Id.* at 40, 50-51. While Healthsource ultimately agreed to pay for Mr. Layton's IVIg treatments, *id*. at 53, Mr. Layton's lifetime coverage through Healthsource was capped at $500,000, *id*. at 33. After Healthsource paid for a few cycles of IVIg, Mr. Layton became concerned that the cost of the IVIg would exhaust the $500,000 available to him from Healthsource, and that he would be unable to rely on Healthsource to pay for other, serious medical conditions that might occur in the future. *Id.* at 54-55. Ultimately, Mr. Layton decided that he would rather go blind and preserve a portion of the Healthsource funds for future emergencies. *Id.* at 55-56. He is now legally blind in both eyes. *Id.* at 56.

Most seriously, one of Dr. Ahmed's pemphigoid patients, Alice Goldrick, died after Medicare refused to pay for IVIg treatments despite repeated letters by her physicians and family. Ms. Goldrick's daughter, Eileen Barnacoat, has written a letter to the Court which describes what happened to her mother and she attaches a copy of her mother's death certificate that identifies pemphigoid as the cause of her mother's death. *See* Ex. E2, (Patient Letters,

Barnacoat Letter).  Ms. Barnacoat recounts how her mother suffered from the side-effects of

steroids and how her life ended in pain, humiliation, and frustration.  She writes:

> This disease caused my mother to lose the most basic pleasures of life.  She could
> no longer enjoy just sitting.  It was too painful for her to sit and chat, or to sit and
> listen to her radio, or watch the daily Mass on Boston Catholic Television.  She
> took to her bed, but the pain followed.  I bought bags of frozen peas for her to
> place between her legs.  Her throat and mouth were sore.  She could no longer
> enjoy a cup of tea and a chocolate chip cookie.  She was in constant pain, with no
> comfort, having no pleasures.

Ms. Goldrick died in 2001.  Ironically, less than twelve months later, in January 2002, Medicare

reversed course and decided to cover IVIg treatments for pemphigoid patients.  The suffering of

patients like Ms. Goldrick demonstrated to Dr. Ahmed that Medicare's decision not to allow

patients with recalcitrant cases of pemphigoid to receive IVIg treatments was unconscionable.

**B.     The Government Initiates an Investigation of Dr. Ahmed's IVIg Billing.**

In early 2000, Medicare noticed that a significant number of Dr. Ahmed's patients were

receiving IVIg to treat pemphigus.  *See* PSR at 7.  Since pemphigus is a rare disease, the United

States Attorney's Office for the District of Massachusetts initiated a health care fraud

investigation to determine whether Dr. Ahmed was billing Medicare for IVIg treatments that

were not being administered to patients suffering from pemphigus.  *Id.*  As part of that

investigation, on June 15, 2000, criminal investigators served Dr. Ahmed with a subpoena

seeking production of various documents, including the medical records of all patients whom he

had treated with IVIg.  *Id.*

The government's subpoena created a crisis for Dr. Ahmed.  He had a small group of

very sick Medicare patients who were receiving IVIg treatments and who had been diagnosed by

their physicians as having pemphigoid.  These patients had been unsuccessfully treated by their

physicians with conventional steroid therapy from anywhere between 3.5 to 14 years before they

came under Dr. Ahmed's care.  Dr. Ahmed believed that IVIg was the only therapy that offered

any hope for improvement for these patients.  He had also watched some of his other patients,

like Ms. Goldrick and Mr. Layton, suffer and even die after being unable to receive IVIg.  Dr.

Ahmed therefore felt impelled by his Hippocratic oath to provide these patients with IVIg,

regardless of whether they had pemphigoid or pemphigus.  Therefore, when the government

requested the medical records of all of the patients Dr. Ahmed had treated with IVIg, Dr. Ahmed

engaged in a desperate, wrongful act.  He created letters and immunopathology reports that

stated that these patients suffered from both pemphigus and pemphigoid and inserted them into

the medical records of these patients to justify the fact that their IVIg treatments had been billed

to Medicare.  Dr. Ahmed admits that he created these letters and the immunopathology reports to

obstruct the government's investigation, and he deeply regrets having done so.

**C.    The Existence of Both Pemphigoid and Pemphigus Antibodies In a Single
        Patient Is a Genuine Phenomenon.**

While Dr. Ahmed admits that he wrongfully inserted letters and immunopathology

reports into patient files provided to the government, the existence of dual diagnosis patients is a

real phenomenon.  There are multiple reports in medical literature of patients who had

pemphigus and pemphigoid simultaneously.[4]  Moreover, research that Dr. Ahmed has carried out

along with Dr. Edmond Yunis, a professor of Pathology at Harvard Medical School, has

identified specific genes that appear to predispose a person to generate both the antibodies

associated with pemphigoid and the antibodies associated with pemphigus.  *See* Ex. I at 11-13

(Expert Disclosures).

---

[4]    *See, e.g.*, N.J. Korman et al., *Coexistence of pemphigus foliaceus and bullous pemphigoid. Demonstration of
autoantibodies that bind to both the pemphigus foliaceus antigen complex and the bullous pemphigoid antigen*,
Archives of Dermatology, Vol. 127, No. 3; K. Tabuci et al., *Coexistance of pemphigus vulgaris and bullous
pemphigoid in the upper aerodigestive tract*, Auris Nasus Larynx, Vol. 33, Issue 2, 231-233; J. Peterson et al.,
*Clinical Evidence of an Intermolecular Epitope Spreading in a Patient With Pemphigus Foliaceous Converting Into
Bullous Pemphigoid*; Archives of Dermatology, Vol. 143, No. 2 (Correspondence).

Since the time of the original indictment in this matter, testing by an independent laboratory of blood samples from six of Dr. Ahmed's patients has shown that these patients do, in fact, have antibodies characteristic of both pemphigus and pemphigoid in their bloodstream. *See* Ex. I at 12-13, Table 1.  To ensure that these sera samples had not been contaminated, they were then submitted to the Serological Research Institute ("SERI") which confirmed that the samples each contained only a single source of DNA.  This data has been provided to the government.  *See* Ex. I at 3.

**D.    It is Undisputed that Dr. Ahmed Administered IVIg to his Medicaid Patients and That the Patients Benefited From the Treatment.**

Dr. Ahmed admits that the government's investigation revealed that he had committed a serious criminal act.  However, the government's investigation did <u>not</u> reveal that Dr. Ahmed had billed Medicare for treatment that was unwarranted or that was not actually given to ailing patients.  Instead, evidence the government collected during its investigation shows that Dr. Ahmed administered IVIg to the patients identified in the superseding indictment and that they experienced significant recoveries as a result.  *See* PSR ¶ 38.  The government agrees that "every one of Ahmed's claims for reimbursement for IVIG treatments administered to his pemphigoid patients represented an actual outpatient IVIG treatment that Ahmed had administered to one of his patients."  *Id.*  The government's own evidence "indicated that a number of these pemphigoid patients were debilitated from their disease, including some in whom the disease was causing partial or total blindness." *Id.*  The government has also stated that: "Many of Defendant's Medicare pemphigoid patients who received IVIG treatments from him had not previously responded to other therapies and suffered serious side-effects from those therapies, but benefited from the IVIG treatments, including some whose pemphigoid symptoms were arrested or halted."  Plea Agreement at 3.

The government's evidence of the efficacy of IVIg included testimony and documents from Dr. Robert Weiss, who was one of the patients included in the government's indictment. Dr. Weiss was diagnosed with bullous pemphigoid in the mid 1990s. *See* Ex. J at 10-11 (Weiss Dep.). After his diagnosis, he spent four and a half years being treated by three different dermatologists and three different academic institutions. *See* Ex. J, Dep. Ex. 115. Dr. Weiss has stated that during that time, "I was slowly dying from the treatment and the disease. I was on 80 milligrams of Prednisone a day and 30 mg of Methotrexate a week. I had developed a cataract and osteroporosis from the Prednisone and severe side effects from the Methotrexate and was wasting away from the disease." *Id.* After he came under Dr. Ahmed's care and received IVIg treatment, he eventually became "symptom free." *Id.* In 2007, when Dr. Weiss was deposed in connection with this case, he testified that the only time since his diagnosis that he was lesion free and pain free was when he received IVIg. *Id.* at 74. He further stated that, "I have no question [that] the treatment was very successful. I was very grateful for it … ." *Id.* at 76.

### III.  GUIDELINE CALCULATION

Dr. Ahmed asks this Court to accept the United States Sentencing Guideline ("Guideline") calculation set forth in the plea agreement. The Probation Department agrees with and has adopted the parties' calculation in the PSR. Since the conduct at issue occurred when Dr. Ahmed produced subpoenaed documents to the government in 2000, the 2000 edition of the Guidelines should be applied.

### A.    Base Offense Level

A violation of 18 U.S.C. § 1518 is governed by Guideline § 2J1.2, "Obstruction of Justice." Subpart (c) of Section 2J1.2 instructs that: "If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in

respect to that criminal offense, if the resulting offense level is greater than that determined

[through the application of Section 2J1.2]."  *See also United States v. LeMoure*, 474 F.3d 37, 45

(1st Cir. 2007) (affirming application of cross-reference).

In this case, Section 2X3.1 controls the calculation of the base offense level.  Section

2X3.1 sets forth that the defendants' base offense level should be "6 levels lower than the

offense level for the underlying offense … ."  The parties agree that Dr. Ahmed's obstruction

was directed toward the investigation of a criminal health care fraud offense, which has a base

offense level of 6 under Section 2F1.1(a).  The parties also agree that Medicare paid

$5,418,601.07 for the IVIg treatment of patients for whom Dr. Ahmed created false letters and

immunopathology reports.  Accordingly, the offense level must be increased by 14 pursuant to

Section 2F1.1(b)(1)(O).  The offense involved more than minimal planning, thereby increasing

the level by 2 pursuant to Section 2F1.1(b)(2).  This yields a total offense level of 22.

**B.     Acceptance of Responsibility**

On the basis of Dr. Ahmed's thorough acceptance of responsibility for his wrongful acts,

the parties agree that the offense level should be reduced by 3 levels under Section 3E1.1(a), (b).

**C.     Total Offense Level**

Under this agreed upon calculation, the total offense level is 13.  Since Dr. Ahmed has no

criminal history, he falls in criminal history category I.  For a typical level 13 offense in criminal

history category I, the recommended sentencing range is 12 to 18 months in prison.

### IV.  SENTENCING RECOMMENDATION

**A.     In Setting Dr. Ahmed's Sentence, the Court Must Individualized Determination of What is Reasonable and Appropriate.**

Six months home confinement, a $20,000 fine, and 400 hours of community service are

the appropriate sentence in this case.  The Supreme Court's recent decision in *Gall v. United*

*States*, 522 U.S. ___, 128 S.Ct. 586, 596-97 (2007) sets forth the correct method for setting a

defendant's sentence:

> [A] district court should begin all sentencing proceedings by correctly calculating
> the applicable Guidelines range. As a matter of administration and to secure
> nationwide consistency, the Guidelines should be the starting point and the initial
> benchmark. The Guidelines are not the only consideration, however. Accordingly,
> after giving both parties an opportunity to argue for whatever sentence they deem
> appropriate, the district judge should then consider all of the § 3553(a) factors to
> determine whether they support the sentence requested by a party. In so doing, he
> may not presume that the Guidelines range is reasonable. He must make an
> individualized assessment based on the facts presented. If he decides that an
> outside-Guidelines sentence is warranted, he must consider the extent of the
> deviation and ensure that the justification is sufficiently compelling to support the
> degree of the variance.

128 S.Ct. at 596-97 (citations omitted). Applying this reasoning here, both the government and

the defense agree that a strict application of the Guidelines calculation is unreasonable and

overstates the seriousness of Dr. Ahmed's offense. *See* Plea Agreement at 3 (the government

agrees "that there is a basis for a deviation from the [Guidelines] pursuant to 18 U.S.C. § 3553(a)

under the unique facts of this case – namely, that the fraud loss under investigation of

$5,418,601.07 set forth above overstates the seriousness of the offense …").

**B.    The Guidelines Yield an Unreasonable Result Because "Loss" Is Not a Proper
Measure of the Seriousness of Dr. Ahmed's Offense.**

The Guidelines yield an unreasonable result in this case because the calculation is driven

by the size of the "loss" sustained by Medicare – the $5.4 million that Medicare paid to Dr.

Ahmed for IVIg treatments for the patients who were the subject of the government's

investigation. This "loss" figure is not a proper basis for setting Dr. Ahmed's sentence because

the government does not allege that Dr. Ahmed failed to administer the IVIg treatments for

which he billed Medicare. Instead, the government's own investigation revealed that Dr. Ahmed

administered the IVIg treatments he billed to patients who were debilitated by their disease. *See*

PSR ¶ 38.  Use of the $5.4 million "loss" figure also ignores the irony that today, Medicare pays

for IVIg treatments provided to pemphigoid as well as pemphigus patients.

More importantly "loss" is an inappropriate measure of Dr. Ahmed's misconduct because

it fails to account for the enormous benefit that Dr. Ahmed provided to his patients.  The

government itself states that many of these patients "had not previously responded to other

therapies and suffered serious side-effects from those therapies" and that the patients "benefited

from the IVIG treatments received" from Dr. Ahmed. Plea Agreement at 3.  The government

even states that in some cases the IVIg treatments caused the patients' symptoms to be arrested

or halted.  *Id.*  Moreover, if these Medicare patients had not received IVIg from Dr. Ahmed they

would still have received some form of medical care, such as steroid treatments, for which

Medicare would have been billed.  These patients probably also would have gotten sicker

without IVIg and might even have needed costly hospitalizations for which Medicare might have

had to pay.  Under these unique circumstances, the government agrees that a deviation from a

strict guidelines calculation is warranted because "loss" is not a good proxy for the harm that

actually ensued from Dr. Ahmed's acts.  *See* Plea Agreement at 3.  *See also United States v.*

*Stuart*, 22 F.3d 76, 82 (3d Cir. 1994) (in some circumstances the loss can overstate both the

degree of the defendant's criminality and his need to be corrected); *United States v. Mueffelman*,

400 F.Supp.2d 368 (D. Mass. 2005) ("With advisory Guidelines, the amount of loss should be

understood in the context of the purposes of sentencing enumerated in 18 U.S.C. § 3553(a)");

*United States v. Emmennegger*, 329 F. Supp.2d 416, 427 (S.D.N.Y. 2004) (noting that loss

amount can be "a relatively weak indicator of the moral seriousness of the offense or the need for

deterrence"); *United States v. Costello*, 16 F. Supp.2d 36, 40 (D. Mass. 1998) (granting

downward departure where loss overstated defendant's culpability).

The $5.4 million also is not a proper measure of Dr. Ahmed's misconduct because the actual profit Dr. Ahmed realized from the administration of these IVIg treatments is only a small part of the money Medicare paid out. IVIg is very costly to purchase and to administer. Each time a patient receives IVIg, he or she must spend several hours in the Center for Blistering Disease's infusion suite under the care of specially trained nursing staff. *See* PSR ¶ 11. During the relevant time period, IVIg had an average retail cost of $5,000 per treatment. *Id.* An examination of the billing records obtained by the government in the course of its investigation reveals that approximately 66% of the reimbursement paid out by Medicare went to pay for just the IVIg drug itself. Additionally, pursuant to Dr. Ahmed's contract with his billing company, Evocare, 5% of all monies received from Medicare was retained by Evocare as a collection fee.[5] The contract further provided that the remaining "profit" (the remaining approximately 29% of the total paid out by Medicare) would be split evenly between Dr. Ahmed and Evocare. It is therefore fair to assume that Dr. Ahmed received no more than approximately 14.5% of the sums reimbursed by Medicare. In other words, Dr. Ahmed probably only received approximately $786,000 of the total $5,418,601.07 according to this formula. This sum, of course, still does not represent Dr. Ahmed's actual profit, as he still had to pay for expenses incurred by the Center for Blistering Disease such as medical equipment, rent, upkeep of the infusion suite, and staff salaries.

In sum, $5.4 million is an inappropriate and unreasonable measure of the harm caused by Dr. Ahmed's crime. This is not a fraud case. The government has agreed to dismiss all charges that Dr. Ahmed falsely billed Medicare for the treatments he administered to his patients. Instead, the parties agree that he administered the IVIg treatments he billed to patients who

---

[5] In addition, under the contract Evocare had the right to keep the cost of services it provided, such as the cost of providing nursing care. However, since these amounts cannot be precisely quantified they are not included here.

needed them.  They agree that he had valid medical reasons for administering the drug and that

his patients made remarkable recoveries they otherwise could not have achieved.  His actions

were not driven by greed, they were driven by a desire to help patients who had failed

conventional treatments and had no other hope for recovery.

C.    **A Host of Factors, Including the Unique Role Dr. Ahmed Plays in the Medical
      Community, Make Six Months Home Confinement the Appropriate Sentence.**

A prison sentence is not appropriate in this case because of the devastating effect Dr.

Ahmed's absence would have on the Center for Blistering Disease and on his patients. Under 18

U.S.C. § 3553(a), a proper sentence should reflect:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;

> (2) the need for the sentence imposed -

>> (A) to reflect the seriousness of the offense, to promote respect for the
>> law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most effective
>> manner;

Applying these factors here, the nature and circumstances of the offense and the history and

characteristics of Dr. Ahmed, do not warrant a prison sentence.  The mere fact of the criminal

charges and his subsequent guilty plea has already had serious consequences for his medical

career.  More importantly, as outlined above, Dr. Ahmed's actions caused limited harm, and his

life has been dedicated to the treatment of patients with serious skin diseases.  He is solely

responsible for operating the Center for Blistering Diseases, and there is no other medical facility

in New England that can readily accommodate and treat all of Dr. Ahmed's patients.  Moreover,

there is no other doctor in New England – and possibly nationwide – who has the same level of blistering disease expertise and who provides the same level of personalized care to pemphigus and pemphigoid patients.  The public does not need to be protected from "harm" by Dr. Ahmed; instead, harm will ensue if Dr. Ahmed is sent to prison and Dr. Ahmed's patients and the larger medical community are no longer able to access his care and expertise.

A sentence of home confinement and of four hundred hours of medical community service is the correct approach because it ensures Dr. Ahmed's patients continued appropriate medical care and takes advantage of Dr. Ahmed's unique skills.  Through his community service, Dr. Ahmed also would provide dermatological care to patients who otherwise would not have access to such a singular doctor.  For example, the elderly often suffer serious skin problems, but there are very few dermatologists who regularly visit nursing homes.  If Dr. Ahmed spent his community service hours visiting such elderly patients, he would be providing free medical care to an underserved and worthy community.

Dr. Ahmed would undertake any order of the Court to carry out community service with seriousness and commitment.  As the affidavits attached at Exhibits K, L, and M reflect, Dr. Ahmed has long been committed to helping those less fortunate than himself.  These affidavits recount that Dr. Ahmed has donated a large portion of his income the Noor Jahan Salam Ahmed Trust, a trust named in honor of his parents.  Mr. Mohommed Asrar, Dr. Mohommed Whaheen Khan, and Mr. Bhavani Tekam attest that the Trust funds a kindergarten, community colleges, provides medical devices (such as wheelchairs), and provides disaster relief.  The Trust also provides a variety of free medical care.  It operates two free medical facilities that provide free health care and medication to two impoverished communities.  It operates periodic medical "camps" that provide specific care such as diabetes screening, cancer screening, malaria

treatment, and vaccinations.  Dr. Ahmed also has donated one and a half acres of land to the

village of Buranda and has paid for the construction of 1,500 homes on the land for people who

had previously been homeless.  Dr. Ahmed's generosity also extends to his own patients at the

Center for Blistering Diseases.  He has personally paid for twelve of his blistering patients to

receive a new drug treatment called Rituximab.

A sentence of home confinement and four hundred hours of medical community service

is a reasonable and appropriate sentence for Dr. Ahmed who is an essential member of the

medical community here in New England and who has a long standing commitment to

supporting community health and welfare in India and the United States.  *See* 18 U.S.C. §

3553(a) (Court shall consider the history and characteristics of the defendant in determining the

correct sentence).

**D.    The $2.9 Million That Dr. Ahmed Has Agreed to Forfeit to the Government Already
Imposes Harsh Consequences on Dr. Ahmed for His Wrongdoing.**

Home confinement and community service are also the correct punishment in light of the

$2.9 million that Dr. Ahmed agreed to forfeit to the government under the terms of his plea

agreement.  *See* Plea Agreement at 7.  While Dr. Ahmed has agreed that this sum is derived from

the "gross proceeds" of the funds he received from Medicare, *see id.*, this figure does not

represent the profits Dr. Ahmed ultimately netted from Medicare.  Instead, as detailed above, Dr.

Ahmed used the funds he received from Medicare to pay for: (1) the IVIg itself, (2) the

administration of the IVIg, (3) maintenance of the infusion facilities and staff at the Center for

Blistering Diseases, and (4) the billing and administrative services provided by Evocare.

Accordingly, the $2.9 million is not a representation of net profit and metes out significant

financial punishment to Dr. Ahmed over and above the $20,000 fine that the parties are

recommending that the Court impose.

## V.  CONCLUSION

Dr. Ahmed has dedicated his life to helping patients suffering from blistering diseases. While his decision to submit false documents to the government was wrong, and he deeply regrets having interfered with the government's investigation.  However, the government's investigation ultimately concluded that the treatments Dr. Ahmed billed to Medicare were, in fact, administered to patients.  It also showed that these patients were failing on conventional steroid therapies and that the IVIg treatments they received from Dr. Ahmed resulted in remarkable recoveries.  Removing Dr. Ahmed from the community would cause great harm to his patients, to the Center for Blistering Diseases, and to the medical community that relies on his advice and assistance.  A sentence of home confinement and community service will meet the requirements of 18 U.S.C. § 3553 "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and will ensure maximum benefit to the community.

> Respectfully submitted,
> **Dr. Abdul Razzaque Ahmed,**
> By his attorney,
>
>  /s/ Richard M. Egbert _____
> Richard M. Egbert
> 99 Summer Street
> Boston, MA 02110
> (617) 737-8222

Dated: March 17, 2008

### Certificate of Service

I, Richard M. Egbert, hereby certify that I have, on this 17th day of March, 2008, caused the above document to be electronically served upon Assistant U.S. Attorneys Michael K. Loucks, James Arnold, and Jeremy Sternberg, Office of the United States Attorney, District of Massachusetts, One Courthouse Way, Boston, MA 02210.

> __/s/ Richard M. Egbert_____
> Richard M. Egbert

26

**Note:  Exhibits to the Defendant's Sentencing Memorandum have been filed with the Court in hard copy only.**