# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.  05-10057-RCL |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ABDUL RAZZAQUE AHMED, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States hereby submits its memorandum in connection with the upcoming sentencing in this case.  Defendant Abdul Razzaque Ahmed ("Defendant") is convicted of obstructing a health care fraud investigation in violation of 18 U.S.C. § 1518, having pleading guilty on November 5, 2007.  As Defendant has admitted, on June 15, 2000, he was served with an administrative subpoena requiring production of certain medical records pertaining to patients whom he was treating with an experimental drug treatment and then billing Medicare for those treatments.  In response to this subpoena, Defendant carefully created numerous false documents, including letters and fictitious test reports, in an attempt to hide the fact that he was knowingly billing Medicare for experimental drug treatments that he knew Medicare would not pay for were he to have listed his patients' diagnoses correctly on the bills.  Defendant then arranged for these false documents to be produced to the United States.  These false documents purported to support Defendant's Medicare billings then under investigation.

The United States urges that the Court impose the following sentence upon Defendant:

- **6 months of community confinement, to be followed by 6 months of home confinement** (with leave for Defendant to work during the day for this entire 12 month period);

- **400 hours of community service medical care** (in a physician capacity to the extent Defendant maintains his medical licence or in a non-physician capacity to the extent he does not);

- **$20,000 criminal fine**;

- **$2.9 million of criminal forfeiture**; and

- **$100 mandatory special assessment.**

As set forth more fully below, the United States' sentencing recommendation seeks to balance the aims of punishing the serious obstruction offense of which Defendant has been convicted, while allowing the Defendant to remain at liberty to work.

## I.   BACKGROUND

On November 5, 2007, Defendant pled guilty, pursuant to a plea agreement, to Count 12 of the Superseding Indictment charging him with obstruction of criminal investigation of health care offenses in violation of 18 U.S.C. §1518.  On that same date, the Court accepted that guilty plea.

### A.   Defendant's Attempt to Obstruct the Investigation

In 2000, the United States commenced an investigation concerning Defendant's Medicare billings pertaining to Defendant's administration of an extremely expensive drug, intravenous immunoglobulin ("IVIG"), to treat patients that Defendant claimed were suffering from pemphigus, a rare autoimmune blistering skin disease.  Presentence Report ("PSR") ¶27(b). During the relevant period (1997-2001), Medicare allowed reimbursement for IVIG treatments for patients suffering from pemphigus, but did not allow IVIG reimbursement for patients who suffered from a different autoimmune blistering skin disease called pemphigoid.  PSR ¶10. Medicare distinguished between reimbursement for the two diseases for various policy reasons,

including, but not limited to the facts that (1) IVIg was an extremely expensive experimental therapy that, at the time, had not been established as being a safe and effective form of treatment, and (2) there was an understanding in the medical community that pemphigus could potentially have significantly more severe consequences for most patients than pemphigoid.

Defendant was well-aware that Medicare only reimbursed for IVIG treatments for patients with pemphigus and not pemphigoid. During this time period, Defendant personally made various efforts to try to change Medicare policy to cover IVIG treatments for both diseases. PSR ¶21. Until 2002, however, Defendant was unsuccessful in causing Medicare to change its reimbursement policy with respect to IVIg treatments administered strictly to treat patients suffering from pemphigoid. As a result, during this time period, although Defendant was entitled to treat his pemphigoid patients using whatever medical treatments he deemed appropriate (including IVIG), Defendant knew and understood that Medicare reimbursement for IVIG treatments for his pemphigoid patients was unavailable.

Despite this, Defendant persisted in both treating his Medicare pemphigoid patients using IVIG **and** submitting claims for Medicare reimbursement for these treatments. In order to obtain Medicare reimbursements for IVIG treatments administered to his pemphigoid patients, Defendant caused the claims for reimbursement for these patients to be submitted with a false diagnosis of pemphigus. By submitting claims for Medicare reimbursement that falsely stated that his patients were suffering from pemphigus, Defendant caused Medicare to provide payments to him that he would not otherwise have received. All told, Medicare paid Defendant in excess of $5.4 million in response to these claims. PSR ¶37.

On June 15, 2000, as part of an investigation into some of these claims, criminal investigators served Defendant with a subpoena, issued pursuant to 18 U.S.C. §3486, seeking production of Defendant's medical records for patients treated with IVIG. PSR ¶27. In response to this subpoena, Defendant created false and backdated documents, which he then caused to be produced to the United States in October 2000. PSR ¶28. Those false and backdated documents, which included numerous bogus test reports (called Immunopathology Reports) and backdated letters to doctors who had referred the patients to Defendant, falsely indicated that various of Defendant's pemphigoid patients had a "dual diagnosis" of both pemphigus and pemphigoid. The false "dual diagnoses" portrayed in these documents were consistent with the claims for reimbursement that Defendant was submitting to Medicare in order to receive payments to which he was not otherwise entitled. PSR ¶¶28-35. In fact, in 2001, Defendant submitted some of the false Immunopathology Reports to Medicare in support of his billings. PSR ¶37.

### B.    The Indictment

On March 15, 2005, a grand jury in the District of Massachusetts returned a 24-count Indictment against Defendant charging him with mail fraud, health care fraud, obstruction and money laundering. The Indictment also included certain forfeiture allegations. On October 10, 2007, the grand jury returned a shorter, 15-count Superseding Indictment that charged the same mixture of crimes, but included fewer mail and health care fraud counts largely due to the fact that certain patients relevant to some of the counts in the original Indictment had passed away during the pendency of the prosecution.

C.    **Defendant's Guilty Plea to Count 12**

On November 1, 2007, Defendant entered into a plea agreement in which he agreed to plead guilty to Count 12 of the Superseding Indictment.  Count 12 charged Defendant with obstructing a health care fraud investigation in violation of 18 U.S.C. §1518.  The essential terms of Defendant's plea agreement, which was filed pursuant to Rule 11(c)(1)(B), were as follows:

- Defendant agreed to (and did) plead guilty to count 12 of the Superseding Indictment, charging him with obstruction of a criminal investigation of health care offenses (1) by creating and causing to be created false documents, including Immunopathology Reports and letters to referring physicians of certain of his Medicare patients, both of which purported to show that certain patients suffered from a "dual diagnosis" of pemphigus and pemphigoid, when in fact those patients only suffered from pemphigoid, and (2) by further causing those false documents to be produced to individuals duly authorized by a department and agency of the United States to conduct and engage in investigations for prosecutions for violations of health care offenses. (Plea Agreement ¶1)

- The United States agreed to dismiss counts 1 through 11 and 13 through 15 after imposition of the sentence. (Plea Agreement ¶1)

- The parties agreed to take the position that under the applicable Sentencing Guidelines (primarily §§2J1.2 and 2X3.1), the Total Offense Level was 13, which when coupled with a criminal history of I, yields a Sentencing Guideline Range of 12 to 18 months (Plea Agreement ¶3)

- The parties also agreed that while there was no basis for departure from the Sentencing Guidelines, there was a basis for a deviation from the advisory Sentencing Guidelines pursuant to 18 U.S.C. §3553(a) under the unique facts of this case.  The basis for these unique deviation from the advisory guidelines was that the fraud loss ($5,418,601.07) that was under investigation at the time of Defendant's obstruction overstated the seriousness of the offense in the following manner:

    Defendant obstructed a criminal investigation concerning billings for actual medical treatments of intravenous immunoglobulin (IVIG) that Defendant, in the course of his medical practice, administered to Medicare patients who were suffering from an autoimmune blistering skin disease called pemphigoid.  A number of these Medicare patients were debilitated from this disease, including some in whom

it was causing partial or total blindness. Many of
Defendant's Medicare pemphigoid patients who received
IVIG treatments from him had not previously responded to
other therapies and suffered serious side-effects from those
therapies, but benefited from these IVIG treatments,
including some whose pemphigoid symptoms were arrested
or halted. During the period under investigation (1997-
2001), Medicare did not reimburse for IVIG treatments for
patients who suffered from pemphigoid; however, in 2002,
Medicare revised its policy to cover the administration of
IVIG to patients suffering from pemphigoid.

(Plea Agreement ¶3).

- The parties agreed to recommend a sentence of probation, that did not include
imprisonment or jail, but did include at least 6 months of home confinement. The
United States Attorney reserved the right to seek up to an additional 6 months of
either community confinement or home confinement. (Plea Agreement ¶4(a)).

- The parties also agreed to recommend that Defendant provide 400 hours of free
medical care, pay a fine of $20,000 and forfeit $2.9 million (Plea Agreement ¶¶4
and 10).

- The parties also agreed that Defendant would retract in writing (in a form agreed
to by the parties) two articles co-authored by him and published in 2001.
Defendant fulfilled this obligation. (Plea Agreement ¶4).

On November 5, 2007, Defendant appeared before the Court and voluntarily pled guilty

to Count 12 of the Superseding Indictment charging him with obstruction of a criminal

investigation of health care offenses in violation of 18 U.S.C. § 1518.

## II.  ARGUMENT

As an overlay to this sentencing, it is important to understand the nature and context of

Defendant's criminal conduct – namely, that it was a sophisticated attempt to obstruct an

investigation into a prototypical white-collar crime, health care billing fraud. Defendant is a

highly educated individual who possesses a Medical Degree, a Doctorate in Medical Science,

and a Masters in Public Administration. Defendant has been working as a physician for over 30

6

years.  During his career he has earned a substantial income and has had every opportunity and reason to earn an honest living.

Defendant was well-aware of Medicare's reimbursement policies with respect to IVIG treatments, and Defendant knew and understood the policy reasons underlying the decision at the time not to provide Medicare reimbursement for experimental IVIG treatments for pemphigoid. Nonetheless, Defendant persisted in seeking Medicare reimbursements for the IVIG treatments he was administering to his pemphigoid patients.  Further, unlike many convicted felons, Defendant was well-aware of the criminal investigation into his conduct at the outset and had the opportunity, had he so chosen, to be honest with the United States and pay back monies to which he was not entitled.  Instead, however, Defendant chose to forsake that opportunity and consciously elected to take a different path – a path involving a sophisticated attempt to hide and obfuscate his original false Medicare billings.  It is for this ultimately unsuccessful obstruction of justice that Defendant now appears for sentencing.

A.    **The Advisory Sentencing Guidelines**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  Gall v. United States, 128 S.Ct. 586, 596 (2007).  Here the parties and Probation agree that the applicable Sentencing Guidelines calculation results in a Total Adjusted Offense Level of 13, which was determined via application of the cross-reference contained within U.S.S.G. § 2J1.2(c).  As the Application Notes provided in the Background section to U.S.S.G. § 2J1.2 explain, criminal offenses involving the "specific offense characteristics reflect the more serious forms of obstruction."

Defendant's Total Adjusted Offense Level of 13, when combined with a Criminal History Category I, translates into an advisory sentencing guideline range of 12-18 months incarceration.

**B.     Sentencing Factors Under 18 U.S.C. §3553**

It is now well-established that the Sentencing Guidelines are advisory and that while they are to be an "initial benchmark," the Court must consider all of the §3553(a) factors to determine whether they support the sentence sought by a party.  <u>Gall</u>, 128 S.Ct. at 596.  Section 3553(a)(1) provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, determining the particular sentence to be imposed, shall consider –
>
> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)     the need for the sentence imposed –
>
> > (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B)     to afford adequate deterrence to criminal conduct;
> >
> > (C)     to protect the public from further crimes of the defendant; and
> >
> > (D)     to provide the defendant with needed educational or vocational training; medical care, or other correctional treatment in the most effective manner;

In the plea agreement, the United States agreed to recommend to the Court that judicial consideration of these factors should lead the Court to impose a sentence outside the advisory

8

guidelines because the fraud loss under investigation overstated the seriousness of the

Defendant's offense.[1]  The United States explains its position with respect to the § 3553(a)

factors and why a sentence of 6 months of community confinement, to be followed by 6 months

of home confinement, is appropriate in this case.

<b>1.    Nature and seriousness of the offense</b>

Obstruction is a serious offense.  See e.g., United States v. Lueddeke, 908 F.2d 230, 233

(7th Cir. 1990) (noting that mere probation is inappropriate for such a serious offense); In re

Sealed Case, 754 F.2d 395, 400-401 (D.C. Cir. 1985)(observing the fact that "perjury and

obstruction of justice constitute 'serious' misconduct strikes us as a relatively uncontroversial

proposition").  In a recent sentencing of another defendant who attempted to obstruct a health

care fraud investigation by committing perjury before the grand jury, Judge O'Toole said the

following, which is equally apt about obstruction:

> Perjury is an offense that strikes directly at the search for truth and,
> therefore, undermines institutions whose office it is to determine
> the truth in order to do justice.  And so it works a corruption of the
> processes of justice and, therefore, is a serious offense that merits a
> serious response.

(Sentencing Transcript dated October 30, 2007, at 22, in United States v. Joanne Richardson, No.

02-10211-GAO; copy attached as Exhibit 1).

In this case, a full understanding of the seriousness of Defendant's criminal conduct is

best appreciated by looking at the extent of its planning, breadth and impact.  Upon being served

with a federal subpoena seeking information about his IVIG treatments, Defendant knew that the

---

[1]For comparison purposes, the sentence urged by the parties is three levels lower than the
Total Offense Level yielded by the guideline calculation.

United States was seeking to learn the true nature of certain of his Medicare billings. In response to that investigation, Defendant created and disseminated numerous false and backdated documents. First, Defendant created a large number of bogus test reports for his pemphigoid patients. Defendant put these false test reports into numerous patient files. Next, Defendant drafted false and backdated letters to these patients' referring physicians, in which Defendant misinformed these referring physicians as to the nature of their respective patients' disease. Defendant then caused these false and backdated letters to be sent to the various referring physicians, thus ensuring that the false and backdated letters ended up both in Defendant's own patient files as well as in the patient files of the referring physicians.

Defendant also used these false records to deceive his business partner Evocare, and its successors who actually processed his bills. With his false records, Defendant convinced Evocare and its successors that his various Medicare patients were suffering from a "dual diagnosis" of pemphigoid and pemphigus and that submitting claims for Medicare reimbursement for the IVIG treatments he administered was therefore permitted. In some instances, including some in 2001, Defendant further used the false test reports as support in his bills to Medicare in order to obtain payment for IVIG treatments that Defendant knew he was not entitled to receive.

Defendant's obstructive efforts were extensive and well-planned. Defendant's efforts involved the creation of various false records involving each of his Medicare pemphigoid patients. Many of the false documents, particularly the backdated "addendum" letters and test results, had to be individually created with care so that the dates and patient description correlated to the dates of earlier actual communications that the Defendant had previously

authored in which Defendant had advised an individual referring physician that he had diagnosed the patient in question as only suffering from pemphigoid.  Defendant created backdated records ranging in time from 1996 to 1999.

In order to accomplish his objective and make the records appear to be contemporaneous rather than backdated, Defendant undertook a substantial effort.  This was no simple task that Defendant could accomplish by writing one false letter and duplicating it multiple times.  Rather, Defendant specifically tailored each letter to be addressed to each individual referring physician, Defendant specifically tailored each letter to describe an individual patient's medical condition and prior medical history,  and Defendant specifically tailored each letter to refer to a false immunopathology report that he also had to specially prepare on a patient-by-patient basis.

Of course, the overlay to this conduct, was that it was all done *after* Defendant had been served with a Subpoena and that it was done for the purpose of providing the United States with this false information.  The final planning touch for the obstruction was the method by which the Defendant arranged for the false, backdated letters to be delivered to the referring physicians.  Because of the obvious problem with merely sending an "addendum" in the year 2000 to an original letter dated as far back as 1996, Defendant directed an employee to write an explanatory letter, dated September 11, 2000, that was to be sent with each phony letter.  The September 11, 2000 cover letter falsely said that the "addendum" had recently been located.  An example of a genuine letter, a false backdated letter and the accompanying September 11, 2000 cover letter is attached hereto as Exhibit 2.

Although ultimately unsuccessful, Defendant's obstruction – in addition to being extensive, well-planned and directed to many recipients (doctors, patient files, Evocare and

11

Medicare) – delayed, prolonged, increased the expense of, and for some period, thwarted the United States' investigation into the "dual diagnoses" IVIG claims for reimbursement that Defendant submitted to Medicare. Had Defendant been truthful and forthcoming in response to the subpoena for documents, his medical files would have demonstrated that for many of his "dual diagnosis" patients there was no medical basis for Defendant's claim that his pemphigoid patients were also suffering from pemphigus. In contrast, by submitted false documents in an effort to fool the United States into believing that his pemphigoid patients were also suffering from pemphigus, Defendant caused the United States to engage in a lengthy, time-consuming investigation that involved issuance of numerous subpoenas, interviews of various referring physicians who had received the phony "addendum" letters, interviews of various patients whom Defendant purportedly diagnosed with suffering from a "dual diagnosis," and laboratory analysis of the ink on one of those letters in an effort to determine if it could have been signed in 1996 (as the date of the letter indicated).

Defendant's position, as articulated in his Sentencing Memorandum, appears to suggest that Defendant was somehow "impelled" to subvert the Government's investigation into his Medicare billings in his zeal to treat his Medicare pemphigoid patients with IVIG. This disturbing subtext runs through the entirety of Defendant's Sentencing Memorandum. The United States' investigation and prosecution of the Defendant was never about quality of care issues. Defendant has provided scores of testimonials from fellow physicians and patients attesting to the quality of the care he provides. Implicit, and even explicit, in some of these testimonials is that Defendant's passion for and wisdom in treating pemphigiod patients with

IVIG cleanses him of any criminal sanction, let alone scrutiny by the United States.  This simply is not so.

First, Medicare is a finite government fund that pays for certain health care to elderly and sick Americans.  The First Circuit has recognized that the crime under investigation, health care fraud, "is a serious crime which affects the financial integrity of a program meant to aid tens of millions of people in need of health care.  Every dollar lost to fraud is a dollar that could have provided medical care to the elderly or the disabled."  United States v. Thurston, 456 F.3d 211, 220 (1st Cir. 2006)(internal quotation and citation omitted); cert. granted and judgment vacated on _Gall_ grounds, 2008 WL 59209 (January 7, 2008).

Medicare typically does not pay for all experimental therapies, which IVIG was for both pemphigus and pemphigoid.  During 1997 to 2001, Medicare agreed to pay for this experimental therapy for pemphigus, which was widely recognized as the more serious of the two diseases. The director of the New England Medicare office urged Defendant, during this period, to publish papers demonstrating that the experimental IVIG therapy worked for pemphigoid, as that would be the most effective way to achieve a national Medicare coverage decision approving IVIG therapy for pemphigoid.  Ultimately Defendant did so and in 2002, Medicare approved IVIG therapy for pemphigoid.  PSR ¶38.

However, Medicare reimbursement for experimental therapies is governed by Medicare policy decisions, not by the views, no matter how strongly held, of individual physicians as to that which is beneficial or best or essential for their patients.  If the standard were otherwise, the Medicare Trust Fund would be spent at the whim of the thousands of Medicare provider physicians.  No health insurer, even a public one like Medicare, operates this way.  Nor should it.

13

Decisions about which experimental therapies can be provided, and under what circumstances, must be made in a centralized, organized way that is for the benefit of all Medicare beneficiaries, not a select physician or a select group of his patients, no matter how compelling their suffering. Just as an individual physician's view of "medical necessity" is not a sufficient reason to allow that physician to use an unapproved drug to treat patients who, in that doctor's individual judgment would benefit from those drugs, Gonzales v. Raich, 545 U.S. 1, 28 (2005) ("the dispensing of new drugs, even when doctors approve their use, must await federal approval"), it is equally impermissible for an individual doctor to force Medicare to pay for any treatments that he wishes to provide just because that individual doctor believes that the treatments may be in the patient's best interest.

Defendant's argument that he "felt impelled by his Hippocratic oath to provide these patients with IVIg, regardless of whether they had pemphigoid or pemphigus," (Defendant's Sentencing Mem. at 16), ignores the crucial distinction between what treatments Defendant could lawfully provide and what treatments Defendant could lawfully bill to Medicare. Consistent with his obligations as a physician, Defendant was entitled to provide IVIG treatments to any patient he sought to treat with the drug. Medicare did not dictate or even counsel what treatments to provide. The treatments Defendant provided to his patients only became a Medicare issue when Defendant elected to bill Medicare for the IVIG treatments he had previously administered. Although Defendant's Sentencing Memorandum attempts to portray Defendant as being altruistic, it is noteworthy that Defendant regularly and consistently billed Medicare for IVIG treatments for his bogus "dual diagnosis" patients at full price. There was nothing to stop Defendant from providing IVIG treatments to all his pemphigoid patients

14

and having the drug paid for by a drug company as part of a clinical trial or by a philanthropist (as he did in the case of patient LW) or some other charitable foundation.  Moreover, Defendant never approached Medicare and offered to bill the IVIG treatments to pemphigoid patients at cost.

The issue before the Court is not the wisdom or benevolence of a particular Medicare reimbursement policy.  Nor is this a referendum on whether the phenomenon of "dual diagnosis" of pemphigus and pemphigoid does occur.[2]  As both parties are well aware, it does, albeit exceptionally rarely, and not at the rate previously claimed by Defendant in two articles published in 2001 by Defendant which he has since retracted because they were based on contaminated blood samples.[3]

As noted in the plea agreement, under the unique facts of this case, the parties agree that there is a basis for a deviation from the Sentencing Guidelines because the fraud loss under investigation, over $5.4 million, overstates the seriousness of the offense.[4]  The United States recognizes that a meaningful portion of Defendant's guideline calculation in this case was driven

---

[2]Defendant asserts in his Sentencing Memorandum (p. 17) that he commissioned disease and DNA testing to demonstrate that six of his patients suffer from a "dual diagnosis."  These six patients are, however, irrelevant to these proceedings as they are not among the group of Defendant's Medicare pemphigoid patients whom Defendant sought and obtained reimbursement by falsely asserting that the patients were suffering from both pemphigoid and pemphigus.

[3]Dermatology, Diagnostic features of Pemphigus vulgaris in Patients with Bullous Pemphigoid; and Clinical Immunology, Simultaneous Presence of Mucous Membrane Pemphigoid and Pemphigus Vulgaris: Molecular Characterization of Both Autoantibodies.

[4]However, contrary to Defendant's arguments, the magnitude of his profits is not a relevant consideration.  See United States v. Cutler, __ F.3d __, 2008 WL 706633 *25 (2d Cir. 2008)("we note that a defendant's lack of personal profit from the offense of conviction is not ordinarily a ground for departure.").

by the dollar figure associated with the fraud loss under investigation.  Because Medicare paid

over $5.4 million in reimbursements for Defendant's administration of IVIG to his purported

"dual diagnosis" patients, this resulted in 14 levels being added to his total offense level pursuant

to U.S.S.G. §2F1.1(b)(1)(O) (2000 Guidelines Manual) (whereas if the loss were only $1 million

only 11 levels would have been added pursuant to U.S.S.G. § 2F1.1(b)(1)(L)).  The United

States recognizes that, under the unique facts of this case, this fraud loss overestimates the

seriousness of Defendant's  criminal conduct.  Unlike many health care fraud cases, the United

States acknowledges that Medicare's payments in this case were for actual treatments of IVIG

administered to patients.  Moreover, the United States is cognizant of the fact that, although at

the time of Defendant's IVIG treatments, Medicare did not reimburse physicians for IVIG

treatments given to patients suffering from pemphigoid, Medicare changed that policy shortly

after the time period in question.  The United States further recognizes that in this case, a number

of Defendant's patients were debilitated from their pemphigoid disease, that some patients'

pemphigoid disease was causing partial or total blindness, that many of these patients had not

previously responded to other more traditional therapies, that some of these patients were

suffering from serious side effects associated with those therapies, and that some of Defendant's

patients benefited from the IVIG treatments administered by Defendant (with their symptoms

being arrested or halted after administration of IVIG).  Thus, while the obstruction offense is

quite serious, the United States recognizes and acknowledges that measuring its seriousness, in

this particular case, by reference to a dollar figure associated with the claims under investigation,

overstates the seriousness of Defendant's underlying conduct.

##### 2.    Characteristics of the Defendant

Much as been written about the Defendant in his Sentencing Memorandum and the testimonials submitted with it.  The United States repeats that this prosecution has never been about quality of care issues.  However, the United States also believes it worth repeating that the Defendant is highly educated and sophisticated, and that Defendant did not engage in his obstructive conduct merely for altruistic purposes.  Defendant was motivated by a profit motive as well:  at no time prior to his Indictment did Defendant offer to return to the Medicare Trust Fund the reimbursements he received to which he knew he was not entitled.

The weight of Defendant's Sentencing Memorandum focuses on the good works that he has engaged in, and argues that incarceration would impair his ability to do good works.  The United States' sentencing recommendation, which seeks an additional 6 months of community confinement, on top of the other aspects of the sentence which are joint recommendations, is consonant with allowing Defendant to continue to work as it contemplates leave to work during the day and community confinement at night.  There would be no impairment of Defendant's ability to do any of his work, including fulfillment of any community service obligations.

##### 3.    Deterrence/Promotion of respect for the law

While the United States' sentencing recommendation does not impair Defendant's ability to continue to work, it does seek an additional restriction on his liberty, by requiring community confinement for 6 months during non-working hours.  The United States submits that this restriction is important both as a general deterrent and in order to promote respect for the law.  Defendant is a prominent physician.  To the extent that other physicians are aware of him and his sentence, the additional 6 months of community confinement sought by the United States would

let the broader medical community know that obstructing health care fraud investigations has

consequences beyond home confinement.  Such a sentence would also promote respect for the

law in the medical community, locally, and given Defendant's profile, nationally.

## CONCLUSION

The parties have jointly recommended a sentence of 6 months home confinement, 400

hours community service, $20,000 fine and $2.9 million of forfeiture.  The United States also

recommends an additional 6 months of community confinement.  This additional sentence

recognizes the seriousness of the offense, will have a deterrent effect and will promote respect

for the law, while allowing Defendant to work and therefore to be available to the patients and

communities that look to him for advice and assistance.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Jeremy M. Sternberg
       James E. Arnold
       Jeremy M. Sternberg
       Assistant United States Attorneys
       One Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3142

March 24, 2008

## Certificate of Service

I hereby certify that I served a copy of the foregoing pleading on Richard M. Egbert, Law
Offices of Richard M. Egbert, 99 Summer Street, Suite 1800, Boston, MA 02110, this day by
mail and by electronic filing, and to USPO Lauro Roffo, 1 Courthouse Way, Boston, MA 02210,
by hand delivery.

/s/ Jeremy M. Sternberg
Jeremy M. Sternberg
Assistant U.S. Attorney

18

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                )
v.                              ) Criminal Action No. 02-10211-GAO
                                )
JOANNE RICHARDSON,              )
                                )
        Defendant.              )
                                )


BEFORE:  The Honorable George A. O'Toole, Jr., District Judge


**RESENTENCING**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Tuesday, October 30, 2007
2 p.m.


Marcia G. Patrisso, RPR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2       OFFICE OF THE UNITED STATES ATTORNEY
         By: Susan B. Winkler, Assistant U.S. Attorney
 3       John Joseph Moakley Federal Courthouse
         One Courthouse Way
 4       Boston, Massachusetts  02210
         On Behalf of the Government
 5
         STERN SHAPIRO WEISSBERG & GARIN LLP
 6       By: Max D. Stern, Esq.
             Alexandra H. Deal, Esq.
 7       90 Canal Street
         Boston, Massachusetts  02114
 8       On Behalf of the Defendant

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.  The United States
 3   District Court for the District of Massachusetts.  Court
 4   is now in session.  Please be seated.
 5            First up for a resentencing is the case of
 6   United States of America versus Joanne Richardson,
 7   Docket 02-10211.
 8            Will counsel please identify yourselves for the
 9   record.
10            MS. WINKLER:  Susan Winkler for the United
11   States, your Honor.
12            MR. STERN:  Max Stern and Alex Deal for the
13   defendant.
14            THE COURT:  Good afternoon.  Ms. Richardson
15   appears this afternoon for resentencing in the light of
16   the vacation of her prior sentence by Judge Young, who
17   then referred the case for general assignment, and it
18   was assigned to me.  I think you all know the history of
19   that, and I thought I'd begin by noting it.
20            The defendant stands convicted by verdict of a
21   jury of one count of violation of 18, U.S. Code, Section
22   1623, making false declarations.  And I have a copy of
23   the updated presentence report revised through, I
24   believe, October 19th, which I guess the parties have
25   had an opportunity to review; is that correct?
```

```
 1          MS. WINKLER:  Yes, your Honor.

 2          MR. STERN:  Yes, your Honor.

 3          THE COURT:  I have, as well, sentencing

 4  memoranda from both sides; and in addition to that, I

 5  have some letters that have been submitted on behalf of

 6  Ms. Richardson.

 7          Is there anything else that I haven't mentioned

 8  that you think I ought to have seen?

 9          MR. STERN:  No.  I just -- our memo had a number

10  of --

11          THE COURT:  Exhibits.

12          MR. STERN:  -- exhibits.  And one of them was

13  intended to be the original grand jury minutes, and

14  apparently we had two of something else and not that, so

15  we submitted that by ECF this morning.  So you should

16  have --

17          THE COURT:  Well, maybe it was this morning.  I

18  saw there was a correction.  I think it was Exhibit D?

19          MR. STERN:  Yes.

20          THE COURT:  Is that right?

21          Yes, I saw that.  I didn't realize it was as

22  recent as this morning -- I was working on it this

23  morning -- so I guess it came in just after you had done

24  that.

25          All right.  Well, as we know, sentencing
```

1    decision-making is governed by 18, U.S. Code, Section

2    3553, particularly subsection (a) of that statute, which

3    enumerates a number of factors for the Court to consider

4    in deciding on an appropriate sentence in a particular

5    case.  They include the nature and circumstances of the

6    offense, the circumstances and prior history and

7    characteristics of the defendant and various other

8    factors that I think are familiar.

9         One of the factors to be considered by the

10   sentencing court is the advice that is given by the

11   Sentencing Guidelines.  No longer mandatory, the

12   guidelines still remain an important consideration as to

13   their advice regarding what would be an appropriate

14   range of sentence for the particular case.  And so my

15   practice in beginning a consideration of the statutory

16   factors is to start with that factor because it can

17   sometimes involve some extended discussion and

18   resolution of issues.

19        Here it appears that the parties are in

20   agreement at this stage with the guidelines range as

21   proposed in the PSR.  I think the question is raised,

22   perhaps by the defendant in the memorandum, whether it's

23   even open for reconsideration at this point.  That's an

24   interesting question.  I don't think we have to resolve

25   it in light of the fact that there is no dispute as to

 1    the range.  I will simply say that I have independently

 2    reviewed the proposed range and I concur with it as it

 3    is set forth in the PSR.

 4         So the Guideline Offense Level is 12, the

 5    Criminal History Category is 1; therefore, the

 6    appropriate range for the various components of the

 7    sentence are, in terms of a term of imprisonment, 10 to

 8    16 months; a fine range of 3,000 to $30,000; and a term

 9    of supervised release between two and three years.  It's

10    further worth noting that the imprisonment range is

11    within Zone C of the sentencing table, which provides

12    within the guidelines regime certain other options in

13    terms of how that sentence might be imposed.

14         Neither party asks for a departure authorized by

15    the guidelines.  The defendant does advocate for a

16    non-guideline sentence.  The government, as I understand

17    it, asks for the imposition of the prior vacated

18    sentence which fell within the guidelines range.  And so

19    with that table setting, I'll invite the parties to

20    address further the matters which are already thoroughly

21    addressed, of course, in the memoranda.  But if you want

22    to advocate for a particular sentence, I'll hear you at

23    this stage.

24         Ms. Winkler?

25         MS. WINKLER:  Your Honor, very briefly because I

1    think it's addressed in the memorandum that we've
2    already provided you, we do advocate on behalf of the
3    United States to reimpose the sentence issued by Judge
4    Young, and the primary, most important reason for that
5    is the nature and seriousness of the crime.  Perjury is
6    insidious in a grand jury setting.  It has consequences
7    that are impossible to determine in some ways given what
8    can happen or what can't happen in an investigation
9    based on it.  And even though we did not convict her of
10   obstruction, and even though there was no
11   cross-reference applied by the Court the first time, and
12   we don't seek that here, the effect of perjury still
13   prevents a grand jury from effectively doing its job and
14   us from effectively prosecuting crimes that we should.
15           In this case we think particularly in connection
16   with white-collar crimes where it has been -- and as I
17   think Judge Woodlock even noted during the trial of the
18   TAP defendants, it's very difficult to get at what
19   actually happened in these circumstances.  And it's
20   particularly important that people tell the truth, all
21   people, including people who work for companies and
22   don't want to believe that anything anyone did was
23   wrong.  When they know it was, they have to come forward
24   and they have to say it.  And especially when they're
25   immunized, they have no reason not to do it other than

1    to protect people that they shouldn't be protecting.

2           And in order to make our system work, it is a

3    serious crime and it's one that, at least in this

4    circumstance, the government does not believe was

5    aberrant, given the other affidavits that were filed

6    that were incomplete by this defendant; in particular,

7    the one in support of her 2255 motion which referenced

8    her belief that her attorneys had told her that her

9    testimony was correct, leaving out all of the things

10   that were proved at trial that she knew and were in her

11   own writings and her own words, and whether any of those

12   had been told to the defendants' attorneys of course was

13   unknown but could not have been correct if the

14   defendants' attorneys had known all those things, which

15   were uniquely known by her.

16          Similarly, with the affidavit filed in response

17   to the motion to disqualify her counsel, on which we did

18   actually bring a superseding indictment but for

19   strategic reasons chose to limit the trial and go

20   narrowly for the grand jury.  But in that case, the

21   affidavit also -- there was a motion to disqualify

22   because her counsel represented one of the defendants in

23   the TAP trial and claimed, essentially, that she had no

24   interactions with this defendant, which was demonstrably

25   false from her own e-mail.

```
 1          And it was written in such a limited way as to
 2  be misleading to the Court, mentioning she didn't have
 3  telephone contacts when we had proof of e-mail contact.
 4  It was the type of thing which was just insufficiently
 5  incomplete, the same way the 2255 affidavit was.
 6          So from our perspective, this is not aberrant
 7  behavior.  The deterrence and the characteristics of
 8  this defendant do not justify anything other than what
 9  the Sentencing Guidelines advise is an appropriate
10  sentence, and in this case that would be the original
11  sentence imposed of six months incarceration; a $3,000
12  fine; and in terms of supervised release, two years
13  supervised release with the first four months of home
14  confinement; and a special assessment of $100.
15          THE COURT:  Mr. Stern?
16          MR. STERN:  Thank you, your Honor.  As you
17  pointed out, this is a resentencing for a January 2004
18  conviction for an offense committed at a December 19,
19  2000, grand jury appearance.  The defendant was
20  convicted of a false statement but acquitted of
21  obstruction of justice, and she was then sentenced by
22  Judge Young within the guideline range to six months.
23          This resentencing, of course, is under Booker
24  which, as Judge Young found, should have been argued in
25  Ms. Richardson's original appeal.  Judge Young stated
```

1   that he did not know what he would do on resentencing,

2   but he then recused himself and sent it in for

3   reassignment.

4       We are here now seven years virtually to the

5   day -- will be the day tomorrow -- from the date of

6   Ms. Richardson's first grand jury appearance in this

7   matter.  And we are here to request a sentence which

8   permits the defendant to remain at home with her two

9   young children, her husband and her father -- her now

10  terminally ill father -- all of whom desperately need

11  her care.

12      And this sentence that we seek requires only a

13  modest variance from the guideline range, two levels,

14  well within what the First Circuit would term a

15  reasonable range, and one which we think is warranted by

16  the statutory command to impose a sentence which is

17  sufficient but not greater than necessary to comply with

18  the statutory purposes.

19      I should point out that many of the

20  circumstances that are set forth in the updated PSR and

21  our sentencing memorandum, which I will review today,

22  are circumstances which were not brought to the

23  attention of Judge Young, some of them because her

24  counsel could not or would not or chose not to bring it

25  to his attention, and others because they have developed

1   only in the interim.

2        First, as to the nature and circumstances of the

3   offense, the government charged the defendant with 19

4   false statements in that appearance in the grand jury,

5   but the jury in this case only had to find a single one.

6   And the First Circuit pointed out that it was impossible

7   to tell which one or more of them it was that the jury

8   had found to be knowingly false.  So identifying

9   precisely what is the offense here is, to some degree, a

10  matter of speculation.  But nonetheless, we have some

11  thoughts to offer your Honor in that regard.

12       The investigation here was about the -- the

13  underlying investigation was about three items which had

14  been provided to the Lahey Clinic by the TAP

15  organization in the form of educational grants,

16  charitable contributions to its charity golf tournament

17  and the like.  And according to the government's theory,

18  these were kickbacks and violations of the Medicare law

19  and were means of evading the so-called best price law,

20  which requires the best price to be given to the

21  government.

22       The defendant was immunized.  She was called to

23  the grand jury twice, and the second time -- just to set

24  the stage, what's happening at the second grand jury

25  appearance, is that Mr. Loucks, who is interrogating

1    her, is intent on getting her to admit that she had done

2    something illegal when she was in TAP. And the

3    defendant, on her part, does not believe that she has

4    done something illegal. According to her way of looking

5    at what TAP did, was that TAP told Lahey that we are a

6    good company because we support education and because we

7    make charitable contributions, and you should continue

8    to do business with our good company for those reasons.

9         And ultimately, later, when we finally get to

10    the prosecution of this case, after the defendant has

11    been tried and convicted and even sentenced, Judge

12    Woodlock rules -- in part even with the government's

13    agreement -- that that, per se, is not illegal. That

14    what is illegal is only giving something as a quid pro

15    quo, which is contingent on contracting with this

16    company. And in the event, of course, that -- that jury

17    also found that the government hadn't proved that there

18    was a quid pro quo and that there was any violation of

19    the law. So that's in the defendant's mindset. She's

20    now three years after she's -- after the events at issue

21    and she is thinking: Mr. Loucks is thinking she did

22    something illegal; she's thinking that I didn't.

23         Now, there are two categories of questions that

24    are being asked of you: One category is did what -- did

25    these grants and so forth, did these things reduce the

1    price?  Were they done in order to reduce the price, to
2    lower the price, to provide a discount?  Now, the
3    defendant says no to that, and it's not likely that
4    these questions were what the jury found to be knowingly
5    false.  Her position was that the contract price is the
6    contract price and whatever else we give to them is
7    something separate.

8          Now, whether it really, in effect, whether it
9    really amounts to a reduction in the contract price or
10   really is something separate is a matter of
11   interpretation.  And indeed what the defendant said, as
12   we pointed out in the memoranda, was actually consistent
13   with the government's best price regulations which say
14   it only counts to reduce the price if it is contingent
15   on a specific sale, which is what the jury found it was
16   not in *McKenzie*, and which the defendant thought it was
17   not.

18          And, moreover -- and we've set forth -- it's set
19   forth in Ms. Richardson's affidavit, the very night
20   before she goes into the grand jury she speaks to the
21   lawyers and she says:  This is my interpretation of what
22   happened, this is what I'm going to say, and nobody
23   says:  Oh, that's a problem.  Nobody says anything like
24   that.

25          Now, if this -- Ms. Winkler says:  Well, that's

 1    another lie; therefore, that compounds it.  If this
 2    really is an issue, your Honor, I actually have a
 3    document -- contemporaneous documentation that this is
 4    what was said the night before she went into the grand
 5    jury.  So I don't think this -- and I'd be happy to show
 6    it to your Honor, if you would like.
 7          So I don't think this group of questions is
 8    really what the jury focused on.  What I do think the
 9    jury focused on was the set of questions that said:  Did
10    you do this to get or keep the business of the Lahey
11    Clinic?  And the reason I think that is because in the
12    literal and broader sense of keeping the business; that
13    is, the sense of cultivating the business relationship
14    between TAP and the Lahey Clinic, that is exactly what
15    TAP was doing.
16          But, your Honor, I think you can see how the
17    defendant got to where she did -- where she was.  And
18    what happened was, and what the minutes -- the testimony
19    shows, is that on these two occasion that she appeared
20    before the grand jury, Mr. Loucks interrogated her, with
21    leading questions, as to what she knew to be the law --
22    what she knew to be illegal.  And after doing it in the
23    first one and after doing it at the beginning of the
24    second one, later on in the second appearance he says to
25    her:  You know, you said before -- you admitted under

1    oath that getting or keeping -- giving free things to

2    get or keep the business is improper, is illegal.

3            Now, that's not what she said and it's not even

4    the law -- or at least it's overbroad.  Because if it's

5    cultivating the business, it's okay, it's only illegal.

6    But now, of course, he follows -- he gets her to say:

7    Yes, that's right.  I said that.  Okay.

8            So now he follows it up by saying:  Okay.  Well,

9    did you do that?  Well, the answer at that point ought

10   to be yes, or it ought to be defined in terms, or it

11   ought to be:  Narrow the category, you know, explain

12   what you mean by that.  She should have had help at that

13   point from her attorney, who was a man by the name of Ed

14   McNally who came in as a stand-in from her Chicago

15   attorney who couldn't make it to this grand jury

16   appearance.  Mr. McNally had never had anything to do

17   with this case before.  She has no help on this.  And

18   what she does is, feeling herself trapped, she takes

19   what is concededly the wrong way out and she just says:

20   No, that's not what we're doing.

21           So it's true -- and by the way, your Honor, this

22   is also in the context in which she feels frightened,

23   shaken, intimidated.  She reports that to Mr. McNally;

24   Mr. McNally goes to Mr. Loucks and complains about that.

25   And that, too, I have documentation of, or a

1   contemporaneous memo on that if your Honor would like
2   that as well.
3        But at any rate, that's the whole context of
4   what happened.  What she did was wrong, but it was not
5   calculated; it was something that emerged out of the
6   situation that she found herself in where she's a
7   battle -- on the losing end of a battle of wits with Mr.
8   Loucks, and feeling herself trapped, as I said, she
9   takes the wrong way out.
10        And it was not -- it was not to shield anything
11   else.  And this is the crucial difference between having
12   the ability to look at this from hindsight.  The way it
13   was presented to Judge Young at that time was:  Well,
14   there's criminal conduct by the others, you're just
15   trying to shield -- at least the purpose or at least the
16   effect of what you're doing is shielding the criminal
17   conduct of others.  That really is not what was going
18   on.  So that's the nature of the circumstances of the
19   offense.  And it is aberrant behavior.
20        Now, what Judge Young said about -- at the time
21   when the departure was requested.  At that time he said:
22   Well, that would not be appropriate because we have this
23   line of authority that says if your lie is a lie about a
24   previous crime, then that would not be appropriate.
25   Well, we know now it was not about a previous crime.

1    She did not think she had committed the previous crime;

2    the government failed to prove a previous crime was

3    committed.

4         This is the one and only time this defendant has

5    ever committed a crime, and these -- and I've already

6    addressed myself to the truth and her current affidavit.

7    This business about this other affidavit that the

8    government included in its superseding indictment is

9    really, I would have to say, frivolous.

10         That -- the government -- what the government

11   said -- what had happened was that Mr. Margolis, her

12   then attorney, was also representing another TAP

13   defendant, and she files an affidavit in which she says,

14   I -- something to the effect:  I don't remember ever

15   having a time when Mr. Guido and I spoke about the

16   Lupron account or any other account that we were working

17   on.  So the government goes into its vast mountain of

18   documents that it's got and comes up with an e-mail that

19   Mr. Guido had sent -- had forwarded an e-mail which had

20   forwarded someone else's e-mail and sends that to

21   Ms. Richardson and says -- and it's about Prevacid,

22   which is not this Lupron account, and it's not about any

23   account that she's working on.  And her response is:

24   Thank you.

25         And other than that, they also found one where

1  he says:  I found a great speaker, an eye, ear and nose
2  speaker, for your interest.  And then finally, they find
3  an e-mail in which she sends to an enormous group of
4  people, and buried in the attachment to that e-mail is
5  something written in one of these compilations of all
6  kinds of reports, something written by Mr. Guido.
7  That's it.
8          And the defendants argue a motion to dismiss
9  before Judge Stearns, and Judge Stearns says:  I'm going
10  to dismiss that if the government doesn't dismiss it
11  themselves.  I recommend that the government drop it.
12  And the government dropped it.  So that's all that is.
13  So there is no other offense by this defendant.
14          Her family circumstances, I alluded to that.
15  She's the mother of two young children.  They're now ten
16  and six.  She's very, very much involved in their lives.
17  Jailing her would be devastating to them, particularly
18  the younger son -- the younger child, Ryan, who is
19  already suffering with certain psychological problems
20  because of the tension and turmoil directly related to
21  this case.  And similarly, her husband has been
22  suffering, which is laid out in a psychological report,
23  which your Honor has in the record, various anxiety and
24  panic attacks.
25          And her father's now diagnosed as being

```
 1   terminally ill.  She is the only one who is able to and
 2   does take care of all of his medical care.  She makes
 3   all his appointments, gets all his medications, gets him
 4   to all of his appointments, does everything for him in
 5   those regards.
 6          So family circumstances really are very
 7   important here.  She always was -- her husband was a
 8   stay-at-home dad, she was the breadwinner in the family.
 9   Because of this situation he started a business.  The
10   business has yet to become profitable.  If she goes to
11   jail and can't earn any money, they can't pay their
12   COBRA payments, they lose their healthcare, they will
13   probably lose their home, which is way behind on the
14   mortgage anyway.
15          She's suffered -- the family has had
16   economically a terrible downhill slide for the last
17   seven years.  She lost the job she had when she was
18   indicted; she loses the next job when her conviction
19   gets affirmed; and recently, she's laid off from her
20   next job which itself was one-third what she was making
21   before.
22          Finally, your Honor, we turn to the issue of
23   consistency and disparity and point out that what we are
24   seeking here is completely consistent with other
25   sentences which have been handed out in this district.
```

1   The *Finneran* case in which even -- in which Mr. *Finneran*

2   was given straight probation and in which he was

3   convicted of obstruction of justice, a more serious

4   offense than the conviction of this defendant; the

5   *Bulger* case which your Honor had in which he got six to

6   12 -- I believe he got six months.  And his offense was

7   far greater than the defendant's.  He lied to two -- two

8   separate grand jury investigations and clearly was

9   covering for his brother, a person who had undoubtedly

10  committed very, very serious crimes.  And then there is

11  the Lewis Libby commutation, a man who was convicted of

12  obstruction of justice regarding national security.

13          And so why is that relevant here in the District

14  of Massachusetts?  It's not in this district, it's not

15  even a judicial decision, so why do we raise that before

16  your Honor?  And I might add I commend to your Honor the

17  very thoughtful decision by Judge Frankel of the

18  Southern District some years ago in the wake of the

19  Nixon pardon, about how that would impact sentencing

20  principles.

21          The reason we say that it's relevant is because

22  this Court must decide under the parsimony principle

23  whether the purposes of sentencing, and in particular,

24  respect for law, deterrence, the need to impose a just

25  punishment, whether these considerations require a

1  mother of two young children, seven years after the

2  offense, to go to jail for an offense which is clearly

3  of lesser gravity -- clearly wrong, but of lesser

4  gravity -- than committed by Mr. Libby.

5          Now, the President, whose photograph hangs in

6  various places throughout this building, he says that

7  Mr. Libby was punished enough by what he has already

8  faced.  If that's so, so has Ms. Richardson who has gone

9  through terrible privation, who if she goes to school to

10 volunteer for her kids, she has to fill out a Cory form.

11 If the President says that justice will not suffer, the

12 judicial sky and the law enforcement sky will not fall

13 if Mr. Libby doesn't serve any time in jail, if that is

14 true for him, the same is true for Ms. Richardson.

15         Judge O'Toole, this is a good woman who made a

16 bad mistake; a mistake, however, that came out of the

17 situation that she found herself in.  She is not the

18 type of person who anything in the statute requires to

19 go to jail.  Thank you.

20         THE COURT:  Ms. Richardson has the opportunity

21 to make a statement, if she wishes, before I sign on a

22 sentence.  She doesn't have to if she doesn't wish to,

23 but this is her opportunity to do so if she wishes.

24         MR. STERN:  No.

25         THE COURT:  Let me address some of the

1    particular sentencing factors in the statute before

2    resolving how those affect the ultimate judgment.

3    Probably the most significant is the combination of some

4    from Sections A1 and A2; and that is, the nature and

5    circumstances of the offense, the need for the sentence

6    that is imposed to reflect the seriousness of the

7    offense, promote respect for the law and provide just

8    punishment for the offense.

9            Perjury is an offense that strikes directly at

10   the search for truth and, therefore, undermines

11   institutions whose office it is to determine the truth

12   in order to do justice.  And so it works a corruption of

13   the processes of justice and, therefore, is a serious

14   offense that merits a serious response.

15           Let me say that I take the jury's verdict at its

16   face.  I don't think I have any choice but to do that.

17   I think some of Mr. Stern's very-able argument was

18   addressing the evidence at trial and how it might be

19   viewed by the jury.  We don't know, as I think Mr. Stern

20   acknowledged, whether the jury was persuaded of the

21   falsity of one or more of those specifics that are

22   identified in the indictment.  The Court of Appeals

23   said in the circumstances of a general verdict on

24   multiple allegations, all that was necessary was that

25   the jury be convinced of at least one.  They had been

1    properly instructed that they had to agree on the same

2    one, but beyond that, it is speculative to know whether

3    they agreed as to one or to 19 or to somewhere in

4    between.

5         And so faced with that record, I have no choice

6    but to, in a sense, stay at the surface of the verdict

7    and not delve below it, because I'm not able to do that

8    with any rational basis. So I simply start from the

9    proposition that the jury convicted the defendant of the

10   offense of willfully testifying falsely before the grand

11   jury as to a material matter -- matter or matters. And

12   that becomes the premise for the sentence.

13        I do think it is appropriate to note that it is

14   evident, even from the face of the indictment and the

15   testimony, that the scope of the perjury was rather

16   relatively limited in its -- in the scope of its content

17   and, therefore, the extent of its likely interference

18   with what was a very wide grand jury investigation. I

19   note that in the computation of the guidelines range,

20   when the issues were -- the question was at issue, it

21   was decided by Judge Young that there was not a

22   substantial interference with the administration of

23   justice and so, therefore, a possible adjustment of the

24   offense level on that basis was not made, and the

25   parties don't ask that that be revisited. And I think

1    that is worth noting.

2          Of course the defendant has no criminal history,

3    which is another factor that can be important in the

4    determination of a sentence.  It's a factor that is

5    taken account of in the mechanical operation of the

6    guidelines in determining the range.  Another factor is

7    the need for the sentence imposed to afford adequate

8    deterrence to criminal conduct and to protect the public

9    from further crimes by the defendant.  In this case the

10   need for specific deterrence is relatively low, I think.

11   I don't think it's very likely that -- first, that the

12   defendant will be in a position to re-offend in the same

13   way, and that even if she is, that her experience in

14   this case, independent of the sentence, is likely to be

15   an adequate deterrent.

16          On the other hand, the need for general

17   deterrence in defense of the institutions of justice

18   aimed at warning other potential offenders away from

19   similar conduct is relatively high.  Unfortunately, one

20   sitting in my position cannot avoid the worry that there

21   is, toward perjury, sort of a widespread cynical belief

22   that everybody does it; everybody lies under oath.  And

23   I'm afraid there may sadly be some accuracy in that

24   observation from my own observations over the years.

25   And it may well be that the obligation to be truthful in

1  events in the course of justice is often too cavalierly

2  regarded.  It may be, in fact, that lying under oath in

3  judicial proceedings is a crime that otherwise

4  law-abiding citizens commit, and so I think that

5  increases the need for a consideration -- serious

6  consideration of the fact that it calls for general

7  deterrence.

8       And finally, an important consideration -- I

9  think it was to some extent addressed by Mr. Stern's

10  argument -- is the need for -- to avoid unwarranted

11  disparities among people with similar backgrounds and

12  records on similar facts, and then, of course, the

13  corollary is to have disparities where they ought to

14  exist, which I think is the burden of Mr. Stern's

15  argument.

16       I don't ultimately agree that the three

17  instances that were cited are all that significant in

18  the decision process.  One, I think the Libby

19  commutation is a commutation; it's an executive action.

20  I respect Judge Frankel's view but I'm not sure I

21  entirely agree with it.

22       The other two occasions where I'm sure they

23  had -- I know nothing about the *Finneran* sentence except

24  what was reported in the newspapers.  And I appreciate

25  from that, I think correctly, that it was a negotiated

1  sentence.  I'm not sure.  It might have even be a Rule
2  11(c) -- (1)(c) sentence.  The *Bulger* sentence, of
3  course, I'm very familiar with, having imposed it.  It
4  came as a result of a plea which affected, to some
5  extent, the guidelines calculation in a way that they
6  would not have been effected if he had gone to trial and
7  been convicted by a jury.
8          So having said all that, I am not able to agree
9  with the defendant that an appropriate sentence is one
10 that does not include a period of incarceration.  I take
11 the verdict as indicating willful perjury, and that I
12 think calls for a term of imprisonment of some degree.
13 I further conclude that the range suggested by the
14 guidelines appropriately balances the need for just
15 punishment, promotion for the respect of law and
16 deterrence of perjury by others in the future, and a
17 sentence within the guideline range gives adequate
18 recognition to the factors which I'm bound to consider.
19         The sentencing range, to recap, is 10 to 16
20 months under the Zone C rules.  Part of that sentence
21 may be served by a term of -- by various things, but
22 including a term of home confinement provided that half
23 the sentence is served in a prison, and that's the
24 sentence that I will impose:  five months of
25 imprisonment followed by a five-month home confinement

1    as part of a two-year term of supervised release.

2    That's very close to the original sentence.  I don't see

3    any reason to go above the minimum -- the low end of the

4    guideline.  In this circumstance it will be five months

5    rather than six months as originally imposed.

6            Ms. Richardson, if you'd stand.

7            MR. STERN:  Your Honor, will you allow

8    self-reporting?

9            THE COURT:  Yes.

10           Pursuant to the Sentencing Reform Act of 1984,

11   it is the judgment of the Court that you be and you

12   hereby are committed to the custody of the Bureau of

13   Prisons to be imprisoned for a term of five months.

14   Upon your release from imprisonment, you shall be placed

15   on supervised release for a term of two years.  Within

16   72 hours of your release from the custody of the Bureau

17   of Prisons, you shall report in person to the district

18   to which you have been released.

19           It is further ordered that you pay to the United

20   States a fine of $3,000.  That shall be paid

21   immediately, or if that's not possible, it can be paid

22   according to a repayment schedule that, in the first

23   instance, could be agreed to between you and the

24   probation office, subject to my approval; in the absence

25   of an ability to agree, a repayment schedule could be

1    set after hearing.  You shall notify the United States

2    Attorney for this district within 30 days of any change

3    of your mailing or residential address that occurs while

4    any portion of the fine is unpaid.

5         While you're on supervised release, the first

6    five months shall be spent in home detention with

7    electronic monitoring.  You may be required to pay a fee

8    in the sum of $3.47 for each day of electronic

9    monitoring, and you will be responsible for the return

10    of the electronic monitoring equipment in good

11    condition.  You may be charged for any replacement or

12    repair of that equipment.

13         While you're on supervised release you shall not

14    commit any other federal, state or local crime; you

15    shall refrain from the unlawful use of any controlled

16    substance.  There is no indication of any substance

17    abuse or drug abuse, and so I'll suspend the ordinary

18    drug-testing conditions that are a part of supervised

19    release.  You shall comply with all the standard

20    conditions that pertain to supervised release.  Those

21    conditions are set forth in the United States Sentencing

22    Guidelines under Section 5D1.3(c).  They are

23    incorporated by reference and will be set forth at

24    length in the judgment.

25         You are prohibited from possessing a firearm or

1    other dangerous weapon; it will be a condition of your

2    supervised release that you pay the balance of any

3    unpaid portion of the fine in accordance with the

4    schedule; and you will be prohibited from incurring any

5    credit charges or opening any additional lines of credit

6    without the approval of your probation officer while the

7    fine remains unpaid.  In that connection, you're to

8    provide the probation officer with access to any

9    requested financial information.  Any information you do

10   provide to the probation office may be shared with the

11   Financial Litigation Unit of the U.S. Attorney's Office.

12          Finally, there is a special assessment -- a

13   mandatory special assessment on the conviction of $100,

14   which is due forthwith.  And I will, as I indicated,

15   permit self-reporting to the institution designated by

16   the Bureau of Prisons.

17          MR. STERN:  Your Honor, could I request that the

18   sentence be stayed until after the holidays, till

19   January 1st?  It's been a long time, your Honor.  I

20   don't think a few -- a couple of months will hurt

21   anybody.

22          THE COURT:  That's fine.  The first Wednesday of

23   January.

24          THE CLERK:  The first Wednesday will be

25   Wednesday, January 2nd.

1          THE COURT:  Make it the next one.  The bureau

2    won't be working either, so...

3          THE CLERK:  Wednesday, January 9th by twelve

4    noon.

5          THE COURT:  That's to the institution to which

6    she's been designated.

7          MR. STERN:  Yes.

8          THE COURT:  The same conditions of pretrial

9    release pending execution of the sentence.

10         PRETRIAL SERVICES:  Your Honor, with regard to

11   the electronic monitoring, could the judgment be the

12   specific -- the special condition state that it be paid

13   according to the price of the national contract, because

14   usually it's around three-dollars-and-whatever, but

15   sometimes it varies by a penny or so.

16         THE COURT:  Fine.  We'll make that amendment.

17         PRETRIAL SERVICES:  Thank you.

18         THE COURT:  You'll make that known.

19         All right.  We'll take a short recess.

20         THE CLERK:  All rise.  Court will take a --

21         THE COURT:  I'm sorry.  Notice of appeal.

22         THE CLERK:  Ms. Richardson, you have the right

23   to file a notice of appeal in this case.  If you do wish

24   to file an appeal, you must file it within ten days from

25   the date judgment is entered.  If you cannot afford an

1    attorney to file the appeal on your behalf, you may

2    request the clerk of the court to file the appeal for

3    you and I will do so.

4            Do you understand that?

5            THE DEFENDANT:  Yes.

6            THE COURT:  All right.  We'll be in recess.

7            THE CLERK:  All rise.  Court will take a short

8    recess.

9            (The proceedings adjourned at 2:45 p.m.)

10

11            C E R T I F I C A T E

12

13        I, Marcia G. Patrisso, RPR, CRR, Official

14    Reporter of the United States District Court, do hereby

15    certify that the foregoing transcript constitutes, to

16    the best of my skill and ability, a true and accurate

17    transcription of my stenotype notes taken in the matter

18    of Criminal Action No. 02-10211-GAO, USA v. Joanne

19    Richardson.

20

21            /s/ Marcia G. Patrisso
              MARCIA G. PATRISSO, RPR, CRR
22            Official Court Reporter

23

24

25

**EXHIBIT 2**





New England Heart Center, P.C.

**Ahmed Mohiuddin, M.D., F.A.C.C.**
*President*

March 29, 1996

Alan N. Binick, MD
140 Hospital Drive
Bennington, VT  05201

RE:

Dear Dr. Binick,

**Cardiology**
  Ahmed Mohiuddin, M.D.
  David Gomolin, M.D.
  Gerald Izzi, M.D.

**Cardiothoracic Surgery**
  Mian M. Ashraf, M.D.

**Dermatology**
  A. Razzaque Ahmed, M.D.

**Gastroenterology**
  Russell S. Boles, Jr., M.D.
  Mamigon M. Garabedian, M.D.

**Internal Medicine**
  Tonuca Basu, M.D.

Thank you very much for referring this very
interesting patient to me.

According to the biopsy reports, that you have sent
me, it is very clear that he has bullous
pemphigoid.  There is a very well- defined
urticarial form of bullous pemphigoid which appears
as circinate margins and this is precisely what the
patient has.  This form of bullous pemphigoid is
often very pruritic  in nature and tends to be
relatively resistant to treatment with cortico-
steroids alone.  I have seen several such patients,
and reported them in the Literature.  A preferable
drug for such patients is Dapsone.  The rationale
for the use of Dapsone is that the inflammatory
infiltrate is often more polymorphonuclear and
eosinophilic in nature, and that the disease has a
more inflammatory response than that observed in
regular bullous pemphigoid.

I have had excellent results in treating some
patients with intravenous immunoglobulins.  I am
planning to do the same for this patient also.  The
insurance company has agreed to allow me to
hospitalize him.  So, I have hospitalized him at
the New England Baptist Hospital.  Here he will
receive intensive topical care, which will involve
twice daily baths in Hubbard  tank with application
of Temovate cream to affected areas.  To control
his itching, I am

125 Parker Hill Avenue        Boston, Massachusetts 02120-2847        Telephone (617) 738-7300
                                                                      Fax (617) 739-4821

Page 2

March 26, 1996

RE:

going to use it.  His G6 PD level is normal, I am
starting him on Dapsone.  In the meantime I will
keep him on 15 mg bid of Prednisone, as you had
done.  Hopefully, this will take care of his will
take care of his problems, and we should be able to
clear him up in a very short time.  Thank you for
referring this very interesting patient to me.  I
will keep you closely posted on his response, and I
will cooperate to the fullest extent in the
management of his care.

With best wishes and deepest regards,

Sincerely yours,

A. Razzaque Ahmed, MD

ARA/ns

September 11, 2000

I have come across some letters in our office that I believe may not have been mailed out. There have been some recent changes in personnel in our office and I apologize for the long delay in sending you this letter.

Please call me at Dr. A. Razzaque Ahmed's Office if you have any questions. Our office number is 617/738-1040.

Thank you for your understanding.

Sincerely,

Phyllis A. MacPherson, RN, MSN

# MEDICAL CENTER OF BOSTON



New England Heart Center, P.C.

April 1, 1996

Ahmed Mohiuddin, M.D., F.A.C.C.
*President*

Alan N. Binick, MD
140 Hospital Drive
Bennington, VT 05201

RE:

Dear Dr. Binick:

This brief note is an addendum to my recent letter to you.

**Cardiology**
Ahmed Mohiuddin, M.D.
David Gomoin, M.D.
Gerald Izzi, M.D.

**Dermatology**
A. Razzaque Ahmed, M.D.

**Gastroenterology**
Russell S. Boles, Jr., M.D.
Harrison M. Sorabilian, M.D.

**Internal Medicine**
Tohuca Basu, M.D.

Interestingly serological analysis by indirect immunofluorescence sera reveals that there are demonstrable levels of two distinct antibodies. There are anti-BMZ antibodies which target BPAg1 and BPAg2 and antibodies to keratinocyte cell surface or intercellular cement substance (ICS), typically seen in pemphigus. This would indicate that we have dual diagnoses. The phenotypic presentation may be similar to typical pemphigoid, but the serological evidence is for both diseases. There are several reports in the literature that support the occurrence of this rare and interesting phenomenon. If you should like the bibliography, please let me know. In my opinion, it is this combination of both diseases that has made the clinical profile, recalcitrant or non-responsive to conventional or usual therapy. I have treated several patients with pemphigus with IVIg and observed a favorable response. Hence, I am optimistically hopeful that this patient will also respond. Thank you again for providing me the opportunity to treat this challenging patient.

Sincerely yours,

A. Razzaque Ahmed, M.D.

ARA/ns

125 Parker Hill Avenue        Boston, Massachusetts 02120-2847        Telephone (617) 738-7300
Fax (617) 739-4821